1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MINNESOTA

3    ----------------------------------------------------------

4
     United States of America,    )  CR 10-159 (DWF/FLN)
5                                  )
                    Plaintiff,     )  CRIMINAL JURY TRIAL
6                                  )  OPENING STATEMENT BY
        -v-                        )  THE PROSECUTION
7                                  )
     Barry Vincent Ardolf,        )  December 15, 2010
8                                  )  3:00 o'clock, p.m.
                    Defendant.     )  St. Paul, Minnesota
9

10   ----------------------------------------------------------

11

12      BEFORE THE HONORABLE JUDGE DONOVAN W. FRANK

13         UNITED STATES DISTRICT COURT JUDGE

14         CRIMINAL JURY TRIAL PROCEEDINGS

15      OPENING STATEMENT BY THE PROSECUTION

16              EXCERPT OF VOLUME I

17

18                    *   *   *

19

20

21

22              JEANNE M. ANDERSON
                Registered Merit Reporter
23         Suite 646, 316 North Robert Street
                St. Paul, Minnesota 55101
24              (651) 848-1221

25

1    APPEARANCES:

2

3

      FOR THE PLAINTIFF:    Timothy C. Rank, Esq.
4                           Laura Provinzino, Esq.
                            Assistant United States Attorneys
5                           Suite 600, 300 South 4th Street
                            Minneapolis, Minnesota 55415
6                           (612) 664-5600

7

8

9

10

11   FOR THE DEFENDANT:    Seamus R. Mahoney, Esq.
                           Attorney at Law
12                         101 East Fifth Street, Suite 2626
                           St. Paul, Minnesota 55101
13                         (651) 398-8691

14

15

16
                           (Defendant present.)
17

18

19

20

21

22

23

24

25

1              (In open court; jury present.)

2              THE COURT:  It is now the opportunity of Mr.

3    Rank on behalf of the United States to present his

4    opening remarks.  So, I will call upon Mr. Rank at this

5    time.

6              MR. RANK:  Thank you, Your Honor.  Your

7    Honor, I don't know if there is a medium light situation

8    and we can be able to see the screen a little bit better

9    than that?  Good.  Thank you.

10             THE COURT:  I just want to remind the jury.

11   You heard me say this during jury selection.  I have

12   certain computer-generated light settings.  It is not to

13   generate mood in here.  And more importantly, in all

14   seriousness, it is not to emphasize any particular part

15   of a trial or an exhibit.  Sometimes I will be asked by

16   one of the lawyers to do it, because unlike yourselves,

17   each of the attorneys at the tables, and myself, in

18   addition to this screen, we have a monitor.  And anybody

19   in the audience or the spectator group has a plasma

20   screen.

21             The sole purpose, and sometimes I will often

22   do it on my own, and that is why we have tried to

23   generate certain settings to emphasize the screen, is

24   for your benefit, without me trying to emphasize a

25   particular thing, because I will oftentimes do it on my

1    own accord.  And we have tried to adjust the lighting,

2    so the lighting stays and remains on each counsel table

3    and on you, to an extent, and of course the Court.  So,

4    you may proceed.

5              MR. RANK:  Thank you, Your Honor.  Good

6    afternoon.  May it please the Court?  Counsel?  Ladies

7    and gentlemen of the jury?

8              As the Judge told you, my name is Tim Rank.

9    I am an Assistant United States Attorney.  And along

10   with Assistant United States Attorney Laura Provinzino

11   and FBI Special Agents Robert Cameron and Dennis Howe,

12   we represent the United States in this criminal case.

13             So, why are we here?  As Judge Frank told

14   you, the Defendant Barry Ardolf has been charged by

15   indictment.  You are going to see a copy of the

16   indictment at some point in time in this case, but I

17   will show you the front page of it.

18             In an indictment, the United States Grand

19   Jury has charged Mr. Ardolf with felony charges of

20   unauthorized access to a protected computer.  Aggravated

21   identity theft, possession of child pornography,

22   transmission of child pornography, and threats, death

23   threats to the Vice-President of the United States.

24   Those are the charges.

25             What is the case really about?  This case is

1   really about the Defendant Barry Ardolf waging a

2   campaign to terrorize his neighbors, to destroy their

3   careers and their marriage, and to do what he could to

4   destroy their lives.

5          Now, Judge Frank read a summary of the

6   indictment to you earlier.  And again, you will see the

7   indictment at the end of this case.  And you are going

8   to see in the indictment there are a couple of people

9   that are described in the indictment as Victim A and

10  Victim B.  And that is how they are framed in the

11  indictment.  And you will learn that both of these

12  people, Victim A and Victim B, they are real people.

13  And you will hear them testify at trial.

14          I want to talk to you about, first of all,

15  the person identified in the indictment as Victim A.

16  Victim A is Matt Kostolnik, the neighbor of Barry

17  Ardolf.  You will hear him testify.  As you will hear

18  him testify, he does not like to be referred to as a

19  victim.

20          But, as the evidence will show in this case

21  and as you will learn at trial, the reason we are here

22  is because Barry Ardolf sought to victimize Matt

23  Kostolnik and Matt Kostolnik's family.  And how did he

24  do that?  What happened?

25          Before we get to the details of the

1    Defendant's crimes and what he did, the "what" of what

2    he did, it is important to learn the "why."  Why would

3    this Defendant work so hard, put so much effort into

4    trying to harm his neighbor's life?  To answer that

5    question we have to go back to the summer of 2008 when

6    Matt Kostolnik and his wife Bethany Kostolnik bought a

7    new home.  They had two boys under the age of five.

8    They had a 4-year-old and an 18-month-old, and Bethany

9    was several months pregnant with their third child.

10              They were looking to move to a different

11   house.  They wanted a house where they could raise their

12   family.  And they wanted a house in a neighborhood with

13   lots of kids, quiet neighborhood with adjoining yards

14   where the kids could have friends and they could run

15   from yard to yard playing.  A house on a quiet

16   cul-de-sac is what they were looking for.  And they

17   looked at a lot of places.  They finally found in the

18   summer of 2008 what they believed to be was their dream

19   home.  It was a home on Xxxxx Xxxxx in Blaine,

20   Minnesota.  I am showing and you an aerial photograph of

21   the neighborhood of Xxxxx Xxxxx.

22              You can see a little cul-de-sac area.  And if

23   I click that you can see there is an arrow that points

24   at the house that Matt and Bethany Kostolnik bought in

25   the summer of 2008 on what they thought was a quiet

1   cul-de-sac.  So, they moved into this house in August of

2   2008.  And on August 2nd of 2008, the day that they were

3   moving in, unpacking boxes, the evening of that day,

4   Matt Kostolnik was upstairs in one of the rooms

5   unpacking boxes, and Bethany Kostolnik was downstairs

6   watching the two boys.

