1                      UNITED STATES DISTRICT COURT

2                        DISTRICT OF MINNESOTA

3      ------------------------------------------------------------

4
       United States of America,    )   CR 10-159 (DWF/FLN)
5                                    )
                    Plaintiff,       )   CRIMINAL JURY TRIAL
6                                    )   VOLUME II
          -v-                        )
7                                    )
       Barry Vincent Ardolf,         )   December 16, 2010
8                                    )   9:30 o'clock, a.m.
                    Defendant.       )   St. Paul, Minnesota
9
10     ------------------------------------------------------------

11

12

13        BEFORE THE HONORABLE JUDGE DONOVAN W. FRANK

14            UNITED STATES DISTRICT COURT JUDGE

15           CRIMINAL JURY TRIAL PROCEEDINGS

16                       VOLUME II

17

18

19                        *    *    *

20

21

22

23                   JEANNE M. ANDERSON
                   Registered Merit Reporter
24            Suite 646, 316 North Robert Street
                 St. Paul, Minnesota 55101
25                    (651) 848-1221

```
 1
      APPEARANCES:
 2

 3

 4    FOR THE PLAINTIFF:      Timothy C. Rank, Esq.
                              Laura Provinzino, Esq.
 5                            Assistant United States Attorneys
                              Suite 600, 300 South 4th Street
 6                            Minneapolis, Minnesota 55415
                              (612) 664-5600
 7

 8

 9

10

11
      FOR THE DEFENDANT:      Seamus R. Mahoney, Esq.
12                            Attorney at Law
                              101 East Fifth Street, Suite 2626
13                            St. Paul, Minnesota 55101
                              (651) 398-8691
14

15

16

17                            (Defendant present.)

18

19

20

21

22

23

24

25
```

```
 1                    (In open court; jury present.)

 2                    THE COURT:  You may all be seated.  Thank

 3     you.

 4                    I told the members of the jury as we came

 5     in, I think they are thankful that the weather folks

 6     were a bit -- it didn't exactly turn out the way they

 7     said.  Because as it difficult it is to get out of

 8     Downtown Minneapolis and St. Paul, it was a much easier

 9     drive in this morning for most of them.

10                    You may call your first witness, Mr. Rank?

11                    MR. RANK:  Thank you, Your Honor.  The United

12     States calls Brenda Murphy.

13                    THE COURT:  And if you would step forward

14     towards the front?  That is the witness stand.  But,

15     right before you go into the -- come around and if you

16     would please stop and raise your right hand?

17                    (Witness sworn.)

18                    If you would have a seat, please, behind the

19     microphone?  As I tell every witness, you need to sit

20     close to the mike or it will not pick you up.

21                    If you would please state your full name and

22     spell your last name?

23                    THE WITNESS:  Brenda Murphy, M-u-r-p-h-y.

24                    THE COURT:  And you probably will have to get

25     even a little bit closer.
```

```
 1                    THE WITNESS:  Okay.

 2                    THE COURT:  You may inquire, Mr. Rank.

 3                    MR. RANK:  Thank you, Your Honor.

 4                         BRENDA MURPHY

 5                      DIRECT EXAMINATION

 6   BY MR. RANK:

 7        Q.    Good morning, Ms. Murphy.

 8        A.    Good morning.

 9        Q.    Mam, where do you work?

10        A.    I work at Moss & Barnett.

11        Q.    And what do you do at Moss & Barnett?

12        A.    I am a legal assistant.

13        Q.    And how long have you been a legal assistant?

14        A.    Almost 24 years.

15        Q.    Has all of that time been at Moss & Barnett?

16        A.    No, 12 years.

17        Q.    You worked at other law firms before that?

18        A.    Yes.

19        Q.    And as part of your job, first of all, what

20   does a legal assistant do?

21        A.    We type documents, make court dates, schedule

22   appointments for the attorneys.

23        Q.    Does it vary on what law firm you work at or

24   what attorneys you work with?

25        A.    Somewhat.
```

1     Q.     And do you work with specific lawyers as part

2 of your job at Moss & Barnett?

3     A.     Yes.

4     Q.     And how many lawyers are assigned to you at

5 Moss & Barnett?

6     A.     Currently there's four.

7     Q.     Who do you work with currently?

8     A.     A Matt Kostolnik, Mathew Meyer, Tom Shroyer

9 and Peter Koller.

10     Q.     How about in February of 2009, were your

11 assignments different at that time?

12     A.     Yes.

13     Q.     Who were you assigned to at that time?

14     A.     Matt Kostolnik, Mathew Meyer and Philip

15 Young.

16     Q.     So, how long as of February of 2009 had you

17 been working with Matt Kostolnik?

18     A.     It would be about four years.

19     Q.     And you were assigned to him, as well as a

20 couple of other attorneys?

21     A.     Yes.

22     Q.     How would you describe your working

23 relationship?

24     A.     It was very professional, friendly.  We got

25 along very well day-to-day, worked great together.

1      Q.    Okay.  Mam, I am going to show you -- Your

2  Honor, may I approach the witness?

3            THE COURT:  You may.

4            MR. RANK:  Thank you.

5  BY MR. RANK:

6      Q.    Ms. Murphy, I am going to show you what has

7  been marked for identification as Government's

8  Exhibit 1.  Do you recognize that?

9      A.    Yes, I do.

10     Q.    And it is an e-mail, is that correct?

11     A.    Yes.

12     Q.    Printout of an e-mail dated February 22nd,

13 2009?

14     A.    Yes.

15     Q.    And that e-mail is addressed to you?

16     A.    Yes.

17     Q.    At your Moss & Barnett address?

18     A.    Yes.

19     Q.    And you remember receiving that?

20     A.    Yes, I do.

21            MR. RANK:  I would offer Exhibit 1 at this

22 time.

23            MR. MAHONEY:  No objection.

24            THE COURT:  Exhibit 1 is received.

25

1          (Government's Exhibit 1 was received in

2    evidence.)

3    BY MR. RANK:

4          Q.     I am going to put that exhibit up on the

5    screen in front of you.  Do you see it?

6          A.     Yes.

7          Q.     Excuse me.  If we focus on just the top part

8    of it, and I can blow this up.  It looks like it was

9    sent on Sunday, February 22nd, in the early morning

10   hours, a little after midnight; is that correct?

11         A.     Yes.

12         Q.     Do you see that?

13         A.     Yes.

14         Q.     Did you actually receive the e-mail on Sunday

15   or did you receive it at a later time?

16         A.     I received it at a later time.

17         Q.     When?

18         A.     Monday morning.

19         Q.     Your normal workday?

20         A.     Normal workday, probably about 7:00, 7:15.

21         Q.     And when you got this e-mail -- first of all,

22   this may sound like a dumb question, but did this seem

23   like a strange e-mail?

24         A.     Yes.  Yes, very much so.

25         Q.     What did you think when you received it?

```
 1        A.      I thought it was kind of a joke when I saw

 2   the subject line, and then I opened it and read it and

 3   thought this is really strange.

 4        Q.      What did you do -- I mean, what it says is,

 5   the subject line is:  You are such a fox.

 6        A.      Right.

 7        Q.      And the text of it says:  I was thinking of

 8   you on Valentine's Day.  I wouldn't mind at all if you

 9   wanted to sneak me a kiss when nobody is looking.

10   Remember what Bill Clinton finally fessed up to?  I want

11   that from you and it is signed Matt.

12                Is that correct?

13        A.      That is correct.

14        Q.      Was this out of character for your working

15   relationship?

16        A.      Completely, completely, yes.

17        Q.      What did you do with it after you got the

18   e-mail?

19        A.      I printed it out and waited until Matt came

20   in.

21        Q.      What happened after that?

22        A.      When he came in, I walked in with it and shut

23   the door.  And said, is there something we need to talk

24   about, kind of --

25        Q.      How did he react?
```

```
 1        A.      He was just mortified.  He was embarrassed.

 2   And, you know, it didn't come from me, which, you know,

 3   I figured and --

 4               MR. MAHONEY:  Objection, hearsay, Your Honor.

 5               THE COURT:  Overruled.  I will permit,

 6   members of the jury, for the statements that were made,

 7   not for the truth of what was asserted, but what was

 8   said in response to this witness and what, if any,

 9   reaction there was.  But not for whether it was true or

10   false what he said, but the fact that he responded and

11   what the reaction was.  Note the objection.  You may

12   continue.

13               MR. RANK:  Thank you, Your Honor.

14   BY MR. RANK:

15        Q.      So, after you showed him the e-mail, he

16   reacted as you testified.  What happened after that,

17   mam?

18        A.      Then he was -- he wanted to talk to Bruce

19   Garber who is our IT guy to find out where these e-mails

20   were coming from.  Then he wanted to know if other

21   people had received any, if I had gotten any other ones.

22   And I think he went to Tom Shroyer, who is our CEO.  And

23   I know we got an e-mail stating we are aware that some

24   e-mails are flying around.  We are looking into where

25   they came from.  And that is kind of where it was left.
```

1     Q.     Okay.  So, after you got this, you showed it

2   to Matt Kostolnik.

3     A.     Yes.

4     Q.     He did something to respond to it?

5     A.     Yes, yes.

6     Q.     Part of that was contacting the IT

7   Department?

8     A.     Yes.

9     Q.     And after you showed it to him and he went

10   off to do whatever --

11     A.     Uh-huh?

12     Q.     -- he was going to do with it, did you have

13   much to do with this e-mail after that?

14     A.     No.  No, I didn't.

15     Q.     Other than the e-mail that you talked about,

16   about a firm-wide e-mail going out saying there are some

17   e-mails going around, did you hear anything more about

18   any other e-mails?

19     A.     No, I didn't.  No, I didn't.

20     Q.     Up until the time that you were called to

21   testify?

22     A.     Yes, then I knew some other attorneys had

23   gotten some.

24     Q.     Okay, very good.  Thank you, Ms. Murphy.  I

25   have no further questions, Your Honor.

1          THE COURT:  You may inquire if you wish, Mr.

2     Mahoney?

3                    CROSS EXAMINATION

4     BY MR. MAHONEY:

5          Q.    Good morning, Ms. Murphy.

6          A.    Good morning.

7          Q.    The e-mail that was shot on the screen there,

8     that is the actual screen that you see with the e-mail

9     that you received, correct?

10         A.    Correct.

11         Q.    It doesn't have your address on it,

12    obviously?

13         A.    Right.

14         Q.    And your address is an e-mail address at Moss

15    & Barnett, correct?

16         A.    Correct.

17         Q.    And that is information that is available on

18    the Moss & Barnett website, correct?

19         A.    Yes.

20         Q.    Thank you.  Nothing further, Your Honor.

21               THE COURT:  Any redirect?

22               MR. RANK:  No, Your Honor.

23               THE COURT:  You may step down.  Thank you.

24               (Witness excused.)

25               You may call your next witness.

```
 1              MR. RANK:  The United States calls Bruce
 2     Garber.
 3              THE COURT:  Sir, if you want to step towards
 4     the front of the courtroom by the witness stand on your
 5     right close to the railing here, if you would, please?
 6     And then before you step into the witness stand, if you
 7     would please raise your right hand?
 8              (Witness sworn.)
 9              And if you would have a seat?  There is a
10     step up there.  And if you would have a seat behind the
11     microphone, please?
12              And you will have to sit fairly close to the
13     mike or it will not pick you up.  And then if you would
14     please state your full name and spell your last name?
15              THE WITNESS:  Bruce John Garber, G-a-r-b-e-r.
16              THE COURT:  You may inquire, Mr. Rank.
17              MR. RANK:  Thank you, Your Honor.
18                        BRUCE GARBER
19                      DIRECT EXAMINATION
20     BY MR. RANK:
21         Q.    Mr. Garber, where do you work?
22         A.    Moss & Barnett.
23         Q.    What is it that you do at Moss & Barnett?
24         A.    The network administrator.
25         Q.    For the benefit of the jury, could you
```

1   describe in general terms what a network administrator

2   does?

3       A.    Basically just keep the computers running and

4   the servers.

5       Q.    Without a network administrator, could Moss &

6   Barnett operate?

7       A.    It would be tough.

8       Q.    How long have you been working at Moss &

9   Barnett?

10      A.    13 years.

11      Q.    And all that time working in the IT

12  Department?

13      A.    Yes.

14      Q.    And all of that time as network

15  administrator?

16      A.    Yes.

17      Q.    And I take it you were working at Moss &

18  Barnett then in February of 2009?

19      A.    Yes.

20      Q.    I am going to show you, Mr. Garber, an

21  exhibit that has already been admitted into evidence.

22  Do you see that on the screen, Government's Exhibit 1?

23      A.    Yes.

24      Q.    Do you remember when this e-mail was received

25  at Moss & Barnett?

```
 1          A.     Yes.

 2          Q.     And how was it that you became aware that

 3    this e-mail came in?

 4          A.     I believe Mr. Kostolnik asked if I would take

 5    a look at it.

 6          Q.     Okay.  And do you recall that around the same

 7    time that this e-mail came in, there were a couple of

 8    other e-mails that came in to employees at Moss &

 9    Barnett?

10          A.     Yes.

11          Q.     I am going to show you -- let's see, may I

12    approach the witness, Your Honor?

13                 THE COURT:  You may.

14    BY MR. RANK:

15          Q.     I will leave a few exhibits up here and ask

16    you about them, Mr. Garber.  But the one I will ask you

17    about first of all is -- has been marked for

18    identification as Government's Exhibit 11.

19                 Do you see that?

20          A.     Yes.

21          Q.     And do you recognize that exhibit, sir?

22          A.     Yes.

23          Q.     If you want to pull it out of the sleeve, it

24    is actually a multiple-page exhibit.  Is that correct?

25          A.     Yes.
```

1     Q.     And is it fair to say that that is an e-mail

2  string starting in the morning of Monday, February 23rd

3  with -- starting with you, to Matt Kostolnik, and also

4  to Cheryl Thompson?

5     A.     Yes.

6     Q.     And there are some follow-up e-mails that

7  come after that, is that correct?

8     A.     Yes.

9            MR. RANK:  I offer Exhibit 11.

10           MR. MAHONEY:  11?  I have no objection, Your

11  Honor.

12           THE COURT:  11 is received.

13           (Government's Exhibit 11 was received in

14  evidence.)

15  BY MR. RANK:

16    Q.     I am going go -- this is the first page of

17  Exhibit 11.  Excuse me, I will try this one more time.

18  I am going to try to take you to the third page and then

19  rotate it.

20           So, focusing on the very bottom of

21  Exhibit 11, this is Exhibit 11, page 3.  And this is the

22  start -- there is actually a page 4 to this exhibit.  Is

23  that correct, Mr. Garber?

24    A.     Yes.

25    Q.     So we get the top part of this message.

```
 1    First of all, who is Matt Kostolnik?

 2         A.    An attorney at Moss & Barnett.

 3         Q.    All right.  And who is Cheryl Thompson?

 4         A.    The IT manager and supervisor.

 5         Q.    Is that your supervisor?

 6         A.    Yes.

 7         Q.    So, this is the e-mail that starts off the

 8    e-mail string?

 9         A.    Yes.

10         Q.    All right.  And so --

11               THE COURT:  Can I have you move, sir, just a

12    little bit closer to the mike?  Thank you.

13    BY MR. RANK:

14         Q.    Mr. Garber, have you ever testified in court

15    before?

16         A.    I have not.

17         Q.    Did I tell you I might have to ask you to

18    speak up a couple of times today?

19         A.    Yes.

20         Q.    All right.  And I guess the Judge might ask

21    you the same --

22               THE COURT:  Frankly, it comes up with a

23    number of witnesses, not unique to this circumstance.

24    Some mikes are better than others.  And even though

25    these are relatively new, they don't have a wide range.
```

1   Because I have got the volume turned up a fair amount,

2   so part of it is the mike.

3   BY MR. RANK:

4        Q.     So we start off, Mr. Garber, it says:  I was

5   just letting you know there were three messages from,

6   and then we go to the next page, and rotate it, and go

7   to the end of that message.  So, there are three

8   messages from, and it says an e-mail address there,

9   mattkostolnik@yahoo.com.  That was the e-mail address on

10  the e-mail we saw to Brenda Murphy, is that correct?

11       A.     Yes.

12       Q.     And it looks like you were advising him that

13  there were three from that e-mail addressed to Dave

14  Senger, Brenda Murphy and Phil Young.  And you were also

15  letting him know that the e-mails are graphic and appear

16  to be from someone spoofing your e-mail address.  If you

17  want more info, let me know.

18            What does that term mean, "spoofing" your

19  e-mail address?

20       A.     Well, someone can send an e-mail and change

21  the from address to read pretty much whatever address

22  they want.

23       Q.     Okay.  And are you familiar with web-based

24  e-mail addresses like Yahoo.com addresses?

25       A.     Yes.

 1      Q.      In order to get a Yahoo.com address for Matt
 2  Kostolnik, do you have to be Matt Kostolnik?
 3      A.      No.
 4      Q.      Can you be kind of anybody you want and get
 5  that e-mail, as long as it is not already taken?
 6      A.      Yes.
 7      Q.      If I go, then -- after you sent him this
 8  e-mail, did he respond?
 9      A.      Yes.
10      Q.      I will show you that response on the screen.
11  This is page three, as we move up the e-mail chain.  Let
12  me try this again.
13              Is that the response from Matt Kostolnik to
14  the e-mail we just looked at?
15      A.      Yes.
16      Q.      And he is saying in response to you with a cc
17  to Cheryl Thompson, this is a problem.  What can we do
18  about this?  Brenda just showed me an e-mail she got
19  from the same address.  Obviously it was not sent from
20  me, is that correct?
21      A.      Yes.
22      Q.      Continue up the chain.  You respond back to
23  him a few minutes later saying, I am not sure how to
24  proceed with this.  It is obvious that whoever sent the
25  e-mails is familiar with you and people you work with.

1    There might be a way to trace the e-mails back to the

2    internet service provider.  And if that is possible,

3    then ask them if they can give you more information.

4    But, I have not done this myself, so I am not sure of

5    the best direction to take.

6              Is this an area that you have a lot of

7    experience in, tracing back e-mails?

8         A.    No.

9         Q.    You have some technical training as a network

10   administrator, is that correct?

11        A.    Yes.

12        Q.    But in terms of investigation of internet

13   communications, is that your area of expertise?

14        A.    No.

15        Q.    Mr. Kostolnik was asking you for some help

16   and you were suggesting some possible avenues?

17        A.    Yes.

18        Q.    And he responds to that with this e-mail a

19   couple of minutes later.  And he says:  I don't know if

20   it is someone who is familiar with people I work with or

21   not.  The reason I say that is that Brenda's e-mail is

22   on my M&B web bio.

23              Do you know what that means?

24        A.    Yes.

25        Q.    What does that mean, M&B web bio?

1      A.      Moss & Barnett has a website.  And on that

2  website the attorneys have a resume, basically.  And it

3  includes information about -- or their e-mail address

4  and their assistants.

5      Q.      So, if you go to the Moss & Barnett website,

6  you can look up information on all of the attorneys that

7  work there?

8      A.      Yes.

9      Q.      Are there things like their e-mail address,

10  telephone number and their legal assistant name?

11      A.      Yes.

12      Q.      And is that what he is referring to there?

13      A.      Yes.

14      Q.      So, if someone Googled me they would be able

15  to pull up my web bio with Brenda's e-mail on it.

16  Senger and Young may have just been picked at random

17  from our website.  I don't know the first thing about

18  tracing the e-mails back to the ISP.  How do we proceed,

19  here?  Can I have your help?

20            And then we go up the chain again.  You

21  respond to him, again, a few minutes later; is that

22  correct?

23      A.      Yes.

24      Q.      And you say:  I will try to find out if we

25  need more information or a way to prevent any further,

1  and let you know what I find out.

2                Can I block this address?

3                What did you mean when you said that?

4        A.     We have a filtering software that e-mail as

5   it comes into the company -- we can set up rules to

6   block spam or a black list, it is called, of addresses.

7   And I asked if I could set up a filter to block that

8   address.

9        Q.     That MattKostolnik@Yahoo.com address?

10       A.     Yes.

11       Q.     And did you get permission to do that?

12       A.     Yes.

13       Q.     And did you set up a rule on that server to

14  segregate out the e-mails?

15       A.     Yes.

16       Q.     You said to block the address.  Did it

17  actually stop it from coming in or did you just

18  segregate it and put it somewhere else on the server?

19       A.     It just moved it to a folder that I set up,

20  so it didn't arrive in Outlook or the client software.

21       Q.     Okay.  After February 22nd, 2009, did anymore

22  e-mails come in from that e-mail address?

23       A.     Not that I saw.

24       Q.     Okay.  I go up again on the chain, after you

25  were able to set that up, Mr. Kostolnik had some more

1    questions for you.  This is a response to your past --

2    sorry, I will try that again to get the whole thing on

3    there, and see if I can do better.

4              It says at 9:47 a.m. he says, the yahoo

5    e-mail abuse form requests the "full header" from the

6    e-mail be copied and pasted.  Can you obtain that?

7              Did you know what he was talking about?

8    A.    Yes.

9    Q.    What does that mean, "full header?"

10   A.    Each message has an information basically of

11   route information that is included in the message, and

12   you can get to that header information in different

13   ways.

14   Q.    Most of the time when we see an e-mail, it is

15   more like in this format, is that correct?

16   A.    Yes.

17   Q.    But most e-mails have a lot more information

18   attached to them?

19   A.    Yes.

20   Q.    If we go back to Exhibit 11, and page 2,

21   which is moving up the string -- I will zoom in on a

22   portion of this.  Is that the kind of thing we are

23   talking about in terms of full header information?

24   A.    Yes.

25   Q.    So, with every e-mail that comes in, there is

1  a lot more data in it than what you would see when you

2  just open the e-mail?

3        A.      Yes.

4        Q.      This kind of data?

5        A.      Yes.

6        Q.      And I am going to ask you about this one, in

7  particular, and follow-up.  You sent the full header

8  information from all three of the e-mails that had come

9  in; is that correct?

10        A.      Yes.

11        Q.      This one refers to, I will zoom in on this,

12  an e-mail that was sent to SengerD@Moss-Barnett.com, is

13  that Dave Senger; is that correct?

14        A.      Yes.

15        Q.      And then this is header information, if I

16  blow that up from a different e-mail address; is that

17  right?

18        A.      Yes.

19        Q.      And I am pointing the arrow at the e-mail

20  address that this one is for, is that right?

21        A.      Yes.

22        Q.      Who is that to?

23        A.      Brenda Murphy.

24        Q.      And then if we go back another page, and blow

25  the header information up here; who is this?

1      A.      Phil Young.

2      Q.      So, this was relative to the e-mail to Phil

3  Young; is that correct?

4      A.      Yes.

5      Q.      Mr. Garber, if you could take a look in front

6  of you, there is an exhibit that has been marked for

7  identification as Government's Exhibit 2.  And I can

8  take that one back and put it back in its sleeve, 11.

9  But, if you would take a look at Government's Exhibit 2

10  and tell me if you recognize that?

11      A.      Yes.

12      Q.      And is that one of the e-mails that was also

13  sent on February 22nd, 2009, from the

14  mattkostolnik@yahoo.com e-mail address?

15      A.      Yes.

16      Q.      And that was sent to whom?

17      A.      Phil Young.

18      Q.      And is that what this header information

19  relates to?

20      A.      Yes.

21             MR. RANK:  I would offer Exhibit 2 at this

22  time.

23             MR. MAHONEY:  No objection.

24             THE COURT:  Government's 2 is received.

25

```
 1                  (Government's Exhibit 2 was received in

 2      evidence.)

 3      BY MR. RANK:

 4           Q.    Government's Exhibit 2 up on the screen.  Do

 5      you see that, Mr. Garber?

 6           A.    Yes.

 7           Q.    And is that -- the header information we were

 8      just looking for, is this the e-mail connected to that

 9      header information?

10           A.    It looks like it is to me.

11           Q.    And it is that same date, early morning hours

12      of Sunday, February 22nd, from the same Yahoo.com

13      address, and this is addressed to Philip Young?

14           A.    Yes.

15           Q.    And do you remember taking a look at that

16      e-mail when it came in?

17           A.    Yes.

18           Q.    That was the text that was in there?

19           A.    Yes.

20           Q.    It says, Philip, hey Phil, ask Brenda if she

21      liks, l-i-k-s me, likes me, likes me, because I like

22      her.  What can I say?  I think she's cute, purportedly

23      signed Matt.  Is that correct?

24           A.    Yes.

25           Q.    I am going to ask you, Mr. Garber, if you
```

```
 1    would take a look at Exhibit 5 which is also in front of

 2    you?

 3                     Would you look at the first page of

 4    Exhibit 5?  Do you recognize that?

 5         A.     This one here?

 6         Q.     There is an exhibit sticker on the bottom

 7    corner and it says 5 on it.  Do you recognize that?

 8         A.     I am not sure which one you want me to look

 9    at.

10         Q.     This exhibit.

11         A.     Oh, I'm sorry, yes.

12         Q.     Do you recognize that?

13         A.     Yes.

14         Q.     Is that an e-mail also on February 22nd,

15    2009?

16         A.     Yes.

17         Q.     From the mattkostolnik@yahoo.com e-mail

18    address?

19         A.     Yes.

20         Q.     To Dave Senger?

21         A.     Yes.

22         Q.     And is that one of the e-mails that you saw

23    that had come in and that you reported to Matt

24    Kostolnik?

25         A.     Yes.
```

1    Q.    There are a couple of attachments that are on

2  there, pages 2 and 3 of Exhibit 5.

3          Do you see those?

4    A.    Yes.

5    Q.    And those are, the attachments are what are

6  called redacted.  Do you know what I mean by that?

7    A.    Yes.

8    Q.    It means that there are some black boxes put

9  over the picture.  When that e-mail came in it had some

10  attachments on it, is that correct?

11   A.    Yes.

12   Q.    And when the e-mail came in, were the

13  attachments redacted or were they unredacted?

14   A.    Unredacted.

15   Q.    Meaning they didn't have the black boxes on

16  them?

17   A.    Yes.

18          MR. RANK:  I offer Government's Exhibit 5.

19          MR. MAHONEY:  No objection.

20          THE COURT:  Government's 5 is received.  Just

21  so it is clear, Government's 5 is received and that is

22  with the redacted attachments.

23          (Government's Exhibit 5 was received in

24  evidence.)

25          MR. RANK:  It is, Your Honor, and there are

1    for purposes of this, unredacted versions that I will be

2    asking about as well, that will be as part of the

3    exhibit.

4              THE COURT:  All right.

5    BY MR. RANK:

6         Q.    Mr. Garber, this is, I will focus in on the

7    top portion of it, as you indicated an e-mail again

8    dated February 22nd, 2009, at 1:03 a.m., and it is from

9    the mattkostolnik@yahoo.com e-mail address to Dave

10   Senger with a subject line, family pic from Matt.

11             Do you see that?

12        A.    Yes.

13        Q.    And then there are a couple of attachments on

14   there.  One is entitled "Matt's Kids," and the other is

15   entitled "Cher," is that correct?

16        A.    Yes.

17        Q.    When you advised Matt Kostolnik about the

18   other two e-mails besides the one he was aware of from

19   Brenda Murphy, and you told him that they were graphic,

20   did you indicate to him that there were some pictures

21   that were attached to the e-mail?

22        A.    Yes.

23        Q.    Did he express some concern about graphic

24   pictures, one of which was entitled "Matt's Kids?"

25        A.    Yes.

1      Q.     Did he tell you why he was concerned?

2      A.     Well, just not knowing what they were and

3  wanting to know what they were.

4      Q.     It is labeled his kids, something like that?

5      A.     Correct.

6      Q.     Did you then provide him with access to the

7  e-mails so he could look at the attachments?

8      A.     Yes.

9      Q.     And when -- you looked at the attachments as

10  well, is that correct?

11      A.     Yes.

12      Q.     And the attachments that were there -- I am

13  going to show you page 2 of Exhibit 5.

14             Do you see that?

15      A.     Yes.

16      Q.     Again, this is an unredacted version of that

17  attachment.  Is that what the attachment looked like

18  when you opened it?

19      A.     Yes.

20      Q.     And then we move on to the next page.  This

21  is the attachment that is entitled, "Cher."  The version

22  that was attached to the e-mail that was sent to Dave

23  Senger, was that redacted or unredacted?

24      A.     Unredacted.

25      Q.     Meaning the black bars were not on it?

1        A.     Yes.

2               MR. RANK:  Your Honor, at this point in time,

3    at least with respect to page 2, the "Matt's Kids"

4    attachment, Your Honor, I would ask that the Court read

5    a stipulation that the parties have reached?

6               THE COURT:  All right.  Mr. Mahoney?

7               MR. MAHONEY:  I have no objection, Your

8    Honor.

9               THE COURT:  All right.

10              MR. RANK:  And this is, Your Honor, for our

11   purposes will also be offered as Government's

12   Exhibit 81.

13              THE COURT:  Any objection to 81, Mr. Mahoney?

14              MR. MAHONEY:  No, Your Honor.

15              MR. RANK:  Your Honor, in 81 there is a

16   stipulation and below the stipulation is the Court's

17   instruction on --

18              THE COURT:  I see that.  I am now going to

19   read a stipulation into the record.

20              I mentioned the word stipulation at the

21   beginning of the case, as a judge oftentimes does.  I

22   first will instruct you what the rule of law is.  In

23   this case the Government and the Defendant have

24   stipulated, that means, certain facts that I am about to

25   state to you, and you must therefore treat these facts

1   as having been proved based upon this stipulation.

2           I will now read the facts that are the

3   subject of the stipulation into the record.  The United

4   States of America by and through its undersigned

5   attorney, and the Defendant by and through his

6   undersigned attorney hereby enter into the following

7   stipulation and respectfully request that the following

8   be read into the record.

9           And now I will read the stipulation, itself.

10  The parties stipulate that the image charged in Counts 4

11  and 5 of the indictment depicts identified minor

12  children engaged in sexually explicit conduct, and the

13  image was transported in interstate or foreign commerce.

14  And that ends the stipulation.

15          MR. RANK:  And Your Honor, that will be

16  available to the jury as Exhibit 81, as well?

17          THE COURT:  Yes.

18          MR. RANK:  Thank you.

19          THE COURT:  And 81 has been received.

20          (Government's Exhibit 81 was received in

21  evidence.)

22  BY MR. RANK:

23      Q.    Now, Mr. Garber, I am going to ask you,

24  there are two in envelopes that are in Exhibit 5; is

25  that correct?

1       A.     Yes.

2       Q.     They are sort of brown envelopes.  And on the

3  cover of one of them it says the unredacted version of

4  page 3 -- excuse me, page 2 of Exhibit 5.

5              Do you see that?

6       A.     Yes.

7       Q.     Can you briefly take a look at that and tell

8  me whether that is the version of the attachment that

9  came in without the redaction?  And you don't have to

10 show anybody, just look at it.  Is that the unredacted

11 version?

12      A.     Yes.

13      Q.     Thank you.  And then if you would do the same

14 thing with the next envelope, which I believe should be

15 entitled Exhibit 5, page 3, the unredacted version.

16      A.     Yes.

17      Q.     And that is -- let me show you the screen.

18 That is page 3 on the screen in a redacted form.  What

19 you looked at is the version as it came in as the

20 attachment?

21      A.     Yes.

22      Q.     Mr. Garber, I am going to take you back to --

23 I am going to try to take you back to Exhibit 11, if I

24 could type better.  There we go.  We had talked a little

25 bit about the full header information.

1          You apparently sent -- I will just blow up a

2     portion of it, here.  At 9:50 a.m. on Monday,

3     February 23rd, you sent that full header information

4     from all three of those e-mails to Matt Kostolnik and to

5     Cheryl Thompson, is that right?

6          A.     Yes.

7          Q.     Were you at some point in time put in contact

8     with some members of law enforcement?

9          A.     Yes.

10         Q.     And who, in particular, did you deal with in

11    law enforcement after this date?

12         A.     I'm sorry, I don't remember the name, but in

13    the Sheriff's Department.

14         Q.     Does the name Detective Pat O'Hara sound

15    familiar?

16         A.     Yes.

17         Q.     And did Detective O'Hara ask you for

18    additional information over the course of the next days

19    and weeks?

20         A.     Yes.

21         Q.     And was this one of the types of information

22    that you provided to Detective O'Hara?

23         A.     Yes.

24         Q.     Did you also provide him with electronic

25    copies of the e-mails to Brenda Murphy, to Philip Young

1    and to Dave Senger?

2         A.    Yes.

3         Q.    Did you also at some point in time provide

4    some information to Special Agent Robert Cameron of the

5    FBI?

6         A.    Yes.

7         Q.    Similar types of information, header

8    information, and electronic versions of the e-mails?

9         A.    Yes.

10        Q.    Besides this e-mail on February -- or excuse

11   me, the e-mails on February 22nd and the e-mail headers

12   regarding that, were there any other e-mails that came

13   in that were of a suspicious nature that you were aware

14   of?

15        A.    Could you tell me the dates again?

16        Q.    Sure.  I guess I asked a very long and

17   winding question.  Let me ask a more specific one.