7              Their 4-year-old, Wxxxxxx, was in the front

8   yard of the house.  If I blow this up, it is a little

9   bit closer view of the house.  The Kostolniks' residence

10  is the house at the bottom.  And Wxxxxxx was running

11  around in the front yard.  And Bethany saw Wxxxxxx run

12  over to the neighbor's yard.  And you can see the

13  neighbor's yard right there.  And he was attracted by

14  what you can see the arrow pointing to there, which is a

15  playset in the back yard.  Bethany saw Wxxxxxx run into

16  the yard.  She called for him to come back.  He didn't

17  come back, he is four.  And she walked closer to the

18  neighbor's yard, but at the same time she was trying to

19  get Wxxxxxx back from the neighbor's yard their

20  18-month-old was standing in the doorway.  And she was

21  trying at the same time to keep him in the doorway as

22  bringing the four-year-old back into the yard.

23              She eventually walked over towards the

24  neighbor's yard.  And as she was walking over, a man

25  came down from, you can see the deck area there on the

1    neighbor's yard, and he walked down to the area where

2    Wxxxxxx was by the playset.

3            And when he went down there, he didn't

4    address Bethany, who was on her way over there, didn't

5    make eye contact with her, but instead went straight

6    over to Wxxxxxx.

7            He called out to Wxxxxxx:  Bet you can't

8    touch me.  And then tried to get the child to chase

9    after him.  Eventually he picked the child up and walked

10   him back over towards the front door of the Kostolniks'

11   house which is shown there by the arrow.

12           Now, at that point in time, Bethany Kostolnik

13   grabbed her 18-month-old and brought him inside of the

14   house.  And as she was putting her 18-month old in the

15   house, she turned her back to the man who had Wxxxxxx in

16   his arms.  And when her back was turned, she heard the

17   man kiss Wxxxxxx, an audible kiss, something that she

18   describes as a wet kiss.

19           Bethany was taken aback by it.  She turned

20   around and she grabbed Wxxxxxx from the man's arms.  She

21   got in the house.  She closed the door.  She went

22   upstairs and got the two kids situated in another room

23   and then she went into the room that Matt was unpacking

24   boxes in, sat down on the bed and began to sob.  She was

25   so unnerved by this encounter, by the man's focus on the

1    child, running away from him and saying:  Bet you can't

2    touch me.  And ultimately, the wet kiss.

3              She sat down, and she told her husband the

4    story while crying.  She said:  Who have we moved next

5    door to?  And even though they had just bought this

6    house, the house they thought was the house of their

7    dreams, she told them that they should move.  They just

8    moved in, but she wanted to move.  They didn't know what

9    to do.

10             And the next day after this incident,

11   Wxxxxxx, unsolicited, told Bethany that the man had

12   kissed him on the lips.  And at that point in time Matt

13   Kostolnik decided he was going to go over and ask the

14   man what had happened.  So, he went over and asked the

15   man what happened in the incident with Wxxxxxx.

16             The man grudgingly told him a little bit

17   about what had happened, a little bit at a time,

18   everything but the kiss.  And finally, when Matt

19   Kostolnik pressed the man, he admitted he kissed him

20   good-bye.  And when Matt said where, he pointed to his

21   mouth.

22             Now, again, Matt and Bethany didn't know what

23   to do, Matt went and talked to his father.  And after

24   talking to his father, he decided to report the incident

25   to the police.  So, he called the Blaine Police

1    Department.  An officer came out to the Kostolniks'

2    residence and took a police report.  The officer also

3    went next door to speak with the man.  And as you will

4    learn at trial, the man who lived in that house was the

5    Defendant Barry Ardolf.

6            And ladies and gentlemen, it was apparently

7    this incident, and particularly the fact that Matt

8    Kostolnik reported the incident to the police, that

9    motivated the Defendant to begin what can only be

10   described as a methodical campaign to terrorize the

11   Kostolniks.  For the Kostolnik family, they went from

12   the excitement of thinking that they had moved into the

13   home of their dreams, to the nightmare of being targeted

14   by the Defendant.

15           So, how was it that Barry Ardolf targeted,

16   harassed, the Kostolnik family?  What did he do?  First

17   of all I need to back-up, you have to understand that

18   Barry Ardolf is a computer enthusiast.  He worked as a

19   computer repair technician for hardware devices used in

20   the medical industry.  And more important, he had spent

21   years learning about computers, wireless networking, and

22   in particular, computer hacking.  He had taken a course

23   on computer hacking.  He had numerous books and manuals

24   on computer hacking in his house.  He even had a bumper

25   sticker on the mirror over his bed proudly proclaiming

1    that he was a hacker.

2              As you can see, some are on the screen,

3    photographs that were taken months after this incident.

4    Barry Ardolf's residence was searched in July of 2009.

5    And when his house was searched, you can see this is a

6    photograph of his bed.  On the bookshelf above his bed

7    you can see a series of books.

8              And I will zoom in on a few of them, because

9    you can see that amongst those books are a series of

10   volumes on computer hacking.  The art of intrusion,

11   intrusion is another name for hacking or exploits.  In

12   the middle of that same stack of books, a book on

13   extreme exploits, the art of deception, a computer

14   hacking book.  A book, tellingly, on wireless

15   networking.  You will learn that that is an important

16   thing in the course of this case, his knowledge of

17   wireless routers and wireless networking devices.  And

18   then finally, as shown on know the screen, a series of

19   books on computer hacking.  This was in his bedroom.

20             And on, as I noted before, the mirror above

21   his bed, he even had a bumper sticker saying that he was

22   a computer hacker.  Now, you will see that this bumper

23   sticker says, ethical hacker, certified ethical hacker.

24   That is how some of the manuals and the classes in this

25   area are labeled.  And there are people who do

1   legitimate network security work, who will take hacking

2   courses to find out what is out there, what kind of

3   hacking is out there to be able to put up defenses.

4   But, there are also, as you will learn in this case,

5   many people who take these cases and use them for

6   illegal purposes.  And what is clear, what became clear

7   months later when Barry Ardolf's house was searched, was

8   that Barry Ardolf knew a lot about computer hacking.

9           Now, you will learn that Barry Ardolf knew

10  about computer hacking from the classes he had taken,

11  from the manuals he had read, and that he also did

12  additional, very specific, research in order to get the

13  information that he needed to hack into the Kostolniks'

14  wireless router to get access to their computer system.

15  You will learn that the Kostolniks had what is called a

16  wireless router.  And as we learned from the questioning

17  from Judge Frank today, many of you have wireless

18  routers at your house and are aware of how they work;

19  that they are used to connect wirelessly to the internet

20  using a laptop or an iPad or some other wireless device.

21          And as you will learn in this case, and

22  perhaps like some of you, the Kostolniks didn't know a

23  whole lot about the right way to protect their wireless

24  router.  They had turned on the encryption function on

25  the wireless router, that is the thing that makes it say

1    you have to enter a password in order to connect up

2    wirelessly.

3            But, unfortunately, the option they used for

4    encrypting their wireless router was one of the options

5    available on the router they got from Qwest, was

6    something called WEP, W-E-P, encryption.  And WEP, or

7    W-E-P stands for wired equivalent privacy, WEP.

8            It is, unfortunately, a very weak encryption

9    standard.  The Kostolniks didn't know this, but that is

10   very well known in the hacking community that WEP

11   encryption is something that is easy to hack into.  And

12   what the evidence at trial will show is that Barry

13   Ardolf knew this.  And in February of 2009, he used his

14   knowledge, his very specific research, to crack the

15   encryption key that the Kostolniks used to password

16   protect their wireless router.  And with this encryption

17   key, with this access to the wireless router, Barry

18   Ardolf was able to get access to the Kostolniks'

19   computers, and he was able to use the internet through

20   the wireless router.