18              I asked you about the e-mails in February to

19   Brenda Murphy, Dave Senger and Philip Young?

20        A.    Yes.

21        Q.    After those e-mails came in, were there any

22   other e-mails related to Matt Kostolnik that came in to

23   Moss & Barnett that were of a suspicious nature?

24        A.    Yes.

25        Q.    What other e-mails came in?

1    A.    There was one that I am aware of from a Mary

2  Sill that was about a month later, I think.

3    Q.    Okay.  And was that something that you were

4  asked also to provide information about that e-mail to

5  law enforcement?

6    A.    Yes.

7    Q.    Other than what we have talked about today in

8  terms of your knowledge of the February e-mails and the

9  March e-mails, did you have much more to do with

10  following up on these e-mails, other than responding to

11  law enforcement requests?

12    A.    No.

13    Q.    You knew that the case had been turned over

14  and was being investigated by law enforcement?

15    A.    Yes.

16    MR. RANK:  All right.  Thank you, Mr. Garber.

17  I have no further questions, Your Honor.

18    THE COURT:  You may inquire if you wish, Mr.

19  Mahoney?

20    MR. MAHONEY:  No questions.

21    THE COURT:  You may step down, sir.  Thank

22  you.  And I will assume, unless otherwise informed by

23  either lawyer that Mr. Garber is excused at this time?

24    MR. RANK:  Yes, Your Honor.

25    THE COURT:  All right.

1              MR. RANK:  Thank you, Mr. Garber.

2              (Witness excused.)

3              THE COURT:  You may call your next witness?

4              MR. RANK:  The United States calls Dave

5    Senger.

6              May I collect the exhibits, Your Honor?

7              THE COURT:  Certainly.

8              Do you want to step forward, sir?  Kind of

9    stay to the right of the courtroom and come close to the

10   witness stand here.  And before you step into the

11   witness box, if you would please raise your right hand?

12             (Witness sworn.)

13             There is a step up there.  If you would

14   please have a seat behind the microphone?  And once you

15   are seated, as I say to everyone, you have to stay

16   fairly close to that mike or it won't pick you up.

17   Would you please state your full name and spell your

18   last name?

19             THE WITNESS:  Dave Senger, S-e-n-g-e-r.

20             THE COURT:  You may inquire, Mr. Rank.

21             MR. RANK:  Thank you, Your Honor.

22                       DAVE SENGER

23                   DIRECT EXAMINATION

24   BY MR. RANK:

25       Q.    Good morning, Mr. Senger.

1      A.      Good morning.

2      Q.      Mr. Senger, where do you work?

3      A.      I work at a law firm called Moss & Barnett.

4      Q.      And what do you do at Moss & Barnett?

5      A.      Well, I am a lawyer, and I am also Chairman

6  of the Board.  So, I spend most of my time working with

7  clients and a little bit of time managing the firm.

8      Q.      And how long have you been an attorney, sir?

9      A.      31 years.

10     Q.      And how long have you been doing that work at

11  Moss & Barnett?

12     A.      Since 1985.

13     Q.      So --

14     A.      25 years?

15     Q.      Okay, good.  And you already indicated that

16  you hold the position of Chairman of the Board of Moss &

17  Barnett.  Can you describe for the jury what that means?

18     A.      We have a Board of Directors that is

19  responsible for overseeing the firm's operations.  It is

20  a board of six members.  And as Chairman of the Board, I

21  lead the Board meetings and I take the initiative to set

22  the agenda and do that kind of thing.

23     Q.      And with that position, is it accurate to say

24  that you are the head of the firm?

25     A.      Yes.

1    Q.    Now, sir, did you hold that position in

2  February of 2009?

3    A.    Yes, I did.

4    Q.    And sir, I am going to show you an exhibit

5  that is already in evidence, and this is an e-mail

6  apparently addressed to you, dated Sunday, February

7  22nd, 2009.  Do you recall that e-mail?

8    A.    Yes, I do.

9    Q.    Did you receive it?

10    A.    Yes.

11    Q.    And do you recall approximately when it was

12  that you received it?

13    A.    Well, it was a weekend in February of '09.

14  And I was at home.  And I believe it was a Sunday

15  morning.  And I had logged on to the computer, and had

16  logged into our firm's computer system to read my

17  e-nails that would have come at the firm.

18    Q.    And this is an e-mail that was addressed to

19  you at your Moss & Barnett e-mail address?

20    A.    Yes, it is.

21    Q.    And when you got this, did you -- first of

22  all I will blow the whole portion of it up so we can see

23  the text of the e-mail, as well.

24          Did you see who it was from?

25    A.    Yes, I did.

1    Q.    And at the time that you received this, did

2    you have a lot of familiarity with Matt Kostolnik?

3    A.    Well, I know Matt Kostolnik as one of the

4    approximately 65 lawyers in our firm.

5    Q.    And what kind of work do you do, sir?

6    A.    I do two types of work.  I represent

7    privately-owned businesses, doing a wide variety of

8    corporate law, and then I also do estate planning work.

9    Q.    You are more of what is called a

10   transactional lawyer?

11   A.    That would be correct.

12   Q.    And just in terms of how civil lawyers work,

13   there are two broad camps of civil lawyers, some people

14   that do transactional work, some people that do

15   litigation work?

16   A.    And that is how our firm is divided, into two

17   groups.

18   Q.    And in general, do the transactional lawyers

19   do more work with the transactional lawyers, and the

20   litigation lawyers do more work with the litigation

21   lawyers?

22   A.    That is generally true, yes.  But, there is

23   some interaction --

24   Q.    Mr. Kostolnik, what area would he have worked

25   in?

1        A.      Matt was a litigation lawyer.

2        Q.      Did you have a lot of interaction with Matt

3   Kostolnik prior to February of 2009?

4        A.      Relatively small amount.

5        Q.      You were, though, the head of Moss & Barnett?

6        A.      Yes.

7        Q.      And so you received this e-mail from a person

8   who is identified as Matt Kostolnik at your firm e-mail

9   address sometime on Sunday, February 22nd?

10       A.      Yes.

11       Q.      When you got it, did you open either one of

12  the attachments?

13       A.      I opened one attachment.

14       Q.      And can you, if you would, describe to the

15  jury what happened when you opened it up?

16       A.      It was horrible.  I felt like puking.

17       Q.      And it was -- in general, can you describe

18  it?

19       A.      It was what appeared to be -- well, it was

20  pornography.  And it seemed to be child pornography.

21              MR. RANK:  Your Honor, may I approach the

22  witness?

23              THE COURT:  You may.

24  BY MR. RANK:

25       Q.      Mr. Senger, I am going to ask you just

1    briefly to take a look at page 2 of Exhibit 5, and tell

2    me if page 2 of Exhibit 5 shows what you saw when you

3    opened that attachment?

4         A.    It is, except for the blacked-out stuff.

5         Q.    That is a redacted version, is that correct?

6         A.    Right.

7         Q.    What you saw was not redacted?

8         A.    That is correct.

9         Q.    After you -- after you got the e-mail, opened

10   the attachment, did you open the second attachment?

11        A.    I did not.

12        Q.    What did you do with that e-mail?

13        A.    Well, I eventually deleted it.  I don't

14   recall if I forwarded it to Tom Shroyer, the president

15   of our firm or not.  I frankly didn't know what to do.

16        Q.    Okay.  Did you in some way report the e-mail,

17   itself, to someone?

18        A.    Yes, I went to see Tom Shroyer, who is the

19   president of our firm, the next week.  I don't recall

20   when I talked to him that week -- as soon as he was

21   available.  I don't remember if he was out of town,

22   initially, but as soon as I could get to see him live, I

23   went and talked to him.

24        Q.    And you mentioned Tom Shroyer as the

25   President of the Board.  Is he someone who is also on

1  the Management Committee of the firm?

2      A.     Yeah, Tom is on the Management Committee and

3  on the Board of Directors.  And just to clarify, the

4  Management Committee is three people who are also on the

5  Board of Directors who gets a little more involved in

6  the day-to-day management of the firm than the Board of

7  Directors does.

8      Q.     Okay, and just with respect to Mr. Shroyer,

9  is he more of a nuts and bolts guy, day-to-day

10  operations guy?

11      A.     Yes.  Tom spends more time on the management,

12  far more time than I do.

13      Q.     And you turn the e-mail over to him?

14      A.     I don't remember if I turned the e-mail over

15  to him.  I went and talked to him and I turned over the

16  whole issue to him.

17      Q.     That is, I guess, what I was trying to ask.

18  You turned over the issue of following up on the e-mail

19  to him?

20      A.     Yes.  And we decided I would stay out of it

21  and he would do whatever had to get done.

22      Q.     After that time period and up until when this

23  case was preparing for trial, did you have any knowledge

24  of what happened to that e-mail?

25      A.     I did not.

1      Q.    Kind of stepped away from it and let Tom

2  handle it?

3      A.    Yes.

4      Q.    Okay.  I have no further questions, Mr.

5  Senger?

6           THE COURT:  Mr. Mahoney, you may inquire if

7  you wish.

8           MR. MAHONEY:  I have no questions.

9           THE COURT:  You may step down, sir.  Thank

10  you.  You may call your next witness.

11           (Witness excused.)

12           MR. RANK:  Thank you, Your Honor.  The United

13  States calls Pat O'Hara.

14           THE COURT:  Sir, if you want to step to the

15  front of the courtroom kind of towards, it would be your

16  right up here, towards this witness stand in front of

17  the big screen?  And before you step into the witness

18  box, would you please raise your right hand?

19           (Witness sworn.)

20           THE COURT:  There is a step up, but if you

21  would please have a seat behind the witness -- in the

22  witness stand and behind the microphone?  And you will

23  have to stay fairly close to the mike or it won't pick

24  you up very well.  And if you would please state your

25  full name and spell your last name?

 1               THE WITNESS:  Patrick William O'Hara, O,

 2   apostrophe, H-a-r-a.

 3               THE COURT:  You may inquire, Mr. Rank.

 4               MR. RANK:  Thank you, Your Honor.

 5                       PATRICK O'HARA

 6                     DIRECT EXAMINATION

 7   BY MR. RANK:

 8       Q.     It is Detective O'Hara, correct?

 9       A.     Correct.

10       Q.     And Detective O'Hara, where do you work?

11       A.     I work for the Anoka County Sheriff's Office.

12       Q.     And what do you do for the Anoka County

13   Sheriff's Office?

14       A.     I am a detective.

15       Q.     And how long have you been with the Anoka

16   County Sheriff's Office?

17       A.     13 years.

18       Q.     Is that the entire time you spent in law

19   enforcement?

20       A.     Correct.

21       Q.     What kinds of positions have you held at the

22   Anoka County Sheriff's Office.

23       A.     Most recently a detective in our major crime

24   unit.  Before that, investigator in our lower level

25   crimes.  Then I was in a civil process unit.  Before

1  that, patrol, drove a squad car.

2      Q.    Is it fair to say that by the time someone

3  makes a detective in a sheriff's office, they have often

4  worked multiple different areas of the sheriff's office?

5      A.    That is correct.

6      Q.    Often starting as a road deputy?

7      A.    That is correct.

8      Q.    That is what you did?

9      A.    Yes.

10     Q.    Do you have as a detective with the Anoka

11  County Sheriff's Office any particular assignments?

12     A.    Our main assignments would be like homicide

13  or death investigation, sexual assaults, child abuse,

14  and my expertise is technology associated with those

15  crimes.

16     Q.    And are you assigned to any task forces as

17  part of your job with the Anoka County Sheriff's Office?

18     A.    Yes.  I am a member of what is called the

19  Minnesota Internet Crimes Against Children Task Force.

20     Q.    Okay.  And what does the Minnesota Internet

21  Crimes Against Children Task Force do?

22     A.    It is a group of several local state and

23  federal law enforcement agencies that formed a task

24  force to combat child pornography.

25     Q.    Child pornography and child exploitation?

1      A.      Correct.

2      Q.      The Internet Crimes Against Children Task

3   Force investigates both child pornography offenses on

4   the internet, as well as enticement, luring, bringing in

5   kids for sexual purposes?

6      A.      Correct.

7      Q.      Have you received any specialized training or

8   do you have any specialized background to become a

9   member of the Internet Crimes Against Children Task

10  Force or to investigate these type of cases?

11     A.      I do.   I have somewhat of a unique

12  background, being an electronics technician, I have a

13  degree in electronics and computers prior to being in

14  law enforcement.   I also have been trained through this

15  Internet Crimes Against Children through -- its called

16  Fox Valley Technical College, they offer many classes

17  for our task force.   I have also been trained by some

18  various private companies, software vendors, including

19  Microsoft.   I am also a member of the High Technology

20  Crime Investigators Association and serve on the Board

21  on that Unit, as well.

22     Q.      And in particular, focusing on the training

23  that you received in connection with the Internet Crimes

24  Against Children Task Force, can you describe some of

25  the training courses that you have taken?

1    A.    Some of the courses include like undercover

2  chatting, where we would pose as a child to adults on

3  the internet.  Also, learning on how to trace e-mails,

4  conduct internet investigations, things like that.

5    Q.    Okay.  As part of your duties with the Anoka

6  County Sheriff's Office, were you assigned to a case

7  that was reported to the Sheriff's Office by Matt

8  Kostolnik in February of 2009?

9    A.    I was.

10    Q.    How was it that that investigation came to

11  you?

12    A.    Mr. Kostolnik lives in Anoka County.  He had

13  reported the incident to another detective that I work

14  with.  And once that detective learned that it was a

15  technology-assisted crime, he referred it to me.

16         THE COURT:  Can we move up just a bit closer

17  to the microphone, sir, so everybody can hear?  Thank

18  you.

19  BY MR. RANK:

20    Q.    Detective, I think you can actually grab the

21  microphone and slide it closer to you.  I think there is

22  enough -- there is a cord on there, so if you pull the

23  base of it to you, you can get it a little closer.

24    A.    Sure.

25    Q.    Thanks.  It is a little awkward, but it

1    helps.

2            So, do you recall approximately when it was

3    that the investigation came to you?

4        A.      February, March of, it would have been '09.

5        Q.      What was it that you learned when you first

6    heard about it?

7        A.      The complainant, Mr. Kostolnik, reported that

8    he received some e-mails at his workplace.  The e-mails

9    depicted that they were coming from him, but he

10   explained that they weren't coming from him.

11           Also, the e-mails depicted that he was

12   sending photographs of his children, photographic child

13   pornography.

14       Q.      And so what did you do to follow-up on that

15   report?

16       A.      I next tried to determine, you know if a

17   crime had actually been committed.  I was put in touch

18   with Mr. Kostolnik's employer and ultimately a man by

19   the name of Bruce Garber who is their technical person.

20       Q.      He worked in the IT staff?

21       A.      Correct.

22       Q.      And did you get some things from Mr. Garber?

23       A.      Yeah, particularly, in my training and

24   experience, in order to trace an e-mail there are

25   certain things that need be obtained from the e-mail.

1   And that is done by a technical person at the place of

2   business, or whatever.  That person being Bruce Garber.

3        Q.    Okay.  Do you need certain information more

4   than just sort of that face of the e-mail in order to

5   trace it?

6        A.    Yeah, an e-mail, typically the person would

7   only see the body, meaning just the text.  Well, there's

8   also other parts of the e-mail that you don't normally

9   see.  And those other parts are the parts that we need

10  in order to trace it.

11       Q.    I am going to show you an exhibit that has

12  previously been admitted into evidence.  This is

13  Government's Exhibit 5.  Is this one of the e-mails that

14  you had obtained as part of your initial investigation?

15       A.    That is correct.

16       Q.    And you said, Detective O'Hara, one of the

17  first things you needed to do was determine whether a

18  crime had been committed; is that correct?

19       A.    Correct.

20       Q.    And did you determine, based on your review

21  of those first three e-mails whether any crime was

22  apparent on the face of those e-mails?

23       A.    Yeah.  Based on my training and experience, I

24  know that there is an attachment on this e-mail called

25  "Matt's Kids."  And I know that to be child pornography.

1      Q.      And that is, go to page 2 of Exhibit 5.  This

2   is one of the attachments, correct?

3      A.      Correct.

4      Q.      And you saw this after the e-mail was

5   provided to you?

6      A.      That is correct.

7      Q.      Is this a piece of child pornography that you

8   are familiar with?

9      A.      I have seen that before.

10     Q.      How is it that you have seen it before?

11     A.      It is part of what is called a known series.

12  On investigations such as these, there is some common,

13  we call them series, that we see several times.  And

14  this being one of the series that we have seen before.

15  And it is documented at what is called the National

16  Center for Missing and Exploited Children.

17     Q.      There is a database of known child

18  pornography at the National Center?

19     A.      That is correct.

20     Q.      This is from one of those series?

21     A.      Correct.

22     Q.      Some of one that you had seen before?

23     A.      Correct.

24     Q.      Okay.  And so, based on that, it merely

25  confirmed your belief that a crime had been committed?

1       A.      Correct.

2       Q.      And that crime was transmission of child

3  pornography?

4       A.      Correct.

5       Q.      Now, you said that you asked for the

6  additional information from Mr. Garber related to that

7  e-mail and the other e-mails, is that right?

8       A.      Right.

9       Q.      I am going to show you another exhibit that

10  has already been admitted into evidence.  And this is

11  page 1 of Government's Exhibit 11.  Is the blowup on

12  page 2 of Government's Exhibit 11, is that the kind of

13  header information that you got from Mr. Garber?

14       A.      That is correct.

15       Q.      In general, what kinds of things can you

16  learn from header information on e-mails?

17       A.      Header information is similar to like an

18  envelope you would write an address to, a return

19  address.  This header information would give us

20  indications of where this letter would have came from.

21       Q.      Do you remember what kind of an e-mail

22  account the e-mail was sent from?

23       A.      Yahoo.

24       Q.      Yahoo.com?

25       A.      Correct.

1      Q.      And Yahoo.com e-mails, are those e-mails that

2   they verify the people that are creating those e-mail

3   accounts?

4      A.      Not at all.

5      Q.      They are what are called web-based e-mails?

6      A.      That is correct.

7      Q.      And if you sign up for them, you can sort of

8   give yourself any name?

9      A.      Yeah.  Most are free.  You don't have to

10  provide any identification to prove who you are or

11  anything like that.  You just pick a name that you want

12  to be known as and that is it.

13     Q.      I could create one called Detective Pat

14  O'Hara@Yahoo.com?

15     A.      If no one has that name already; yes, you

16  can.

17     Q.      Is there any information that you can glean

18  from e-mail header information on a web-based account

19  that will give you some indication of its source?

20     A.      Yes, we can.

21     Q.      What kind of information is that?

22     A.      Basically in this header information, it will

23  show you typically where it originated from.

24     Q.      Okay, and I am blowing up a portion right

25  here.  Is this the area that you are talking about?

1      A.      That is correct.

2      Q.      So, if I blow that up, it says received, and

3 then there is a colon, and from, and then in square

4 brackets there a series of numbers, 71.34.6.6; is

5 that correct?

6      A.      That is correct.

7      Q.      What is that?  In general, what is that?

8      A.      In general, those numbers mean something to

9 us as far as tracing.  Those numbers are called an IP

10 address.

11     Q.      What does IP stand for?

12     A.      IP, internet protocol, and it is basically

13 like a telephone number.  Every device that gets on the

14 internet has to have this number.  And those numbers are

15 similar to like a phone number.

16     Q.      It is a unique number?

17     A.      Yes.

18     Q.      So, anybody that is connecting up to the

19 internet, they have to have one of these numbers in

20 order to get access to the internet?

21     A.      That is correct.

22     Q.      So, what did you do once you found that

23 number from the header information you got from Bruce

24 Garber?

25     A.      Based on that number, there is another

1    database that we can check to see who owns this block of

2    numbers.  So, it is similar to like a phone company.  We

3    could look up to see, okay, who owns 763444, you know,

4    we can look that up and it will give us a company.

5         Q.    Did you do that for this number?

6         A.    Yes.

7         Q.    What did you find out?

8         A.    Learned that this block of numbers belongs to

9    Qwest.

10        Q.    Once you found out that the block of numbers,

11   that this number would then belong to Qwest, what can

12   you do with that information?

13        A.    Based on that information we can get a legal

14   document, an order for the company to turn us over the

15   documents belonging to that account.

16        Q.    Issue a subpoena to Qwest and say, who was it

17   that had this number at this time?

18        A.    Correct.

19        Q.    So, you could take that number, send it to

20   Qwest and say on the date and time this e-mail went out

21   who had this internet protocol number?

22        A.    Correct.

23        Q.    And did you do that?

24        A.    Yes.

25        Q.    What did you learn?

1      A.      I learned that indeed it was a Qwest number,

2   and in fact belonged to Matt Kostolnik.

3      Q.      And so this e-mail was sent from an internet

4   account belonging to Matt Kostolnik?

5      A.      Yes.

6      Q.      And that indicated it was sent through his

7   internet account, is that correct?

8      A.      Yeah.

9      Q.      Did you do some follow-up investigation to

10  determine what kind of an internet connection that the

11  Kostolniks had?

12     A.      I did.

13     Q.      What exactly did you do?

14     A.      I did what is called a wireless survey, drove

15  basically to the Kostolniks' home and conducted a survey

16  to see what wireless connections are in his area.

17     Q.      Okay.

18     A.      Determined that Mr. Kostolnik had a wireless

19  connection.

20     Q.      And that is meaning that, as opposed to a

21  hardwired connection?

22     A.      Correct.  It is similar to like if you have a

23  cordless phone in your house.  Most people have a

24  cordless phone now, instead of a hardwired phone,

25  similar technology.

1      Q.    Can you protect -- if you have a wireless

2  router, can you protect your wireless router from people

3  getting access to it?

4      A.    You can.

5      Q.    How can you do that?

6      A.    It is based on a theory or a security called

7  encryption.

8      Q.    Encryption?

9      A.    Yes.

10     Q.    And in general, is that sort of like password

11 protecting your router?

12     A.    Similar to like a password, yes.

13     Q.    If you are connecting up to a wireless device

14 that is encrypted or secured, generally speaking you

15 have to enter in a password?

16     A.    Generally.

17           MR. MAHONEY:  Objection, Your Honor.  Mr.

18 Rank is leading the witness through expert testimony.

19           THE COURT:  Sustained as to the form of the

20 question.  Allow the inquiry, but sustain as to form.

21 All right?

22           MR. RANK:  I will rephrase, Your Honor.

23 BY MR. RANK:

24     Q.    If a router is encrypted in order to connect

25 to that router is there anything you have to do?

1          A.       Typically, you have to do what is called

2     authenticating.  Authenticating may be a password,

3     something of that nature.

4          Q.       Encryption key?

5          A.       Correct.

6          Q.       When you did the survey, the wireless survey

7     in the neighborhood and you concluded that the

8     Kostolniks had a wireless router, did you find out

9     whether it was encrypted in any way?  Could you tell

10    from your survey?

11         A.       I could tell based on the readings that I

12    took that it was encrypted.

13         Q.       And did it give an indication of what kind of

14    encryption was on the Kostolniks' wireless router?

15         A.       Yes.

16         Q.       And what kind of encryption was it?

17         A.       The particular encryption that Mr. Kostolnik

18    had on his router was called W-E-P.

19         Q.       Is that also sometimes referred to as WEP?

20         A.       Yeah, WEP or its equivalent privacy.  It is a

21    sort of low-level encryption.

22         Q.       Okay.  And is that something --

23              MR. MAHONEY:  Your Honor, I am going to

24    object to this witness' testimony regarding the

25    expertise on -- his expertise regarding being able to

1  define the computer and security encryption and WEP

2  technology.

3              MR. RANK:  I am happy to lay additional

4  foundation, Your Honor.

5              THE COURT:  Anything further Mr. Mahoney?

6              MR. MAHONEY:  No, Your Honor.

7              THE COURT:  Well, to the extent that the

8  objection is foundation, the Court will sustain and

9  require additional foundation.

10              MR. RANK:  Thank you, Your Honor.

11  BY MR. RANK:

12      Q.      Detective O'Hara, as part of your training

13  and experience in working in the Crimes Against Children

14  Task Force, have you received some specialized training

15  in wireless technology?

16      A.      I have.

17      Q.      And have you also learned as part of your

18  training about the different types of wireless

19  encryption standards there are?

20      A.      There are several, yes.

21      Q.      And as part of your training, have you

22  learned that there are different levels of strength of

23  those wireless encryption standards?

24      A.      There are.

25      Q.      And when you learned that, what did you learn

1  about the various encryption standards?

2       A.    Well, there is -- a router can have higher

3  levels of security, starting at no security.  The next

4  step would be what is called WEP, which is usually the

5  default of the router.  You can increasingly increase

6  the security of the router.  The next one would be WPA,

7  there is another one called WPA-2 and perhaps a couple

8  of others.

9       Q.    And based on your training and experience,

10  were you aware that WEP encryption is something that was

11  capable of being compromised?

12       A.    Yes, there are documented instances where WEP

13  has been vulnerable since 2001.

14       Q.    Is that something that would be well known in

15  the hacker community?

16       A.    Well known.

17       Q.    In addition to the information that you

18  received back from Qwest on this IP address, Detective

19  O'Hara, did you ever do any research into the Yahoo.com

20  e-mail address?

21       A.    Yes.

22       Q.    What did you do, sir?

23       A.    Similarly to the Qwest, sent a subpoena to

24  Yahoo, an order for subscriber records related to the

25  e-mail account.

1    Q.    And what did you learn when you got that

2  information back from Yahoo?

3    A.    Again, obtained some identifying numbers,

4  similar to that 71.34.

5    Q.    Actually, let me just ask and blow up a

6  portion of it right here.  This is the e-mail address we

7  are talking about, the mattkostolnik@yahoo.com?

8    A.    Correct.

9    Q.    Did you learn from Yahoo.com when that e-mail

10  address was created and when it was created?

11    A.    Yes.

12    Q.    What did you learn?

13    A.    I don't recall off the top of my head.  It

14  was created sometime before the incident with the

15  "Matt's Kids" picture.

16    Q.    And do you remember where it was created?

17    A.    I believe that was created at one of the

18  Hennepin County libraries.

19    Q.    If I showed you a document -- first of all,

20  did you create a report in connection with your

21  investigation?

22    A.    Correct.

23    Q.    If I showed you a document, would it refresh

24  your recollection as to the timing of the creation of

25  that Yahoo account?

1     A.     Yes.

2            MR. RANK:  May I approach, Your Honor.

3            THE COURT:  You may.

4   BY MR. RANK:

5     Q.     Without reading this out loud, Detective, if

6   you want to decide to look at your report and tell me

7   if, first of all, that refreshes your recollection?

8     A.     It does.

9     Q.     And based on your refreshed recollection,

10  what date was it that that Yahoo.com account was

11  created?

12    A.     November 19th, 2008.

13    Q.     And if you -- it is November 19th.  Is there

14  a time on that?

15    A.     There would be.  It would be on my subpoena

16  that I requested from Yahoo.

17    Q.     Sometimes on the times that you get, are they

18  often different than central time?

19    A.     Yes.

20    Q.     So, sometimes on subpoena returns you are

21  getting a time that is based on either where the company

22  is located; is that correct?

23    A.     Many times it is Pacific time.  That is where

24  the companies are.

25    Q.     And is it often also the case that companies

 1  will use a standardized time?

 2       A.     Yes, Greenwich Mean Time.

 3       Q.     Greenwich Mean Time?

 4       A.     Yes.

 5       Q.     Okay.  Let me actually step back for a second

 6  and ask you, sir, you had done what you referred to as a

 7  wireless survey; correct?

 8       A.     Correct.

 9       Q.     In the Kostolniks' neighborhood?

10       A.     Yes.

11       Q.     Where was it that you actually did that?

12       A.     Right at the base of the driveway of Matt

13  Kostolnik's residence.

14       Q.     I am going to show you, sir, a map there and

15  that has been marked for identification as Government's

16  Exhibit 40.  It is a three-page exhibit.  If you could

17  take a look at all three pages and tell me if what is

18  shown there accurately reflects the area?

19       A.     That is the neighborhood, yes.

20       Q.     That is the area that you did the survey in?

21       A.     Yes.

22              MR. RANK:  I am going to offer Exhibit 40 at

23  this time.

24              (Discussion off the record.)

25              MR. MAHONEY:  No objection, Your Honor.

1          THE COURT:  Received.

2          (Government's Exhibit 40 was received in

3     evidence.)

4     BY MR. RANK:

5          Q.    I will put Exhibit 40 up on the screen and

6     zoom in on that portion right there.  Can you point to

7     or at least describe on the map approximately where it

8     was that you did the wireless survey?

9          THE COURT:  You can actually touch your

10    screen and it will --

11          THE WITNESS:  Oh, okay, sorry.

12    BY MR. RANK:

13         Q.    It is like a Madden Telestrator, so you

14    can -- there you go.

15         A.    This area here is the Kostolnik driveway.  I

16    was parked similar to where this van is, in this area.

17         Q.    Okay, you were parked right there when you

18    did the wireless survey?

19         A.    Yes.

20         Q.    And that is where you could determine that

21    the Kostolniks were running a wireless router that was

22    WEP encrypted?

23         A.    Yes.

24         Q.    Did you also when you were running that find

25    that there were other wireless access points in the

1  neighborhood?

2      A.      Several.

3      Q.      Were some of them encrypted?

4      A.      Yes.

5      Q.      Were some of then unencrypted?

6      A.      Yes.

7      Q.      Now, Detective, I am going to ask you about

8  another e-mail.  We talked about the three e-mails that

9  went out on February 22nd of 2009, correct?

10     A.      Correct.

11     Q.      After you got those e-mails and you began

12 your investigation, did you at some point in time learn

13 that another e-mail had gone to Moss & Barnett related

14 to Matt Kostolnik?

15     A.      Yes.  I believe it was on a Monday.  Mr.

16 Kostolnik called me and informed me there was another

17 e-mail that showed up over the weekend.

18     Q.      Okay.  I am going to show you an e-mail that

19 has been marked for identification as Government's

20 Exhibit 32.  Can you take a look at that and tell me if

21 you recognize it?

22     A.      That is the e-mail that Mr. Kostolnik told me

23 about.

24     Q.      Can you say who it was from, who it was to,

25 and the date of it, sir?

1    A.    It was from a person that identified

2  themselves as Mary Sill.  And it was addressed to a

3  Joseph Maternowski and Anthony Dorland.

4            MR. RANK:  I offer Exhibit 32.

5            MR. MAHONEY:  No objection.

6            THE COURT:  Received.

7            (Government's Exhibit 32 was received in

8  evidence.)

9  BY MR. RANK:

10   Q.    I will put Exhibit 32 up on the screen,

11 Detective O'Hara.  And this e-mail here is -- the

12 previous one is from a Yahoo e-mail account, is that

13 correct?

14   A.    Yes.

15   Q.    The e-mails that we saw to Dave Senger?

16   A.    Yes.

17   Q.    And that was true with the e-mails to Phil

18 Young and to Brenda Murphy, as well?

19   A.    Yes.

20   Q.    This e-mail that is in Mary Sill's name is

21 from a gmail account, is that correct?

22   A.    Yeah, very similar to like a Yahoo --

23   Q.    It is a web-based account?

24   A.    Another web-based account, yes.

25   Q.    Who owns gmail?

1      A.      Google.

2      Q.      And what, if anything, did you do in response

3  to being notified about this e-mail?

4      A.      A similar process of sending subpoenas out to

5  the company.

6      Q.      And prior to doing that and prior to

7  receiving this, what was -- you were in the middle of

8  the investigation.  What are you thinking is going on in

9  the investigation?

10      A.      Well, first I wasn't sure.  It was strange

11  that the victim, Matt Kostolnik -- the e-mails were

12  actually coming from his house.  It was sort of strange.

13  I investigated further, kept doing these subpoenas,

14  tracking down where these e-mails are coming from

15  because I truly didn't believe they were coming from

16  Matt Kostolnik, himself.  It didn't make any sense.  Why

17  would he be harassing himself?  Harassing his own

18  family?  I believe that someone was probably somehow

19  circumventing his encryption, getting on his own router

20  and sending them that way.

21      Q.      So, at this point in time what you were able

22  to do as part of the investigation is send out subpoenas

23  and get information back from -- you talked about Yahoo

24  and Qwest, is that right?

25      A.      Yes.

1     Q.     And did you do the same thing to try to get

2  some information from Google?

3     A.     Yes, I did.

4     Q.     What did you do, in particular?

5     A.     Sent off a subpoena to Google requesting

6  information on this account, this Mary Sill account.

7     Q.     What, if anything, did you learn about the

8  Mary Sill account?

9     A.     Received information that these actually

10  belonged to a Comcast account, instead of a Qwest, like

11  before.

12     Q.     So, back from Google, you learned -- did you

13  use that same sort of header information?

14     A.     Yes.

15     Q.     And determined that this e-mail account was

16  created using a Comcast internet account?

17     A.     I don't recall if it was the header, but it

18  was the information I received from Google.  I was able

19  to use that.

20     Q.     What did you do after you found that out?

21     A.     There again, sent off another subpoena to

22  Comcast, basically trying to track down where this was

23  coming from.

24     Q.     What did you get back from Google that

25  allowed you to send that additional request off to

1   Comcast?

2          A.      Again, we got what is called an IP address,

3   kind of like the phone number, like I talked about

4   before.

5          Q.      Was there an IP address associated with the

6   creation of the Mary Sill account?

7          A.      There was.

8          Q.      Can you -- do you recall when the Mary Sill

9   account was created?