21           And what that meant was when he did that and

22   went through their wireless router, and he used the

23   internet or sent e-mails through it or did anything

24   through it, it would look like that access was being

25   done by the Kostolniks through their own router.  And

1    that, ladies and gentlemen, as you will learn, is

2    exactly why Barry Ardolf did that, why he hacked into

3    the router why he compromised it, why he got into the

4    Kostolniks' router.

5              How did he use that power?  Well, first he

6    did some more research.  And as you will learn at trial

7    his residence was searched in July of 2009.  The FBI

8    searched it and found lots and lots and lots of detailed

9    notes that Barry Ardolf kept on his hacking of his

10   neighbors and all of the things that he was doing with

11   the information that he obtained.

12             He kept detailed notes on his computer.  And

13   the FBI found them when they searched his house and

14   found multiple computers, external hard drives, thumb

15   drives, and data CDs and DVDs.  You will see a lot of

16   these notes that he kept during the course of trial.

17             You will learn that in doing his research,

18   the Defendant learned that Matt Kostolnik was a lawyer

19   and that he worked at a law firm called Moss & Barnett.

20   This is a computer file you will see on the screen that

21   was found on a thumb drive in Barry Ardolf's bedroom

22   during that July 2009 search.  And it was in a file that

23   he had named, I bet my CO2.txt -- do you see that in the

24   upper left-hand corner?  I think I can -- you can see

25   that up there.  And on here you can see again in the

1    upper left-hand corner of the file, which I will blow

2    up, that he had information on Matt Kostolnik, his work

3    telephone number which I have blacked out, his work

4    e-mail address, and also information on who was Matt

5    Kostolnik's legal assistant.  And you will see that that

6    person's name is Brenda Murphy.  I want you to remember

7    Brenda Murphy's name for the moment.

8              What did he do with this information?  And we

9    have got to go back in time again to tell you what he

10   did with this.  Because what you will learn is that a

11   few months before he completed the hack of the

12   Kostolniks' router in February of 2009, he created a

13   couple of things.  He created a fake Yahoo.com e-mail

14   address in Matt Kostolnik's name,

15   MattKostolnik@Yahoo.com, and he created a fake

16   MySpace.com web page.

17             Now, you will learn that in order to create

18   these things, a Yahoo.com e-mail address, a MySpace

19   page, a gmail address, you don't need to be who you say

20   you are.  You don't have to be Matt Kostolnik in order

21   to get Matt Kostolnik at Yahoo.com.  And Google and

22   Yahoo and MySpace and do not make you prove you are who

23   you purport to be in order to get those things.  You

24   just have to sign up for them.

25             But, what they do do is they keep records of

1  where these accounts are signed up for, and when they

2  were created.

3            And you will learn that these two accounts

4  right here, the MattKostolnik@yahoo.com e-mail account,

5  and then the Matt Kostolnik MySpace page were created,

6  both of them, on November 18th, 2008, from a public

7  library computer in Minnetonka, Minnesota.

8            You will also learn that when Barry Ardolf's

9  house was searched in July of 2009, he kept notes on

10  both of these accounts on his computer.

11            Let me show you one.  This is again from a

12  file, a computer file recovered from a thumb drive from

13  Barry Ardolf's bedroom.  And it is a file entitled

14  AlamoMattAllStuff.txt, and you will see a number of

15  these files during the course of the trial.  You will

16  see how detailed he maintained these notes.

17            On here you can see there are notes relating

18  to him watching and almost doing surveillance of a

19  birthday party taking place at the Kostolniks' house,

20  reference to phone numbers, address, license number of

21  vehicles, of the cars.  And the thing that I am focusing

22  on at the bottom and will blow up for your attention is

23  he had on here, MattKostolnik@Yahoo.com, a password,

24  "TheTrust12345" and as you can see, a security question

25  and answer to get access to that account at a later

1   time, information that you get at the time you are

2   creating that account.

3          Now, in another file also found in Barry

4   Ardolf's bedroom during the July 2009 search warrant,

5   this is a file entitled, MattMySpaceLogIn.txt.  I will

6   click and blow up the center portion of it so you can

7   see that this is information related to that MySpace

8   account, the MySpace password.  And you can see the

9   e-mail address he used to create the MySpace page was

10  that same MattKostolnik@Yahoo.com e-mail address.

11  Because you need, in order to set up a MySpace page,

12  MySpace has to be able to send you an e-mail with your

13  confirmation information on it, and that is what is

14  referenced in there.

15         So, what did Barry Ardolf do with this

16  information?  What did he do with the fake e-mail and

17  the fake MySpace page?  We will talk about the fake

18  e-mail address first.  After he had hacked the

19  Kostolniks' wireless router, he used the router to send

20  e-mails from that Yahoo.com address, this address right

21  here.  And you remember, I asked you to remember Brenda

22  Murphy's name, because he had done research, and we saw

23  the notes, the detailed notes that he kept, some of

24  which referenced Matt Kostolnik's legal assistant Brenda

25  Murphy.  And he used that information to send an e-mail

 1    with the Matt Kostolnik MySpace account.  Excuse me,

 2    MattKostolnik@Yahoo.com e-mail address.

 3              I am putting up on the screen an e-mail that

 4    was sent in the early morning hours of February 22nd,

 5    2009 from the MattKostolnik@Yahoo.com e-mail address to

 6    Brenda Murphy.

 7              Subject line:  You are such a fox.

 8              I was thinking of you on Valentine's Day.  I

 9    wouldn't mind at all if you wanted to sneak me a kiss

10    when nobody is looking.  Remember what Bill Clinton

11    finally fessed up to?  I want that from you, signed

12    Matt.

13              This is going to Matt Kostolnik's legal

14    assistant, sent by Barry Ardolf.

15              Now, how do we know that it was sent by Barry

16    Ardolf?  Well -- and I guess what I would want to back

17    up and tell you, that when this e-mail came in in

18    February of 2009, it came in on a Sunday.  Brenda Murphy

19    came into work on Monday morning.  She gets this e-mail,

20    reacts to it as you would expect her to react to it.

21    But, she thought it was out of character for Matt

22    Kostolnik, so she printed out the e-mail.  She had

23    worked with him for several years before this time.

24              So, she printed out the e-mail.  She walked

25    into his office.  She put it on his desk and said:  Do

1    we have something to talk about?  She will tell you when

2    she testifies that Matt Kostolnik turned red, told

3    Brenda Murphy he had never sent the e-mail, and he had

4    never this e-mail address.

5           He also learned that later that morning that

6    Matt Kostolnik learned from the law firm's IT

7    Department, that two other lawyers at Moss & Barnett,

8    the law firm that he worked at had received e-mails from

9    the same Yahoo.com address.  One of them went to Philip

10   Young.  You will see that this one is related to the

11   Brenda Murphy e-mail.

12          It is from the MattKostolnik@Yahoo.com e-mail

13   address to Philip Young.