10         A.      I would have to check my notes.

11         Q.      If it would refresh your recollection to

12  check your notes, go ahead, sir.

13         A.      The e-mail to Mary Sill was sent on March 8th

14  of 2009.  I don't have that information in front of me.

15         Q.      Would it be helpful to take a look at the

16  subpoena return received from Google?

17         A.      Yea.  That would help, yes.

18                 MR. RANK:  May I approach the witness?

19                 THE COURT:  You may.

20                 MR. RANK:  Actually, I will offer 153.  This

21  is a document that has been provided to counsel and a

22  document with respect to which we have a record

23  certification pursuant to Rule of Evidence 902.11, Your

24  Honor.

25                 MR. MAHONEY:  I have no objection, Your

1     Honor.

2                THE COURT:  153 is received.

3                (Government's Exhibit 153 was received in

4     evidence.)

5     BY MR. RANK:

6         Q.    So, Detective O'Hara, you can take a look at

7     Exhibit 153 which contains the Google's subpoena return.

8     Can you take a look at that and determine based on that

9     when the Mary Sill gmail account was created?

10        A.    The creation date and time was March 8th,

11    2009, 10:29 p.m. Greenwich Mean Time.

12        Q.    And so Greenwich Mean Time is some time ahead

13    of us, right?

14        A.    Yes.

15        Q.    Do you know how many hours it is?

16        A.    I believe it is like 7 hours, yeah.

17        Q.    So, it would have been created approximately

18    around the same time that the e-mail was sent?

19        A.    Correct.

20        Q.    And then this e-mail says it was sent at

21    5:37 p.m.. Can you tell from that if the e-mail account

22    was created before the e-mail was sent?

23        A.    It was created approximately 9 minutes before

24    the e-mail was sent.

25        Q.    So, created and sent all around about the

1   same time?

2        A.      Correct.

3        Q.      When you learned -- I guess I will back up

4   and ask the question.  You talked about two Comcast

5   accounts came back from that Google information, is that

6   correct?

7        A.      That is correct.

8        Q.      Indicating what?

9        A.      When I got that information back, it would

10  give a name and address of the person that owns those

11  Comcast accounts.

12       Q.      Does that indicate that during that 8 or

13  9-minute time period that the person was using two

14  different internet accounts?

15       A.      Yes.

16       Q.      And how would that be -- how would that be,

17  do you know?

18       A.      Well, whoever was sending these e-mails got

19  on to two different routers, meaning he used one

20  person's internet and then used another person's

21  internet.

22       Q.      So, you got some information back from Google

23  about those two internet accounts.  Did you issue a

24  subpoena to Comcast to find out who owned those internet

25  accounts?

1    A.    I did.

2    Q.    What did you learn?

3    A.    I learned that both accounts were not owned

4  by the same person.  They were two different people, and

5  those people lived in the same neighborhood as Matt

6  Kostolnik.

7    Q.    Okay.  Do you recall the names of the people

8  that they came back to?

9    A.    I believe it was the last name of Vang and

10  Scobbie.

11    Q.    All right.  I am going to put, sir, back on

12  the screen Exhibit 40, and this is page one of

13  Exhibit 40.  That is the aerial map of the neighborhood

14  around the Kostolnik's residence, is that correct?

15    A.    That is.

16    Q.    And as you can see, there are also a couple

17  of houses that are marked on there at the top, the

18  houses marked for Vang, is that correct?

19    A.    That is correct.

20    Q.    Do you know, is that one of the people that

21  the Mary Sill e-mail account came back to being used?

22    A.    Yes, it did.

23    Q.    And is the other account also shown on the

24  screen?

25    A.    The Scobbie account is also shown here.

1    Q.    At the bottom?

2    A.    Yes.

3    Q.    And if I -- showing you page two of

4 Government's Exhibit 40, do you see that?

5    A.    Yes.

6    Q.    And that shows a measurement.  Are you

7 familiar with the Anoka County Property website?

8    A.    Yes.

9    Q.    And is this like a function that the Anoka

10 County Property website has on it, a measurement

11 function?

12    A.    Yes, part of their mapping software, yes.

13    Q.    You can go on the website and then kind of

14 click the two ends of it and find the distance?

15    A.    Yes.

16    Q.    Is that what page two of Exhibit 40 reflects?

17    A.    Yes.

18    Q.    And can you tell based on that how far,

19 approximately how far the Scobbie residence is from the

20 Ardolf residence?

21    A.    Approximately 150, 160 feet?

22    Q.    And if we go to page 3 of that exhibit, can

23 you also determine approximately the distance between

24 the Ardolf residence and the Vang residence?

25    A.    Similar distance, yes.

1    Q.    And both of those distances, is that within a
2  range for a wireless antenna?
3    A.    It could be, yes.
4    Q.    If the Vangs were running a wireless router
5  and the Scobbies were running a wireless router, is that
6  something that could be reached from the Ardolf
7  residence?
8    A.    It could.
9    Q.    Now, at some point in time, Detective O'Hara,
10 we talked about the e-mails, did you do some additional
11 research at some point in time and find out there was
12 something else created with Matt Kostolnik's name on it?
13   A.    Yeah, based on my training and experience, if
14 someone is being harassed, perhaps the only thing that
15 we know about isn't the only thing, so I was checking to
16 see what else might be out there in Matt Kostolnik's
17 name.
18   Q.    What did you do to find that out?
19   A.    I did a Google search on his name.
20   Q.    What did you determine when you did the
21 Google search?
22   A.    I found a, what is called a MySpace account
23 that was in Matt Kostolnik's name.
24   Q.    And were you familiar with what MySpace is
25 prior to doing that search?

1        A.      I was.

2        Q.      What is MySpace, generally speaking?

3        A.      MySpace is a social networking website.  It

4   used to be the most popular one back in 2006, since

5   overcome by Facebook.

6        Q.      Okay.  And what was it that you saw when you

7   went to that MySpace page?

8        A.      Immediately you can see the -- under what is

9   called the home page of the account, you can put

10   pictures and text.  I could see on the picture portion

11   it was the same photograph as the "Matt's Kids."

12              MR. RANK:  May I approach the witness, Your

13   Honor?

14              THE COURT:  You may.

15   BY MR. RANK:

16        Q.      Detective O'Hara, I am going to leave two

17   exhibits in front of you.  The first one is Government's

18   Exhibit 20 marked for identification, and the second one

19   is Government's 22 for identification.  If you could

20   look at Government's Exhibit 20, first of all, and tell

21   me if you recognize it?

22        A.      I do.

23        Q.      And is that a printout of the MySpace page

24   that you found when you Googled Matt Kostolnik's name in

25   March of 2009?

1        A.      Yes, this would be the first page that would

2    show up.

3        Q.      That is something you printed out?

4        A.      Yes.

5                MR. RANK:  I would offer 20.

6                MR. MAHONEY:  No objection.

7                THE COURT:  20 is received.

8                (Government's Exhibit 20 was received in

9    evidence.)

10   BY MR. RANK:

11       Q.      And as it indicates at the bottom of the

12   exhibit, it says, printout of MySpace page located by

13   Detective Patrick O'Hara on 3-17-09; is that correct?

14       A.      That is correct.

15       Q.      And it also indicates that the original has

16   been redacted for a Court exhibit; is that also correct?

17       A.      Correct.  The black boxes were not there.

18       Q.      You anticipated my question.  I am going to

19   blow this up slightly -- it is more than slightly.  I

20   will blow it up slightly and ask you about that picture.

21   You said you recognize it as a picture you have seen

22   before.  Where have you seen it before?

23       A.      This was the same photograph as the "Matt's

24   Kids" e-mail.

25       Q.      And you had indicated that the black box was

1  not there.  But, in addition to the black box there are

2  some other sort of squiggles on there.  Do you see

3  those?

4       A.     Yes, the faces of the children are

5  obliterated.

6       Q.     Are the faces of all three children

7  obliterated or just two of them?

8       A.     Just two.

9       Q.     Was that how the picture looked when you went

10  to the MySpace page?

11      A.     Yes, the white scribbles were on that.

12      Q.     Was that different than what the picture

13  looked like when it was attached to the e-mail to Dave

14  Senger?

15      A.     Yes.  The picture on the e-mail to Mr. Senger

16  did not have the scribbles.

17      Q.     And again, before you had seen it on the

18  attachment to the e-mail to Dave Senger, you were also

19  familiar with this picture; is that correct?

20      A.     Yes, it is the same, what we call the same

21  series.

22      Q.     In front of you, Detective O'Hara, is another

23  document.  And that is --  let me take this down for a

24  moment, another document that is marked for

25  identification as Government's Exhibit 22.

1           Do you see that?  It is going to be in the

2   folder I think I placed it on -- it would have been

3   right underneath --

4       A.     Yes.

5       Q.     Do you see that?  There are two versions of

6   it, Detective.  First is -- you are opening the

7   unredacted version.  If you could actually open -- pull

8   out the redacted version first?

9       A.     Yes.

10      Q.     Do you see that?  And is that a blowup of

11  that image that we were just talking about?

12      A.     Yes, what you just put on the screen.

13             MR. RANK:  I offer Exhibit 22.

14             MR. MAHONEY:  No objection.

15             THE COURT:  Received.

16             (Government's Exhibit 22 was received in

17  evidence.)

18  BY MR. RANK:

19      Q.     Sir, if you would take a look in the envelope

20  and be clear that the unredacted version is the same one

21  but without the black boxes?

22      A.     Yes.

23      Q.     And that is how it was on the MySpace page,

24  is that correct?

25      A.     That is correct.

1       Q.      I am going to go back to, sir, Exhibit 20.

2   And first of all, you got to this page simply by

3   Googling Matt Kostolnik's name, is that right?

4       A.      That is correct.

5       Q.      So, anybody that Googled his name, this is

6   one of the things that would come up?

7       A.      Yes.

8       Q.      When Google gives you its results when you

9   type in something, it is usually in the form of a

10  ranking, is that right?

11      A.      Yes.

12      Q.      Where did this one come up when you did the

13  search for Matt Kostolnik's name?

14      A.      I don't recall exactly, but it was quite

15  close to the top.

16      Q.      And let's kind of look at a few things that

17  are on this.  Obviously one of the things, very blurry,

18  but one of the things is Mr. Kostolnik's name?

19      A.      Correct.

20      Q.      And I blew up a portion on the left-hand

21  side.  Still a little bit blurry, but what is it that

22  this shows on the screen?

23      A.      This shows the creator of this webpage

24  physically had to put in this text.  And under here it

25  says about me, and it says Matthew P. Kostolnik and

1   several more lines of text.

2        Q.      Are you familiar with the way you set up a

3   MySpace page?

4        A.      I am.

5        Q.      How is it that you can create a MySpace page,

6   in broad strokes?

7        A.      Similar to like an e-mail, you can just go on

8   there.  You don't have to provide any identifying

9   information.  You pick a name that you want to be,

10  create an account.  You can put photos or text in the

11  account.

12       Q.      So, you have a little option.  And is one of

13  the options this area about describing who you are and

14  who you would like to meet?

15       A.      Correct.

16       Q.      In terms of -- did you do anything to

17  follow-up with MySpace to determine anything about the

18  MySpace page?

19       A.      Again, I sent out subpoenas to MySpace, tried

20  to track down who created it.

21       Q.      What, if anything, did you learn from

22  MySpace?

23       A.      I would have to refer to my notes again with

24  the subpoena that I sent.

25       Q.      Okay.  Would you refresh your recollection,

1    sir?

2         A.    (Witness complied.)  Yeah.  I don't recall

3    exactly.  I know I discovered the page on March 17th,

4    and in the course of my investigation I would have

5    subpoenaed MySpace to get that IP address, that phone

6    number again.

7              MR. RANK:  Okay.  I am going to see if we can

8    get that --

9              THE COURT:  Mr. Rank, it doesn't have to be

10   this moment, but if you find a logical place to take our

11   morning recess, we will take that.  So --

12             MR. RANK:  Certainly, Your Honor.  I am

13   actually fairly close to being -- in concluding with

14   Detective O'Hara, so --

15             THE COURT:  Then why don't we do that?  We

16   will finish up.

17             MR. RANK:  I am going to offer, Your Honor,

18   Government's Exhibit 152.  And this is a

19   self-authenticating document consistent with the others.

20             THE COURT:  Mr. Mahoney?

21             MR. MAHONEY:  No objection.

22             THE COURT:  It's received.

23             (Government's Exhibit 152 was received in

24   evidence.)

25             MR. RANK:  May I approach, Your Honor?

1              THE COURT:  You may.

2    BY MR. RANK:

3         Q.     Detective O'Hara, this document, if you take

4    a look at it, is a document from MySpace.  In reviewing

5    it, does it refresh your recollection as to when this

6    MySpace account was created?

7         A.     Yes.

8         Q.     And on what date was it created?

9         A.     It looks like the account was created on

10   November 18th, 2008.

11        Q.     Is that approximately the same time as that

12   Yahoo.com address of the MattKostolnik@Yahoo.com?

13        A.     Right around the same time.

14        Q.     Okay.  I guess I would just ask you very

15   quickly, we didn't really look around the MySpace page,

16   but if we blow up different portions of it, this is a

17   portion under who I would like to meet.  And it says any

18   ladies looking for a good time, I am married but my

19   spouse bites big time.  I am looking for a new love of

20   my life.  I can afford to let her go and start new.

21   After all, I am a lawyer and I am rich.

22              Is that correct?

23        A.     Yes.

24        Q.     There is also -- I am not going to blow it

25   up, but there is also a portion on here that would

1    indicate Mr. -- the person who created this wanted to

2    indicate that Mr. Kostolnik was interested in

3    pornography, as well; is that correct?

4         A.    Correct.

5         Q.    There is a reference at the bottom to the

6    porn stars that this person would like to meet, is that

7    right?

8         A.    Correct.

9         Q.    Thank you, Detective O'Hara.  I have no

10   further questions.

11        THE COURT:  Mr. Mahoney, I was going to take

12   our morning recess, here, unless you object to the

13   timing?

14        MR. MAHONEY:  No objection to the timing.

15        THE COURT:  All right.  We will stand in

16   recess, folks, for 15 minutes.  I anticipate when we

17   come back, unless somebody has some noon plans, if there

18   is a logical place to break before 12:30, we may do

19   that, or if it seems there is a logical place somewhere

20   between noon and 12:30 when we come back, we will just

21   see how that goes.  But, somewhere in that neighborhood

22   before we take our noon recess.

23        We will stand in recess for 15 minutes.  If

24   one of you would be so kind as to use your bar code on

25   the -- otherwise I can step down and do it.

```
 1                (Jury excused.)

 2                THE COURT:  All right.  Unless counsel needs

 3      to see me, I will see you in just a few minutes.  All

 4      right?  Thank you.

 5                (Recess.)

 6                THE COURT:  You may all be seated.  You may

 7      inquire if you wish, Mr. Mahoney.  Kind of give the

 8      jurors a chance to get seated.  I kind of jumped the

 9      gun.  Inquire whenever you are ready.

10                MR. MAHONEY:  Thank you.

11                     CROSS EXAMINATION

12      BY MR. MAHONEY:

13           Q.    Good morning, Mr. O'Hara.

14           A.    Good morning.

15           Q.    I want to talk to you about a few things this

16      morning.  First of all, you received the information

17      that got you going on this investigation from Mr.

18      Kostolnik?

19           A.    Correct.

20           Q.    Or from the firm's IT guy, Mr. Garber?

21           A.    First from Mr. Kostolnik.

22           Q.    And once you became aware that it involved

23      allegations of the use of child pornography on the

24      internet, did you ever consider asking Mr. Kostolnik if

25      you could review his computers?
```

1      A.      I did.

2      Q.      And did you do an inventory of his computers?

3      A.      I didn't do an inventory of his, no.  I

4  didn't believe that he was doing it.

5      Q.      My question was, did you consider it.  And

6  you said, you did consider it?

7      A.      I considered it, yes.

8      Q.      But you did not go to his home and check his

9  computers?

10      A.      Correct.

11      Q.      And that is based on the assumption that you

12  made that while this guy harassed himself, it must be

13  somebody else, so I am going to look someplace else for

14  this problem?

15      A.      That's a way to say it, yeah.

16      Q.      So, no one has ever seen what computers Mr.

17  Kostolnik has, correct?

18      A.      I don't believe that is a fair statement.

19      Q.      Okay.  You don't know, though?

20      A.      No.

21      Q.      That is a fair statement, right?

22      A.      Correct.

23      Q.      All right.  Now, one of the things that I

24  think you talked about was -- well, first of all, when

25  you are creating an e-mail account, is it illegal to

1  make an e-mail account that is not in your name?

2      A.    No.

3      Q.    Is it illegal to make a MySpace account that

4  is not in your name?

5      A.    It is not illegal, but it violates the terms

6  of service of that company.

7      Q.    Of the company.  But, there is nothing

8  criminal about it?

9      A.    Correct.

10     Q.    It is a contractual matter?

11     A.    Correct.

12     Q.    You can call yourself anything and make an

13  e-mail account because people today understand that what

14  comes to the internet has no basis, necessarily, in

15  truth, right?  I mean --

16     A.    It is possible.

17     Q.    Okay.  Now, you talked about having a survey

18  of the area, right?

19     A.    Correct.

20     Q.    And the survey you talked about was for the

21  wireless networks in the area?

22     A.    Correct.

23     Q.    And what programs did you use, or what

24  technology did you use to do that survey?

25     A.    I used a wireless laptop.

1       Q.      Okay.  So, you had your own wireless laptop?

2       A.      Correct.

3       Q.      And that was property of the Sheriff's

4   Department?

5       A.      Correct.

6       Q.      And what did you do with that?

7       A.      I used a program called NetStumbler to do the

8   software portion of it.

9       Q.      Now, NetStumbler, what is that?

10      A.      NetStumbler is a free program available on

11  the internet that you can do a wireless survey with.

12      Q.      Is it a certified program by any manufacture?

13      A.      No, it is open source.

14      Q.      It is an open source?

15      A.      Open source meaning it is free use to the

16  public.

17      Q.      And who has designed it?

18      A.      I am not sure.

19      Q.      When was it created, do you know?

20      A.      I do not.

21      Q.      Do you know when it was last updated?

22      A.      No.

23      Q.      You have no idea, 2004, 2009?

24      A.      Based on my experience I knew that the

25  program worked.

1      Q.      And it worked, and from your experience,

2   meaning the tests that you had run, you turned on your

3   computer, you turned on your Wi-Fi, the NetStumbler

4   program and you could see that somebody had a Wi-Fi

5   system within 10 yards?  Or, I mean, how did you get

6   this experience?

7      A.      Yeah, the colleagues of mine, on my own

8   experiences.

9      Q.      So, whether it was based on your personal

10   experience of saying, well, it seems to capture some

11   Wi-Fi, at least that you know -- that you know exists,

12   Joe down the hallway he has his computer on.

13      A.      Correct.

14      Q.      Do you know the technical capabilities of how

15   far Wi-Fi can be -- a computer can connect to another

16   Wi-Fi?

17      A.      It varies depending on the equipment.

18      Q.      So, that was a general question -- I mean,

19   general statement.  You don't know specifically what the

20   parameters are?

21      A.      You can't say specifically without knowing

22   what the equipment is.

23      Q.      So, when you were saying before on the map

24   you pointed out that there was 150 feet between the

25   houses, the Vang house, I think it was the Scobbie

1    house, Mr. Ardolf's house, Mr. Kostolnik's house, about

2    150 feet radius, right?

3        A.    Correct.

4        Q.    But, that is not a limitation, as far as you

5    know?

6        A.    No, that is not a limitation.

7        Q.    Is it fair to say or do you know whether the

8    limitation is 100 yards?

9        A.    There again, you keep asking.  It depends on

10   the equipment.

11       Q.    When you say the equipment, what equipment

12   are you referring to?

13       A.    The antenna that the person is using,

14   obstructions in the way, things like that.

15       Q.    So the purpose of the survey, again, was to

16   do what?  What did that tell you?

17       A.    Basically to get a general idea of what type

18   of wireless is in that area.

19       Q.    I am going to try to use this.  Brenda did

20   show me, I think, but maybe I will ask Mr. Rank to show

21   me how to get that thing turned on.  Good.  Thank you.

22            This is a document that we received from the

23   Government that purports to be part of the disclosure

24   from your investigation.

25            THE COURT:  Has that been offered and

1    received?

2              MR. MAHONEY:  No, Your Honor, I am just using

3    it for demonstrative purposes.

4              THE COURT:  Then we probably shouldn't have

5    it to the jury.  If you want to give it to the witness,

6    that is fine.

7              MR. RANK:  I don't have a problem with it

8    being made an exhibit, Your Honor.  But, it just hasn't

9    been admitted into evidence.

10             THE COURT:  If you want to offer it either

11   for illustrative purposes or to receive it, we can do

12   that, Mr. Mahoney.

13             MR. MAHONEY:  I think illustrative purposes

14   would be fine.

15             THE COURT:  And I would define illustrative

16   as, we will show it.  The jury can see it.  It won't go

17   back to the jury room.  The witness can see it.  Mr.

18   Rank?

19             MR. RANK:  That is fine, Your Honor.

20             THE COURT:  Do we have a number on it?  Or we

21   will just call it for now Defendant's 1, if that is

22   acceptable?

23             MR. MAHONEY:  Defendant's 1 would be fine.

24             THE COURT:  All right.

25             (Defendant's Exhibit 1 was received in

1  evidence.)

2  BY MR. MAHONEY:

3      Q.    Do you recognize this document?

4      A.    I do.

5      Q.    What is this document?

6      A.    This is basically what my screen showed when

7  I was parked at the end of the driveway at Mr.

8  Kostolnik's house and doing what is called a wireless

9  survey.

10     Q.    Okay.  And the various columns, here -- the

11 various columns here, it says, MAC.  What is a MAC?

12     A.    MAC is an acronym for machine access control,

13 I believe.  It is kind of like a serial number.

14     Q.    All right.  And then the SSID, what is that?

15     A.    That is the name that you can give your

16 router.

17     Q.    And the CHAN, what does that mean?

18     A.    It is called channel.  What frequency the

19 router is on.

20     Q.    Okay.  And the next one, it says speed.  What

21 is that?

22     A.    Speed would be the speed of the connection.

23     Q.    Okay.  Let's talk about speed for a second,

24 there.  It says 54 Mbps.  Do you know what that stands

25 for?

1     A.     Megabits per second.

2     Q.     Okay.  And then there is also -- one of them

3 says 11, right?  That would be 11 megabits per second?

4     A.     Correct.

5     Q.     Now, do you know what the standard -- not the

6 standard, but the current standard of speed for routers?

7     A.     54 megabits per second.

8     Q.     Isn't it up to 300 megabits?

9     A.     Not typically for this scenario, no.

10    Q.     Okay.  When you say not typically for this

11 scenario, you mean this program only captures routers

12 acting at this speed, it doesn't capture routers above

13 this speed; is that fair?

14    A.     Correct.

15    Q.     So, there could be several routers that -- or

16 many routers in this neighborhood that you are not

17 picking up because they have a faster speed?

18    A.     Yeah, it really wasn't applicable for this

19 situation.  That wasn't what the purpose of the survey

20 was.

21    Q.     My question was, it is not picking up the

22 speeds that are available in today's technology,

23 correct?

24    A.     Correct.

25    Q.     And we don't know how many there are, but

1    there could be some missing, correct?

2       A.    Correct.

3       Q.    And the type, the AP, what does that --

4    sorry, the vendor, first of all.  That just reflects the

5    vendor, the manufacturer of the router, itself?

6       A.    Yes.

7       Q.    So what does fake mean?

8       A.    Either the router isn't broadcasting the

9    manufacturer ID, that's one possibility, it's hard to

10   say.

11      Q.    So you don't know what it means?

12      A.    I do know what it means, but it is hard to

13   say why it didn't show up.

14      Q.    So, you are essentially saying why the symbol

15   or the word fake is appearing, you are saying one

16   possibility is the manufacturer's ID isn't showing?

17      A.    Correct.

18      Q.    But there are other possibilities?

19      A.    Correct.

20      Q.    And then, the type AP, what does that stand

21   for?

22      A.    I believe it is access point.

23      Q.    All right.  And then the WEP, what is that?

24   That's a type of encryption, you talked about that

25   earlier?

1          A.      Correct.

2          Q.      What other types of encryption are there?

3          A.      Several.  I mentioned them earlier, WPA,

4     WPA-2, there's a few others.

5          Q.      And none of those are appearing in your

6     survey, correct?

7          A.      Correct.

8          Q.      And that doesn't mean that they are not

9     there, it's just that they are not being recognized by

10    this software?

11         A.      It's hard to say.

12         Q.      Is that a fair statement?

13         A.      The software --

14         Q.      They could be there, but they are not being

15    recognized by this software?

16         A.      That's a possibility.

17         Q.      This is a document I received from the

18    Government.  So, this pointed line here, the Qwest

19    number, do you know what that is in reference to?

20         A.      Basically it is showing which router is Mr.

21    Kostolnik's.

22         Q.      That identifies his router?

23         A.      The Qwest 3984.

24         Q.      Okay.  And that identifies his MAC address?

25         A.      Yes.

1        Q.      Turn that off, so I don't make everybody

2   seasick.  So, let me see, the e-mail that was sent in

3   the name of Mary Sill, again that did not go through the

4   Kostolnik router, is that correct?

5        A.      Correct.

6        Q.      And the routers that it did go through, were

7   they encrypted or not encrypted, or you don't know?

8        A.      I'm not sure at this point.

9        Q.      When you spoke to Mr. Kostolnik about this

10  incident, or this problem he said he was having, your

11  assessment was that maybe someone from the outside was

12  accessing his router, is that what was going on?

13       A.      Correct.

14       Q.      Did you advise him maybe he should change his

15  router or upgrade his security?

16       A.      We discussed that.

17       Q.      Did he do that?

18       A.      No.

19               MR. MAHONEY:  No further questions, Your

20  Honor.

21               THE COURT:  Any redirect?

22               MR. RANK:  Yes, Your Honor.  Thank you.

23               THE COURT:  You may inquire if you wish.

24                      REDIRECT EXAMINATION

25  BY MR. RANK:

1    Q.    The technical area Mr. Mahoney was just

2  asking you some questions about, the discussions about

3  whether Mr. Kostolnik should change the encryption on

4  his wireless router.  Do you recall that?

5    A.    Right.

6    Q.    You, at some point in time, were involved in

7  the investigation into the e-mails that we talked about

8  here today; is that right?

9    A.    Correct.

10    Q.    Were some other law enforcement agencies

11  involved?

12    A.    Several.

13    Q.    And how was it that those law enforcement

14  agencies came to be involved?

15    A.    I asked for assistance, and I they also

16  offered assistance once the threats continued.

17    Q.    What was the first law enforcement agency

18  that you reached out to?

19    A.    The Minnesota Bureau of Criminal

20  Apprehension.

21    Q.    And when you reached out to the Minnesota

22  Bureau of Criminal Apprehension, what were you looking

23  for?  What kind of help were you looking for?

24    A.    Looking for advice, talking with colleagues,

25  ideas for the investigation.

1    Q.    In your investigation, were you feeling like

2 you were successfully tracking down the source of the

3 e-mails?

4    A.    It was apparent pretty quickly that I kept

5 hitting a deadend, basically, on all of my traces.

6    Q.    So, you reached out for some assistance from

7 the Bureau of Criminal Apprehension?

8    A.    Correct.

9    Q.    And were you looking for some assistance on

10 figuring out how to locate the person who was hacking

11 into --

12    A.    Yeah, I didn't know if there was maybe some

13 equipment that I didn't have that maybe they had that

14 would assist in tracing back these intrusions.

15    Q.    Detective O'Hara, is law enforcement,

16 especially local law enforcement, Anoka County Sheriff's

17 Office always able to keep up to speed on technological

18 advances?

19    A.    No.

20    Q.    You often find yourself feeling behind the

21 curve?

22    A.    Yeah, law enforcement generally is behind the

23 curve in technology.

24    Q.    You have to use things like open source free

25 software programs like the one Mr. Mahoney was asking

1    you about?

2         A.    Yes.

3         Q.    When you reach those deadends, is it common

4    for you to then reach out to other law enforcement

5    agencies?

6         A.    Yes, that is common.

7         Q.    So, you went to the Bureau of Criminal

8    Apprehension.  Could they help you?

9         A.    They could not.

10        Q.    Who else did you reach out to?

11        A.    The FBI.

12        Q.    Specifically, what part of the FBI?

13        A.    Innocent Images, or Internet Crimes Against

14   Children.

15        Q.    The Cybercrime Task Force?

16        A.    Yes.

17        Q.    Who did you speak to first at the Cybercrime

18   Task Force?

19        A.    An agent by the name of Bob Blackmore.

20        Q.    And were you familiar with Agent Blackmore

21   from previous contacts?

22        A.    Yes.  I worked with him before.

23        Q.    What is his primary focus at the Cybercrime

24   Task Force?

25        A.    His prior focus is, I believe, peer-to-peer

1    investigations, things like that.  It is still a

2    computer crime, but I know his expertise is not wireless

3    technology.

4         Q.    Is his focus on child pornography

5    investigations?

6         A.    Yes.

7         Q.    When you talked to him, did you ask him for

8    some assistance on who was compromising the router?

9         A.    Yes.

10        Q.    And did he indicate that that was an area

11   that he had knowledge in or there was somebody else in

12   the office?

13        A.    He indicated that he would have to check with

14   a colleague.

15        Q.    Do you know who that colleague was?

16        A.    I'm not sure.

17        Q.    Could it have been Agent Cameron?

18        A.    I believe it was, but at that point I wasn't

19   sure.

20        Q.    When you first asked, you didn't know?

21        A.    Yes.

22        Q.    Did you come to learn that it was Agent

23   Cameron?

24        A.    Yes.

25        Q.    And when you first reached out to Agent

1    Blackmore and sought the assistance of the FBI, did they

2    have any technology that they could help with to

3    determine the source of the compromise of the

4    Kostolnik's router?

5         A.    At that time Agent Blackmore did not indicate

6    they had anything.

7         Q.    Did you also learn at some point in time that

8    the law firm that Matt Kostolnik worked for had retained

9    an outside investigator to assist?

10        A.    After that Mary Sill e-mail, they hired a

11   private investigator to investigate the allegation.

12        Q.    And do you know who that was?

13        A.    An individual by the name of Scott Johnson.

14        Q.    A private forensic investigator?

15        A.    Correct.

16        Q.    Did you have some conversations with Mr.

17   Johnson?

18        A.    Several.

19        Q.    And one of the things Mr. Mahoney asked you

20   about -- Mr. Mahoney, if I could see your Exhibit 1?

21              (Discussion off the record.)

22              MR. RANK:  Bear with me, Your Honor.

23              THE COURT:  All right.

24              MR. RANK:  Oh, thank you.

25   BY MR. RANK:

1    Q.    Mr. Mahoney asked you about this document.

2  Do you recall his questions?

3    A.    Yes.

4    Q.    And one of the things that he asked you

5  about -- I will zoom in.  I usually go out first.

6  Successfully zooming in.  Is the reference here to that

7  Qwest 3984.  Do you see that?

8    A.    Yes.

9    Q.    And I think you answered in response to Mr.

10  Mahoney's question that that was the name or the SSID of

11  the Kostolniks' router?

12    A.    Correct.

13    Q.    How did find out that that was the SSID of

14  the Kostolniks' router?

15    A.    By talking with that private investigator,

16  Scott Johnson.

17    Q.    And Mr. Johnson -- did you learn that he was

18  taking some steps to determine the source of the

19  compromise of the Kostolnik's router?

20    A.    Yes, he was.

21    Q.    Did he describe to you what those steps were?

22        MR. MAHONEY:  Objection, hearsay.

23        THE COURT:  Sustained.

24  BY MR. RANK:

25    Q.    Did you -- and again, you were trying to

1   reach out to find some assistance in locating the source

2   of the intrusion, correct?

3          A.      Correct.

4          Q.      Were you aware of, from your training and

5   experience, of certain technologies that are available

6   for tracking traffic through internet routers?

7          A.      Yes.

8          Q.      What kind of technology is available for

9   that, generally speaking?

10         A.      Generally speaking, if there is a -- somebody

11  that is getting on to your wireless, there is some

12  technology out to enable you to somewhat trace that

13  person back, as long as they are still on the router.

14         Q.      And did you have access to that technology?

15         A.      I did not.

16         Q.      Are you also familiar with something called

17  packet capture technology?

18         A.      Yes.

19         Q.      What is that, generally speaking?

20         A.      Packets are basically bits of information

21  that go out to the internet or inside, it depends.  But,

22  basically packet is a piece of information, they have a

23  body and a header.  And basically you can record all of

24  that information and analyze it for what you are looking

25  for, I guess.

1    Q.    If a computer is communicating with the

2  internet, does it do so in bursts of electronic

3  information?

4    A.    Yes.

5    Q.    And those are referred to as packets?

6    A.    Yes.

7    Q.    And packet capture can record all of the

8  packets that are passing through a router?

9            MR. MAHONEY:  Your Honor --

10           THE WITNESS:  Basically.

11           MR. MAHONEY:  -- I object to the question as

12  leading.

13           THE COURT:  Sustained as to the form of the

14  question.  The answer was yes.  I will let the answer

15  stand, but sustained as to the form of the question.