14          Hey, Phil, ask Brenda if she liks, l-i-k-s,

15   misspelled, me.  And then it says, Philip, hey, Phil,

16   ask Brenda if she again, liks me, likes me, likes me,

17   because I like her.  What can I say?  I think she's

18   cute, Matt.

19          This is going to Philip Young who was another

20   lawyer at Moss & Barnett.

21          Now, again, I showed you some of the notes

22   that were found on Barry Ardolf's computer in his

23   bedroom during the July 2009 search.  I will show you

24   one more, and this is found on that same text file we

25   had looked at before, the "IBetMyCO2.txt" file recovered

1  from his bedroom.  And in this, at the bottom, I will

2  blow it up so it is easier to see, is the name of the

3  person who had the e-mail sent to them, Philip Young,

4  his e-mail address, YoungP@Moss-Barnett.com, and the

5  exact text of the subject line of that e-mail, including

6  l-i-k-s, that misspelling, that you can see if you

7  compare those notes to the e-mail that was sent to

8  Philip Young, also on February 22nd of 2009.

9          Now, so at this point in time he knows that

10  two e-mails have been sent to people at Moss & Barnett

11  and the IT Department informed him on that morning,

12  February 23rd, 2009 that yet another lawyer had received

13  an e-mail from the Yahoo.com address.  And this one, as

14  you can see, went to a person by the name of Dave

15  Senger.

16          And it is from the MattKostolnik@Yahoo.com

17  e-mail address.  And the subject line is, family pic

18  from Matt.  It says, check it out, new family pic.  I

19  was thinking you could appreciate these.  Plausible

20  deniability, right?  Matt K.

21          Now, as you learn in this trial Dave Senger

22  is the Chairman of the Management Committee at Moss &

23  Barnett.  Matt Kostolnik was a relatively young attorney

24  at Moss & Barnett.

25          Dave Senger was the firm's top lawyer, the

1    Chairman of the Management Committee, sort of the top

2    guy at Moss & Barnett.  And as you will learn -- let me

3    go back to some of these text files of the notes that

4    Barry Ardolf was keeping, he knew that.  In fact, he

5    kept in his notes that the big guy at Moss & Barnett was

6    SengerD@Moss-Barnett.

7            Now, if we go back to the e-mail, you will

8    note that there are a couple of attachments that are on

9    this e-mail.  And you will learn at trial that when Matt

10   Kostolnik was told about this e-mail by the IT

11   Department, the IT Department also said, there are two

12   photos attached to one of the e-mails, and they contain

13   pornographic material.

14           Matt Kostolnik saw the name of one of them.

15   It says, "Matts kids."  And he became frantic.  He was

16   wondering if somehow someone had a picture of his

17   children.  He went down to the IT Department.  He looked

18   at the picture, and he was sort of relieved it wasn't

19   his kids.  But, not very relieved, because what it

20   turned out to be was a picture of child pornography.

21           Now, the picture was a picture of children

22   engaged in sex acts.  I am going to show you on the

23   screen what is called a redacted version of the

24   attachment, meaning there is going to be a big black box

25   over a chunk of it.  But, this, ladies and gentlemen,

1  shows the photograph that was attached to the e-mail

2  that was sent to Dave Senger in Matt Kostolnik's name on

3  February 22nd, 2009, by the Defendant Barry Ardolf.  It

4  shows three real identified children engaged in sexual

5  contact.

6         Now, it is blacked out here.  It is described

7  in the indictment.  You will hear some testimony about

8  what is shown in there, because we have to meet the

9  elements of the offense, as the Judge described them to

10  you.  And you will learn through that testimony that the

11  picture that was sent with the e-mail was a picture of

12  real children involved in sexual acts.

13         What you will also learn is that this was

14  sent in a February 22nd e-mail.  When Barry Ardolf's

15  house was searched several months later on July 21st,

16  2009, this same picture was found on several computers

17  located in Barry Ardolf's bedroom.

18         As you can see on the left-hand side of the

19  picture as it was found on the attachment to the Dave

20  Senger e-mail, and what is shown on the right-hand side

21  are the five different places that same picture was

22  found on computers or computer media in Barry Ardolf's

23  bedroom when his house was searched in July of 2009.

24         Now, after the three e-mails came to the Moss

25  & Barnett employees in February of 2009, we didn't have

1    the benefit of what was found during the search warrant

2    several months later.  So, I am showing you information

3    that law enforcement doesn't find out for a few months.

4              When you go back to February of 2009, Matt

5    Kostolnik, all he knows is that someone is sending

6    e-mails to his co-workers, his legal assistant, his

7    supervisor, in his name, some of them containing child

8    pornography.

9              Who sent them?  Why?  They are certainly not

10   the kind of things that anyone would want to have sent

11   to their assistant or their boss.  So, he spoke to the

12   management of Moss & Barnett.  It was obviously an area

13   of concern for the law firm.  And he assured them that

14   he hadn't sent the e-mails.

15             He also reported the sending of the e-mails

16   to the Anoka County Sheriff's Department.  He was put in

17   touch with Detective Pat O'Hara.  Pat O'Hara is assigned

18   to the Internet Crimes Against Children Task Force at

19   the Anoka County Sheriff's Department.  It is a unit

20   that investigates child exploitation crimes, child

21   pornography crimes using computers.

22             Shortly after getting involved in the

23   investigation, Detective O'Hara, as you will learn,

24   reached out to the FBI's Cybercrime Task Force.  The

25   Cybercrime Task Force is the computer internet

1    investigation agency to which Agent Cameron and Agent

2    Howe are assigned.  And relatively quickly when

3    Detective O'Hara started his investigation, he was able

4    to use something called an IP address, something you

5    will learn a little bit about and hear about at trial.

6              There was an IP address associated with the

7    e-mail.  He was able to track that back and determine

8    pretty quickly that the three e-mails that had gone to

9    the Moss & Barnett employees in 2009 had come from the

10   Kostolniks' wireless router.  So, what he realized is at

11   that point in time what Matt Kostolnik realizes is it

12   looks like it is him that is sending the e-mails.  And

13   what Detective O'Hara had in front of him was either

14   Matt Kostolnik was sending those e-mails, or someone has

15   hacked into his router and is sending those e-mails.

16             A few days after Detective O'Hara got

17   involved in the investigation, he also was doing some

18   simple internet research and Googled Matt Kostolnik's

19   name.  And by doing that, he discovered the fake MySpace

20   page that Barry Ardolf had created in Matt Kostolnik's

21   name.

22             And this, showing you on the screen a

23   printout of that MySpace page as it existed in April of

24   2009, but it was also the same one Detective O'Hara

25   would have seen early in March of 2009.

1                Now, if you look at that MySpace page, I will

2    blow this up a little bit, you will see there is a

3    photograph on there, and it is mostly blacked out

4    because I have redacted the bottom portion of it again.