16  BY MR. RANK:

17    Q.    Did you, yourself, have access to a packet

18  capture technology device?

19    A.    Personally, I did not.

20    Q.    With the Anoka County Sheriff's Office?

21    A.    I did not.

22    Q.    How about the Bureau of Criminal

23  Apprehension?

24    A.    I can't speak for them, but I wasn't offered

25  that.

1    Q.    How about the FBI?

2    A.    There again, not sure if they did or not.

3    Q.    Did you reach out to them for some assistance

4  in that area?

5    A.    Yes.

6    Q.    And that wasn't forthcoming?

7    A.    Right.

8    Q.    Did you learn through your investigation as

9  to whether Mr. Johnson was able to install some sort of

10  capture packet technology?

11    A.    Yes, he was able.

12    Q.    I think you mentioned the Bureau of Criminal

13  Apprehension, the FBI, the Anoka County Sheriff's

14  Office.  Did any other law enforcement agencies

15  eventually get involved in the investigation?

16    A.    Yes, the Secret Service.

17    Q.    All right.  And why was it that the Secret

18  Service became involved?

19    A.    There was another series of e-mails later in

20  the investigation, and it went to several members of

21  Congress, the Vice-President, the Governor, things like

22  that.

23    Q.    And in fact, did some of them also go to like

24  local law enforcement?

25    A.    Yes.

1      Q.      The Blaine Police Chief?

2      A.      Correct.

3      Q.      And as a result of that, the threat that went

4    to the Vice-President of the United States, did the

5    Secret Service get involved?

6      A.      Yes, they did.

7      Q.      At that point, do you remember approximately

8    the timing of those e-mails?

9      A.      That was probably in the spring of 2009.

10      Q.      And you started off with this investigation

11    back in February and March and you were kind of leading

12    the investigation, initially?

13      A.      Yes.

14      Q.      Did that change at some point in time?

15      A.      Yes.

16      Q.      And so, did the lead of the investigation

17    shift to another law enforcement agency?

18      A.      It did.

19      Q.      And who did it shift to?

20      A.      The FBI.

21      Q.      And specifically, who is the lead agent on

22    the investigation moving into the spring of 2009?

23      A.      Agent Cameron.

24      Q.      Detective O'Hara, at some point in time after

25    the lead of the investigation had switched over to the

1   FBI, was there a search warrant that was executed at

2   Barry Ardolf's residence?

3        A.    There was.

4        Q.    Were you involved in getting the search

5   warrant to be able to get access to that residence?

6        A.    I didn't write the warrant, but I

7   participated in some of the research and gathering of

8   reports, things like that.

9        Q.    And I guess --

10             MR. MAHONEY:  Your Honor, I would object as

11  beyond the scope of redirect.

12             THE COURT:  It is beyond the scope, but I

13  will allow some limited inquiry.

14             MR. RANK:  I will link it up with this

15  document that is on the screen, Your Honor, and probably

16  quickly.

17             THE COURT:  All right.

18  BY MR. RANK:

19        Q.    Detective O'Hara, as part of the drafting of

20  the search warrant to get into Barry Ardolf's residence,

21  did you provide your investigative file to the FBI?

22        A.    I did.

23        Q.    And did you know that some of the information

24  that you developed was used in the affidavit to get the

25  search warrant?

1      A.      That is correct.

2      Q.      Did you actually participate in the execution

3  of the search warrant?

4      A.      I did.

5      Q.      And what role, if any, did you have in the

6  execution of the search warrant?

7      A.      I participated in the search of the premises.

8      Q.      Did you take some photographs?

9      A.      I did.

10     Q.      Did you also search the house for documents

11  and other items relevant to the investigation?

12     A.      Yes.

13     Q.      Prior to -- and there will be more testimony

14  about this later, but prior to the execution of the

15  search warrant, did you read the affidavit in support of

16  the search warrant?

17     A.      Yes.

18     Q.      Does that kind of generally describe the

19  investigation up to the point of going into the house?

20     A.      A summary, yes.

21     Q.      So, you were aware of sort of relevant facts

22  going into the execution of the search warrant?

23     A.      Yes.

24     Q.      And I am going to ask you as part of that

25  whether Exhibits 136 and 137 -- approach the witness,

 1    Your Honor?

 2              THE COURT:  You may.

 3    BY MR. RANK:

 4        Q.    Showing you a document obtained during the

 5    course of that search warrant, do you recognize that

 6    document?

 7        A.    I do.

 8        Q.    What is it?

 9        A.    It is a printout of a -- basically a wireless

10    survey of the neighborhood.

11        Q.    Where was that located?

12        A.    Barry Ardolf's bedroom.

13              MR. RANK:  I offer 136.

14              MR. MAHONEY:  No objection.

15              THE COURT:  Received.

16              (Government's Exhibit 136 was received in

17    evidence.)

18    BY MR. RANK:

19        Q.    So, Detective O'Hara, we are looking right

20    now on the screen, if you can see it.  I want you to

21    keep that in mind because I want to switch over now.

22    Okay.  This is what we are talking about, is that

23    correct, Exhibit 136 that I put up on the screen?

24        A.    Correct.

25        Q.    And as I break the mouse -- this was found in

1    Barry Ardolf's bedroom, is that correct?

2         A.    Correct.

3         Q.    Does this contain some of that same

4    information that you had seen when you ran the wireless

5    survey?

6         A.    Same, similar information that I saw months

7    prior.

8         Q.    And in fact, if we look at that, there is on

9    the left-hand column, there are some CHs and some

10   numbers.  Is that similar to some of the questions that

11   you were asked about?

12             Let me switch back.  In that middle column

13   here with the numbers underneath it, that is channel

14   information.  Is that the same kind of information?

15        A.    Correct.

16        Q.    And then there are also on this list -- well,

17   actually, why don't you describe exactly what this list

18   is showing?

19        A.    It is basically similar to what I did.  This

20   is where I did a screen shot.  This is a printout.  CH

21   means the channel.  Where you see this WEP and OPN, that

22   is the encryption.  WEP meaning what we discussed

23   before, and the OPN means open, meaning there is no

24   encryption.  The series of numbers separated by colons,

25   that is the MAC address.  And the last letters is the

1    SSID, meaning the name of the router.

2         Q.     And I see on here there are some of those

3    SSID, that last column, some of them, one, two -- two of

4    them are Linksys.  What does that refer to?

5         A.     Linksys is the manufacture.  It is like Sony

6    or, you know, something like that.

7         Q.     And for routers manufactured by Linksys, is

8    the default name, SSID name, the name of the company?

9         A.     Usually.

10        Q.     And how about for routers with Qwest?  Is it

11   common for you to see Qwest and a number afterwards?

12        A.     Yes.

13        Q.     I see a couple of them in there that are

14   Qwest, is that correct?

15        A.     That is correct.

16        Q.     In fact, the second one on there, the Qwest

17   3984, do you recall seeing that when you did that

18   wireless survey around the Kostolnik's house?

19        A.     Yes.

20        Q.     I will go back to that document camera.  Is

21   that what my pen is pointing at?

22        A.     Yes, the Qwest 3984.

23        Q.     Let's look at this again.  The SSID number,

24   which we can barely see that, but that is what I am

25   pointing to right there, the column entitled SSID?

1    A.    Correct.

2    Q.    By the way, there are some that are labeled

3 Linksys that are on there, some labeled Actiontec, but

4 there are also some kind of unique names, is that

5 correct?

6    A.    Yes.

7    Q.    Can you, if you want, name your wireless

8 router?

9    A.    Yes.  When the person is setting up the

10 router, they can rename it, rather than the default

11 name.

12    Q.    All right.  And I am looking on this.  I can

13 see one that is we love Jesus, one that is H-a-r-a

14 J-u-k-u, Hara Juku?

15    A.    Yes.

16    Q.    And then another one right below that, it

17 looks like Sweet Home?

18    A.    Yes.

19    Q.    Do you see those three SSIDs also referenced

20 on the printout found in Barry Ardolf's bedroom?

21    A.    Yes, in his bedroom were the exact same

22 names.

23    Q.    And do you also see the SSID for the

24 Kostolnik's router on that printout?

25    A.    Yes, number 2.

1    Q.    And let me ask you one other thing.  During

2  your participation in the search warrant of the Barry

3  Ardolf's residence, take a look at Government's

4  Exhibit 137, which has been marked for identification

5  and tell me if you recognize that.

6    A.    I recognize it.

7    Q.    And how was it -- how is it that you

8  recognize it?

9    A.    This was a piece of mail addressed to W.K. at

10  xxxx Xxxxx Xxxxx.

11    Q.    And if you could refrain from using --

12    A.    Oh, I'm sorry.

13    Q.    -- specific addresses, but where was it that

14  was located?

15    A.    Under the mattress in Barry Ardolf's bedroom.

16    Q.    Did you see it when it was located?

17    A.    Yes.

18      MR. RANK:  I would offer 137 at this time.

19      MR. MAHONEY:  Can I see that?

20      MR. RANK:  I am not going to put it up on the

21  screen.  I am offering it, Your Honor.  I don't believe

22  there is any objection.

23      MR. MAHONEY:  Your Honor, my objection is,

24  again, it is a little bit beyond the scope of redirect,

25  but --

1          THE COURT:  Note the objection.  I will, even

2     assuming that to be the case, I will receive Exhibit

3     137.

4          (Government's Exhibit 137 was received in

5     evidence.)

6     BY MR. RANK:

7          Q.    And again, I am not going to put this up on

8     the screen, Detective.

9          MR. RANK:  May I approach, Your Honor?

10         THE COURT:  You may.

11    BY MR. RANK:

12         Q.    I just want you to confirm, Detective, that

13    that is -- well, that is a printout of it, the original.

14    Is that a format that the mail was found?

15         A.    That is correct.

16         Q.    And it is 1, 2, 3 pages, all of which appear

17    to be medical bills from the Kostolnik family?

18         A.    That is correct.

19         Q.    Thank you, Detective O'Hara, I have no

20    additional questions.

21         THE COURT:  Any additional recross?

22         MR. MAHONEY:  Yes, Your Honor.

23              RECROSS EXAMINATION

24    BY MR. MAHONEY:

25         Q.    Detective, Exhibit 136, this list of wireless

 1    network routers, basically it is the same, the process

 2    is the same, the open source software that you used, you

 3    used to do something like this, correct?

 4         A.    It could be.

 5         Q.    Basically it is available to anybody?

 6         A.    That is correct.

 7         Q.    So, it is not some nefarious thing to have a

 8    document like this, with this information?

 9         A.    Correct.

10              MR. MAHONEY:  Okay.  Nothing further, Your

11    Honor.

12              THE COURT:  You may step down, Detective,

13    thank you.  You may call your next witness.

14              (Witness excused.)

15              MR. RANK:  Thank you, Your Honor, the United

16    States calls Joseph Maternowski.

17              THE COURT:  Sir, if you want to step to the

18    front of the courtroom, kind of come to your right,

19    close to the witness stand here on the right?  And then

20    before you step into the stand, if you would please

21    raise your right hand?

22              (Witness sworn.)

23              THE COURT:  There is a step up, there.

24    Please have a seat behind the microphone.  As you get

25    situated, you will have to sit fairly close to the mike,

1    or it won't pick you up.  If you would please state your

2    full name and spell your last name?

3        A.      Joseph Girard Maternowski.  Last name,

4    M-a-t-e-r-n-o-w-s-k-i.

5                THE COURT:  You may inquire, Mr. Rank.

6                MR. RANK:  Thank you, Your Honor.

7                      JOSEPH MATERNOWSKI

8                      DIRECT EXAMINATION

9    BY MR. RANK:

10       Q.      Mr. Maternowski, I don't think we are going

11   to have to ask you to speak up.  You have good

12   enunciation.

13               Mr. Maternowski, where do you work, sir?

14       A.      I work at the Moss & Barnett Law Firm in

15   Minneapolis.

16       Q.      And what do you do there?

17       A.      I am a shareholder and I practice

18   environmental law.

19       Q.      Shareholder as you are an attorney there?

20       A.      I am an attorney, yes.

21       Q.      What is shareholder?  Is that what used to be

22   called a partner?

23       A.      It is the equivalent of a partner, yes.

24       Q.      How long have you worked at Moss & Barnett?

25       A.      Since January of 2000.

1      Q.      And how long have you been an attorney?

2      A.      I have been an attorney since, I believe --

3    well, 1985.

4      Q.      All right.  Mr. Maternowski, I am going to

5    ask you to take a look at some exhibits for me.  And

6    with the permission of the Court --

7              THE COURT:  You may.

8    BY MR. RANK:

9      Q.      -- if I can approach?  I put several paper

10   exhibits in front of you and ask you to take a look at

11   them.  If you would, sir, take a look at what has been

12   marked for identification as Government's Exhibit 32.  I

13   believe that will be the top document there.  I may have

14   it in a different pile.  You might be looking at 33.

15     A.      I have got 33.

16     Q.      My apologies.  And 32 is already in evidence.

17   So, I am going to put Exhibit 32 up on the screen, try

18   to.  Do you see that it is on the screen in front of

19   you, sir?

20     A.      Yes, I do.

21     Q.      And is this an e-mail that you received at

22   your Moss & Barnett e-mail address?

23     A.      Yes, it is.

24     Q.      And what is your Moss & Barnett e-mail

25   address?

1      A.     It would be my last name, Maternowski with

2  the letter J, @Moss-Barnett.com.

3      Q.     And this e-mail appears to have been received

4  or come into your mailbox at about 5:37 p.m. on Sunday,

5  March 8th, 2009.  Do you recall when it was you actually

6  received the e-mail?

7      A.     I received it at about that time.  I have a

8  BlackBerry, and so when I get a message, work-related, I

9  get it.  I usually read it.  I am pretty prompt about

10  it.

11      Q.     And it was sent to you, and then there is

12  also another person on the recipient line.  Do you see

13  that?

14      A.     I do.

15      Q.     And that looks like Anthony Dorland?

16      A.     Yes.

17      Q.     Who is Anthony Dorland?

18      A.     Anthony Dorland at the time -- well, he is a

19  colleague of mine, another attorney at Moss & Barnett

20  who I work with on matters.

21      Q.     And this e-mail, though, the subject line of

22  it says:  I was at William Mitchell College of Law

23  Friday, 3/6.  And then the text says, Friday afternoon

24  on 3/6, I was at William Mitchell College of Law.  I

25  approached Mr. Kostolnik and we talked about his

1   presentation.  We ended the conversation in a parking

2   lot where he made sexual advances and grabbed at my

3   breasts.  I slapped his face and took off yelling at him

4   to leave me alone.

5           I know the Boys Club sticks together, so I

6   don't expect anything to happen to Mr. Kostolnik.  But,

7   I'm still going to try to make it so he doesn't grope

8   another young lady.

9           Please do not allow him back here.  If I see

10  him here again, I will call the police and I will press

11  charges.  And it appears to be on here, signed by Mary

12  Sill from Wayzata, Minnesota.

13          Do you see that?

14     A.    Correct, I do.

15     Q.    That was the e-mail you received on Sunday,

16  March 8th?

17     A.    Yes.

18     Q.    Do you remember what you did, if anything,

19  with the e-mail once you received it?

20     A.    I read it.  I was very surprised by it.  And

21  I may have tried to contact Mr. Dorland about it because

22  I see that he had received it, too.

23     Q.    Okay.  Did you eventually forward the e-mail

24  to someone?

25     A.    I did.  I believe that day, probably that day

1    I would have done this.  It would have been either

2    Sunday or Monday.  I forwarded it to Thomas Shroyer, our

3    CEO, President of our firm.  Because it looked firm

4    related and I didn't know what to make of it, and so I

5    forwarded it on to him.

6         Q.    If you could take a look, sir, at what has

7    been marked for identification as Government's 33?  I

8    believe that one is in front of you.

9         A.    Yes, it is.

10        Q.    And do you recognize Government's Exhibit 33?

11        A.    Yes, I do.

12        Q.    And what is it?

13        A.    This is my forwarded e-mail to Mr. Shroyer

14   with a cc to Tony Dorland.  I call him Tony, Anthony.

15             MR. RANK:  I offer Exhibit 33, Your Honor.

16             THE COURT:  Mr. Mahoney, they have offered

17   Government's Exhibit 33?

18             MR. MAHONEY:  33, I have no objection.

19             THE COURT:  That is received.

20             (Government's Exhibit 33 was received in

21   evidence.)

22   BY MR. RANK:

23        Q.    I am going to put 33 on the screen, Mr.

24   Maternowski.  It is relatively small, so what I am going

25   to do, I guess, is first -- this is a printout of the

1    e-mail.  It is a printout that does not appear to have a

2    date on it, is that correct?

3         A.     That is correct.

4         Q.     Your recollection is you forwarded this to

5    Mr. Shroyer relatively quickly?

6         A.     Probably on Sunday.

7         Q.     And so this e-mail is addressed to Tom

8    Shroyer from you, and then there is a cc on there, as

9    well?

10        A.     That is correct.

11        Q.     To Mr. Dorland.  The e-mail says -- actually,

12   would you read the e-mail, sir?

13        A.     "I received this unsolicited e-mail and

14   thought I should forward it to you for review and

15   appropriate discussion/action.  It strikes me as bizarre

16   and out of character for Matt.  I have not discussed it

17   with anyone.  I am copying Tony, as he was copied, as

18   well."

19        Q.     And then signed by you?

20        A.     Yes.

21        Q.     As of the time that you received this, and I

22   guess just for the benefit of completeness, I will show

23   what it is that you were forwarding.  You were

24   forwarding that e-mail we looked at before, is that

25   correct?

1      A.      Correct.

2      Q.      And I am going to go back and blow this up so

3  hopefully we can see it a little bit better.  As of the

4  time that you received the e-mail in March of 2009, did

5  you do any work with Matt Kostolnik?

6      A.      Yes.

7      Q.      And how well did you know him?

8      A.      Fairly well.  I worked with him on a couple

9  of cases involving environmental claims.

10     Q.      Well enough to determine, or at least your

11 opinion was, this was out of character for him?

12     A.      I said it was bizarre and out of character.

13     Q.      Do you, yourself hold any particular

14 positions at Moss & Barnett?

15     A.      I am a shareholder.  I had in the last year

16 been an adjunct board member at Moss & Barnett.

17     Q.      Are there some practice groups at Moss &

18 Barnett?

19     A.      There are.

20     Q.      And in particular, do you belong to any

21 particular practice groups?

22     A.      I am the chair of the environmental law

23 practice group, yes.

24     Q.      So, you are the head of that group?

25     A.      I am.

1      Q.      And did you in fact work on some

2    environmental law cases with Matt Kostolnik?

3      A.      I did.

4      Q.      And is he a member, also listed as a member

5    of that environmental law practice group?

6      A.      Matt is also a member, yes.

7      Q.      Can you just briefly describe for the jury

8    what a practice group is?

9      A.      We're a law firm of 70 lawyers, and so we

10   break out into different practice groups or areas where

11   we have expertise.  So Matt was in that group, along

12   with Tony Dorland, as well.

13     Q.      Is that something that somebody could find

14   out if they did an internet search?

15     A.      Yes.

16     Q.      Does Moss & Barnett have a website?

17     A.      We do.  Yes, the law firm has a website.  And

18   that practice group is there identified as a group.  And

19   if you click on that, it tells you what we do and who is

20   in our group.

21     Q.      So, do you have any sort of responsibility

22   with putting information on to that portion of the

23   website?

24     A.      I do.  And in addition to that website, I

25   have a website of my own where I am promoting my own

 1    environmental law practice, and Moss & Barnett's

 2    environmental law practice.  And Matt Kostolnik and Tony

 3    Dorland are members and are listed in that website, as

 4    well.

 5        Q.    I am going to ask you about -- and actually,

 6    do you have Government's Exhibit 37 in front of you?

 7        A.    Yes, I do.

 8        Q.    And I am not going to ask you about the full

 9    portion of it, but if you could turn to page 2?  If you

10    could pull it out of the sleeve of Government

11    Exhibit 37?  Are you with me on page 2 of Government

12    Exhibit 37?

13        A.    Yes, I am.

14        Q.    And there is some language on there -- first

15    of all your name is in there, is that right?

16        A.    Yes, it is.

17        Q.    And there is a description, as well, of the

18    environmental law practice group?

19        A.    Yes, that is, I believe, on page 3.

20        Q.    Is that language that comes from the

21    environmental law practice website at Moss & Barnett?

22        A.    I believe -- yes, it is either the Moss &

23    Barnett website or it may be the other website that I

24    mentioned.  Matt and Tony and I had collaborated for the

25    other website.  And so seeing these three names alone

1   and together makes me think that is more related to

2   that.  They are attorneys in addition to Matt and Tony

3   and I that are in the environmental law practice group

4   at Moss & Barnett.

5           MR. RANK:  Your Honor, I am, subject to

6   firming up the remainder of the chain of custody of this

7   e-mail, I am offering Exhibit 37 with respect to this

8   portion of the document.

9           Do you want to see it?

10          MR. MAHONEY:  Yes.  You are talking about

11  the -- not the addresses, but the actual e-mails that

12  were sent or are you talking about that document?

13          (Discussion off the record.)

14          MR. MAHONEY:  Can we approach, Your Honor, on

15  that?

16          THE COURT:  You can.

17          (At the bench.)

18          MR. MAHONEY:  Your Honor, the only thing that

19  is missing in connection with the e-mail is with him,

20  how he ties into the chain of custody on the document.

21          MR. RANK:  He doesn't tie into chain of

22  custody.  I said subject to firming up chain of custody

23  through a different witness, I was going to ask him, and

24  put it in evidence, about portions of this document that

25  he can identify, including this language which comes off

1    of his website.

2                MR. MAHONEY:  Okay.

3                THE COURT:  Maybe the way we can handle it so

4    everybody is protected, I can just provisionally receive

5    it defining provisionally, 104, so you are not waiving

6    any right, so if there is some unanticipated chain of

7    custody down the road, nobody has given up anything.

8    So --

9                MR. MAHONEY:  That is fine with me.

10               MR. RANK:  I will provisionally offer it.

11               THE COURT:  All right.

12               (In open court.)

13               THE COURT:  Are you going to provisionally

14   offer that subject to the foundation and some of the

15   rest of it being laid, Mr. Rank?

16               MR. RANK:  Yes, Your Honor, I will

17   provisionally offer --

18               THE COURT:  If we handle it that way, Mr.

19   Mahoney, any objection to that?

20               MR. MAHONEY:  That is fine.

21               THE COURT:  We will receive it with that

22   understanding.  You may proceed.

23               (Government's Exhibit 37 was received in

24   evidence.)

25   BY MR. RANK:

1      Q.      Mr. Maternowski, what I am showing you on the

2  screen is page one of Government's Exhibit 37,

3  indicating that the file we are about to look at was

4  recovered.  Where it was recovered was a thumb drive in

5  Barry Ardolf's bedroom.

6           And if I go to the second page of

7  Government's Exhibit 37, and then the third page, I will

8  blow up a portion of that on the screen.  And if you

9  look at the screen in front of you, it's the portion I

10  am talking about.

11           First of all, your name and telephone number

12  are listed on there?

13      A.      That is correct.

14      Q.      As well as the indication that you are the

15  chair of Moss & Barnett's Environmental Law Practice

16  Group?

17      A.      Yes.

18      Q.      And then there is also sort of a blurb about

19  your background in the environmental area, is that

20  correct?

21      A.      That is correct.

22      Q.      Does that description that is on there that

23  starts off, Joseph Maternowski, Chair of Moss &

24  Barnett's Environmental Law Practice Group has litigated

25  clean-up and cost-recovery claims under MERLA.  I won't

1     continue.  Does that come off of the website?

2          A.     It does.

3          Q.     Thank you.  All right.  So, going back, Mr.

4     Maternowski, to Exhibit 33, you had forwarded the e-mail

5     from a person who claimed to be Mary Sill to Tom

6     Shroyer.  Did you get a response from Mr. Shroyer?

7          A.     I believe he replied to me perhaps by phone

8     call, e-mail, and told me something like, we will be

9     handling this.

10         Q.     Okay.  Can you take a lock at what has been

11    marked as Government's Exhibit 34?

12         A.     Yes.

13         Q.     And is that an e-mail from Tom Shroyer to you

14    and to Anthony Dorland?

15         A.     Yes, it is.

16         Q.     Dated March 11th?

17         A.     Correct.

18         Q.     And was that a response from Mr. Shroyer to

19    what is shown in Exhibit 33?

20         A.     Yes.  Yes, it is.

21                MR. RANK:  I would offer 34.

22                MR. MAHONEY:  No objection.

23                THE COURT:  Received.

24                (Government's Exhibit 34 was received in

25    evidence.)

BY MR. RANK:

Q.    All right.  These are small e-mails and they are hard to see, but I think I can probably blow up only the top portion, because the bottom stuff from Tom Shroyer's name on down, it is kind of boilerplate?

A.    Yes, that is some confidentiality language that we typically use in e-mails.

Q.    I will blow this up.  I don't know how much bigger it is going to make it.  In fact, it barely made it any bigger, but at least it identifies it.  This is an e-mail from Tom Shroyer to you and Anthony Dorland with a cc to Matt Kostolnik.  And can you read the text of the e-mail, sir?

A.    "Joe and Tony:  Thank you for forwarding Sunday's e-mail from --

THE COURT:  If we can just slow it down, just a little, so my reporter can get it down?  That's okay?  Thank you.

MR. RANK:  She likes your volume.

THE WITNESS:  I didn't have my head turned toward her, which she would probably like.

THE COURT:  That's all right.

THE REPORTER:  Oh, that's okay.

THE WITNESS:  "Thank you for forwarding Sunday's e-mail from 'Mary Sill.'  We are in the midst

1  of a full investigation, but we have concluded that the

2  incident in the e-mail is false.  Please do not mention

3  this matter to anyone else.  You may need to be

4  witnesses, depending upon what happens, and an innocent

5  and well-deserved reputation lies in the balance.

6  Thanks."

7  BY MR. RANK:

8      Q.    And Mr. Maternowski, since that e-mail in

9  March of 2009, setting aside and being interviewed by

10  law enforcement, have you essentially kept this to

11  yourself?

12     A.    Yes.

13     Q.    Do you recall that after this e-mail to you

14  that on that same day Tom Shroyer had sent out a couple

15  of all firm e-mails?

16     A.    I recall those all firm e-mails.  Yes, I do.

17     Q.    Would you take a look at Government's

18  Exhibits 35 and 36, sir?

19          Do you recognize those two exhibits as the

20  follow-up e-mails, the all firm follow-up e-mails from

21  Tom Shroyer?

22     A.    Yes, I do.  Those are the e-mails that

23  followed it up.

24     Q.    Very good.  I am going to put -- I am going

25  to offer 35 and 36, first of all.

1              MR. MAHONEY:  No objection.

2              THE COURT:  Received.

3              (Government's Exhibits 35 and 36 were

4    received in evidence.)

5    BY MR. RANK:

6         Q.    I will put 35 up on the screen for us to take

7    a look at.  Again, we have this very small print.  Let's

8    see if I can come to the edge and get it a little bit

9    bigger.

10             This is an e-mail that went out from the

11   president of the firm to everyone at the firm is that

12   correct?

13        A.    That is correct.

14        Q.    And in general, without reading the entire

15   text of it, what was it that Mr. Shroyer was advising

16   people and also asking them to do?

17        A.    It informs everyone in the firm that one of

18   our attorneys was targeted as a victim from an outside

19   e-mail source.  And it talks about the content of the

20   e-mail sometimes having a sexual nature, close to

21   shocking in some ways.  And he requests that anybody

22   receiving such an e-mail forward it to him.  Tom

23   Shroyer, Kevin Busch, B-u-s-c-h, Bruce Garber or Cheryl

24   Thompson, who are other members of our firm.

25             And he asked people to do that quickly, not

1    to e-mail it to anyone else.  He mentions there is a

2    game plan in place to deal with this.  And we will take

3    care of the matter.

4          Let's see, he advises everyone the matter is

5    subject to a full investigation, and not to discuss it

6    internally.  Do not attempt to guess who may be

7    involved, or any other activities related to this.  And

8    he ends it by saying, if what we suspect has happened

9    has occurred, then this serves as a reminder of how

10   very, very vulnerable each and every one of us are to

11   the nightmare of having our life hijacked by a computer

12   hacker.

13        Q.    And then let me show you 36 on the screen, as

14   well.  And this is a follow-up, sort of a clarification

15   e-mail, also from Mr. Shroyer?

16        A.    That is correct.

17        Q.    All right.  Again, other than talking about

18   in preparation for trial here, have you spoken to anyone

19   about the e-mail that you received back in March of

20   2009?

21        A.    No, I have not.

22        Q.    Thank you very much.  I have no further

23   questions for Mr. Maternowski.

24        THE COURT:  You may inquire, Mr. Mahoney, if

25   you wish.

1           MR. MAHONEY:  No questions.

2           THE COURT:  You may step down, sir.

3           (Witness excused.)

4           I would suggest, Mr. Rank, unless you have a

5    witness that is ten minutes or less, that we will --

6    otherwise if you do, we will take that witness and then

7    we will take our lunch break.

8           MR. RANK:  I think I can fit this witness in

9    by 12:30.

10          THE COURT:  I don't want to put time limits

11   on you or Mr. Mahoney, but if it is in the neighborhood,

12   let's proceed.

13          MR. RANK:  It is in the neighborhood, Your

14   Honor.

15          THE COURT:  All right.  Let's proceed.

16          MR. RANK:  The United States calls Anthony

17   Dorland.

18          THE COURT:  Would you step forward, sir,

19   close to the witness box there?  And before you step in

20   there, if you would raise your right hand?

21          (Witness sworn.)

22          There is a step up, sir, but if you would

23   have a seat behind the microphone?  And you have to sit

24   fairly close to the mike or it will not pick you up.

25   And if you would please state your full name and spell

1    your last name.

2              THE WITNESS:  Anthony Arthur Dorland,

3    D-o-r-l-a-n-d.

4              THE COURT:  You may inquire, Mr. Rank.

5              MR. RANK:  Thank you, Your Honor.  And for

6    the purposes of expedition, Your Honor, I will lead on

7    background if that is permissible?

8              THE COURT:  I see a nod from Mr. Mahoney, so

9    that is acceptable.

10             MR. RANK:  Thank you.

11                       ANTHONY DORLAND

12                       DIRECT EXAMINATION

13   BY MR. RANK:

14        Q.    Mr. Dorland, you are an attorney at Moss &

15   Barnett, is that correct?

16        A.    Correct.

17        Q.    How long have you worked at Moss & Barnett?

18        A.    10 years.

19        Q.    You are a person who works, at least in part

20   of your time, in the Environmental Law Practice Group?

21        A.    Correct.

22        Q.    Joe Maternowski is the chair of that practice

23   group?

24        A.    Yes.

25        Q.    Some of the other lawyers that work in the

1    Environmental Law Practice Group, one other lawyer is

2    Matt Kostolnik; is that correct?

3         A.     Yes.

4         Q.     And how much interaction did you have with

5    Mr. Kostolnik at Moss & Barnett prior to February of

6    2009?

7         A.     I think we worked on one case together, one

8    environmental case together.

9         Q.     Do you know that if you had gone to the Moss

10   & Barnett website at that time period that your name

11   would appear in the Environmental Law Practice Group,

12   Mr. Kostolnik's name would appear, and also Mr.

13   Maternowski's?

14        A.     Yes.  In addition to this, I don't know if

15   you said the separate website, also.

16        Q.     Okay, there were a couple of different

17   websites?

18        A.     Yes, there is a firm website, and then Joe

19   has a separate website.

20        Q.     And those names would appear on both of those

21   websites?

22        A.     Definitely Joe's, and I don't know if Matt is

23   on the firm website or not.

24        Q.     I am going to show you, sir, an exhibit that

25   has already been admitted into evidence.  And if you can

1  see it on the screen in front of you, do you recall

2  receiving this e-mail in March of 2009?

3      A.    Yes.

4      Q.    And when did you receive it, if you recall?

5  It looks like it came in on a Sunday.  Did you get it on

6  a Sunday or later than that?

7      A.    Yeah, I didn't have a BlackBerry at that

8  time, and I don't check my e-mails.  So, it would have

9  been probably Monday morning for me.

10      Q.    And when you received it on Monday morning,

11  did you also see that Joe Maternowski had forwarded that

12  document to Tom Shroyer?

13      A.    I don't know which, what order that happened.

14      Q.    Did you learn at some point in time, though,

15  that Joe had forwarded the e-mail to Mr. Shroyer?  Let

16  me show you Exhibit 33.  Maybe this will refresh your

17  recollection.  If you can read it?

18      And I apologize because it doesn't -- it is

19  not a dated e-mail.  But, there is an e-mail that is to

20  Tom Shroyer from Joe Maternowski with a cc to you,

21  correct?

22      A.    Correct.

23      Q.    Forwarding the Mary Sill e-mail, is that

24  right?

25      A.    Yes.

1    Q.    And you are aware that it had been forwarded?

2    A.    Yes.

3    Q.    Do you also remember getting a response from

4  Tom Shroyer to this e-mail being forwarded?

5    A.    Yes.

6    Q.    How about if I show you Exhibit 34, does that

7  refresh your recollection?  How about if I blow it up?