5    But, as you will learn at trial, that picture right

6    there is the same image of child pornography that had

7    been attached to the e-mail sent to Dave Senger on

8    February 22nd, 2009.

9                The only difference is that the redaction on

10   the bottom, that black portion, is something I put on

11   there to present as a court exhibit.  But, this image

12   had some kind of unique squiggly lines, if you see, it's

13   kind of white squiggly lines on the faces of the two

14   boys.  So, that was the same image sent to Dave Senger,

15   but with the boys' faces obscured.

16               And what you learn, again, is that a few

17   months later when Barry Ardolf's house was searched in

18   July of 2009, you see that is the image that was posted

19   on the MySpace page on the left.  Three instances of

20   that same image with the same squiggly lines over the

21   faces of the boys were found on computers in Barry

22   Ardolf's bedroom.

23               Now, if we go back to the MySpace page, you

24   will also note that on MySpace pages, you can put a

25   little description of yourself on it, and there was a

description on this MySpace page that I am going to blow

up.  And it says, Matt's blurbs, and there is a section

on there that is about me.  It says, I bet my co-worker

that since I am a lawyer and a darn great one that I

could get away with putting up porn on my site here.  I

bet that all I have to do is say there is a plausible

deniability, since anybody could have put this on my

site, like someone hacked my page and added this porn

without my knowledge.  This is a reasonable doubt.  I'm

a damn good lawyer.  And I can get away with doing

anything.  Lawyers rule the world.  I am part of such a

big firm that I will have unlimited resources to get off

scot free, even though most of the people in my firm,

law office, are assholes, I know they will support it.

So, that was on that same MySpace page.

Now, I want to take you a few months into the

future when a search warrant is done on Barry Ardolf's

house, and the same "IBetMyC02.txt" text file, you will

see that the same language that was in the "About Me"

section of the MySpace page was found in the notes kept

by Barry Ardolf of what he was doing.  If you compare

the two, you will learn, as the evidence will show at

trial, it is the exact same language.

Again, the FBI only found this evidence in

July of 2009.  And back in February and March of 2009,

1  neither Matt Kostolnik nor Detective O'Hara knew who had

2  sent the e-mails or set up the MySpace page.

3           And shortly after those e-mails got sent in

4  February of 2009 with the e-mail address that was

5  supposedly in Matt Kostolnik's name, two other lawyers

6  at Moss & Barnett received a strange e-mail again

7  related to Matt Kostolnik.

8           And I am going to put this up on the screen.

9  This is an e-mail that was received by Joseph

10 Maternowski and Anthony Dorland on March 8th of 2009 --

11 actually, probably received by them the following Monday

12 when they came into their office.  And it purports to be

13 by a person by the name of Mary Sill.  And as you can

14 see, it claims to be Mary Sill, a person who was at the

15 Wxxxxxx Mitchell College of Law on March 6th, and that

16 she was assaulted by Matt Kostolnik.  That is what this

17 e-mail is purporting to tell the two lawyers from Moss &

18 Barnett, Joe Maternowski and Anthony Dorland, and it is

19 signed Mary Sill from Wayzata, Minnesota.

20          You will learn during the course of trial,

21 ladies and gentlemen, that Mary Sill is a real person, a

22 real person who lives in Wayzata, Minnesota.  And you

23 will hear her testify.  I will blow that up a little bit

24 so you can see it better.

25          You will hear her testify that she did not

 1   write this e-mail.  That she was not at Wxxxxxx Mitchell

 2   Law School on March 6th, 2009, that she has never met

 3   Matt Kostolnik; that this incident in this e-mail did

 4   not occur; and that this is not her e-mail address.  And

 5   she never gave anyone permission to create a fake e-mail

 6   address in her name.

 7            And ladies and gentlemen, remember a little

 8   earlier, I told you that the person identified in the

 9   indictment is Victim A, I told you who that was.  And

10   you will learn that the person identified in the

11   indictment as Victim B is Mary Sill, the person who

12   Barry Ardolf used her identity to create the false

13   e-mail address to send that e-mail to the attorneys at

14   Moss & Barnett.  It is her identity that is charged with

15   being stolen in Count 3 of the indictment.

16            How do we know Barry Ardolf sent this e-mail?

17   Well, again, in July of 2009, more files were found.

18   This one is from a file found in Barry Ardolf's bedroom

19   called, "March 6th."  And on here, as you can see in the

20   center of it, is the name Mary Sill, Mary Sill's

21   telephone number.  I blacked out the last four digits,

22   but that is in fact Mary Sill's telephone number.

23   Wayzata, Minnesota, Mary Sill's 2008 gmail.com e-mail

24   address, the password for that e-mail address and then

25   the security question for that e-mail account.  And as

1   you can see at the bottom of that same file as I blow it

2   up, you had in those same notes the names and the e-mail

3   addresses of the two lawyers at Moss & Barnett, Joe

4   Maternowski and Anthony Dorland who he sent the e-mail

5   to.

6           Later, you can go on to the same file and you

7   can see at the bottom of it, again, is Mary Sill's name.

8   And in the section right here that I am blowing up is

9   the precise text that is contained in that March 8

10  e-mail, written in the name of Mary Sill to Anthony

11  Dorland and Joe Maternowski, on a file found when Barry

12  Ardolf's bedroom was searched in July of 2009.  And

13  again, you can compare the text of the two and see that

14  it is the same as the e-mail that was sent.

15          Now, again, law enforcement didn't have this

16  information that was in the files that they found in

17  July of 2009 until after the search of Barry Ardolf's

18  house.  And going back to when this e-mail was sent in

19  March of 2009, neither Matt Kostolnik nor Detective

20  O'Hara, or anyone from the Cybercrime Task Force knew

21  who was sending the e-mails.

22          And in fact, after this e-mail was sent, Matt

23  Kostolnik got pulled in front of his supervisors at work

24  and got grilled about, where were you on March 6th?

25  Were you at Wxxxxxx Mitchell College of Law?  Wanting to

 1    find out if this was a real e-mail.  At first Matt

 2    Kostolnik couldn't remember where he was.  And finally

 3    he said, I was in court that day.  And as it turns out

 4    on March 6th of 2009, Matt Kostolnik was actually in the

 5    Federal Courthouse in Minneapolis arguing a case in

 6    front of Judge Joan Ericksen.

 7              And it was after that meeting that the law

 8    firm decided they should hire an outside investigator to

 9    find out what was going on.  The firm hired an outside

10    law firm, and that law firm hired an outside computer

11    forensic investigator named Scott Johnson.  Scott

12    Johnson went to Matt Kostolnik's house, looked through

13    Matt Kostolnik's computer to see if there were any

14    viruses on it or anything like that that could be

15    causing a problem, looked for words related to the

16    e-mails that had been sent out.  Didn't find anything,

17    but he did determine by looking through the logs of the

18    wireless router that a device that was not a device

19    under the Kostolniks had been on the wireless router.

20    So, he installed what is called a packet capture device

21    on the wireless router, basically something that gathers

22    up all of the packets of information, all of the data

23    that runs through a wireless router when it is

24    connecting up with the internet, information going to

25    the internet, information coming back from it over time.

1           And the purpose of this was to determine

2    whether somebody else, besides the Kostolnik family was

3    using the router.  And shortly after the packet capture

4    device was installed and during this time period, Mike

5    Kostolnik is at work.  And he is told by the

6    receptionist at work that he has some visitors, and he

7    learns that there are two agents from the United States

8    Secret Service investigating a death threat e-mail to

9    the Vice-President sent in his name.