8    A.    No, I can read it.

9    Q.    Okay.

10    A.    Yes.

11    Q.    And do you recall getting this e-mail from

12  Tom Shroyer?

13    A.    Yes.

14    Q.    And basically what is the e-mail asking you

15  to do?

16    A.    Well, I am not going to read it -- I can

17  read, but I remember the part not to mention it to

18  anyone else.

19    Q.    Because you may need to be a witness?

20    A.    Yeah, and I didn't focus on that.

21    Q.    That is what it says?

22    A.    Yes.  It does say that, yeah.

23    Q.    And you are a witness to that, correct?

24    A.    Correct.

25    Q.    He was right?

1     A.     He was.

2     Q.     And he also asked you not to discuss the

3   matter with anyone else.  Since March of 2009, other

4   than being interviewed by law enforcement have you

5   discussed that e-mail with anyone else?  Did you do what

6   he asked you to do?

7     A.     Yeah, I did.  Yes, I did have one person ask

8   me and I said I can't talk about it.

9     Q.     Okay.  I have no further questions, Your

10   Honor.

11             THE COURT:  Mr. Mahoney, any further

12   questions?

13             MR. MAHONEY:  No questions.

14             THE COURT:  You may step down, sir.  Thank

15   you.

16             We will stand in recess until 1:30.  It is

17   nearly 12:30 now.  We will stand in recess until 1:30.

18   The jury is excused.  If you would be so kind as to use

19   your security card again?

20             (Jury excused.)

21             THE COURT:  Unless counsel needs to see me,

22   we will recess until 1:30.

23             (Noon recess.)

24             (In open court; jury present.)

25             THE COURT:  You may all be seated.  Thank

1    you.  You may call your next witness, Mr. Rank.

2              MR. RANK:  Thank you, Your Honor.  The United

3    States calls Mr. Thomas Shroyer.

4              THE COURT:  Sir, if you want to come toward

5    the witness stand on your right, there, and I will

6    administer the oath once you get close to the stand?

7    Please raise your right hand.

8              (Witness sworn.)

9              There is a step up, there.  And then if you

10   would please have a seat behind the microphone?  And

11   then once you are seated, in addition to stating you

12   will have to stay fairly close to the mike or it will

13   not pick you up, if you would please state your full

14   name and spell your last name?

15             THE WITNESS:  Thomas Jerome Shroyer, spelled

16   S-h-r-o-y-e-r.

17             THE COURT:  You may inquire, Mr. Rank.

18             MR. RANK:  Thank you, Your Honor.

19                       THOMAS SHROYER

20                     DIRECT EXAMINATION

21   BY MR. RANK:

22        Q.    Good afternoon, Mr. Shroyer.

23        A.    Good afternoon.

24        Q.    Mr. Shroyer, where do you work?

25        A.    I work at Moss & Barnett.

1    Q.    Can you tell the jury what you do at Moss &

2  Barnett?

3    A.    I am an attorney licensed in Minnesota and

4  Wisconsin.  I am a shareholder with the firm, Director,

5  as well as the Chief Executive Officer at the law firm.

6    Q.    That means you hold some leadership positions

7  at Moss & Barnett?

8    A.    Yes, I suppose, colloquially, I would be

9  called the managing partner.

10    Q.    President and Chief Operating Officer?

11    A.    Not COO, but CEO.

12    Q.    And the leadership positions that you hold at

13  Moss & Barnett today, did you also hold those positions

14  in February of 2009?

15    A.    Yes.

16    Q.    From February of 2009 until today?

17    A.    That is correct.

18    Q.    Do you recall, sir, in February of 2009 that

19  a number of e-mails were sent to various Moss & Barnett

20  employees from a Yahoo.com address that was created in

21  Matt Kostolnik's name?

22    A.    I do recall that that occurred.

23    Q.    And did you have any role in dealing with the

24  response of the firm to the receipt of those e-mails?

25    A.    Well, initially, the e-mail -- those e-mails,

1   three e-mails came in when I was on vacation.  I did not

2   hear about them when they came in, but rather when I

3   returned from my vacation.

4          At that time I found out about them.  I was

5   given a briefing by the administrative staff, our

6   director of administration.  And I saw a couple of them,

7   the ones to Brenda Murphy and Phil Young.  I did not see

8   the one to Dave Senger at that time, initially.

9       Q.    Were you apprised of what was in all three of

10  the e-mails?

11      A.    Yes.

12      Q.    And the one to Dave Senger, were you aware

13  there were some attachments on that e-mail?

14      A.    I found out later, yes.

15      Q.    With respect to the first e-mail, I am going

16  to put it up on the screen.  It has been previously

17  admitted into evidence.  This is the e-mail to Brenda

18  Murphy.

19          Do you recognize that?

20      A.    I do.

21      Q.    And Brenda Murphy, do you know what her role

22  was with respect to Matt Kostolnik?

23      A.    She is a legal assistant.  Formerly we would

24  have called that position a secretarial position.  And

25  she was the person who was supporting Mr. Kostolnik,

1    among others.

2        Q.    Now, had this been a real e-mail from Matt

3    Kostolnik, an attorney at Moss & Barnett to his legal

4    assistant, would have some concerns about possible

5    sexual harassment claims?

6        A.    Well, as a matter of fact, when I found out

7    about this, I made sure to verify that we had followed

8    our law firm's employment manual or set of policies to

9    make sure we addressed the possibility that sexual

10   harass meant had occurred.  And I was assured that

11   someone had determined that Brenda Murphy did not have

12   any issues with Mr. Kostolnik.

13       Q.    Someone from your Human Resources Department?

14       A.    That is my recollection.

15       Q.    All right.  And I am also going to show you

16   the e-mail that went to Mr. Senger.  This is just the

17   front of the e-mail without the attachments, sir.  This

18   is something you didn't see right away when you came

19   back, but did you eventually see this e-mail?

20       A.    I did.

21       Q.    Obviously, you talked about the possible

22   sexual harassment claims related to Brenda Murphy's

23   e-mail.  Did you have some concerns arising from this

24   e-mail and what was attached to it from a firm liability

25   perspective?

1      A.      Well, surely.  It was, you know, quite

2  offensive, obscene -- or at least the attachment was.

3  And so, naturally enough, it raised concern.  Though I

4  would say initially, the reaction of the folks who

5  received these was all consistent, and that was it

6  looked like, you know, somebody had done something,

7  other than Matt Kostolnik -- nobody thought it really

8  was consistent with his character.

9      Q.      Did you know whether these e-mails, the

10  sending of these e-mails was at some point in time

11  reported to law enforcement?

12      A.      You know what?  I lost that a little.

13      Q.      Sure.  Did you learn that these e-mails were

14  reported at some point in time to law enforcement?

15      A.      Yes.

16      Q.      And how did you find that out?

17      A.      As I recall, I was told by Mr. -- either

18  somebody on the admin team, most likely Cheryl Thompson,

19  or else Bruce Garber, or else Mr. Kostolnik, himself.

20      Q.      Cheryl Thompson is the head of IT at Moss &

21  Barnett?

22      A.      Right.

23      Q.      Bruce Garber is your network administrator?

24      A.      Correct.

25      Q.      Mr. Shroyer, I am going to take you a couple

1    of weeks later and show you another e-mail that has

2    already been admitted into evidence.  And I guess before

3    I get to asking you questions about this, did you have a

4    conversation with Matt Kostolnik after you came back

5    from your vacation and learned about the February

6    e-mails?

7         A.    You know, I don't think so.  I don't recall

8    it, anyway.

9         Q.    Okay.  Is it possible that you had one?

10        A.    Sure.

11        Q.    Then you were satisfied, at least, from those

12   February e-mails that things were being taken care of

13   and dealt with appropriately?

14        A.    Absolutely.

15        Q.    Then Exhibit 32, this is an e-mail dated

16   March 8th, 2009.  And do you remember when this e-mail

17   came in?

18        A.    Well, I remember when I found out about it.

19   And it was the next day, actually, not a Sunday, as I

20   was returning from a physical down at Rochester -- or I

21   was at a physical down at Rochester, I should say, and

22   was able to follow-up on it with my cell phone as I was

23   driving home.  So, yes, I remember when I first found

24   out about it, anyway.

25        Q.    So, in terms of your response, going back to

1   the February e-mails, you were satisfied that things

2   were being dealt with.  When this e-mail came in, did

3   that sort of raise your concern level?

4        A.    Well, absolutely.  It had the appearance of

5   being an e-mail from, potentially, a credible source on

6   the face of it.  There was at least some reason for it

7   to have gone to Maternowski and Dorland, i.e., they were

8   represented as being in a practice area that Matt

9   Kostolnik was in on our website.  And, you know, it was

10  a piece with the earlier e-mail that suggested maybe we

11  did have an issue.

12       Q.    And what did you do, if anything, to

13  follow-up on that issue?

14       A.    Well, first of all, I made sure that Mr.

15  Maternowski and Mr. Dorland were aware that I had the

16  matter in hand and that they, as it were, could stand

17  down.  They didn't have to do anything further about it.

18  And in fact, as I recall, I asked them to hold it in

19  strict confidence.

20       Q.    I will stop you there and show you, sir,

21  Exhibit 34.  And show you -- I will blow it up,

22  hopefully, so you can see this -- an e-mail that you

23  sent to Joe Maternowski and Tony Dorland.

24             Do you recall this?

25       A.    I do, but this was a couple of days later.

1    And you know, the initial thought is, hold off, we've

2    got to, you know, sell this off, wall it off, contain

3    it, move forward in an effective way to protect the law

4    firm.  So, what I -- I didn't tell them I was doing, but

5    which I did as I would normally do in this situation is

6    to, yes, call our law firm's attorney who is an outside

7    lawyer.  We don't use our own personnel for these kinds

8    of matters.

9              So, I called our outside counsel, Susan

10   Thurmer, and we started to talk through and work up a

11   game plan together.

12        Q.      And did you also -- law firms carry

13   malpractice insurance, don't they?

14        A.      Sure.

15        Q.      Insurance in case the law firm gets sued?

16        A.      Right.

17        Q.      Do you have a responsibility to notify your

18   carrier in those situations?

19        A.      Well, this would not be covered under our

20   professional liability practice policy.  It might have,

21   had it been deemed to be a violation of employment law,

22   it might have triggered coverage under our employment

23   practices liability policy.  But, at this stage, you

24   know, it didn't strike me as being at that level.  And

25   so, that is why I did not alert our insurance companies,

1   but rather went right to our own lawyer.

2       Q.    What was the point of going to a lawyer

3   again?

4       A.    Well, attorneys don't, you know, have the

5   entire picture, necessarily, of the law anymore.  I used

6   to practice in employment law.  I don't anymore.  I

7   haven't for about 10 years or so.  We do have employment

8   lawyers at our firm, but for something like this, in my

9   view and judgment, we need to be protective of the

10  confidentiality of the individuals involved, and that

11  means going outside of the firm to make sure that we are

12  getting objective advice and advice that is delivered to

13  us in confidence, and the information is received in

14  confidence.

15      Q.    The outside law firm that you went to, is

16  that Cousineau McGuire?

17      A.    It is.

18      Q.    Have you turned to them, has Moss & Barnett

19  turned to them in the past to conduct employment-related

20  investigations?

21      A.    Well, we hired them, we hired them on

22  occasion when there have been situations involving

23  claims of violation of employment laws.  And when they

24  have advised us that it is appropriate to do so, we have

25  through their good offices, yes, hired outside

1    investigators to look into the matter.

2         Q.    So, you reported this incident to Susan

3    Thurmer at Cousineau McGuire and developed a game plan?

4         A.    Yes, sir.

5         Q.    What happened after that?

6         A.    Well, as I said, I was coming back from

7    Rochester, as I recall, arriving mid, or thereabouts in

8    the afternoon.  I recall Googling the name of the

9    purported author of that last e-mail, the one to

10   Maternowski and Dorland, Mary Sill.  And I remember

11   getting one hit or two.  But I remember only one of them

12   had an address of Wayzata, which was the address on that

13   e-mail.

14         And I have forgotten how I learned of Ms.

15   Sill's, or a person named Ms. Sill's home address and

16   phone number, but I did.  And I called it.  And if I

17   didn't reach her live, I think I did -- but at least we

18   had a telephone conversation where I asked her flat out

19   about the particulars of the e-mail.  And I recall our

20   discussion was, you know, courteous and brief, and that

21   she flatly denied that she sent that e-mail or that she

22   was associated with the William Mitchell College of Law

23   on the day in question when Mr. Kostolnik had allegedly

24   accosted her.

25         Q.    And when was it that you made that call?  Was

1    it before or after you talked to Mr. Kostolnik?

2        A.    That was before.

3        Q.    Okay.

4        A.    I mean, I had to find out if there was a Mary

5    Sill and if he had attacked her.

6        Q.    And you made the call?

7        A.    I did.

8        Q.    The conversation you just described?

9        A.    Right.  And I left the door open to her to

10   call me back if she wanted to, and I never did hear

11   back.

12       Q.    What happened after that?

13       A.    Well, I was in connection or contact with

14   Susan Thurmer, who has a very busy practice of her own.

15   So, we were talking back and forth.  At some point we

16   agreed the next step was to get Matthew Kostolnik in.

17            And as part of that I determined I needed to

18   have a witness with me, somebody with me to help and to

19   make sure that, you know, I was acting appropriately, as

20   a witness to what happened.  And so I invited Kevin

21   Busch to join me.

22            Kevin is a shareholder in our law firm.  He

23   was at that time and still is a director of the law

24   firm.  And as I recall, he was an officer -- I am going

25   to say he was the treasurer.  His titles have grown

1  since then, he is now lou our chief operating officer,

2  but also still a director.  So, Kevin Busch and I then

3  proceeded with what I will call a cross-examination or

4  interrogation, perhaps, of Matthew Kostolnik.

5        Q.    Did you ask Matt Kostolnik to come into your

6  office?

7        A.    Yes.  We cold called him in.  As I recall, it

8  is a little bit hazy, but I think he was out at a court

9  hearing and was kind of just getting back in when,

10  frankly, we jumped him and pulled him into my office.

11        Q.    Brought him in cold?

12        A.    Uh-huh.

13        Q.    And the two people that are interviewing him

14  or interrogating him are both members of the management

15  committee?

16        A.    Not the management --

17        Q.    Board?

18        A.    Both are on the Board, both are officers of

19  the law firm and both are clearly leaders of the firm,

20  yes.

21        Q.    Relatively senior attorneys in the firm?

22        A.    Oh, sure.  At the time I think Mr. Kostolnik

23  had maybe 10 or fewer years in practice, and he had just

24  been elected as a shareholder to the firm.  So, yes, he

25  was relatively junior.

1    Q.    So, you guys were senior and he was a younger

2    attorney?

3    A.    They don't call me the Shroyatollah for

4    nothing.

5    Q.    It was not a -- it was an aggressive

6    interview, I take it?

7    A.    It was, yes.  At that time, my position was,

8    our position as I defined it, with Susan's help, too,

9    was stand back, take some deep breaths, don't get

10   emotionally involved, but try to figure it out.  I mean,

11   the potentials were that somebody internal was after Mr.

12   Kostolnik, internal in our law firm -- who knows?  A

13   third party who had something at issue.  I had no clue

14   as to whether there was such a person.  Or, you know,

15   worst case, it was Mr. Kostolnik, himself, and we had

16   all been misled by the person we thought we knew.

17   Q.    And what did you ask him in the course of

18   that interview?

19   A.    Well, among other things, we pressed very

20   hard for what he had been up to on the prior Friday.

21   Q.    The date that is referred to in the e-mail?

22   A.    Correct.  Ms. Sill's e-mail, that is right.

23   Is it March 6th?  Yeah.

24   Q.    And what happened when you asked that

25   question?

1      A.      Well, we kept going at it like, you know, you

2  are supposed to and coming back with questions and we

3  were pressing him and asking him about this in the

4  context of the three prior e-mail which were, of course,

5  now looming ever larger in our mind in terms of, do we

6  have a problem with young Mr. Kostolnik, here?

7      Q.      Did you find out anything about where he was

8  on Friday the 6th?

9      A.      He told us that he had been at some

10  proceeding.  I am going to say it was a court hearing,

11  maybe even a Federal Court hearing somewhere, but I

12  don't have anymore memory than that.  I'm sorry.

13      Q.      Are you familiar with the ECF system?

14      A.      Yes, the Federal Courts docket filing system?

15  Sure.

16      Q.      And if I showed you a document from the ECF

17  system, would you recognize it?

18      A.      I would.

19              MR. RANK:  May I approach the witness, Your

20  Honor?

21              THE COURT:  You may.

22  BY MR. RANK:

23      Q.      I show you a document.  And don't read from

24  it, just take a look at it and see if reading that

25  refreshes your recollection as to where Mr. Kostolnik

```
 1   was on the 6th of March.
 2        A.      Yes.  He was in Federal Court that day.
 3        Q.      And do you know what Judge he was in front
 4   of?
 5        A.      He was in front of Judge Joan Ericksen.
 6        Q.      Do you know where she has her courtroom?
 7        A.      Well, I think at that time it was St. Paul.
 8   Is that right?  Maybe it was Minneapolis.  I don't
 9   remember, I'm sorry.
10        Q.      I won't press you on that.
11        A.      Okay.
12        Q.      You don't know whether it was St. Paul or
13   Minneapolis?
14        A.      You know, I didn't look closely enough at the
15   docket sheet.  I just don't remember.  Sorry, Judge.
16               THE COURT:  I won't tell her.
17   BY MR. RANK:
18        Q.      In any event, were you able to confirm he was
19   not at William Mitchell on the 6th of March?
20        A.      Right.  He had a very clear appearance, and
21   he couldn't have done it, physically.  Although, you
22   know, I still hadn't ruled him out.
23        Q.      So, what did you do in response to that after
24   you had the aggressive interview with Mr. Kostolnik?
25        A.      Well, Matthew became very emotional, very
```

1    upset.  And Kevin and I both remarked later, you know,

2    it is too bad we had to go through all of that to get to

3    it.  But then he came forth with his experiences that he

4    had been having at his home.  And so we talked through

5    those.

6         Q.    Can you be more specific?

7         A.    Sure.  He described how he had moved into his

8    home.

9              MR. MAHONEY:  Objection, hearsay.

10             THE COURT:  Sustained.

11   BY MR. RANK:

12        Q.    Without getting into any details of what he

13   was talking about, did he indicate to you he had some

14   issues with a neighbor?

15        A.    Well, indeed.  In fact, perhaps just to be

16   very specific, he indicated that they had arisen to the

17   level of involving the Anoka County Law Enforcement

18   folks.

19        Q.    So, after he had given you that information,

20   what did you do?

21        A.    Well, we followed up with Susan Thurmer and

22   we talked to her.  And now our thinking had evolved from

23   somebody hacking into our computer, or perhaps if it had

24   been an internal Moss & Barnett person, you know,

25   somebody going in over a lunch hour, or some night if

1    Matthew had left his computer on, you know, and sort of

2    just taking over his laptop and doing stuff, to focusing

3    on his home.  So, Ms. Thurmer advised us that she knew

4    of someone with a great amount of expertise in computer

5    forensics, who she had worked with before and wondered

6    if we shouldn't hire that person and start to get to the

7    bottom of it.

8              So, we proceeded immediately with that.  In

9    fact, I think that individual started very quickly to

10   meet with our IT people, to help sort through what they

11   had, or could find still on our system, and then he also

12   moved out to the Kostolnik residence to proceed

13   forensically with their server.

14        Q.   What was the name of that person, sir?

15        A.   Scott, and it is Scandinavian, I think

16   Hanson.

17        Q.   Could it have been Scott Johnson?

18        A.   It was Scandinavian, so Scott Johnson works

19   for me.

20        Q.   You followed Susan Thurmer's recommendation

21   to retain a forensic investigator to work on this case?

22        A.   Right.  And keep in mind, this was -- this

23   isn't Matt Kostolnik hiring Ms. Thurmer, this is Moss &

24   Barnett.  I am the representative of that law firm.  She

25   is our lawyer.  We are her client.

1           And so she was doing this for us to figure

2   out what was going on.  As I made it clear, she to me,

3   and I agreed with her, was that this was still a wide

4   open investigation.  And, you know, we didn't know what

5   it was going to turn up.  And it was going to be -- when

6   they found out what Mr. Johnson found out was going to

7   be relayed back to me via the attorney-client

8   relationship, and we would figure out what to do with it

9   after that.

10      Q.    And if it turned out to be Mr. Kostolnik, the

11  chips would have fallen where they fell?

12      A.    Right.  And we talked about the possibility

13  that somebody internal had an axe to grind against him.

14  He had just been elected, as I said, a shareholder.

15  Maybe somebody had a bad feeling about that, who knows?

16  Or something else?  You never know.  Or, possibly, it

17  was Mr. Kostolnik, or this other situation that I

18  mentioned he described to us.

19      Q.    So, your directive to Ms. Thurmer and the

20  investigator is find out what has happened, whatever it

21  is?

22      A.    No agenda, just get me the information,

23  right.

24      Q.    After the March 8th e-mail, and then you

25  working with Ms. Thurmer and the forensic investigator,

1    did you learn of yet another odd e-mail that was sent

2    related to Matt Kostolnik?

3         A.    I sure do.  I was in my office one morning

4    and Matt Kostolnik walked in the door and said:  The

5    Secret Service is here to talk to you.  And that was

6    kind of an eye opener.

7         Q.    Do you regularly get visits from the Secret

8    Service at your office?

9         A.    I have never met any of them before, right.

10   So, I went down to a conference room and we had a, you

11   know, a pleasant chat with them about an e-mail that

12   they were interested in.

13        Q.    I take it when you say a pleasant chat, it is

14   kind of a euphemism, because the e-mail was actually,

15   what?

16        A.    Well, as I recall, it was a threat against

17   Vice-President.

18        Q.    A death threat?

19        A.    Yes, yes.

20        Q.    And did you see the text of the e-mail?

21        A.    I recall that I did, but just briefly.  Or

22   perhaps it was just the title of it, but I was aware

23   that that was the content of it as we were having the

24   discussion with them, yes.

25        Q.    Did you also learn that it had been sent in

1    an e-mail address with the name of both Matt Kostolnik

2    and his wife?

3         A.      I did.

4         Q.      Did you also learn that it was from a Yahoo

5    address like those February 2009 e-mails were?

6         A.      Right.

7         Q.      What was the purpose of bringing you into the

8    conversation, if you know?

9         A.      My recollection is that we talked about the

10   firm -- first of all, when Matthew Kostolnik was still

11   there at the start of this meeting with the Secret

12   Service, we talked about the history of the

13   investigation.  The fact that, yes indeed, we had this

14   track record, these events that occurred, and that we

15   were proceeding with an investigation.  Then they

16   excused Matthew Kostolnik and we talked back and forth

17   about him.  They wanted to know my thoughts and views

18   and opinions.  And, you know, I went through the

19   narrative that we have gone through about how, you know,

20   we were initially focused strictly on protecting the law

21   firm from what was clearly a threat of some kind and

22   focused on figuring out the truth, not with any agenda,

23   and what we had then found out from Susan Thurmer who

24   had heard from Scott Hanson about what was happening.

25        Q.      And did you give --

1    A.    Scott Johnson, excuse me.

2    Q.    I will apologize to him for you.  Did you

3  provide the Secret Service agents with an update on what

4  you had learned from Susan Thurmer, and from Forensic

5  Investigator Johnson?

6    A.    Right.

7    Q.    Okay.  Did you learn at some point in time

8  that the forensic investigator had made some connection

9  with someone using Matt Kostolnik's wireless router?

10   A.    I did.

11   Q.    And identified the person that was doing it?

12   A.    Yes.

13   Q.    And did you learn at some point in time that

14  there was a search warrant done on that person's house?

15   A.    I learned that.

16   Q.    Did you learn that around the time it

17  happened or did you learn it closer to today's date?

18   A.    I recall the day of the warrant being

19  executed that Matt Kostolnik said that they had at some

20  point prior to then finally picked up enough evidence to

21  get a search warrant and that they had executed it, yes.

22   Q.    Okay.  I have nothing further for Mr. Shroyer

23  at this time.  Thank you very much, sir.

24            THE COURT:  You may inquire if you wish, Mr.

25  Mahoney?

1          MR. MAHONEY:  Yes, Your Honor.

2

3                  CROSS EXAMINATION

4     BY MR. MAHONEY:

5          Q.     As part of your investigation, did you have

6     the computer, Matt Kostolnik's computer reviewed,

7     forensically, at the office?

8          A.     I do know that our IT folks took steps to do

9     some things internally, and I believe they consulted

10    with Mr. Johnson.  But, I don't know what they did.

11         Q.     And so, as far as you know, as far as we

12    know, and you can say today, is you are not aware that

13    his actual computer was reviewed forensically?  The

14    computer at the office?

15         A.     You mean his laptop?

16         Q.     His laptop.

17         A.     I don't know one way or the other.

18         Q.     And whether his office was searched for any

19    thumb drives or any CDs that might contain any of the

20    information or the alleged e-mails?  That didn't happen?

21         A.     No one told me that any such search had

22    occurred.  And frankly, I would be surprised if it did,

23    without my knowledge, anyway.

24         Q.     And you didn't direct it?

25         A.     Correct.

1          MR. MAHONEY:  All right.  Nothing further,

2     Your Honor.

3          THE COURT:  Mr. Rank?

4          MR. RANK:  Nothing.

5          THE COURT:  You may step down, sir.  Thank

6     you.  You may call your next witness.

7          (Witness excused.)

8          MR. RANK:  The United States called Andrew

9     Scobbie.  May I collect the exhibits?

10          THE COURT:  You may.  Sir, if you want to

11     step forward, and come to your right here, come through

12     here towards the chair in front of the big screen.  And

13     then before you go into the witness box if you would

14     please raise your right hand?

15          (Witness sworn.)

16          Then there is a step up there, sir, but if

17     you would have a seat behind the microphone?  And then

18     as I say to each witness, you will have to sit fairly

19     close to the mike or it will not pick you up.  And then

20     if you would please state your full name, and spell your

21     last name?

22          THE WITNESS:  My name is Andrew James

23     Scobbie, S-c-o-b-b-i-e.

24          THE COURT:  You are going to have to sit up a

25     little bit -- and you can slide the mike from the base

1    closer to you, as well.  You many inquire whenever you

2    are ready.

3                    MR. RANK:  Thank you, Your Honor.

4                         ANDREW SCOBBIE

5                       DIRECT EXAMINATION

6    BY MR. RANK:

7         Q.     Good afternoon, Mr. Scobbie.

8         A.     Good afternoon.

9         Q.     Mr. Scobbie, do you live in Blaine,

10   Minnesota?

11        A.     Yes.

12        Q.     And in fact, do you live in the area of

13   Blaine, Minnesota around the Defendant Barry Ardolf?

14        A.     Yes, I do.

15        Q.     Also around the house of Matt Kostolnik and

16   Bethany Kostolnik?

17        A.     Yes, yes.

18        Q.     I am going to show you, sir, on the screen in

19   front of you an exhibit that has already been in

20   evidence, it is an aerial shot of your neighborhood.  I

21   know that if you look due west of your house, that that

22   looks like an empty lot there.  I think now there is a

23   house built there?

24        A.     Yes.

25        Q.     Is this, first of all, an accurate shot of

1    your neighborhood, other than the fact that those two

2    lots, I think, there are houses on now?

3         A.    It is.

4         Q.    And there is a -- the house that is at the

5    bottom of Exhibit 40, there is a box and it says your

6    name.  Is that accurately placed?

7         A.    It is, yes.

8         Q.    And next to that there is a box and a yard

9    next to it that says Kostolnik on there, is that

10   accurately placed?

11        A.    That is correct, yes.

12        Q.    How about above that?  There is a box for the

13   Ardolf residence.  Is that also accurately placed?

14        A.    It is.

15        Q.    Do you know the Vang family?

16        A.    I do.

17        Q.    And if you look at the top of Exhibit 40

18   there is a box there.  Is that an accurate placement of

19   the Vang residence?

20        A.    Yes.

21        Q.    Sir, did you live in this location in March

22   of 2009?

23        A.    Yes.

24        Q.    And at that point in time did you have a

25   wireless internet router in your house?

1        A.      I did.

2        Q.      At that point in time in March of 2009, do

3   you know whether your internet router was encrypted,

4   unencrypted?

5        A.      Definitively, I don't know.  I thought it

6   was.

7        Q.      Do you remember approximately when you first

8   set up your wireless connection?

9        A.      I don't.

10       Q.      When you set it up, did you try to encrypt

11  it?

12       A.      Yes, I believe did.

13       Q.      Did you believe it was encrypted?

14       A.      Yes, at the time I did.

15       Q.      Did you learn at a later time it wasn't

16  encrypted?

17       A.      I did.

18       Q.      Sir, did you give Barry Ardolf permission to

19  go on your wireless internet router to connect to the

20  internet?

21       A.      I did not.

22       Q.      And did you give Barry Ardolf permission to

23  create a gmail.com e-mail account, specifically

24  MarySill2008@gmail.com using the router?

25       A.      I did not.

1    Q.    Did you give Barry Ardolf permission to

2    create or send an e-mail from your wireless router using

3    that gmail account?

4    A.    I did not.

5    Q.    Sir, I am going to ask you, and I am going to

6    provisionally offer this, Your Honor, this is 144,

7    subject to firming up chain of custody.

8         And I show you a document, first of all,

9    Government's Exhibit 144.  And if you look at the top of

10   it, you will see information related to you and your

11   family.

12   A.    Yes, I do.

13   Q.    And there is actually a version with a

14   post-it note on that.  Do you see that?

15   A.    Yeah.

16        MR. RANK:  I offer Exhibit 144 provisionally

17   at this time.

18        MR. MAHONEY:  Can I see it?

19        THE COURT:  Mr. Mahoney?  Oh, do you want to

20   take a look-see?  All right.

21        MR. MAHONEY:  This is the -- okay.  No

22   objection.

23        THE COURT:  Provisionally received, that is

24   144.

25        (Government's Exhibit 144 was provisionally

1    received in evidence.)

2

3    BY MR. RANK:

4        Q.     I am going to put that up on the screen, Mr.

5    Scobbie, and just blow up that portion.  And I am going

6    to actually take -- that is a photocopy that I am

7    showing you right there.  And show the actual document

8    because there is a post-it note on the actual document.

9    All right?

10            I will put that on this machine which

11   hopefully will be able to project it up on that same

12   screen, momentarily.

13            All right.  First of all, I am going to take

14   off the post-it note there.  Is that your name and the

15   name of your wife?

16       A.     Yes, it is.

17       Q.     And is that -- I am not going to say the

18   address on there, but is that your address?

19       A.     That is correct.

20       Q.     And the post-it, do you recognize the

21   information on the post-it?

22       A.     Yeah, it would be probably appropriate for

23   that time frame.

24       Q.     Okay, those are the names of your children?

25       A.     Names of my children, yes.

1      Q.      Thank you, Mr. Scobbie.  I have no further

2 questions.

3              THE COURT:  You may inquire if you wish Mr.

4 Mahoney.

5              MR. MAHONEY:  One second, Your Honor.

6              THE COURT:  All right.

7                      CROSS EXAMINATION

8 BY MR. MAHONEY:

9      Q.      Good afternoon, sir.

10     A.      Good afternoon.

11     Q.      I just wanted to make sure.  When you asked

12 whether your Wi-Fi was encrypted, you said you didn't

13 know at this time.  At one point you said you tried to

14 encrypt it, but you were not sure if it was effective,

15 is that what you mean?

16     A.      I thought it was effective at the time.  But,

17 I didn't do -- I didn't like get another computer to

18 check it out or anything like that.  So, that is where

19 the uncertainty comes in.

20     Q.      That is perfectly fine, so you are not

21 absolutely sure that the Wi-Fi was encrypted.  And if

22 that is your answer, that is okay.

23     A.      Yeah, that is the best I can do.

24     Q.      What was the name of your Wi-Fi?

25     A.      That, again, I'm not sure of.

1          Q.      Okay.  Thank you.  No further questions.

2                  THE COURT:  Mr. Rank?

3                  MR. RANK:  No redirect.

4                  THE COURT:  You may step down, sir, thank

5     you.  You may be excused.

6                  You may call your next witness.

7                  (Witness excused.)

8                  MR. RANK:  Thank you, Your Honor.  The United

9     States calls Mou Cheng Vang.

10                 THE COURT:  Sir, if you would step to the

11    front of the courtroom, kind of come to the right here,

12    your right, and close to that witness stand.  I am going

13    to ask you before you go in there, if you would just

14    please raise your right hand?

15                 (Witness sworn.)

16                 Then there is a step up, there, sir.  If you

17    want to have a seat in the witness chair?  And then I

18    would ask you, as I do everyone, if you would please

19    move close to the mike, because it won't pick you up,

20    otherwise.  And then if you would please state your full

21    name and spell your last name.

22                 THE WITNESS:  My name is Mou Cheng Vang,

23    V-a-n-g.

24                 THE COURT:  Thank you.  You may inquire,

25    counsel.

1          MR. RANK:  Thank you, Your Honor.

2                    MOU CHENG VANG

3                    DIRECT EXAMINATION

4    BY MR. RANK:

5          Q.    Good afternoon, Mr. Vang.  Mr. Vang, in March

6    of 2009, did you live in a house in Blaine, Minnesota?