10          So, you may know the United States Secret

11   Service, one of the things they do is protect the

12   president and other public officials, the people in the

13   black suits and the dark sunglasses who you see around

14   the President at public events.  The Secret Service also

15   investigates death threats to the President and other

16   public officials.  And you will learn about that through

17   the course of trial.

18          And you will learn that at the beginning of

19   April of 2009, that two agents from the United States

20   Secret Service came to talk to Matt Kostolnik about this

21   e-mail that was sent out on Wednesday, April 1st, 2009.

22   And you can see that the sender of that e-mail purported

23   to be MattBethanyKostolnik2009@Yahoo.com.  And the

24   recipient of that e-mail, or at least one of the

25   recipients of that e-mail was the Vice-President at

1    WhiteHouse.gov.

2            What did the e-mail say?  I will blow up some

3    of the portions of it.  It said:  This is a terrorist

4    threat.  Take this seriously.  Time for a new government

5    officials after a year all are put to death by us.  I'll

6    kill you all one at a time or a bunch at a time.  I

7    swear to God I will kill you guys.  You guys better

8    start watching your back, Matt and Bethany.

9            When the Secret Service agents asked about

10   the e-mail Matt Kostolnik said he didn't send it, his

11   wife hadn't sent it.  And he instead told the Secret

12   Service agents about the other e-mails that had been

13   sent and said I have reported this to the Anoka County

14   Sheriff's Office and the FBI is working on it and that

15   his firm was conducting an outside investigation into

16   who was sending the e-mails.

17           So now, at this point in time, the Secret

18   Service becomes involved in the investigation.  And over

19   the next months, at least, two more threat e-mails are

20   sent with approximately the same type of message as the

21   one that is in this e-mail that went out on April 1st.

22   So, who sent these e-mails?  Well, again, we have to

23   look at evidence that was recovered from Barry Ardolf's

24   house several months after April 1st.

25           This was from a computer file found in Barry

1   Ardolf's bedroom that is titled, "MattsNiks-2.txt" and

2   recovered from his bedroom.  And as you can see at the

3   bottom of that text file that is shown on the screen,

4   and I will blow up that portion, it has got the

5   MattBethanyKostolnik2009Yahoo.com e-mail address, the

6   password, security question, and other information

7   reportedly related to the Kostolniks.

8            A little later on in that file, I will blow

9   that portion of it up.  The FBI when they searched the

10  computer found this, which is the text of that e-mail

11  threat to the Vice-President of the United States.  And

12  if we blow up the bottom, it also has the e-mail

13  addresses of the various public officials that Barry

14  Ardolf sent this e-mail to.

15           Now, what else was found on the computer

16  files recovered from Barry Ardolf's bedroom is what is

17  called a -- it really could be called a trophy shot.  It

18  is a screen shot saved in a computer file format, saved

19  as "Some Sent May 6th.jpeg."  JPEG is a file extension

20  for an image, for a computer image file.  So, Barry

21  Ardolf took a screen shot of what was on the screen.

22  And what we see is the sent e-mail box of the

23  MattBethanyKostolnik2009@Yahoo.com e-mail address.

24           And if you look on here, and am taking an

25  arrow and I will blow that up, the last of the e-mails

1   shown as being sent to Vice-President@WhiteHouse.gov was

2   sent on May 6th 2009.

3           It was this last e-mail that was sent out,

4   and sort of the persistence of Barry Ardolf in doing

5   different things to try to harm his neighbors that

6   proved to be his downfall.  Up to this point, he had

7   done an extremely good job of covering his tracks, of

8   creating fake e-mail addresses, of hacking into a

9   wireless router, doing things to get around being caught

10  to the point where Detective O'Hara of the Cybercrime

11  Task Force wasn't able to figure out who was the one

12  that was sending the e-mails.

13          But, he had used a lot of the tricks that he

14  had learned from his studies to be able to do that.

15  But, when he sent this e-mail, that packet capture

16  device, the device that was attached to the wireless

17  router to collect data collected a couple of things.

18  First of all, it collected the text of the threat e-mail

19  that went out on May 6th, and around it, on the same

20  device ID of the computer that sent this e-mail, it

21  found information related to Barry Ardolf's name and

22  Barry Ardolf's Comcast internet account, indicating that

23  Barry Ardolf was using the Kostolniks' router to be able

24  to send this e-mail.  And it was this information

25  combined with a lot of other information developed over

1    the course of the investigation that gave law

2    enforcement enough to get a search warrant to search

3    Barry Ardolf's house.  And at this point in time the

4    investigation was being headed up by the FBI Cybercrime

5    Task Force.  And Special Agent Cameron obtained a search

6    warrant and put together a team of law enforcement

7    agents from a number of different agencies to conduct a

8    search of Barry Ardolf's house, people from the FBI, the

9    U.S. Secret Service, the Blaine Police Department and

10   the Anoka County Sheriff's Office, a number of people

11   went out and executed a search warrant on Barry Ardolf's

12   residence on July 21st, 2009.

13            Now, prior to going out there, Agent Cameron

14   determined that there was reason to believe that there

15   might be a number of computers at Barry Ardolf's

16   residence.  And so as part of the search warrant team

17   going out to do the search warrant, the FBI's Forensic

18   CART Unit, headed by Special Agent Jerry DeWees, who is

19   a veteran of the Cybercrime Squad, who went out to

20   oversee the search warrants of the computer devices at

21   Barry Ardolf's house.

22            So, on July 21st, 2009, the search warrant

23   team went to Barry Ardolf's residence.  When they

24   arrived they found Barry Ardolf in his yard.  They

25   explained why they were there, walked up to his house,

1    and he let them into the house.

2              And when they went in, they found all kinds

3    of computers, computer monitors, computer hard drives,

4    and massive amounts of storage media.  Here are just a

5    few pictures of some of the things that were found in

6    the course of the house search.

7              These, as I am starting right here, are just

8    some pictures from his bedroom.  A number of the discs

9    that were found, I think I talked about before that

10   there were computers, there were computer storage

11   devices, loose hard drives, CDs, DVDs.  And a number of

12   the CDs and DVDs that contained data contained hacking

13   software programs on them.

14             I will show you one of them.  This is a CD

15   that was recovered from Barry Ardolf's bedroom and it

16   was labeled, real hacking software Munga Bunga, which

17   contained multiple hacking software.

18             Also, this is one of a number of CDs that

19   were recovered from Barry Ardolf's house containing, and

20   it says, BackTrack 3 on it, containing a suite of

21   software programs used in hacking wireless routers

22   called BackTrack.  And this is BackTrack Version 3 that

23   is shown here.