7          A.    Yes.

8          Q.    I am going to show you, sir, on the screen in

9    front of you an aerial map of an area around Xxxxx

10   Xxxxxx in Blaine, Minnesota.

11              Do you recognize that area?

12         A.    Yes.

13         Q.    And in fact at the top of the screen, there

14   is a house and there is a box underneath it that says,

15   "Vang."

16              Is that your house?

17         A.    Yes.

18         Q.    Across the street from that, is that Barry

19   Ardolf's residence?

20         A.    Yes.

21         Q.    You live across the street from Mr. Ardolf?

22         A.    Yes.

23         Q.    In March of 2009, did you have a wireless

24   internet router in your house?

25         A.    Yes.

1    Q.    And was the wireless internet router

2    encrypted in 2009?

3    A.    No, it wasn't.

4    Q.    Have you since that time encrypted it?

5    A.    Yes.

6    Q.    You learned that that is a good idea?

7    A.    Yes.

8    Q.    Mr. Vang, did you give Barry Ardolf

9    permission to use your wireless router to connect to the

10   internet?

11   A.    No, I didn't.

12   Q.    Did you give him permission to create a gmail

13   account in the name of Mary Sill and send it through

14   your internet router?

15   A.    No, I didn't.

16   Q.    Did you give him permission to use your

17   internet for any purpose?

18   A.    No.

19   Q.    Thank you, Mr. Vang.

20        MR. RANK:  I have no further questions, Your

21   Honor.

22        THE COURT:  Any questions, Mr. Mahoney?

23        MR. MAHONEY:  No questions.

24        THE COURT:  You may step down, sir.  Thank

25   you.  You may call your next witness.

```
 1                    (Witness excused.)

 2                    MR. RANK:  Thank you, Your Honor, the United

 3       States calls Mary Sill.

 4                    THE COURT:  If you want to make your way to

 5       the front of the courtroom towards the -- it would be

 6       your right -- towards the witness stand up here?  And

 7       before you go into the witness stand, if you would

 8       please raise your right hand?

 9                    (Witness sworn.)

10                    There is a step up there, but if you please

11       have a seat in the chair behind the microphone.  And you

12       will have to sit fairly close to the mike or it won't

13       pick you up.

14                    If you would please state your full name

15       spell your last name?

16                    THE WITNESS:  Mary Jean Sill, S-i-l-l.

17                    THE COURT:  You may inquire, Mr. Rank.

18                    MR. RANK:  Thank you, Your Honor.

19                              MARY SILL

20                         DIRECT EXAMINATION

21       BY MR. RANK:

22            Q.    Good afternoon, Ms. Sill.

23            A.    Good afternoon.

24            Q.    Mam, I am going to show you a document on the

25       screen in front of you that has previously been admitted
```

1    into evidence.

2              First of all, have you ever seen this before?

3         A.    Never.

4         Q.    Are you aware that an e-mail had been sent in

5    your name at one point in time?  Do you know that from

6    law enforcement --

7         A.    Yes.

8         Q.    -- telling you that?

9         A.    Yes.

10        Q.    You have never actually seen the e-mail?

11        A.    No, never.

12        Q.    Mam, this is an e-mail that has your name on

13   it; is that correct?

14        A.    Yes, it is.

15        Q.    And that is the correct spelling of your

16   name?

17        A.    Yes, it is.

18        Q.    And there is -- I guess if you wouldn't mind,

19   I will just ask you, did you send this e-mail?

20        A.    I did not.

21        Q.    Did you or have you ever met a person named

22   Matt Kostolnik?

23        A.    No, never.

24        Q.    Did the incident that is described in this

25   e-mail, and you may not know what it says, but if you

1  want an opportunity to take a look through it, I am

2  going to read it.  I will ask you whether the incident

3  described in there took place.

4       A.     It did not.

5       Q.     Were you ever at William Mitchell College of

6  Law on March 6th, 2009?

7       A.     No.

8       Q.     And if you look to the bottom it says your

9  name, and then there is a city that is in there,

10  Wayzata, Minnesota; correct?

11       A.     Yes.

12       Q.     Do you live in Wayzata?

13       A.     Wayzata ZIP code.

14       Q.     So, if you do an internet search for you,

15  does your name come up as living in Wayzata?

16       A.     Yes, it does.

17       Q.     Mam, did you give Barry Ardolf permission to

18  use your name to create a gmail account?

19       A.     I did not.

20       Q.     Did you give him permission to send an e-mail

21  to these people that are on the list, Joseph Maternowski

22  and Anthony Dorland in your name?

23       A.     No.

24       Q.     Now, I am going to ask, Your Honor, about a

25  document that has been previously provisionally admitted

1   into evidence.  It's Exhibit 37.  I am going to ask

2   again about a couple of items related to that.

3            I am going to show you, this is on the second

4   page of -- the second page of Government's Exhibit 37,

5   and ask you -- I won't make you read the information

6   off, but I am blowing up the middle portion of it.

7   There is a telephone number on there.  Is that your

8   telephone number?

9        A.    It is.

10       Q.    And it comes back as Wayzata, Minnesota and

11  you described why it is that your name would come back

12  as Wayzata, Minnesota; is that correct?

13       A.    Yes.

14       Q.    And then if we go to the next page of the

15  same document, again at the bottom, there is page four

16  of Government's Exhibit 37.  Again, this is the same

17  telephone number; is that correct?

18       A.    Yes, it is.

19       Q.    And that is your real telephone number?

20       A.    Yes, it is.

21       Q.    Thank you Ms. Sill.

22            MR. RANK:  I have no further questions, Your

23  Honor.

24            THE COURT:  Any questions, Mr. Mahoney?

25            MR. MAHONEY:  No, Your Honor.

1          THE COURT:  You may step down, Ms. Sill,

2     thank you.

3          You may call your next witness whenever you

4     are ready.

5          (Witness excused.)

6          MR. RANK:  Your Honor, the United States will

7     be calling as soon as he is here the United States

8     Secret Service Special Agent Brent Knutson.

9          THE COURT:  Oh, okay.

10         MR. RANK:  I have been advised he is

11    momentarily indisposed, Your Honor.

12         THE COURT:  Just a reminder to the members of

13    the jury, something I said at the beginning of the

14    testimony yesterday, or at the beginning of the trial

15    yesterday.  You have seen me yesterday, and then today,

16    the light, and that is me doing it, coming on and off.

17    It is again, just to help you on the assumption that it

18    assists you in looking at an exhibit on the screen.  It

19    is not to emphasize an exhibit.  You shouldn't read

20    anything into it.  It is just done simply to -- my

21    assumption.

22         I do it in every case, and that is why we

23    have these settings up here.  Sometimes a lawyer will

24    ask me to do it if I either have not done it or have

25    forgotten to do it.  You shouldn't read anything into it

1    because it is unrelated to an exhibit, other than to

2    increase your ability to look at a particular exhibit.

3    How much weight and value it should have is always your

4    decision to make.  So, you may call your next witness?

5                MR. RANK:  The United States calls Secret

6    Service Special Agent Brent Knutson.

7                THE COURT:  If you would step forward, sir?

8    And then right before you go into the witness stand I

9    will administer the oath to you.  Raise your right hand.

10               (Witness sworn.)

11               And there is a step up, there.  But if you

12   would please have a seat behind the microphone?  And

13   then once you are seated, you will first find if you are

14   not fairly close to it, it won't pick your voice up.  If

15   you would please state your full name, and spell your

16   last name.

17               THE WITNESS:  Brent Thomas Knutson,

18   K-n-u-t-s-o-n.

19               THE COURT:  You may inquire, Mr. Rank.

20               MR. RANK:  Thank you, Your Honor.

21                         BRENT KNUTSON

22                       DIRECT EXAMINATION

23   BY MR. RANK:

24       Q.    Special Agent Knutson, where do you work?

25       A.    I work for the U.S. Secret Service here in

1    Minneapolis.  W.

2        Q.    How long have you been with the Secret

3    Service?

4        A.    20 years.

5        Q.    What kinds of things have you done with the

6    Secret Service in your time there?

7        A.    Protection, investigations into threats,

8    counterfeit money, bank fraud, credit card fraud.

9        Q.    And just in general, what kinds of things are

10   the United States Secret Service responsible for looking

11   after?

12       A.    Protection of the President, Vice-President,

13   visiting Foreign Heads of State, and also investigation

14   into threats against the President, Vice-President, also

15   counterfeit money, bank fraud, credit card, computer

16   fraud.

17       Q.    All of the things that the Secret Service has

18   done, how many areas have you worked in?  It sounds like

19   3 or 4 of them?

20       A.    Yeah, I've pretty much hit them all.

21       Q.    And the protection detail that you talked

22   about, are there people at the Secret Service who are

23   assigned to protect the President, Vice-President and

24   their families?

25       A.    Yes.  There are permanent protection details

1    that are assigned to the President and the

2    Vice-President, former Presidents, and then we also put

3    together details for visiting Foreign Heads of State

4    while they are in the country.

5        Q.    In addition to the Secret Service agents that

6    are assigned to protect the President, the

7    Vice-President, if the President or Vice-President

8    travel to another place like Minneapolis, are there

9    Secret Service agents from the Minneapolis office, as

10   well as other law enforcement that assist in protection

11   details?

12       A.    Yes.  We work on a counterpart basis.  So,

13   the local field office assists the detailing, because

14   they have all of the contacts with state, federal law

15   enforcement here locally.  And we work on a counterpart

16   basis where we help them set all of the security up for

17   a visit.

18       Q.    Is it common with the Secret Service to work

19   hand-in-hand with other law enforcement agencies?

20       A.    Absolutely.

21       Q.    Sir, you talked a little bit about the

22   physical protection part of the Secret Service's duties,

23   the details and the protection assignments.  Does the

24   Secret Service protection role also extend to following

25   up on threats to the President and the Vice-President?

1      A.     Yes, it does.  I would say that is the number

2   one priority of the Secret Service, as far as an

3   investigation, is a threat.  We do take all threats

4   seriously.  We do investigate them thoroughly.

5      Q.     As part of the physical protection, it is

6   intercepting the threats before they actually happen?

7      A.     Correct.

8      Q.     As part of your duties, Agent Knutson, were

9   you involved in the investigation of an e-mail threat

10  that was made to the Vice-President of the United States

11  in April of 2009?

12     A.     Yes, I was.

13     Q.     I am going to show you four -- if I may

14  approach, Your Honor?

15            THE COURT:  You may.

16  BY MR. RANK:

17     Q.     Mr. Knutson if you would look at what has

18  been marked for identification as Government's

19  Exhibit 41?  Do you recognize that?

20     A.     Yes, I do.

21     Q.     It is a multi-page exhibit, but if you just

22  take a look at -- well, actually, if you could pull out

23  the other portions of it, do you see the date on that

24  e-mail?

25     A.     I see the first one is April 1st, and the

1    second one is April 2nd.

2         Q.    Okay.  And if you are looking at the one from

3    April 2nd, can you tell who the recipient of the April

4    2nd e-mail was?

5         A.    I know the -- on the April 2nd was the Vice

6    President, the White House is where it was sent, yeah.

7         Q.    What was the actual e-mail address,

8    VicePresident@WhiteHouse.gov?

9         A.    That is correct.

10        Q.    And pages two and three is sort of a printout

11   with a lot of code in it in addition to the text of the

12   e-mail?

13        A.    Yes.

14        Q.    Do you know that to be how the Internet

15   Threat Desk of the Secret Service receives e-mails?

16        A.    That how the Internet Threat Desk -- that is

17   correct.  That is how they receive them.

18        Q.    We will follow-up on that in a moment.  But,

19   the front page of that is a more readable text of that

20   e-mail?

21        A.    Yes.

22              MR. RANK:  We offer 41.

23              MR. MAHONEY:  No objection.

24              THE COURT:  41 is received.

25              (Government's Exhibit 41 was received in

1    evidence.)

2    BY MR. RANK:

3         Q.     I am showing you on the screen, Agent

4    Knutson, this document, and this one at least has an

5    April 1st, 2009 date on it, and it is sent to a number

6    of different entities, including starting with

7    VicePresident@WhiteHouse.gov, is that correct?

8         A.     That is correct.

9         Q.     What is the subject line of the e-mail?

10        A.     "This is a terrorist threat.  Take this

11   seriously."

12        Q.     You said you learned about this e-mail at

13   some point in time.  How is it that you first learned

14   about the existence of this e-mail?

15        A.     How we first learned about it was from the

16   Capitol Security -- or I should say, the Minnesota State

17   Patrol assigned to the Capitol in Minnesota.  They had

18   received some of these e-mails, as well, and they called

19   us and, you know, forwarded it to our duty agent.

20        Q.     There were some e-mail addresses on here,

21   Representative Kate Knuth, or RepKateKnuth@House.mn,

22   SteveSmith@House.mn, TimSanders@House.mn, and

23   Sen.Don.Betzold@Senate.mn.

24               Do you understand those to be State

25   Legislators?

1    A.    That is correct.

2    Q.    Is that why the State Capitol Security

3 contacted you?

4    A.    Yes.

5    Q.    So, that is how you first learned about it?

6    A.    Yes.

7    Q.    What did you do in response to learning about

8 this and why was it that they were calling you?

9    A.    Well, they were calling us, because they saw

10 also on the header of the e-mail where it was sent to

11 the VicePresident@WhiteHouse.gov, and that was the

12 reason they called us.

13    Q.    What did you do when you learned about it?

14    A.    We called what is normal, we called our

15 Internet Threat Desk and reported that we had received

16 this e-mail from a fellow law enforcement officer from

17 the state, and also had to ask them to check on that, as

18 well.

19    Q.    Did you get a copy of --

20    A.    I got a copy of it, right.

21    Q.    I will blow up the text of this e-mail.  When

22 you got it, did you read through it?

23    A.    Yes, I did.

24    Q.    And did this cause you some concern that this

25 was being sent to the Vice-President of the United

1  States?

2          A.       Yes, yes.

3          Q.       And does that kind of hit right in --

4          A.       Absolutely.  I mean, we take all of these

5   threats seriously and you don't know what you have at

6   the time.  It is a very direct threat, so you don't know

7   what you have until you actually investigate it.

8          Q.       And the top of the e-mail, I guess -- I am

9   going to ask you to read a portion of it.  If you could

10  read for the record, and slowly, if you could, starting

11  with "This is a terrorist threat."

12         A.       "This is a terrorist threat.  Take this

13  seriously.  I hate the way you government people are

14  spending money you don't have.  All of the real people

15  of this country would be jailed if we spent money we

16  didn't have.  If real people go to jail for writing a

17  bad check, you should, too.  I'm assigning myself to be

18  the judge, jury and executioner.  Since you government

19  folks have spent what you don't have, it's time to pay

20  the ultimate price."

21         Q.       Down further, I ask you to read the next

22  batch.

23         A.       "Time for new government officials after you

24  all are put to death by us.  Don't bother trying to

25  trace this e-mail.  I'm a lawyer for one of the largest

1  firms in the Metro area.  And I know you can't touch me.

2  All I have to do is deny everything and say a hacker

3  created this e-mail.  I also have a friend who is a

4  computer whiz, and she says you can't really trace an

5  e-mail to a person.

6       Q.    Down -- you can just read it.

7       A.    "F you all for spending money you don't have.

8  I'll kill you all one at a time, or a bunch at a time.

9  I'll take any opportunity I can get.  My wife Bethany is

10  sitting next to me, works for one of the largest real

11  estate agencies.  And all her co-workers feel the same

12  as we do.  You guys better start watching your back.

13  I'm coming for you all.  I swear to God I will kill you

14  guys.  Math and Bethany."

15       Q.    Those are strong words.

16       A.    Very strong.

17       Q.    There is no, really, mincing those words?

18       A.    No, there is not.  I mean, I swear to God I

19  will kill you.  I mean, it was pretty much -- it was a

20  direct threat.

21       Q.    Would somebody who is assigned to protecting

22  the President and Vice-President, would you act pretty

23  quickly?

24       A.    Very quickly.  Yeah, we follow-up on those

25  right away.

1    Q.    What did you do in response to getting this,

2  besides contacting the Internet Threat Desk?

3    A.    First thing I did was just some open source

4  checks and did some record checks to find out who Matt

5  Kostolnik is, because we determined that, you know, it

6  came from him.  So, we found out where he works where he

7  lives.

8    Q.    And what did you do after that?

9    A.    I actually went over to his -- where he works

10  at the law firm of Moss & Barnett and set up an

11  interview and interviewed him.

12    Q.    Did you go in and talk to him directly?

13    A.    Yes, I did.

14    Q.    At his firm?

15    A.    Yes.

16    Q.    Generally speaking, is that a comfortable

17  interview if someone is having the Secret Service come

18  to them to talk about a death threat that has been sent

19  in their name?

20    A.    No, not at all.  In fact he was very upset

21  about what had occurred.

22    Q.    What did he say in response to you showing

23  him this e-mail?  Did you show him the e-mail or just

24  ask him about it?

25    A.    I asked him about it that, you know, we

1    received an e-mail.  And then eventually, you know, when

2    he told me he denied it, or hey, he didn't send it,

3    these things had been occurring.  I did show him the

4    e-mail.  And I also spoke at that time to one of his

5    supervisors, as well.

6         Q.    And what was purpose of speaking to his

7    supervisor?

8         A.    Just to verify the things that the victim had

9    told us, Matt Kostolnik had told us.  And his supervisor

10   also wanted to talk to us, as well, because the firm had

11   received several inappropriate e-mails.

12        Q.    So you were given some background

13   information?

14        A.    Correct.

15        Q.    And you have been saying "we."  When you went

16   to do the interview, were you with --

17        A.    I was with a partner of mine, Special Agent

18   Eric Humbert.

19        Q.    The two of you went together?

20        A.    Correct.

21        Q.    Again, so the two of you are going to his

22   office to interview him about a death threat?

23        A.    Yes.

24        Q.    After you left the Moss & Barnett firm, did

25   you contact anyone to confirm that there was in fact a

1  law enforcement investigation taking place?

2      A.   Yes, I did.  Because I learned at that time

3  the Anoka County Sheriff's Office had an open case on

4  that.

5      Q.   Who did you learn that from?

6      A.   From the victim, Matt Kostolnik, and also

7  Thomas Shroyer, who was the managing partner of Moss &

8  Barnett.

9      Q.   Who did you contact to determine that Anoka

10  County had an existing investigation?

11      A.   Detective Pat O'Hara.

12      Q.   After you learned about that, did the Secret

13  Service remain as part of the investigation into these

14  e-mails?

15      A.   Yes, we did.

16      Q.   Were you the lead agency on it, or was there

17  another agency that was also involved?

18      A.   Well, when I spoke with Detective O'Hara, he

19  had an open investigation and was welcoming any

20  assistance.  So, I turned the information that I had

21  received over to the Minnesota Cyber Crimes Task Force.

22      Q.   And is that a task force that the Secret

23  Service participates in?

24      A.   That is correct.

25      Q.   As well as the FBI?

1      A.      Correct.

2      Q.      And do you know whether Special Agents

3  Cameron and Howe are agents of the Minnesota Task Force?

4      A.      Yes, they are.

5      Q.      After -- actually, let me ask you a couple of

6  things about pages two and three of Exhibit 41.  Let me

7  go to the next page because -- I will blow up the top

8  portion.  I asked you about this, but I didn't show it

9  to you or show it on the screen.

10             This is information that you received from

11  where, from what source?

12     A.      I never received this exact source.

13     Q.      Have you seen the sort of printout like this

14  before?

15     A.      I have seen these printouts before, but I did

16  not receive this particular printout at that time.

17     Q.      If there were printouts received by the

18  Internet Threat Desk, who would be the appropriate

19  person to talk about that?

20     A.      That would be an agent from the Internet

21  Threat Desk, which in this case was Special Agent David

22  Ruffino from Washington, D.C., assigned to our Internet

23  Threat Desk.

24     Q.      And I guess I asked you about that.  You said

25  you contacted the Internet Threat Desk?

1      A.      Correct.

2      Q.      Did you talk to Agent Ruffino when you did

3   that?

4      A.      Yes, I did.

5      Q.      And after you learned that there was an

6   ongoing, an existing law enforcement investigation into

7   some other e-mails, as well as this e-mail, did you pass

8   that information back to Agent Ruffino?

9      A.      Yes, I did.

10     Q.      Did you ask him also to look for additional

11  e-mails if they came in?

12     A.      That is correct.

13     Q.      And did you learn that there were additional

14  e-mails that came in after April 1st, 2009?

15     A.      Yes.

16     Q.      Did you also learn that there was a search

17  warrant eventually conducted on Barry Ardolf's house in

18  July of 2009?

19     A.      Yes, I did.

20     Q.      Do you know whether the Secret Service

21  participated in any way in that search?

22     A.      Yes, we did.

23     Q.      Did you, yourself, participate in that?

24     A.      I did not.

25     Q.      Do you know who from Secret Service

1    participated?

2         A.      Special Agent Eric Humbert and Special Agent

3    Lawrence Propes.

4         Q.      Thank you, Agent Knutson.  I have no further

5    questions.

6              THE COURT:  Mr. Mahoney?

7              MR. MAHONEY:  I have a few questions, Your

8    Honor.

9              THE COURT:  All right.

10                    CROSS EXAMINATION

11   BY MR. MAHONEY:

12        Q.      Good afternoon.  Let's see, I wasn't sure,

13   was it ever confirmed that these e-mails actually went

14   to the Vice-President?

15        A.      Yes, it was.

16        Q.      And in preparing -- you started writing

17   memorandums and things like that regarding this case,

18   right?

19        A.      Yes.

20        Q.      And you do that to try to keep track of the

21   facts as accurately as you can, correct?

22        A.      Yes.

23        Q.      Right.  At some point you wrote a report and

24   you said that there was a Facebook account.

25              Do you recall that?

```
 1          A.      Yes.

 2          Q.      And that was a mistake, correct?

 3          A.      That is correct.

 4          Q.      All right.

 5          A.      It is actually a MySpace account.

 6          Q.      Later on you corrected that to say MySpace

 7   account, okay.

 8                  Also, you did a review of Mr. Ardolf,

 9   correct, some background check of him?

10          A.      I just ran some record checks, just criminal

11   record checks.

12          Q.      Okay.  As I see in your report, it says

13   something to the effect of 4-3-09, NCIC and NCI checks?

14          A.      Yes.

15          Q.      NCIC is -- what is that, NCIC?

16          A.      National Criminal Information Center.  That

17   is just a standard criminal check that every police

18   agency runs.

19          Q.      And there was a negative result for Mr.

20   Ardolf, correct?

21          A.      Yes.

22          Q.      He never made any threats to anybody in

23   government before?

24          A.      No.

25          Q.      And he had no criminal record as far as you
```

 1   could see?

 2        A.     Not that I was aware of.

 3        Q.     Okay.  No further questions, Your Honor.

 4               THE COURT:  Mr. Rank?

 5               MR. RANK:  No redirect.

 6               THE COURT:  You may step down, sir.  Thank

 7   you.  You may call your next witness.

 8               MR. RANK:  The United States calls Special

 9   Agent David Ruffino.

10               THE COURT:  Do you want to step forward, sir,

11   towards the right front of the courtroom, if you would,

12   please?  And please raise your right hand.

13               (Witness sworn.)

14               If you just want to step around and go into

15   the witness stand, and then once you are seated you will

16   have to sit quite close to the mike, or it won't pick

17   you up.  And then if you would please state your full

18   name and spell your last name?

19               THE WITNESS:  David Ruffino, R-u-f-f-i-n-o.

20               THE COURT:  You may inquire Mr. Rank.

21               MR. RANK:  Thank you, Your Honor.

22                        DAVID RUFFINO

23                      DIRECT EXAMINATION

24   BY MR. RANK:

25        Q.     Good afternoon, Agent Ruffino.

```
1         A.      Sir.

2         Q.      Where do you work, sir?

3         A.      Washington Field Office Secret Service.

4         Q.      And what do you do for the Secret Service?

5         A.      I am a field agent at the moment, Special

6    Agent Field Agent.

7         Q.      How long have you worked for the Secret

8    Service?

9         A.      Approximately 12 years.

10        Q.      And as part of your duties with the Secret

11   Service, what different roles have you played with

12   different sections that you've worked in?

13        A.      I started off in the New Orleans Field Office

14   for approximately five years and then transitioned to

15   the Criminal Investigative Division at Headquarters for

16   two years, and then worked with the Intelligence

17   Division for four years.  Then this past two months I

18   have been at the Washington Field Office.

19        Q.      As part of your duties with the Intelligence

20   Division, did you work in some capacity with the

21   Internet Threat Desk of the Secret Service?

22        A.      Yes, sir, I did.

23        Q.      Can you describe for the jury in broad

24   strokes what the Internet Threat Desk is?

25        A.      One of the main things that we do is we would
```

1    take information from the public that would come in and

2    they would pass on information and we would follow-up on

3    leads and threats and such.   Then the other half would

4    be the information that we get from the White House

5    comment sections that go over the internet, and we would

6    follow-up on that.

7        Q.     And over the four years that you worked in

8    the Intelligence Division, would you say that the number

9    of threats coming in over the internet increased?

10       A.     Yes, definitely.

11       Q.     True every year?

12       A.     Correct.

13       Q.     When an e-mail comes into a WhiteHouse.gov

14   e-mail account, can you describe for the jury generally

15   how -- first of all, are there a lot of e-mails that

16   come into that account?

17       A.     There are thousands every day, thousands and

18   thousands every day.

19       Q.     How is it that going through thousands of

20   e-mails that the Secret Service and the Internet Threat

21   Desk are able to keep on top of it?

22       A.     Sure.   We -- first of all, the e-mails that

23   go through the WhiteHouse.gov, they go through a filter

24   system.   By that, which I mean a filter system, they go

25   off of keywords.   Say, for instance:  Kill, gun,

 1   hanging, stuff like that, words like that.

 2           Then what they do is they take those filtered

 3   e-mails and they look over them.  And if they deem them

 4   a threat, they send them to us directly to the Secret

 5   Service Internet Threat Desk.

 6           Then we look over them in turn, and we

 7   determine if we need to follow-up on that.

 8       Q.    And just if I can summarize, the first batch

 9   that comes in, those are those are filtered

10   electronically?

11       A.    Yes.

12       Q.    So, there is a piece of software or something

13   that is looking for keywords in e-mails?

14       A.    Correct.

15       Q.    Keywords like you described, kill, or gun or

16   things like that?

17       A.    Correct.

18       Q.    Once that batch of filtered e-mails is pulled

19   out electronically, are there human beings that actually

20   go through the e-mails?

21       A.    Yes.  Yes.

22       Q.    And determine whether in going through the

23   e-mails they are actual threats?

24       A.    Yes.

25       Q.    Now, once the human beings identify what they

 1    think are actual threats, what happens to those e-mails?

 2    Do they get sent to the Internet Threat Desk?

 3         A.     Yes.

 4         Q.     And the Internet Threat Desk is part of the

 5    Secret Service?

 6         A.     Correct.

 7         Q.     Everything that we've talked about up until

 8    this point, the filter, the human beings, they are part

 9    of White House staff?

10         A.     White House staff.

11         Q.     Excuse me.  Agent Ruffino, I am going to show

12    you a document that has already been admitted into

13    evidence.  And this is Exhibit 41.

14                And 41 is -- the front page is an e-mail that

15    is printed out in sort of readable format.  Do you see

16    that?

17         A.     Yes.

18         Q.     And this is -- the text of this e-mail is an

19    e-mail that was received by the Internet Threat Desk, is

20    that correct?

21         A.     Correct.

22         Q.     If we go to page -- as you look at it, I will

23    blow it up so we can be on the same page.  This e-mail

24    went to a number of different recipients, is that

25    correct?

1      A.      Correct.

2      Q.      The WhiteHouse.gov, but a number of other

3  recipients, as well?

4      A.      Yes.

5      Q.      And if we go to page two of Exhibit 41, this

6  is actually the e-mail that came into the WhiteHouse.gov

7  -- I'm sorry.  I can try and do that better.

8              This was the e-mail that actually came into

9  the WhiteHouse.gov e-mail address, is that correct?

10     A.      Yes.

11     Q.      And do you recognize the sort of version that

12  it is in?

13     A.      Yes.

14     Q.      And this is -- if we even go down to the text

15  of it, at the bottom, there are a lot of different kind

16  of equal signs and numbers in here that were not in the

17  text on page one.  That was received by a different

18  entity, correct?

19     A.      Yes.

20     Q.      Do you know why that is?

21     A.      I do not.  I mean, it is just -- it could be

22  you know, different reasons as far as computer-related

23  entries and stuff like that and --

24     Q.      Do you read a lot of e-mails in this format?

25     A.      Yes.

1    Q.    Did you learn to read it and just sort of
2  skip over the extraneous zeroes and equal signs?
3    A.    Yes.
4    Q.    So, have you compared this language on here
5  to the other e-mails that you saw that were sent out
6  that were in a more readable text?
7    A.    I'm sorry?
8    Q.    Let me just ask it, this version right here
9  starts off with a line:  "This is a terrorist threat.
10 Take this seriously."  Correct?
11   A.    Right, yes.
12   Q.    And if we go to page 1, that is exactly what
13 is on page 1?
14   A.    Correct.
15   Q.    And if we went through the rest of this
16 e-mail, although it would be in less readable format,
17 that is the same language that is in here without the
18 extraneous characters?
19   A.    Right.  From my knowledge, if you cut and
20 paste, cut and paste and put it in different documents,
21 it is going to come up in different languages like this.
22 So --
23   Q.    If there is a piece of software that the
24 White House was using to read this, it might -- it would
25 be easier --

1    A.    Yes.  Sure, yes.  I am not an expert on that

2  particular thing, but --

3    Q.    Your expertise is in identifying threats?

4    A.    Yes.

5    Q.    And you saw one in this e-mail?

6    A.    Yes.

7    Q.    If we go to the next page, I want to ask you

8  towards the end, we will blow this portion up.  And in

9  the portion that I have blown up, there are two words

10  that are in red.

11        Do you see that?

12    A.    Yes, sir.

13    Q.    And why is that?

14    A.    That comes from the White House, that is

15  their identifiers for the keywords.

16    Q.    Okay.  When you talked about that filtering

17  process, the keyword searching, "kill you" is one of

18  them?

19    A.    Correct.

20    Q.    Then if we look further down, you see also

21  again, "kill you all" is highlighted?

22    A.    Correct.

23    Q.    And similarly, kill you is highlighted, once

24  again?

25    A.    Yes.

1      Q.      Is that an indication that this has been

2   received by the WhiteHouse.gov e-mail address?

3      A.      Correct.

4      Q.      If we go to the next page, this is the last

5   page.  I will ask you, though, Agent Ruffino, how did

6   you become aware, first, of this e-mail that was sent in

7   April of 2009?

8      A.      Well, initially, when it came to the White

9   House, from the White House to us, I reviewed it and I

10  determined that we need to follow-up on this and it was

11  a serious threat.

12     Q.      Did you also receive some communication from

13  someone in the Minneapolis field office about this same

14  threat e-mail?

15     A.      Yes.  Apparently, Agent Knut was on top of

16  this already and they were following up on this.

17     Q.      Agent Knutson?

18     A.      Yes.

19     Q.      Now, after the April 2009 e-mail, were you

20  aware that other e-mails came in from the same source

21  with similar text?

22     A.      Yes.

23     Q.      Were there several of them over the course of

24  the next month or so?

25     A.      It was from April to June, of '99 (SIC).

1       Q.      And do you know approximately how many there

2   were?

3       A.      We received four.

4       Q.      If we go, first of all, in front of you, you

5   should have Exhibits 42 and 43.  Am I right?  I may be

6   wrong.

7       A.      I have 41.

8       Q.      There is an excellent reason for that.  May I

9   approach, Your Honor?

10              THE COURT:  You may.

11  BY MR. RANK:

12      Q.      I apologize.  Would you, Agent Ruffino, first

13  of all take a look at Exhibit 43?

14      A.      Yes.

15      Q.      Do you recognize Exhibit 43?

16      A.      Yes, I do.

17      Q.      And was that an e-mail that was sent to the

18  Vice-President of WhiteHouse.gov e-mail on May 6, 2009?

19      A.      Yes, it was.

20      Q.      And can you tell the e-mail address of the

21  entity or person that sent it?

22      A.      Yes, Matt Bethany.

23      Q.      Can you actually tell the e-mail address?

24      A.      You want me to spell it out for you?

25      Q.      Yes, please.

1    A.    M-a-t-t underline B-e-t-h-a-n-y underline

2    Kostolnik underline 2009@Yahoo.com.

3    Q.    And was that an e-mail that was received, the

4    WiteHouse.gov e-mail address on or about May 6th, 2009?

5    A.    Correct.

6    Q.    If you could take a look also at Exhibit 42,

7    which is also in front of you, and I will ask about both

8    of them at the same time.  I am going to offer 42 and

9    43, Counsel.

10          Does that appear to be the same text as that

11   e-mail?

12   A.    Correct.  It is the same e-mail address and

13   the same content.

14   Q.    It may have gone to a different recipient,

15   but it is the same --

16   A.    Yes.

17          MR. RANK:  I would offer 42 and 43.

18          MR. MAHONEY:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibits 42 and 43 were

21   received in evidence.)