24             And during the course of the investigation,

25   agents found not only this, but other items relevant to

1   their investigation, including printouts of wireless

2   access points in the neighborhood, manuals on hacking,

3   some of which we saw pictures of earlier, notes related

4   to Barry Ardolf's hacking of the Kostolniks' wireless

5   router, including the encryption key and his accessing

6   of the password to get access to the wireless router,

7   and even open pieces of mail addressed to Matt Kostolnik

8   under Barry Ardolf's bed.  And I have blacked out those

9   two black portions on there, the things that I have

10  affixed.  Those are, as you can see, a Blue Cross Blue

11  Shield statement that was mailed to the Kostolniks.

12  This and several other pieces of opened mail addressed

13  to the Kostolnik family were found under Barry Ardolf's

14  bed.

15          During the course of the search warrant in

16  July of 2009, Barry Ardolf was interviewed by both

17  Special Agent Cameron and Special Agent Eric Humbert of

18  the United States Secret Service.  And when he was

19  interviewed by Agent Cameron, he claimed not to know

20  much about computers.  He was asked about the framed

21  hacking certificate.  You will see a picture of that

22  during the course of the trial that he had on his

23  bedroom wall, indicated that he completed training in

24  hacking.  He claimed that he couldn't remember any of

25  the specifics from that training.

1          And when he asked if he was familiar with the

2    hacking software BackTrack, he claimed that he was not.

3    But, of course, FBI agents still finding a bunch of

4    these discs with BackTrack written on them.

5          And when they came up to him and said, they

6    showed him the CD with BackTrack on it that was found in

7    his bedroom, he acknowledged that it was his

8    handwriting, but stated that someone had given him a

9    copy, and he had not used it.

10          Similarly, when he was asked about the mail

11    from the Kostolnik family that was found under his bed,

12    he claimed not to know anything about that.

13          And after Agent Cameron was finished speaking

14    with the Defendant, he was interviewed by Special Agent

15    Humbert from the Secret Service.  And Agent Humbert

16    explained that the purpose of the Secret Service being

17    involved in the investigation were the threat e-mails to

18    the Vice-President.  And he asked Barry Ardolf whether

19    he wanted to do harm to the Vice-President, whether they

20    should be concerned about him doing harm to the

21    Vice-President.  Barry Ardolf said, no, no, no, he was

22    happy with both the President and the Vice-President.

23    And so Agent Humbert read one of those threat e-mails

24    out loud and said:  Well, if you like the

25    Vice-President, then why would you make a death threat

1  against him?  To which Barry Ardolf responded:  Maybe I

2  was mad at my neighbor.

3  Later, after the search warrant was conducted

4  of the house, there was a forensic examination conducted

5  on a number of different computers that were recovered

6  from the residence.  And as I discussed, the FBI found

7  file after file of detailed notes on the hacking of the

8  Kostolniks' router done by Barry Ardolf.  I have shown

9  you just a small portion of the ones that were found

10  during the course of the search.  As well as e-mails,

11  the e-mails that he sent to the co-workers and the

12  Vice-President, notes related to the MySpace page, and

13  again some of them I have shown you during the course of

14  this opening statement.  You are going to see more of

15  those over the course of the next several days.

16  Now, ladies and gentlemen, although you are

17  going to hear testimony and get some evidence on some

18  rather complicated hacking that was done by the

19  Defendant, you are going to hear some technical

20  information as a part of that testimony.  I want you to

21  focus on the heart of the case, because the heart of

22  this case is not a complicated case.  There is going to

23  be some technical testimony, but this case is about a

24  dangerous man, a person who got mad at his neighbors and

25  decided that because he got mad at his neighbors, he was

1    going to use his technical knowledge, knowledge that he

2    had acquired to terrorize them and to do what he could

3    to destroy their lives.

4            I have given you an overview of what you are

5    going to learn over the next few days about what the

6    evidence will show.  And ladies and gentlemen, at the

7    end of this trial, the evidence, as you will hear over

8    the next few days, will show beyond a reasonable doubt

9    that the Defendant Barry Ardolf committed the crimes

10   charged in the indictment.

11           And after you have heard all of the evidence,

12   I am going to come back here and I will ask that you

13   look at the evidence and apply the law as the Judge

14   gives it to you and return verdicts of guilty on all

15   counts charged in the indictment.  Thank you very much.

16           THE COURT:  Mr. Mahoney, do you wish to

17   reserve your right to present your opening remarks at

18   the end of the Governments's case?

19           MR. MAHONEY:  Yes, Your Honor.

20           THE COURT:  Members of the jury, it is my

21   responsibility, with input from counsel, to always look

22   for a logical place that minimizes disruption of the

23   case, that is fair to your time schedule, and logical in

24   the presentation of things.

25           And what I am going to do is we are going to

1  recess at this time, rather than begin the testimony,

2  since it is nearly 4:30.  You had a longer day than

3  usual, just because of how we begin jury selection in

4  the morning.  So, we are going to stand in recess.

5            And ordinarily, I would say we will begin at

6  9:00.  We will begin at 9:30 in the morning.  You can

7  come in as early as you like.  And we will have the

8  coffee on, not that everybody is coffee drinkers, but we

9  will have that on if you need something.  There will be

10  somebody in my chambers.

11            The 9:30 start is for two primary reasons.

12  One, it will give me -- the least important reason is if

13  I need any extra time to chat with on our time, not your

14  time, with counsel.  But more importantly, even though I

15  think the weather forecast ranges, depending on where

16  one is coming from, anywhere from one to six inches of

17  snow, somewhere in that regard, give people a little bit

18  of breathing room, because I am confident I can keep us

19  on track and be fair to you and be fair to both of the

20  parties.  So, we will begin at 9:30.  The courthouse

21  opens at 7:00.  You can come in when you like.

22            In the unlikely event -- or if you would

23  forget your passkey, you can buzz my chambers.  It is

24  out in the hallway up here, and somebody can let you in,

25  in that event, if you forget your pass card.

1          When you go home this evening, wherever you

2     may go, you can, of course, tell people where you have

3     been, what you are doing.  You are a juror on the case.

4     You can say the name of the case.  You can say what the

5     charges are, and that the Defendant denies the charges.

6     That is all you should say.

7          And you and I all know people, because it is

8     easy to say to you, you can't investigate and ask

9     questions of people, and I have talked about the

10    internet and the media issue, but we all are friends

11    with people, and maybe even have family members where

12    without asking a question, you can just say the right

13    thing and they will just start talking and tell you

14    probably what you are trying to seek to find out so you

15    can actually say, well, I didn't ask anybody a question.

16         Well, it is your responsibility as a juror,

17    going back to that very important principle of what

18    should happen in this case, no matter what your verdicts

19    may be, should be based upon what goes on in here.

20         You also have a responsibility not only not

21    to do investigation or ask questions, but also to

22    interrupt somebody and say, look it.  I am on a case.

23    This is the name of the case.  This is what we are

24    hearing, but I can't talk about it or let you ask me

25    questions or give me your opinions on whatever issues

 1   you perceive as relevant to the case.

 2           So, perhaps enough said, in the unlikely

 3   event you get exposed to some information, or someone

 4   tries to talk to you, then I would like to know about it

 5   promptly in the morning.  I hope you have a nice

 6   evening.  Safe travels.

 7           I thank you for your full attention and

 8   patience today and we stand in recess until 9:30

 9   tomorrow morning.  You can leave your -- I wouldn't

10   leave the three-ring books out here, although they would

11   be safe here.  You can just leave them on your table in

12   the jury deliberation room.  We are in recess.