22   BY MR. RANK:

23   Q.    Let's talk first about 43.  And again looking

24   at it, it is kind of hard to read language; is that

25   correct?

1      A.      I'm sorry?

2      Q.      It is in that kind of hard to read language?

3      A.      Yes.

4      Q.      Do you understand this to be e-mail header

5   information?

6      A.      Yes.

7      Q.      Up at the top it indicates the center that

8   you just read for us, and the recipient.  And at the

9   bottom of the e-mail, generally speaking, I will not ask

10  you to do a one-to-one comparison but is the content of

11  this e-mail that went out on May 6th, 2009,

12  approximately the same as the threats that were in the

13  April 1st e-mail?

14     A.      Correct.

15     Q.      And we go on to page 2 of that exhibit.

16  Again, there are some words that are highlighted in red,

17  the "kill you" and "you will be dead."

18             Do you see those?

19     A.      Yes, sir.

20     Q.      Again, what does that indicate?

21     A.      A threat against the President or

22  Vice-President.

23     Q.      Does the red indicate that that was flagged

24  by the White House?

25     A.      That is correct.

1    Q.    That was received by the WhiteHouse.gov?

2    A.    Correct.

3    Q.    And if we go to Exhibit 42, again that is the

4  same e-mail to a different recipient on this

5  distribution list with the same text, is that correct?

6    A.    Yes.

7    Q.    Thank you, Agent Ruffino.  I have no further

8  questions.

9         THE COURT:  Mr. Mahoney, you may inquire if

10  you wish.

11        MR. MAHONEY:  Yes, Your Honor.

12              CROSS EXAMINATION

13  BY MR. MAHONEY:

14    Q.    Good afternoon, Agent.

15    A.    Yes.

16    Q.    I wanted to ask you about communications you

17  had with Mr. Knutson -- Agent Knutson.  He -- regarding,

18  I suppose, the first e-mail, at some point he had

19  contact with you and you said the case would not be

20  referred.

21        When you say "referred," what does that

22  regard?

23    A.    That regards, at the moment, the victim that

24  we thought of, we did not think he was a victim.  It was

25  a poison pen that we thought of.  So, we disregarded it

1    as him as a victim.  And we now referred it as far as

2    not putting him as a suspect.

3         Q.    So, at this point, you are saying that the

4    case would not be referred to for prosecution?

5         A.    Yes.  We would not further investigate the

6    case, as far as that suspect.

7         Q.    Okay.  I have nothing further.

8              Thank you.  No further questions, Your Honor.

9         A.    Thank you.

10             THE COURT:  Mr. Rank?

11                        REDIRECT EXAMINATION

12   BY MR. RANK:

13        Q.    Just to clarify what Mr. Mahoney was asking

14   you, originally, from the text of the e-mail threat, you

15   had suspects that were Matt and Bethany Kostolnik?

16        A.    Correct.

17        Q.    Your investigation, you concluded that they

18   were no longer suspects?

19        A.    Correct.

20        Q.    Thank you.

21             THE COURT:  Anything else, Mr. Mahoney?

22             MR. MAHONEY:  No, Your Honor.

23             THE COURT:  You may step down, Agent.

24             THE WITNESS:  Thank you.

25             THE COURT:  I will take our afternoon recess,

1    here, unless either one of you think -- all right, then

2    we will stand in recess, members of the jury, for

3    15 minutes.  You are excused at this time.  If you would

4    be so kind as to one of you use your card?

5              (Recess.)

6              THE COURT:  You may all be seated.  Thank

7    you.  Call your next witness?

8              MR. RANK:  The United States calls Special

9    Agent Dennis Howe.

10             THE COURT:  Raise your right hand, sir?

11             (Witness sworn.)

12             If you would have a seat behind the

13   microphone, please?  Then once you are seated, if you

14   would please state your full name and spell your last

15   name?

16             THE WITNESS:  Dennis Lee Howe, Junior.

17   H-o-w-e.

18             THE COURT:  You may inquire, Mr. Rank.

19             MR. RANK:  Thank you, Your Honor.

20                      DENNIS HOWE

21                   DIRECT EXAMINATION

22   BY MR. RANK:

23        Q.    Special Agent Howe, where do you work?

24        A.    Federal Bureau of Investigation, Minneapolis

25   Division.

```
1        Q.      What do you do for the FBI?

2        A.      I work on cybercrimes and investigate

3   cybercrimes.

4        Q.      How long have you been with the FBI?

5        A.      Approximately three years.

6        Q.      And in general, do special agents with the

7   FBI have certain responsibilities?

8        A.      Yes.

9        Q.      Do they vary depending on what section or

10  what unit they are assigned to?

11       A.      They do.

12       Q.      And you are assigned to a special unit within

13  the FBI, is that correct?

14       A.      Correct.

15       Q.      That is the Cyber Squad?

16       A.      Correct.

17       Q.      What kinds of things do the FBI Cyber Squad

18  investigate?

19       A.      We investigate child pornography, intrusions,

20  or hacking, IPR cases.

21       Q.      Okay, probably the jury doesn't know what an

22  IPR is.  Can you describe what that means?

23       A.      Yeah, intellectual property rights crimes.  I

24  apologize for that.

25       Q.      In your three years at the FBI, is this your
```

1    first time testifying in trial?

2         A.    Yes, it is.

3         Q.    And in addition to child pornography, hacking

4    and intrusion cases, I think you said intellectual

5    property cases, does the Cyber Squad also do cyber

6    terrorism and national security type investigations?

7         A.    Correct.

8         Q.    Do you, in order to be assigned to the cyber

9    Squad have to have some specialized background?

10        A.    Yes.

11        Q.    And what, specifically, was your background

12   that qualified you to come to the Cyber Squad?

13        A.    Prior to joining the FBI, I had a couple of

14   different employment opportunities that gave me that

15   background.  First I had a computer information systems

16   degree, and I also worked for a major university,

17   maintaining the systems for the English Department of

18   that particular university, managing the labs for that

19   university.

20             And most recently, coming into the Bureau, I

21   worked for a major insurance company managing and

22   distributing all software for the insurance company, and

23   analyzing any new software coming in, and verifying and

24   making sure that it worked, properly.

25        Q.    The major university that you worked for, was

1    that state directly to this state south?

2         A.    Correct.

3         Q.    Are you a Hawkeye?

4         A.    I am a Hawkeye, but I did not work for the

5    Hawkeyes, unfortunately.

6         Q.    In addition to the education that you talked

7    about, you had a degree in information sciences?

8         A.    Information systems, correct.

9         Q.    Okay.  And did you receive some specific

10   training both in your job at the University and in your

11   job at the insurance company?

12        A.    I did.

13        Q.    Technical training?

14        A.    Correct.

15        Q.    And did you also have some technical training

16   required to become -- let me back-up.  Do you have to

17   take specific training to become an FBI agent?

18        A.    You do.

19        Q.    Their basic agent training?

20        A.    Correct.

21        Q.    Where does that take place?

22        A.    New agent training takes place in Quantico,

23   Virginia.

24        Q.    In order to be assigned to a Cyber Squad, do

25   you get additional training either before you join the

1    squad or after you are on the squad?

2         A.    Correct.

3         Q.    And have you received additional training?

4         A.    I have.

5         Q.    Can you, in general, describe some of the

6    training for the jury?

7         A.    Sure.  I have taken part in numerous

8    trainings, from wireless training, to network training,

9    as far as network -- some of you may have heard of

10   network, network plus, security plus certifications.  I

11   have also taken part in a SANS Security Bootcamp.  And

12   other investigation training as far as cybercrimes are

13   concerned.

14        Q.    How many agents are assigned to the Minnesota

15   Cyber Squad from the FBI, approximately?

16        A.    Approximately 10.

17        Q.    And even within the Cyber Squad, are there

18   people that have sort of subspecialties?

19        A.    Yes.

20        Q.    Who is the person in the Cyber Squad with the

21   greatest expertise in investigating hacking and

22   intrusion cases?

23        A.    Special Agent Bob Cameron.

24        Q.    The person with the most background in it?

25        A.    Correct.

1    Q.    And are there agents in the Cyber Squad who

2    specialize in computer forensics?

3    A.    There are.

4    Q.    Can you describe in general what computer

5    forensics is?

6    A.    Sure.  It is basically steps that an

7    investigator takes to ensure the integrity of the data,

8    you know, that nothing has changed.  We haven't looked

9    at something and changed -- basically it maintains its

10   pure forensic.

11   Q.    Are there times at which as part of your job

12   duties or the Cyber Squad's job duties that electronic

13   evidence is obtained?

14   A.    Yes.

15   Q.    In some format?

16   A.    Yes.

17   Q.    Is one of those formats going out and

18   actually taking physical possession of computers or

19   electronic storage devices?

20   A.    Yes.

21   Q.    And when you are talking about maintaining

22   the integrity of that data, is that what you are

23   referring to?

24   A.    Correct.

25   Q.    Is part of computer forensics also acquiring

1    or locating information within the electronic data?

2        A.      Yes.

3        Q.      And can you -- who at the FBI Cyber Squad

4    specializes in doing computer forensics?

5        A.      We have two agents, Special Agent Christopher

6    Luster and Special Agent Jerry DeWees.

7        Q.      And of those two agents, special Agent Luster

8    and Special Agent DeWees, who has been doing it the

9    longest?

10       A.      Definitely Special Agent DeWees.

11       Q.      Do you refer to him as grizzled?

12       A.      No comment.   He is very good at it.   He has

13   been doing it a long time.

14       Q.      Agent Howe, as part of your duties with the

15   Cybercrime Task Force were you involved in the search of

16   Barry Ardolf's residence on July 21st, 2009?

17       A.      I was.

18       Q.      And was the search of that residence

19   conducted according to a search warrant?

20       A.      It was.

21       Q.      Can you describe for the jury, and again in

22   general terms, what a search warrant is?

23       A.      Sure.   It is an order that is given by a

24   judge that permits law enforcement to search a specific

25   location.

1     Q.     And in general, can you describe a process

2  for obtaining a search warrant to search a specific

3  location?

4     A.     A law enforcement officer prepares an

5  affidavit that explains and lays out the probable cause

6  that a crime has been committed, and that we will find

7  evidence of that crime at that specific location.  And

8  then the law enforcement officer takes that affidavit,

9  presents it to the Judge.  And if the Judge agrees that

10  there is probable cause to show that that crime was

11  committed and we will find evidence for the crime, he

12  swears it out and it becomes a warrant that you can

13  execute.

14     Q.     And that is what happened in this case, there

15  was a warrant that was issued for the search of Mr.

16  Ardolf's residence in July of 2009?

17     A.     Correct.

18     Q.     Did you obtain that search warrant?

19     A.     No, I did not.

20     Q.     Who did?

21     A.     Special Agent Cameron.

22     Q.     Was Special Agent Cameron the one who

23  submitted the affidavit to the Judge to determine

24  probable cause?

25     A.     Yes.

1    Q.    All right.  Agent Howe, I have used the term,

2    I think, in the course of the last couple of days,

3    execute a search warrant.

4         What does that mean?

5    A.    Basically when you receive a search warrant

6    you have a certain number of days to execute it.  And

7    the execution of the search warrant is going out and

8    actually executing it at that location.

9    Q.    And going out and conducting the search?

10   A.    Correct.

11   Q.    That the warrant allows?

12   A.    Right.

13   Q.    How many -- approximately how many law

14   enforcement officers participated in the execution of

15   the search warrant at Barry Ardolf's residence in July

16   of 2009?

17   A.    Approximately 14.

18   Q.    And from how many different agencies?

19   A.    Four different agencies.

20   Q.    What were they?

21   A.    FBI, Secret Service, Blaine Police Department

22   and Anoka County Sheriffs.

23   Q.    Prior to the execution of the search warrant

24   in July of 2009, did you have any role in the

25   investigation into the activities of Mr. Ardolf?

1      A.      No, I did not.

2      Q.      Is that common for -- when a team to go

3  execute a search warrant is put together that more than

4  just the agent responsible for the investigation does

5  the search warrant?

6      A.      Yes, it is.

7      Q.      Why is that?

8      A.      We have the case agent, who runs and conducts

9  the investigation.  And if it gets to the point where it

10  is ready to serve a search warrant, we need a team to do

11  that.  And basically, the case agent then proposes an

12  operations plan and lays out everything, gives the other

13  team members involved kind of a quick synopsis of what

14  is going on, what the probable cause is behind the

15  warrant, and kind of our agenda and what we are looking

16  to do.

17      Q.      And what are some of the reasons that you

18  need more than one agent to go out and execute a search

19  warrant?

20      A.      Well, for one, the biggest one is officer

21  safety.  And two, there is just -- there is too much for

22  one person to possibly do.

23      Q.      And some searches, if there is a search

24  warrant for a small area, that is something that can be

25  done by one or a few officers?

1    A.    We typically -- we have a team.  We always go

2  out with the team.

3    Q.    Does the size of the team vary depending on

4  the size of the area to be searched?

5    A.    It does.

6    Q.    And so with 14 agents that went out to search

7  Mr. Ardolf's residence, on the scale of things was that

8  fairly large or fairly small?

9    A.    In this particular case, it was fairly large.

10  But I think with all of the factors involved and the

11  different parties involved, that is how it became to

12  grow.

13    Q.    Was one of the factors being taken into

14  consideration the number of computers that might be

15  there?

16    A.    Yes.

17    Q.    You indicated that prior to the execution of

18  the search warrant the team members are kind of briefed

19  on what is going on?

20    A.    Correct.

21    Q.    So, is it common for search warrant people to

22  be on that team that have not been part of the

23  investigation?

24    A.    Yes.

25    Q.    Kind of like yourself?

1      A.      Correct.

2      Q.      How is it that they are briefed?  Who does

3  the briefing, generally?

4      A.      It is the case agent.  And the case agent

5  prepares the operations plan.  And we get together as a

6  team.  And the operations plan is provided to each one

7  of the individuals involved in the team.

8      Q.      I am going to stop you and ask you to explain

9  a term.  You've used it a couple of times, operations

10  plan.  What does that mean?

11      A.      Oh, I apologize.  It is basically what the

12  plan is for executing the search warrant.  In this

13  particular case, the OPS plan would include, for

14  example, a rally point or a location we are going to

15  meet prior to going out to the search, and also would

16  have a quick synopsis from the case agent as to what is

17  involved, what we are looking for, and it also has roles

18  and responsibilities of each of the team members

19  involved in the search.  It has subject information,

20  photos of the place that we are going to search, and

21  other essential information like emergency locations in

22  case if there is an issue and need for those services.

23      Q.      An operations plan is a written document?

24      A.      Correct.

25      Q.      With some attachments?

1      A.      Right.

2      Q.      And you indicated that you expected that

3  there was going to be a lot of computer equipment at

4  this search, correct?

5      A.      Yes.

6      Q.      And were any precautions taken to deal with

7  that possibility?

8      A.      Yes, there were.  We brought along one of our

9  CART experts, Special Agent Jerry DeWees, to oversee the

10  seizing of that equipment, to make sure it was properly

11  taken in and forensically sound.

12     Q.      And are there steps that are usually taken to

13  make sure that the evidence is preserved properly?

14     A.      Yes, there are.

15     Q.      And was Agent DeWees in charge of making sure

16  that that was done?

17     A.      He was.

18     Q.      And in addition to the operations plan, that

19  written document you talked about before, are the

20  members of the search warrant team also given the search

21  warrant affidavit, and the warrant, itself, as well as

22  the list of items that can be seized?

23     A.      Yes, they are.

24     Q.      What is the purpose of that?

25     A.      So you can identify and see what the probable

1    cause -- and the biggest thing is so that you know what

2    you are looking for at the search.

3         Q.    A number of the folks that are on the team

4    haven't been involved in the investigation before, so

5    before they are told, they are not going to know what to

6    look for?

7         A.    Right.

8         Q.    The purpose of that is to tell them what to

9    look for?

10        A.    Correct.

11        Q.    Now, I am going to show you, Agent Howe --

12   actually, I can't do it yet, because I need to offer it.

13   I am going to offer a number of exhibits.  I have

14   discussed this with counsel, Your Honor.

15              Counsel, I intend to offer at this time

16   Exhibits 96 through 121.  For the record, 96 is an

17   aerial photograph of the area surrounding Mr. Ardolf's

18   residence.  97 through 101 are diagrams of the interior

19   of the house.  And the remaining exhibits are

20   photographs.

21              MR. MAHONEY:  No objection, Your Honor.

22              THE COURT:  Those are received.  And that is

23   96 through 101(SIC)?

24              MR. RANK:  That's right.

25              (Government's Exhibit 96 through 121 were

1  received in evidence.)

2  BY MR. RANK:

3      Q.    I am going to start off, Agent Howe, with --

4  Your Honor, could I ask that we get the other light

5  setting?

6              THE COURT:  Yes.

7              MR. RANK:  Thank you.

8  BY MR. RANK:

9      Q.    Agent Howe, I put Exhibit 96 on the screen.

10  Do you see that?

11      A.    Yes, I do.

12      Q.    And do you recognize the Ardolf residence on

13  the map that is on the screen?

14      A.    I do.

15      Q.    Can you circle it?  I guess it is labeled,

16  but can you also circle it for the benefit of the jury?

17      A.    Sure.

18      Q.    Now, can you describe what took place when

19  you executed the search warrant?  Maybe describe it from

20  the time that you are at the rally point to the time

21  that the search warrant started to be executed?

22      A.    Sure.  We gathered at the rally point and

23  went over, you know, what was going to take place in the

24  OPS plan.  We then got into our vehicles and we

25  caravanned over to the Ardolf's residence.  And we

1   exited our vehicles.  And we have teams set up.

2   　　　　　So, we had a perimeter team set up that

3   approached the house, and we also had a team that was

4   going to the front door to knock and announce the

5   presence of agents and to announce the execution of a

6   federal search warrant.

7   　　Q.　　So, when you say perimeter teams, what does

8   that mean?

9   　　A.　　We had agents come up on both sides of the

10  house, here, and we had agents enter right here.

11  　　Q.　　And what is the purpose of having the agents

12  on -- flanking the house, and somebody approaching the

13  front door?

14  　　A.　　It is for safety, and also to ensure that

15  basically there is nobody out in the back or out and

16  around.  We just need to make sure that we have

17  accounted for any individuals that are on the property.

18  　　Q.　　And when you approached the house, how were

19  you dressed?

20  　　A.　　Big FBI labels on.  I guess, our counterparts

21  had their, you know, appropriate agencies branded as

22  well.

23  　　Q.　　Fairly clear it was law enforcement?

24  　　A.　　Correct.

25  　　Q.　　Where were you?  You sort of showed three

1    different groups of people.  Which one were you in?

2         A.    I was on this side right here.

3         Q.    What happened as you approached the house?

4         A.    As I approached the house, there was a person

5    crouched down right around that point there, working on

6    the fence, fence line area.  And as we were getting

7    ready to identify that individual, the team that was

8    coming around from the other side came around here and

9    identified him as Mr. Ardolf.  And we asked him

10   basically to stand up and we had a federal search

11   warrant.

12        Q.    Okay.  And then did Mr. Ardolf accompany you

13   back to the entry of the house?

14        A.    He did.

15        Q.    Did he let you into the house?

16        A.    Yes.

17        Q.    Did you start the search warrant?

18        A.    We did.

19        Q.    What is the first thing you do when you are

20   executing a search warrant, particular search warrant on

21   a residence after you gain entry?

22        A.    We do a safety sweep to make sure that, you

23   know, there are no other individuals, or anything for

24   safety issues for the officers in the house.

25        Q.    When you say safety sweep, what does that

1  mean?

2      A.     We go through the house and basically clear

3  each room and account for any individuals that are in

4  the house.

5      Q.     Okay, making sure there is nobody that is

6  going to surprise you during the course of the search

7  warrant?

8      A.     Correct.

9      Q.     I am going to show you, Agent Howe, some

10  photographs.  The first one -- first of all, describe to

11  me the house, in general, as you walked in.  What did

12  you see?

13      A.     Sure.  I would describe it as like a

14  four-level split.  You walk in the front door and it

15  opens into a dining room, kind of a living room, dining

16  room, and kitchen area.  And you can either go upstairs

17  or downstairs.  Downstairs, there is a main living area.

18  And then there is also stairs that continue down, that

19  is what I would call the basement area.  The stairs that

20  go upstairs went to bedrooms.

21      Q.     Okay.  I am going to show you some diagrams

22  and maybe you can just tell me whether these are

23  generally accurate.  This is Government's Exhibit 98,

24  and it is labeled basement at the address associated

25  with Mr. Ardolf's residence, correct?

1    A.    Correct.

2    Q.    And this is a rough drawing, is that correct?

3    A.    Right.

4    Q.    It is not to scale?

5    A.    No, it is not.

6    Q.    Did you help prepare these diagrams?

7    A.    As a search team, we had designated an

8    individual to prepare the diagrams.

9    Q.    You reviewed his drawing of the diagrams with

10   the diagrams that we have got in the few exhibits?

11   A.    Right, to make sure they are accurate,

12   correct.

13   Q.    Roughly accurate?

14   A.    Correct.

15   Q.    You did not get any drafts personal training,

16   I take it?

17   A.    No, I did not.

18   Q.    So, the basement is kind of a large open plan

19   that is designated as A.  And then a room that is

20   smaller, designated as B; is that right?

21   A.    Yes.

22   Q.    And then if you go to Exhibit 99, you said

23   that there was -- this is level one.  It was kind of a

24   split-level residence?

25   A.    Yes, it was.

1      Q.      And so this is the level one area, correct?

2      A.      Yes.

3      Q.      What are we looking at here in terms of what

4  was shown on the diagram?

5      A.      Area C was like an entertainment type of room

6  or living room.  I remember there was a TV on the wall.

7  If I remember correctly, D was a bedroom and E, I can't

8  remember if that was a bathroom or not.

9      Q.      And if we go to Exhibit 100, this is

10  described as level two.  Do you see that?

11      A.      Yes.

12      Q.      What is on that level?

13      A.      This is the main entrance to the house.  Off

14  to the left was like a living room area.  And G is the

15  kitchen and dining room area.

16      Q.      Kind of an open floor plan?

17      A.      Right.

18      Q.      On all of these exhibits, we note that there

19  are no stairs that are put on there.  Are there stairs

20  referenced anywhere?  Were there stairs in the house?

21      A.      Yes, there were.

22      Q.      They are not shown on the diagram?

23      A.      Correct.

24      Q.      And then if I take you to Exhibit 101, what

25  is shown on Exhibit 101?

1      A.      We have J, N and K were bedrooms.  And M was

2   a closet.  L was a bathroom and I was a bathroom.

3      Q.      Okay.  No, assurance that this is to scale,

4   but generally, this is where they were located?

5      A.      Right.

6      Q.      And in here, can you see a room that you

7   determined was Barry Ardolf's bedroom?

8      A.      Room K.

9      Q.      Let me ask you, then, and I am going to show

10  you some photographs from the search.  Can you review

11  the search warrant photographs?

12     A.      Yes.

13     Q.      Let me show you -- all right.  The first one

14  is Exhibit 102, do you recognize that?

15     A.      I do.

16     Q.      What does that show?

17     A.      That is a bunch of equipment that we found

18  down in the basement of the home.

19     Q.      That big open area we saw in the first

20  diagram?

21     A.      Correct.

22     Q.      What is it that is shown in this photographs,

23  in general?

24     A.      It looks like we have some hard drives

25  sitting up on the ledge and some loose CDs.  And there's

1  a lot of ribbon cables for hard drive connectors.

2       Q.    Let me ask you, in general, when you went in

3  the house I know you were expecting to find some

4  computers.  Did you find a lot of computers?

5       A.    Yes, we did.

6       Q.    A surprising number of computers?

7       A.    Yes.

8       Q.    For a residence?

9       A.    Correct.

10       Q.    In addition to computers, did you also find

11  other computer components?

12       A.    We did.

13       Q.    Some of them were computer hard drives?

14       A.    Yes.

15       Q.    And looking at this up here, what are those?

16       A.    Those are hard drives that you normally would

17  find in a computer.

18       Q.    Those are all internal hard drives?

19       A.    Correct.

20       Q.    It looks like there are one, two, about seven

21  of them there?

22       A.    Yes.

23       Q.    And then did you find large numbers of hard

24  drives in other locations, as well?

25       A.    We did.

1      Q.     Did you also find -- well, I will keep going

2  forward to see, I show you 103, another photograph.   Is

3  this just another picture from that basement area?

4      A.     Yes.

5      Q.     And that shows some computer monitors, as

6  well as some other computer equipment?

7      A.     Correct.

8      Q.     Showing you 104, what room was this from?

9      A.     I don't recall the room letter, but I know it

10  was just off of the main basement room down there.

11      Q.     We saw in the basement diagram what you think

12  was 98, a real big room, that is where that first

13  picture was from, and the second picture?

14      A.     That was from room B.

15      Q.     The one we were just looking at was from room

16  B?

17      A.     Yes, the one we were just looking at was from

18  room B.

19      Q.     Thank you.  That was from room B.

20      A.     Correct.

21      Q.     It is like a storage room?

22      A.     Yes.

23      Q.     It looks like there is a water heater on the

24  left-hand side?

25      A.     Yes.

1      Q.     All right.  Show you Exhibit 105, and what
2  was that?
3      A.     This was a computer that was sitting at the
4  kitchen table.
5      Q.     Was it open when you entered to execute the
6  search warrant?
7      A.     I do not recall if it was open or closed.
8      Q.     This was on the kitchen table?
9      A.     Yes.
10     Q.     All right.  I will show you 106.  And what
11 is -- what is shown in 106?
12     A.     This is Mr. Ardolf's bedroom.
13     Q.     And you know that because up on the wall
14 there is a letter K?
15     A.     Yes.
16     Q.     And does that correspond to the diagram shown
17 in Exhibit 101?
18     A.     Yes.
19     Q.     In fact, showing you Exhibit 97, that
20 specifically is a diagram of Mr. Ardolf's bedroom,
21 correct?
22     A.     Correct.
23     Q.     What we are looking at when we look at that
24 photograph we just looked at is his bed, is that
25 correct?

1     A.     Yes.

2     Q.     And going back to Exhibit 106, and I will

3  show you Exhibit 107, kind of a panoramic view of the

4  room.  Exhibit 108, what was Exhibit 108?

5     A.     This is a certificate for the certified

6  ethical hacker in Mr. Ardolf's name, and this was

7  hanging in his bedroom.

8     Q.     Is this a -- this is a cabinet or chest of

9  drawers in the bedroom?

10    A.     Yes.

11    Q.     And it looks like there is a piece of

12 software for Windows Vista on there?

13    A.     Correct.

14    Q.     Exhibit 110, where were these located?

15    A.     These were just right down below that dresser

16 that you just showed in his bedroom.

17    Q.     It is kind of hard to see, but it gets very

18 dark.  If I blow up that, what is it that is leaning up

19 against the cabinet?

20    A.     Two laptops.

21    Q.     And also was it playing then some CDs?

22    A.     Correct.

23    Q.     And I guess, actually, DVDs?

24    A.     DVDs, sure.

25    Q.     Was that something that you found in a lot of

1    different places throughout the house, CDs and DVDs?

2         A.    Yes, it was.

3         Q.    I show you that.  Can you tell me what those

4    are?

5         A.    They look like extra bays.  I can't -- they

6    look like they are probably CD bays that you can

7    interchange in and out of the laptop.

8         Q.    In any event, computer components?

9         A.    Yes.

10        Q.    I will show you 111 and what are we looking

11   at here?

12        A.    We have, it looks like, a couple of printers

13   and another laptop on the floor.

14        Q.    Is it there on the floor, is that correct?

15        A.    Yes.

16        Q.    Can you tell who manufactured that computer?

17        A.    Dell.

18        Q.    112, what is that showing?

19        A.    This is the desk that was in Mr. Ardolf's

20   room showing two computer monitors and a Dell Computer.

21        Q.    All right.  One of the computer monitors is

22   actually on, is that correct?

23        A.    Correct.

24        Q.    Do you know whether that was on when you went

25   into the residence?

1    A.    The computer was on.  It may have been on a

2  screen saver or something, but it was on.

3    Q.    And in addition to -- so, we have got one

4  monitor shown here, the Dell monitor; is that correct?

5    A.    Correct.

6    Q.    And a monitor and a Dell work station?

7    A.    Correct.

8    Q.    First of all, what is shown on the monitor,

9  can you tell?

10    A.    It looks like a survey for the property.

11    Q.    And over here, what was that?

12    A.    An additional laptop.

13    Q.    And then what is shown in the portion that I

14  have just blown up?

15    A.    That was a 32-gigabyte thumb drive that we

16  found.

17    Q.    And it is standing upright, why is it

18  standing upright?

19    A.    It is plugged into a USB hub, which allows

20  you to basically plug multiple USB devices into one port

21  in the back of the computer.

22    Q.    And it was like that when the search warrant

23  was executed?

24    A.    Correct.

25    Q.    And I am going to ask you in just a second,

1  we are looking at the computer desk.  There is an area

2  that is down in the bottom corner, a closed portion of

3  the cabinet.

4           Do you see that?

5      A.    Yes.

6      Q.    Open that, is that what we saw or what you

7  saw?

8      A.    Yes, it is.

9      Q.    What is that?

10     A.    It is a generic computer tower.  And you can

11  see that part of a front is off of it and there's a

12  couple of hard drives exposed in there, as well as CDs

13  up on the shelf above.

14     Q.    And was that something that you had seen and

15  was taken during the course of that search warrant?

16     A.    It was.

17     Q.    What, in particular -- it looks like there is

18  more than one hard drive in there.  Do you recall how

19  many drives were in that tower?

20     A.    I believe there were five, total, in that

21  tower.

22     Q.    Do you know how much total storage capacity

23  was in those drives?

24     A.    If I recall correctly, it was approximately

25  two terabyte.

1      Q.      Is that a lot?

2      A.      It is a lot of space.

3      Q.      And I am going to focus on this in the

4   photograph and I will ask you about it later, but it is

5   a notebook that was on the floor in the bedroom, as

6   well?

7      A.      Correct.

8      Q.      And the while the color is not that great on

9   the screen behind you, take a look on the screen behind

10  you.  It looks almost black.

11          What color is it on your screen?

12     A.      It is red.

13     Q.      I will move on to Exhibit 114.  What is shown

14  there?

15     A.      We have the laptop that was on the corner of

16  the desk, as well as a scanner, telephone, and it looks

17  like a router.

18     Q.      All right.  So, I am pointing to -- this is

19  the laptop that I am pointing to?

20     A.      Correct.

21     Q.      It is a little better right there.  The

22  laptop and scanner we talked about?

23     A.      Yes.

24     Q.      Wireless router?

25     A.      Correct.

1     Q.     Anything I am missing?

2     A.     I don't believe so.

3     Q.     On 115, let me go -- and I best go back to

4  first, Exhibit 106.  There were some books on the

5  bedstead, the headboard of the bed.

6            Do you see those?

7     A.     Yes, I do.

8     Q.     Did you see those during the course of the

9  search warrant?

10    A.     Yes, I did.

11    Q.     No, I will focus, then, on Government's

12 Exhibit 115.  Is that a close-up of those same books?

13    A.     It is.

14    Q.     And out of that, some of the books that are

15 on there, are there some volumes relating to hacking?

16    A.     Correct.

17    Q.     And one, another book on hacking, too?

18    A.     Correct.

19    Q.     And I ask you about this book, in particular,

20 The Art of Intrusion.  Does the term intrusion have any

21 significance in the area of cyber investigations?

22    A.     Yes, it does.  It is very interchangeable

23 with the term hacking.

24    Q.     There is another book on hacking?

25    A.     Correct.

1      Q.      And if we go on to the next exhibit,

2   Government's Exhibit 116, we are moving along on a

3   close-up of those books, correct?

4      A.      Correct.

5      Q.      And I will ask you about this book.  It is

6   called, "Extreme Exploits."  Does the term exploit have

7   some significance in cyber investigation?

8      A.      It does.

9      Q.      What is that?

10     A.      Exploits are what is used, basically, to gain

11   access into a system, unauthorized access into a system.

12     Q.      So, another hacking-related term?

13     A.      Correct.

14     Q.      And I will ask you about the four volumes of

15   books related to hacking, is that correct?

16     A.      Correct.

17     Q.      And here, if I will blow that up, it is a

18   "CWNA Guide."

19             Do you know that term, CWNA?

20     A.      I do.

21     Q.      What does that stand for?

22     A.      Certified Wireless Network Administrator.

23     Q.      Is that something that you are familiar with?

24   What does it mean?

25     A.      I am not extremely familiar with it, but I

1    know it has to do with wireless networks.

2         Q.    It is a way of getting certification to

3    administer wireless networks?

4         A.    Correct.

5              MR. MAHONEY:  Objection, Your Honor.  I don't

6    believe that the witness said that he knew anything

7    about the contents of the --

8              THE COURT:  Sustained as to the form of the

9    question, as leading and foundation.  And the jury

10   should just, until there is further inquiry -- I will

11   allow the inquiry -- but, disregard the last answer of

12   the witness.  You may continue, Mr. Rank?

13   BY MR. RANK:

14        Q.    Thank you, Your Honor.  Exhibit 117, and

15   there are some more books that were in that same area

16   above Mr. Ardolf's bed, correct?