13           (Jury excused.)

14           THE COURT:  If I may, Counsel?  I admittedly

15   didn't give you input into the 9:30 start.  Two things.

16   One, Mr. Mahoney they will have your client -- they will

17   pick your client -- I am still waiting to hear, in

18   between the Marshal Service -- and this is about,

19   currently, about tomorrow morning.  I know the way

20   tomorrow morning is going to be handled, and that

21   explains another reason that I didn't explain to the

22   jury, for the 9:30, although I think the weather is

23   reason enough.  But your client will be picked up at

24   7:30 tomorrow morning by the Marshal Service and will

25   be -- I will ask that he be brought to the courtroom, or

1   it can be the courtroom next door, as well.  It won't be

2   open to the public.  The purpose of that is for you to

3   consult with each other.  So, whether it is here -- I

4   can arrange a spot at 8:00 -- so, he can be in the

5   courtroom no later than 8:00 in the morning.  So that

6   would give you an hour and a half.  There is 90 minutes

7   there.

8           I believe that there may be an issue about

9   staying significantly after tonight, and I am getting

10  that information as we speak.  We will have it in the

11  next couple of minutes.  And also, trying to make

12  arrangements at Ramsey County, and you say, well, what

13  arrangements?  Because I don't view a glass pane as

14  acceptable between a lawyer and a client.  The jail has

15  their job to do, but -- so, I am waiting for that

16  information now.

17          So, we know at a minimum we have the 8:00 to

18  9:30 in the morning, rather than just 8:00 to 9:00.  And

19  then I will likely set that up and communicate with the

20  Marshal Service so that you can have your private

21  access, and yet the Government can go about their

22  business.

23          I will probably set it up in the courtroom

24  next door.  And it won't be open to the public.  Who you

25  want here is, then, as long as the Marshal -- I assume

1   it is going to be you and your client, Mr. Mahoney?

2            MR. MAHONEY:  Yes, sir.

3            THE COURT:  So, we have got that set up for

4   tomorrow morning.  We can probably recreate that each

5   day.  What I am waiting to hear from is to -- there is

6   communication going on.  I had gotten a message on the

7   instant message between the Marshal Service and Ramsey

8   County and we will get that figured out.  I am not

9   saying everybody is going to be happy or in agreement.

10  I want to determine that, currently, and then I will

11  give you the message.  Because I don't know where you

12  are at.  I am just assuming you are saying, well, even

13  with 90 minutes tomorrow morning, to begin with, I will

14  take as much time as I can get this evening.  We are

15  working on that right now.  So, I will get that

16  information to you shortly.  That is where Ms. Schaffer

17  just went, so --

18           MR. MAHONEY:  Your Honor, if I might just on

19  that?  Once he is back in Ramsey County, the problem

20  yesterday was the booking in process.

21           THE COURT:  Exactly.

22           MR. MAHONEY:  Once he is booked in, we can

23  share a space together and speak.

24           THE COURT:  We will see, because that is not

25  true in all of the jails.  That is the problem.  That

1  varies dramatically.  So, we are going to get the

2  information on that and get that set up, because we are

3  not going to have a repeat of what happened -- it may be

4  nobody's particular fault.  There may have been some

5  protocol -- unfortunately, I learned about it at 9:00

6  this morning as we were in the courtroom, so did most of

7  my staff.  And obviously, it is beyond the control of

8  Mr. Rank.  And so I am not suggesting -- I mean, so we

9  have got tomorrow morning set up.  So, I think that is a

10 good start and we are just waiting --

11            THE CLERK:  I am going to go call now.

12            THE COURT:  We are waiting on the information

13 now.  So, we will get that information to see, well, if

14 that is the situation -- but we are getting that

15 shortly.  Because there has been some communication

16 going on.

17            MR. MAHONEY:  Well, Your Honor, I mean, I can

18 just have a few minutes with him as they are closing the

19 courthouse at five.  I can be at the jail later this

20 evening, that is fine.  We don't need to keep everybody

21 here.  So, I am not too worried --

22            THE COURT:  But I think what I promised I

23 would do is find out the arrangements at Ramsey County.

24 And I am assuming there is not going to be an issue, but

25 I just want to be able to verify that, so I can

1    represent that to everybody so that everybody knows

2    exactly what is going on, so I don't receive a surprise.

3    Again, perhaps best known protocol, I don't know that.

4    But, I just wanted to make sure that I get the

5    information so that if there is something that I can do,

6    that I can intervene in some appropriate way.

7                    MR. MAHONEY:  Appreciate that.

8                    THE COURT:  Is there -- for the Deputy

9    Marshals in the room, can he have a few minutes with his

10   client right now until we get this information on Ramsey

11   County?

12                   THE MARSHAL:  Yes.  We can give him until

13   five, at least.

14                   THE COURT:  And then I will have the

15   information before five.

16                   And what I will probably do, this is more for

17   the Defense Counsel and the Marshal Service.  Let's just

18   plan to set up tomorrow morning next door.  That is an

19   empty courtroom, and there might be others, too.  But, I

20   know that one is.  So that way whoever is working in

21   here, or if it is opened up for any reason, that won't

22   interfere with anyone?

23                   All right, so we will get back to you on that

24   issue.  And we will stand in recess -- we agreed to,

25   unless somebody gets a message to me -- I do have the

1   one instruction I will send with each of you that I

2   don't think -- it won't come up tomorrow, maybe it will.

3   It is not given in writing, but what I refer to as that

4   404(b) cautionary instruction customized for this case.

5   I said I would have that for you.  I have got that here.

6   And I will send that to you this evening.  I have one

7   copy, actually two for -- well, I have got four, two for

8   each of you.  I will send that with you.

9           And then I have nothing further.  And then if

10  you need -- I will come shortly before 9:30 to the -- I

11  will be in chambers probably by 7:00, but if somebody

12  needs access to me for an issue, I will take it up

13  before 9:30, then send a message to the jury that well,

14  you are ready to go, but the Judge is going to meet with

15  counsel.  So, I will be available if needed.

16          Anything further on behalf of -- you can

17  leave things in here.  We can lock it down shortly.  Or,

18  if you are going to leave things, Mr. Mahoney, in the

19  attorney conference room, since it is outside of the

20  security barrier, we have already made arrangements.  We

21  will have the CSO lock that down for you.

22          I don't have any court scheduled.  Sometimes

23  I do before 9:30, or I would move it to another

24  courtroom.  You could have access here as need be.  And

25  we will convene with the first witness at 9:30 in the

1  morning.

2          Anything further from the Government?

3          MR. RANK:  No, Your Honor.

4          THE COURT:  Or from the Defense?

5          MR. MAHONEY:  No, Your Honor.

6          THE COURT:  We are adjourned.

7          (Evening recess.)

8

9

10

11

12          Certified by:  __s/ Jeanne M. Anderson__

13                         Jeanne M. Anderson, RMR-RPR
                           Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25

1                  I N D E X

2              VOLUME I (Excerpt)

3

4

OPENING STATEMENT BY MR. RANK               Page 3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25