17        A.    Correct.

18        Q.    Move on to Exhibit 118.  Where was this

19   bumper sticker located?

20        A.    It was right above the bed on the headboard,

21   on the mirror of the headboard.

22        Q.    Okay.  If we can look at 106, again.  Is it

23   something that is visible in 106?

24        A.    Yes.

25        Q.    That is a pretty blurry photo of it

 1   especially on that screen.  But, 118 is a lot clearer,

 2   is that correct?

 3        A.    Correct.

 4        Q.    I show you Exhibit 119.  119 is -- where was

 5   this taken from?

 6        A.    This was in a desk drawer in Mr. Ardolf's

 7   room.

 8        Q.    That same desk drawer we were looking at

 9   before that had the two computer monitors on the top?

10        A.    Yes.

11        Q.    What we are looking at here is a Comcast

12   bill?

13        A.    Correct.

14        Q.    That indicates that Mr. Ardolf had a Comcast

15   account?

16        A.    Yes, it does.

17        Q.    All right.  And then Exhibit 120, another

18   computer, where was that located?

19        A.    This was located in Mr. Ardolf's closet.

20        Q.    And if I go to the next, this is Exhibit 121,

21   where were those -- what is shown on there?

22        A.    Multiple CDs that were tacked around the

23   doorway of the closet.

24        Q.    And it kind of looks like some are singles,

25   but some are actually more than one CD or DVD?

1          A.      Correct.

2          Q.      Now, in addition to the search warrant photos

3     that were taken, what happened at the execution of the

4     search?  I take it these photos were taken during the

5     search warrant execution?

6          A.      Yes.

7          Q.      Can you describe for the jury how it was that

8     the search actually took place?

9          A.      Sure.  We have members of our team that

10    started searching throughout the house for pertinent

11    items, such as the items you just saw there, the DVDs,

12    the CDs and the computers.  And once those are collected

13    by that individual, they go to a person who is

14    designated as a search team lead, who is basically

15    intaking all of those items and making notes of where

16    they came from, who they were collected by, and a

17    description of those items.

18         Q.      And did you have a specific role -- I am

19    asking you this, did different people have different

20    roles during the execution of the search warrant?

21         A.      They do.

22         Q.      And did you have a specific role in the

23    execution of the search warrant at Barry Ardolf's

24    residence?

25         A.      Yes, I was the search team lead that took in

1    all of the evidence.

2        Q.    What does that mean, in particular, as the

3    search team lead in taking in evidence?  What did you do

4    during this search warrant?

5        A.    Sure.  I kept what is called an evidence

6    recovery log.  And when a person would bring me a piece

7    of evidence, I would make a notation of a description of

8    the evidence, where it was located, who found it, and we

9    would also give it an item number.  And I take that -- I

10   would take that piece of evidence.

11            And I put it into a bag and I put on a tag

12   that corresponds with the evidence recovery log that has

13   the item number, the location, who found it, and a

14   description.

15       Q.    What is the purpose of doing that?

16       A.    So we know where it came from and we can

17   identify who gathered the evidence, and for a chain of

18   custody of who had it, when, and --

19       Q.    In case you are called to testify in court

20   about it later?

21       A.    Exactly.

22       Q.    After the search warrant is done, do you

23   still have a role in maintaining the custody of the

24   items that are seized pursuant to the search warrant?

25       A.    Yes.

1    Q.    What was that in this case?

2    A.    Until I turned them over to the evidence

3    locker, for lack of a better word, evidence team at our

4    office, they maintained -- I maintained possession of

5    those.  Or if I turned them over to somebody, we have a

6    log that we keep if I relinquish my custody to somebody

7    else.

8    Q.    So you do the search and if you take

9    possession of it during the course of the search, do you

10   keep a log of where things were found?

11   A.    Correct.

12   Q.    At the conclusion of the search, at some

13   point in time you turn it over to the evidence folks at

14   the FBI?

15   A.    Correct.

16   Q.    And you said locker.  Is it actually a locked

17   room with all of the evidence in there?

18   A.    It is.

19   Q.    And in order for you to turn it over, do they

20   have to sign off on the chain of custody?

21   A.    They do.

22   Q.    In order for you to then go back and get it

23   at a later time, do you have to go through some steps in

24   order to get it again?

25   A.    Yes, you do.

1      Q.      The people that are in charge of the evidence

2   room at the FBI, do they relinquish those things easily?

3      A.      No, you have to have a good reason to pull

4   them out of evidence.

5      Q.      And have to have them sign off on it?

6      A.      Correct.

7      Q.      Did you do that in this case, the items that

8   you seized, did you bring them and put them into the

9   evidence locker?

10      A.      Yes.

11      Q.      And with respect to some of those items, did

12   you request to get them out of the evidence locker to

13   bring them into court today?

14      A.      Yes, I did.

15      Q.      Let me ask you about a few of those items,

16   Agent Howe.

17          I am going to start off, I believe, start off

18   with Exhibit 123.  And for Counsel's benefit, I am

19   planning on offering Exhibits 123 through 141.

20          MR. MAHONEY:  141?

21          MR. RANK:  Yes.

22          MR. MAHONEY:  Okay, no objection.

23          THE COURT:  Those are received.

24          (Government's Exhibits 123 through 141 were

25   received in evidence.)

1    BY MR. RANK:

2        Q.    Agent Howe, I will show a couple of these to

3    you on the screen, first ones.  We will use the document

4    camera, here.  These exhibits have a couple of

5    components to them.

6              First of all, there is a color scan of a disc

7    that has the location of where the disc was found; is

8    that correct?

9        A.    Correct.

10       Q.    And that is shown as Exhibit 123.  And also,

11   the disc, itself, is in here, is that also correct?

12       A.    Correct.

13       Q.    I will put that on the screen.  I hope it

14   doesn't shine too much.  There are some post-its that

15   are shown both on the first document I showed you, as

16   well as the disc, itself.

17             Do you know wrote the information that is on

18   those post-its?

19       A.    Special Agent Cameron.

20       Q.    And the tag that is with these, this exhibit

21   indicates that it contains BackTrack 4 hacking software

22   found in Barry Ardolf's bedroom, et cetera.  Do you know

23   who confirmed there was BackTrack 4 hacking software on

24   there?

25       A.    Special Agent Cameron did.

1    Q.    I am going to ask you, then, next I am going

2  to kind of go through one of these, Exhibit 124.  I will

3  put Exhibit 124 up on the screen.

4           And again, this is a screen shot or a scan of

5  that disc, which is in Exhibit 124.

6           In that same exhibit is also the disc,

7  itself, correct?

8    A.    Correct.

9    Q.    And this, Exhibit 124 also has some notation

10  on it.  That notation came from a review of the CD by

11  whom?

12    A.    Special Agent Cameron.

13    Q.    Next, I showing you Exhibit 125.  And

14  Exhibit 125, we have the same situation, which is a

15  scan, as well as the disc, itself?

16    A.    Correct.

17    Q.    I will stop asking you this question, but in

18  terms of checking out each one of these CDs, is that

19  something that Special Agent Cameron did?

20    A.    Correct.

21    Q.    I am showing you, and I will be showing you a

22  few CDs.  Were there lots and lots and lots of CDs and

23  DVDs recovered from Mr. Ardolf's residence?

24    A.    Yes, there were a lot.

25    Q.    These are just a portion of them?

1          A.     Correct.

2          Q.     This one is entitled general cracks and

3    hacks, and it was also found in Barry Ardolf's bedroom,

4    correct?

5          A.     Correct.

6          Q.     Exhibit 126, this is an unlabeled CD,

7    multiple hacking software programs found in Barry

8    Ardolf's bedroom during that same search; is that

9    correct?

10         A.     Correct.

11         Q.     127, this is a CD entitled, "Real Hacking

12   Software, Munga Bunga," and handwritten.  Is that

13   correct?

14         A.     Correct.

15         Q.     And in all of the CDs that we have looked at,

16   all of the labeling, if there was any, had just been

17   done in handwriting?

18         A.     That is correct.

19         Q.     And again, this contained multiple hacking

20   software programs that was something that was confirmed

21   by Agent Cameron?

22         A.     Correct.

23         Q.     128 is a CD labeled BT3, containing BackTrack

24   3 hacking software found in Barry Ardolf's bedroom

25   during the search warrant.  Are you familiar with

1   BackTrack 3?

2        A.     I am.

3        Q.     Is that something you are very familiar with

4   or is it something that you are kind of at a 30,000-foot

5   level familiar with?

6        A.     I would say more of the 30,000-foot level.

7        Q.     Do you understand it to be a wireless hacking

8   software suite?

9        A.     Correct.

10        Q.     129, this is another CD that was found in

11   Barry Ardolf's bedroom containing that same hacking

12   program, BackTrack 3; is that correct?

13        A.     Correct.

14        Q.     130, another program containing BackTrack 4

15   hacking software?

16        A.     Correct.

17        Q.     131, a CD labeled BT3 containing BackTrack 3

18   hacking software found in Barry Ardolf's bedroom?

19        A.     Correct.

20        Q.     132, Exhibit 132, a CD labeled BackTrack

21   Final, containing BackTrack hacking software found in

22   Barry Ardolf's guest room?

23        A.     Correct.

24        Q.     And it says, room end.  Do you see that on

25   there?

1       A.      Yes.

2       Q.      And so that just references -- the bedroom

3   was labeled what room number?

4       A.      Which bedroom was that?

5       Q.      Mr. Ardolf's bedroom?

6       A.      K.

7       Q.      So, this would have been located in a

8   different bedroom?

9       A.      Correct.

10       Q.      133, this is also from the same room, room N,

11  and it is a CD entitled BackTrack data, including

12  BackTrack hacking software?

13       A.      Correct.

14       Q.      And 134, Government's Exhibit 134, this is a

15  CD labeled BT3 containing BackTrack hacking software

16  found in Barry Ardolf's kitchen.  Room G was the

17  kitchen, is that correct?

18       A.      Correct.

19       Q.      All right.  Agent Howe, I am going to ask you

20  about another exhibit, Government's Exhibit 135.  The

21  picture of it wasn't so good on the big screen.  I think

22  I can do this better on the document camera.

23              What are we seeing here, Exhibit 135?

24       A.      This is the Five Star, the red notebook that

25  was found in Mr. Ardolf's bedroom.

1      Q.      If I go to -- this may take me a couple of

2   seconds to find exactly which exhibit it was.

3              There we go, this is Government's

4   Exhibit 113, and I highlight that.  Is this that same

5   notebook?

6      A.      It is.

7      Q.      And that was found on the floor of Mr.

8   Ardolf's bedroom?

9      A.      Correct.

10     Q.      Go back to the document camera.  And if you

11  open it up, this is the first page of Government's

12  Exhibit 135; is that correct?

13     A.      Correct.

14     Q.      Generally speaking, do you know what we are

15  looking at?

16     A.      It looks like it is information, as far as,

17  the wireless connections go.

18     Q.      The wireless router?

19     A.      Correct.

20     Q.      And do you see -- I can't do it, because I am

21  on a different system.  If he would look at -- this is

22  terrible.

23              Do you see the combination of letters and

24  numbers that I just circled?

25     A.      Yes.

1    Q.    What does that say?

2    A.    Qwest 3984.

3    Q.    Have you come to learn over the course of the

4    investigation what Qwest 3984 is?

5    A.    Yes.

6    Q.    What is that?

7    A.    That is Matt Kostolnik's SSID number for his

8    wireless router.

9    Q.    In fact, we had seen some materials earlier

10   in the day.  You were present during the testimony of

11   Detective O'Hara, weren't you, Special Agent Howe?

12   A.    Yes.

13   Q.    And did you see that Qwest SSID on some of

14   the exhibits that he talked about today?

15   A.    Yes.

16   Q.    And if we look on that same -- referring to

17   the same SSID, do you see a name?

18   A.    I do.

19   Q.    What is that name?

20   A.    Matt.

21   Q.    And that is related to that same Qwest SSID,

22   is that correct?

23   A.    Correct.

24   Q.    Other than these identifiers related to the

25   wireless router, the rest of the notebook appears to be

1    blank?

2          A.     Yes.

3          Q.     Let me then ask you about an exhibit that we

4    did talk about earlier today, and I believe it was

5    accepted into evidence, provisionally, which is

6    Government's Exhibit 136.  Is that same Qwest 3984 SSID

7    for the Kostolnik's router found on that sheet of paper

8    that was in Mr. Ardolf's bedroom?

9          A.     Yes.

10         Q.     And I will ask you about Government's

11   Exhibit 137.  Because it is a kind of a multi-part

12   exhibit, Your Honor, may I approach?

13               THE COURT:  You may.

14   BY MR. RANK:

15         Q.     There are a couple of things.  This says it

16   is a scan of all of the pieces of paper in there; is

17   that correct?

18         A.     Correct.

19         Q.     And then maybe I will ask and show you this

20   on the document camera so you can describe what we are

21   looking at for the jury.

22               So, first of all, it looks like a lunch bag?

23         A.     Yes.

24         Q.     And what did this bag contain?

25         A.     That contained the mail, pieces of mail that

1    was found underneath the mattress of the Kostolniks.

2         Q.    Whose?

3         A.    I'm sorry, let me rephrase that.  It was the

4    Kostolniks' mail that was found underneath Barry

5    Ardolf's mattress in his bedroom.

6         Q.    When you say underneath his mattress, where

7    exactly was it located?

8         A.    It was in between like the mattress and the

9    box spring.

10        Q.    And if we zoom in on it, there is an

11   evidence -- there is evidence tape over the top of it

12   and also some initials, it looks like, right here.

13             Do you know how the evidence tape got on it?

14        A.    Yes, I put it there.

15        Q.    And when did you put it there?

16        A.    Once I received the evidence.

17        Q.    When you were acting as the evidence

18   custodian at the search warrant?

19        A.    Correct.

20        Q.    And how do you know you put that tape on it?

21        A.    Because I put my initials right there on it.

22        Q.    And I was going to ask you, are those your

23   initials right there?

24        A.    Yes, they are.

25        Q.    D.L.H.?

1          A.      Correct.

2          Q.      And this is also labeled, and it indicates on

3     there that it is two pieces of mail in Matt Kostolnik's

4     name; is that correct?

5          A.      Correct.

6          Q.      And then I will show you the documents that

7     were found in there.  These are three loose sheets, is

8     that right?

9          A.      Correct.

10         Q.      Showing the opened mail?

11         A.      Correct.

12         Q.      And without getting into the details of what

13    this was for, one of it was an explanation of health

14    care benefits from Blue Cross Blue Shield; is that

15    correct?

16         A.      Correct.

17         Q.      And on the second sheet, which was another

18    explanation of health care benefits from Blue Cross Blue

19    Shield?

20         A.      That is correct.

21         Q.      And then a billing to Great Lakes Medical

22    Billing, is that correct?

23         A.      Correct.

24         Q.      I ask you to look at it.  These are -- is

25    there an address on those pieces of mail?

1       A.      Yes, there are.

2       Q.      And were those addressed to the Kostolniks'

3  residence?

4       A.      Yes, they were.

5       Q.      Not to Mr. Ardolf's residence?

6       A.      Correct.

7       Q.      Agent Howe, I am going to wheel something up

8  to you and ask you -- maybe you can be the one to pull

9  some of these out.  What I am showing you is actually

10  some of the items that were physically seized from the

11  search warrant, is that correct?

12      A.      That is correct.

13      Q.      Is that all of them or just a handful of what

14  the FBI seized in connection with the search warrant?

15      A.      It is just a handful.

16      Q.      Can I ask you to find, if you would,

17  Exhibit 137 -- or excuse me, 138?

18      A.      It is right here.

19      Q.      May I have that?  And I'll ask you about it

20  on the document cam.  And that is Exhibit 138.

21              And once again, looking at a bag, the bag

22  contains some evidence tape.  Who took that evidence

23  tape off?

24      A.      It would have been one us at the FBI,

25  either -- probably our CART Team, probably Mr. Jerry

1    DeWees.

2        Q.    And that is the person who would have looked

3    at this, looked inside of it for forensic purposes?

4        A.    Correct.

5        Q.    I will flip it over, and it shows once again,

6    are those your initials that are on there?

7        A.    Yes, they are.

8        Q.    And what is the contents of this bag, sir?

9        A.    It is a 32-gigabyte thumb drive and a Qwest

10   payment for a phone number that is listed on there.

11       Q.    I take the items out of 138 and put this on

12   the stand.  The first item we are looking at on the back

13   side, is that a piece of paper recovered from the search

14   warrant?

15       A.    Yes, it was.

16       Q.    And it is a photocopy or a scan of a check,

17   correct?

18       A.    Correct.

19       Q.    From whom, to whom?

20       A.    It is to Qwest, in payment of $242.55 cents

21   from Barry Arnold.

22       Q.    And then I will show you what is on top of

23   it.  And what are we looking at here that is on top of

24   that Qwest bill?

25       A.    That is a USB thumb drive.

1      Q.      And when you turn it this way so it can be

2  read, there is, on the top of it there is some

3  lettering.  What does that say?

4      A.      SanDisk.

5      Q.      What is SanDisk?

6      A.      It as manufacturer of thumb drives.

7      Q.      And what does a thumb drive do?

8      A.      It holds information.  It is a storage -- it

9  is just basically a small hard drive.  It is mobile.

10      Q.      And is it something that you can plug into a

11  USB port?

12      A.      Yes.

13      Q.      And then store data on it?

14      A.      Correct.

15      Q.      This one, the size of this one was how big?

16      A.      32 gigabytes.

17      Q.      Is that a pretty large thumb drive?

18      A.      Yes, it is.

19      Q.      And then there is -- on this thumb drive,

20  there is a white sticker.  Do you see that?

21      A.      Yes.

22      Q.      What does that reference?

23      A.      That references when S.A. DeWees takes it out

24  and starts his forensic review of it, he places a

25  sticker on there and it has some information that is

1    pertinent to him.

2         Q.    So that 305C-MP, QMP1, that is something that

3    was placed on there by Agent DeWees?

4         A.    Correct.

5         Q.    Who is the forensic examiner, CART forensic

6    examiner with the FBI?

7         A.    That is correct.

8         Q.    Is this that is shown in Exhibit 138, was

9    that something that we had see in any of the search

10   warrant pictures we looked at before?

11        A.    Yes, it was.

12        Q.    And is it shown here in Government's

13   Exhibit 112?

14        A.    Yes, it is.

15        Q.    I will have to blow it up.  You can kind of

16   see that laniard that is sticking off of it?

17        A.    Correct.

18        Q.    And that is also something that could be seen

19   on what is showing in the document camera?

20        A.    Correct.

21        Q.    Let me ask you, Agent Howe, about Exhibit

22   139.  If you could recover that?  For the record that

23   is, I think, a Dell Optiplex Computer GX270?

24        A.    Correct.

25        Q.    Okay.  And you can just show that that is

1    Exhibit 139, is that correct?

2         A.    Correct.

3         Q.    That was something that was recovered from

4    Mr. Ardolf's bedroom?

5         A.    That is correct.

6         Q.    And in fact is that something that we see

7    here in Exhibit 112?

8         A.    Yes, it is.

9         Q.    Under the monitor?

10        A.    Yes.

11        Q.    I am going to ask you now about the Dell

12   laptop computer, Exhibit 140, search warrant item number

13   41.

14        A.    It is right here.

15        Q.    Where was that located?

16        A.    This one was in Barry Ardolf's room.

17        Q.    Is it -- if you look on Exhibit 112, is that

18   the computer that you can see on the right side of the

19   desk?

20        A.    Yes, with the remote control on top of it.

21        Q.    Let's see if I can get a better view.  Is

22   that the same computer?

23        A.    Yes, it is.

24        Q.    And then would you grab Exhibit 141?  Or you

25   don't have to grab it, because it is going to be that

1  big computer tower.

2       A.       This big one right here?

3       Q.       Yes, sir.  And is that Exhibit 141?

4       A.       Yes, it is.

5       Q.       Is that what we see in Government's

6  Exhibit 113?

7       A.       Yes, it is.

8       Q.       And is the one that you thought had 2

9  terabytes of storage in the five drives inside of it?

10      A.       Correct.

11      Q.       And then I am going to ask you about one last

12  thing, which is Government's Exhibit 143.  And you can

13  sit down.  Actually, if you can hand that to me, Exhibit

14  143?  Thank you.

15               What is Government's Exhibit 143?

16      A.       It is a camera, an Olympus camera.

17      Q.       Is this an Olympus digital camera?

18      A.       Yes.

19      Q.       And if I turn it, can you see on there the

20  name and model number of this digital camera?

21      A.       Yes, digital camera C-750 Ultra Zoom.

22      Q.       By Olympus?

23      A.       Correct.

24      Q.       And lastly, this is an exhibit that -- I

25  don't believe -- I think it has come in, 144?

1          MS. PROVINZINO:  Uh-huh, 144 provisionally.

2    BY MR. RANK:

3          Q.     All right, provisionally.  I am going to ask

4    you, Agent Howe, about a document that we have admitted

5    through Mr. Scobbie's testimony.  Do you see that?

6          A.     Yes.

7          Q.     And that is a paper containing information on

8    Barry Ardolf's neighbors, correct?

9          A.     Correct.

10         Q.     If I can lay my hands on it, do you remember

11   this being a document that had a post-it note on it, but

12   information about Mr. Scobbie's children?

13         A.     I do.

14         Q.     Do you remember seeing that earlier when Mr.

15   Scobbie testified?

16         A.     Yes, I do.

17         Q.     Agent Howe, in general, do you have a

18   ballpark number as to how many computers that were

19   seized during the execution of the search warrant at

20   Barry Ardolf's residence in July of 2009?

21         A.     Approximately 16.

22         Q.     And do you have any approximation of how many

23   loose hard drives were seized?

24         A.     There were so many.  I would have to

25   approximate a total of 50.

1    Q.    And how about the CDs, is that an even harder

2    question?

3    A.    Yes, it is.

4    Q.    More than a hundred?

5    A.    I would say so.

6    Q.    And how many external drives, not internal

7    drives, but external drives or thumb drives?

8    A.    I would say five to ten, possibly.

9    Q.    Okay.  Your Honor, if I may have a moment

10   with co-counsel?

11             THE COURT:  All right.

12             MR. RANK:  Thank you.  I think, Your Honor,

13   the Court has admitted 144 provisionally?

14             THE COURT:  That is true.

15             MR. RANK:  I think with this additional

16   foundation, I would offer 144 fully at this time.

17             MR. MAHONEY:  I didn't hear the testimony

18   about where this was found, that is one thing I missed.

19   BY MR. RANK:

20   Q.    Do you know where this was found?

21   A.    Yes, in Mr. Ardolf's bedroom.

22   Q.    And actually, I can quickly lay my hands on

23   it.  There is some documentation on the document,

24   itself, about where it was found?

25   A.    Correct.

1    Q.    We have looked at page 2 of Exhibit 144.

2  What is that?

3    A.    That is a notation, for one, it told us where

4  in evidence, our evidence system is at.  The item number

5  as it refers to our evidence recovery log, room K, which

6  is Barry Ardolf's room is where it was found.

7    Q.    That was on the flip side of that document?

8    A.    Correct.

9    Q.    Which indicates where it was located?

10   A.    Correct.

11        MR. MAHONEY:  No objection.

12        THE COURT:  144 is received.

13        (Government's Exhibit 144 was received in

14  evidence.)

15        MR. RANK:  With that, Your Honor, I have no

16  further questions for right now.

17        THE COURT:  You may inquire, Mr. Mahoney, if

18  you wish.

19        MR. MAHONEY:  Yes, Your Honor, I have a few

20  questions.

21                    CROSS EXAMINATION

22  BY MR. MAHONEY:

23    Q.    Agent Howe, that last document, 144, was

24  found in the bedroom.  Was it found on his desk or in

25  some particular part of the room?

1    A.    I do not know for sure, because I am not in

2  every room.

3    Q.    There is no indication it was hidden

4  somewhere?

5    A.    Not that I am aware of.

6    Q.    So, he might have some information about his

7  neighbors because one might like to know the name of the

8  neighbor's kids, is that possible?

9    A.    Possible.

10   Q.    There is nothing nefarious about that

11 document in and of itself, correct?

12   A.    Correct.

13   Q.    You were talking about some of your training.

14 The term hacking, do you know where the term hacking

15 comes from?

16   A.    Not exactly sure.

17   Q.    And in terms of your training, you have been

18 trained in "hacking," too, isn't that correct?  Isn't

19 that a way you sort of learned how to counteract

20 intrusions?

21   A.    I wouldn't say I have been trained in

22 hacking.  I am trained in techniques that hackers

23 typically use.

24   Q.    Right.  So what that means is you study how

25 hacking is done, correct?

1      A.      Correct.

2      Q.      So you can protect either the companies you

3 work for, or to figure out how a computer might have

4 been infiltrated, correct?

5      A.      I have not been in that capacity in any of my

6 previous employment.

7      Q.      In your understanding of computers and

8 computer security, would that be a true statement?

9      A.      Yes.

10      Q.      The computers that you, in Mr. Ardolf's

11 bedroom; that was on, correct?

12      A.      Correct.

13      Q.      And do you know if it was password protected?

14      A.      I do not know.

15      Q.      And the thumb drive being in -- what was that

16 term you used for it?

17      A.      USB hub.

18      Q.      USB hub.  That was plugged into the tower,

19 correct?

20      A.      I do not know.  Special Agent Jerry DeWees

21 would have dealt with all of our computer items.

22      Q.      If it was connected to the tower, that would

23 just be, essentially, another hard drive on the

24 computer?

25      A.      Correct.

1     Q.     So, all of the information in that computer

2 could be shared between the various hard drives,

3 correct?

4     A.     Correct.

5     Q.     Counsel made a point of the books in the

6 room.  You never opened the titles of these books -- or

7 opened these books to see when they were published, did

8 you?

9     A.     No, I did not.

10    Q.     And essentially, all we know is that they

11 have some time, you know, when they were printed, if

12 they were ever read, and if there is actually anything

13 inside of them, correct?

14    A.     Correct, I did not look in them.

15    Q.     Have you ever heard of certified ethical

16 hacking?

17    A.     Yes, I have.

18    Q.     What is that?

19    A.     I just know that it is a certification that

20 is given to individuals who are privy to the ways of how

21 to hack into systems.

22    Q.     Again, that might be a way of training in

23 terms of being ethical or law abiding, would that be

24 fair?

25    A.     Correct.

1      Q.      You talked about the size of the -- I think

2    it was the hard drive of the main tower.  You said two

3    terabytes?

4      A.      Yes.

5      Q.      How big is that?  What does that number

6    translate into?

7      A.      As far as --

8      Q.      Billion, trillion, or million --

9      A.      Well, you have got, you know, I am not an

10   expert on the translation of it, but typically 1,000

11   gigabytes is one terabyte.  So, you are talking, 2,000

12   gigabytes, which is a considerable amount of space for

13   hard drives.

14     Q.      And then again, all of the CDs, you haven't

15   gone through all of those CDs?  You haven't done the

16   analysis?  That is Agent DeWees?

17     A.      I believe it was Special Agent Cameron who

18   looked at the CDs.

19           MR. MAHONEY:  No further questions, Your

20   Honor.  Actually, one moment, please.

21           THE COURT:  All right.

22           (Discussion off the record.)

23           MR. MAHONEY:  No further questions, Your

24   Honor.

25           THE COURT:  Mr. Rank?

1          MR. RANK:  Your Honor, conceding this is

2    beyond the scope of my redirect, I have one exhibit that

3    I didn't offer, an exhibit that was actually shown in

4    one of the photographs, Exhibit 148, which is a physical

5    Comcast bill.

6          MR. MAHONEY:  No objection.

7          THE COURT:  Received.

8          (Government's Exhibit 148 was received in

9    evidence.)

10          MR. RANK:  Thank you, Your Honor.  And with

11   that no further questions.

12          THE COURT:  Anything further, Mr. Mahoney?

13          MR. MAHONEY:  No, Your Honor.

14          THE COURT:  You may step down, Agent.

15          (Witness excused.)

16          MR. RANK:  May we approach, Your Honor?

17          THE COURT:  Yes.

18          (Discussion at the bench off the record.)

19          THE COURT:  You will notice I didn't activate

20   the hissing sound.  You kind of nodded approval.  I had

21   an idea what both lawyers wanted to talk to me about.

22          We had agreed at the last recess, we checked

23   in with one another on where a logical place was to

24   break for the day.  So, this is that spot.  So, we will

25   stand in recess until 9:00, not 9:30, 9:00 tomorrow

1  morning.

2          I know that as we came into the courtroom it

3  wasn't snowing, so I don't know how that will affect

4  your commute for those of you who have a way.  So, I

5  hope you have a pleasant evening.  We will see you in

6  the morning.

7          We stand in recess.  And of course tomorrow

8  is Friday, so we will stand in recess tomorrow sometime

9  once we are done until Monday.  So, stand in recess.

10         (Jury excused.)

11         THE COURT:  Anything further from the

12  Government or Mr. Mahoney?

13         MR. MAHONEY:   No, Your Honor.

14         MR. RANK:  No, Your Honor.

15         THE COURT:  See you in the morning.  And

16  then, of course, the same as yesterday, if there are

17  things you want to leave in here, we will lock it down.

18         MR. RANK:  Thank you, Your Honor.  So, 9:00

19  tomorrow morning?

20         THE COURT:  9:00.

21         MR. MAHONEY:  Your Honor, is it all right if

22  I stay with Mr. Ardolf for a few minutes in the

23  courtroom?

24         THE COURT:  As long as we, I suppose --

25         MR. MAHONEY:  Until 5:00?

1           THE COURT:  Until 5:00?  All right.  Thank

2  you.

3           (Evening recess.)

4

5

6

7

8

9      Certified by:   s/ Jeanne M. Anderson

10                     Jeanne M. Anderson, RMR-RPR
                       Official Court Reporter.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      I N D E X

2                     VOLUME II

3

4
     Government's Witnesses:
5

6

7      BRENDA MURPHY

8
            Direct Examination by Mr. Rank      Page   54
9           Cross Examination by Mr. Mahoney    Page   61

10

11
       BRUCE GARBER
12

13          Direct Examination by Mr. Rank      Page   62

14

15
       DAVE SENGER
16

17          Direct Examination by Mr. Rank      Page   86

18

19
       PATRICK O'HARA
20

21          Direct Examination by Mr. Rank      Page   94
            Cross Examination by Mr. Mahoney    Page  133
22          Redirect Examination by Mr. Rank    Page  144
            Recross Examination by Mr. Mahoney  Page  162
23

24

25
```

I N D E X (Continued)

VOLUME II


Government's Witnesses:



   JOSEPH MATERNOWSKI

      Direct Examination by Mr. Rank        Page 164


   ANTHONY DORLAND

      Direct Examination by Mr. Rank        Page 182


   THOMAS SHROYER

      Direct Examination by Mr. Rank        Page  187
      Cross Examination by Mr. Mahoney      Page  208


   ANDREW SCOBBIE

      Direct Examination by Mr. Rank        Page  210
      Cross Examination by Mr. Mahoney      Page  215

I N D E X (Continued)

VOLUME II

Government's Witnesses:

MOU CHENG VANG

Direct Examination by Mr. Rank          Page  217

MARY SILL

Direct Examination by Mr. Rank          Page  219

BRENT KNUTSON

Direct Examination by Mr. Rank          Page  225
Cross Examination by Mr. Mahoney        Page  238

DAVID RUFFINO

Direct Examination by Mr. Rank          Page  240
Cross Examination by Mr. Mahoney        Page  252
Redirect Examination by Mr. Gross       Page  253

I N D E X (Continued)

VOLUME II

Government's Witnesses:

DENNIS HOWE

    Direct Examination by Mr. Rank      Page   254
    Cross Examination by Mr. Mahoney     Page   309

EXHIBITS

Government's Exhibits:              Page Received:

        1                              57
        2                              75
        5                              77
       11                              65
       20                             125

       22                             127
       32                             115
       33                             168
       34                             176
       37                             174

       40                             113
       41                             228
       42                             250
       43                             250
       81                              81

```
 1                        I N D E X (Continued)

 2                            VOLUME II

 3


 4


 5                             EXHIBITS


 6


 7    Government's Exhibits:              Page Received:


 8
               96                            267
 9             97                            267
               98                            267
10             99                            267
              100                            267
11
              101                            267
12            102                            267
              103                            267
13            104                            267
              105                            267
14
              106                            267
15            107                            267
              108                            267
16            109                            267
              110                            267
17
              111                            267
18            112                            267
              113                            267
19            114                            267
              115                            267
20
              116                            267
21            117                            267
              118                            267
22            119                            267
              120                            267
23
              121                            267
24            123                            290
              124                            290
25            125                            290
              126                            290
```

1                         I N D E X (Continued)

2                            VOLUME II

3


4


5                              EXHIBITS


6


7      Government's Exhibits:              Page Received:


8


9          127                                  290
           128                                  290
10         129                                  290
           130                                  290
11         131                                  290

12         132                                  290
           133                                  290
13         134                                  290
           135                                  290
14         136                                  157

15         137                                  162
           138                                  290
16         139                                  290
           140                                  290
17         141                                  290

18         144 (provisionally)                  213
           144                                  309
19         148                                  314
           152                                  130
20         153                                  119

21


22


23     Defendants' Exhibits:


24


25          1                                   139