1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF MINNESOTA

3    ------------------------------------------------------------

4

     United States of America,   )   CR 10-159(1) (DWF/SRN)
5                                 )
                   Plaintiff,     )   SENTENCING HEARING
6                                 )
        -v-                       )
7                                 )
     Barry Vincent Ardolf,        )   July 12, 2011
8                                 )   9:30 o'clock, a.m.
                   Defendant.     )   St. Paul, Minnesota
9

10   ------------------------------------------------------------

11

12        BEFORE THE HONORABLE JUDGE DONOVAN W. FRANK

13            UNITED STATES DISTRICT COURT JUDGE

14         CRIMINAL SENTENCING HEARING PROCEEDINGS

15

16

17

18                        *    *    *

19

20

21

22

23                    JEANNE M. ANDERSON
                    Registered Merit Reporter
24            Suite 646, 316 North Robert Street
                 St. Paul, Minnesota 55101
25                     (651) 848-1221

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFF:    Timothy Rank, Esq.
                          Laura Provinzino, Esq.
 4                        James Alexander, Esq.
                          Assistant United States Attorneys
 5                        Suite 600, 300 South 4th Street
                          Minneapolis, Minnesota 55415
 6                        (612) 664-5600

 7

 8

 9   FOR THE DEFENDANT:   Barry Ardolf, Pro Se

10
     STANDBY COUNSEL
11   FOR THE DEFENDANT:   Kevin M. O'Brien, Esq.
                          Law Office of Kevin M. O'Brien
12                        247 3rd Avenue South
                          Minneapolis, Minnesota 55415
13                        (612) 333-6440

14

15

16

17

18

19

20

21

22

23

24

25
```

 1                    (In open court.)

 2              THE COURT:  You may be seated.  Thank you.

 3    Why don't we have -- I will leave it to the discretion

 4    of counsel.  Obviously, we can start with Mr. O'Brien if

 5    you want to note your presence for the record, along

 6    with Mr. Ardolf at counsel table?

 7              MR. O'BRIEN:  Good morning, Your Honor.  I am

 8    Kevin O'Brien.  I am remaining as standby counsel for

 9    Mr. Ardolf, who is present today.

10              THE COURT:  I will come back to that issue in

11    just a moment.

12              We will just make clear what everybody's --

13    what the scope of that representation is as we begin

14    this hearing.  So, all right?

15              MR. O'BRIEN:  Sure.

16              MR. RANK:  Good morning, Your Honor.

17    Assistant United States Attorney Tim Rank, appearing on

18    behalf of the United States.  And with me at counsel

19    table are Assistant United States Attorney Laura

20    Provinzino; Assistant United States Attorney Jim

21    Alexander is present to address forfeiture issues, Your

22    Honor.  And FBI Special Agent Bob Cameron is also at

23    counsel table.

24              THE COURT:  Good morning.  Let me indicate my

25    understanding, and actually how I typically would

1    handle -- how most sentencings are handled.  And so we

2    will see procedurally what the respective views of the

3    parties are.

4              Generally, the first thing we discuss, one

5    because the law requires it and the parties are entitled

6    to know from the Court, is what the applicable

7    guidelines are.  Not to be confused with -- and the not

8    to be confused with phrase is more for the benefit of

9    the non-lawyers in the room with the congressional

10   maximums and the issues of consecutive and concurrent,

11   because that is a separate issue.

12             But, generally, we begin with, well, what are

13   the applicable advisory guidelines?  And that is a

14   second issue from what mandatory minimums, because there

15   are a couple of those in play in this case, as well,

16   today.  And so, whether it was based on both testimony

17   and oral argument, we would deal with those arguments

18   and testimony first before we go on to, okay, here's the

19   Judge's findings as to the applicable guidelines.  And

20   in this context, we will now have separate argument on

21   what the appropriate sentence should be.

22             So, I am assuming by the submissions that I

23   received from all of the parties, that I will start

24   first with the United States, that the testimony of the

25   agent you've suggested, apart from any exhibits, relate

1  in substantial part to some, if not all, of the

2  objections that the Defense has made to the computations

3  under the Guidelines.  And so some of that testimony is

4  going to relate to -- in addition to argument, there

5  will be testimony on the issue of responding to some of

6  these objections.  Or have I misread the Government's

7  position?

8          MR. RANK:  That is correct, Your Honor.  The

9  testimony that the Government sought the evidentiary

10  hearing to present is both to address some of the

11  objections to the enhancements in the presentence

12  investigation, and also to give it a more complete

13  picture of the offense and the Defendant.

14          THE COURT:  And that is what I assumed coming

15  into the courtroom.  Mr. O'Brien -- in other words, how

16  I assumed, if somebody would have asked me based upon

17  all of the submissions, I would have said, well, I

18  assume that we are going to hear any testimony that will

19  relate primarily to the offense and objections,

20  themselves.  And then once that is done, any separate

21  oral argument on, well, given what each claims the

22  record is, here is what we believe your ruling should be

23  on these objections and the applicable guidelines.

24          I would then make those rulings after

25  argument and testimony and then we would proceed with

1   any separate argument on a sentence.  I also believe

2   that one or more victims will either be speaking from

3   the podium or will be asking the Government to read a

4   statement.  But, I am assuming, much like other

5   sentencing proceedings, that is how we are going to

6   proceed today?  I will hear from you, Mr. O'Brien?  If

7   you are saying, well, no, that is not what I assumed, at

8   all --

9            MR. O'BRIEN:  No, Your Honor, it is what I

10   assumed.  I anticipated that the Government would call

11   their witness to augment the trial testimony in order to

12   establish the -- or attempt to establish the

13   enhancements that they are recommending in the PSR.

14            THE COURT:  Now, do you have any questions or

15   requesting any guidance from the Court?  I will note for

16   the record I have received extensive position

17   submissions, both from you and -- maybe now is a good

18   time to -- bear with me just a moment.

19            I will note position and responsive position

20   pleadings from both parties.  I will also note, if you

21   will bear with me a moment, the receipt of -- these are

22   not likely to come up at this time, but seven -- well,

23   actually eight letters from seven parties, because Kelly

24   Ardolf sent me two letters.  But, from friends, family,

25   the father of Mr. Ardolf.  And I won't go through each

1   and every one.  But, in addition to that, I received the

2   position papers, extensive, along with the information

3   you dropped off yesterday, including some photographs,

4   family photographs.

5              I am assuming that unless you say otherwise,

6   that it seems like everything has been submitted, both

7   the two-page submission, the statement by Mr. Ardolf and

8   your extensive submission with the letters that have

9   come in throughout the case.  But, I had them all in one

10  spot.

11             I assume that unless you ask me for guidance

12  on -- or Mr. Ardolf does, on the scope of your

13  representation today, that we are kind of set to

14  proceed, until you tell me otherwise?

15             MR. O'BRIEN:  Your Honor, I did submit that

16  information on behalf of Mr. Ardolf as standby counsel.

17  And we will not be presenting any further evidence.  I

18  did want to clarify, the Court did receive the letter

19  from Mr. Ardolf's son Taylor, correct?  I noted it in

20  my position paper --

21             THE COURT:  I did.  I have a letter from -- I

22  singled out Kelly, the youngest daughter, just because I

23  received two letters from her, not at the same time.

24  And then I have Taylor's letter, as well.  Well, I will

25  just briefly read through them so both the Government

1    and the Defense believe that, well, so if you are

2    saying, well, we assumed you had something more than

3    that.

4              I have someone who has described themselves

5    as a friend of 11 years, attended school together.  I

6    have two letters from Kelly Ardolf.  I have Taylor

7    Ardolf's letter, Matthew Chapman who describes being a

8    good friend since the third grade of Mr. Ardolf, and a

9    friend of his deceased wife, I believe, who -- that is

10   going to come up today.  Because as emotional as it is

11   for Mr. Ardolf and others, I believe, with the tragic

12   and untimely death, and I think if my memory serves me

13   correct, November 6th of 2000, I believe.  And so --

14   because they discussed both Mr. Ardolf and the mother of

15   his children.

16             From his father, Robert Ardolf, I received a

17   letter.  A letter from Elizabeth Henderson.  A letter

18   from his brother, I am probably mispronouncing the name,

19   Blaze Ardolf.  I am not implying at all they just came

20   in recently.  Some of these may have come in some time

21   ago.

22             Those are the letters that I have received.

23   So, either -- and I am not talking now about any victim

24   impact statements, because anything I have seen, you

25   have seen.  Nothing has come to me confidentially,

1  because as you all know, that is not the way the system

2  works.  So, if one or both of you are saying, well, then

3  there are some other letters he has either missed or we

4  thought he had he doesn't have, and I have had extensive

5  contact with the probation officer.  So, if she is

6  thinking, I have got a letter that the Judge doesn't

7  have, and she is shaking her head no, but is there other

8  information that you, other than the photographs that I

9  received, that you -- and of course, I haven't built in

10  here, I have numerous correspondence, many of the

11  letters e-filed with Mr. Ardolf over the history of the

12  case.  I haven't included his statement or his letters

13  to me over the course of time and whatever I have,

14  everybody else has.  Because there is nothing I have in

15  a secret file or anywhere else that has been sealed.

16  So, if I have it, you have it, they have it.

17          Some of those -- just like a presentence

18  report, not unique to this case, they are not public in

19  any case.  Sometimes I think they should be.  Probation

20  officers panic when they hear me say that, so people

21  could see all of the work that goes into a file by the

22  Probation Department.  But, those are the letters that I

23  have and submissions.  And so, apart from the position

24  pleadings of both yourself and the Government.  So, if

25  you are thinking that, well, there are other letters

1  that we thought you had and you don't have, then I don't

2  know if you want to ask Mr. Ardolf if that seems to

3  cover everything.

4  　　　　　　THE DEFENDANT:  It is covered.

5  　　　　　　MR. O'BRIEN:  We are satisfied that the Court

6  has received everything that it should have.  Thank you.

7  　　　　　　THE COURT:  Somebody has their hand up back

8  there, Mr. O'Brien?

9  　　　　　　FEMALE VOICE:  You didn't mention my name and

10  sending in a letter, but I also sent a letter in?

11  　　　　　　THE COURT:  And your last name is?

12  　　　　　　FEMALE VOICE:  I don't want to say.  I am

13  Barry's sister.

14  　　　　　　THE COURT:  Oh, I received your letter.  I

15  do -- yes, I do have your letter.

16  　　　　　　FEMALE VOICE:  Thank you.  You didn't say my

17  name out loud.

18  　　　　　　THE COURT:  Yeah, that is fair enough.  And

19  actually, the reason I asked that question, to be candid

20  is, if I didn't, I am sure some of you didn't miss it

21  when I said there is another -- I thought, actually, and

22  now that you say it, I do have that.  But, there is the

23  letter that I couldn't read the writing, even though it

24  is better than my handwriting, when I referred to the

25  first letter as a friend of eleven years who attended

1    school together, I wanted to make -- I wasn't sure, but

2    now that you say that, I do have that letter, as well.

3              FEMALE VOICE:  Okay.

4              THE COURT:  Mr. Rank, same question I asked

5    Mr. O'Brien?

6              MR. RANK:  I am unaware of any additional

7    letters, Your Honor.

8              THE COURT:  All right.  Mr. O'Brien, if I may

9    ask you, as the Government calls the agent, even though

10   the Rules of Evidence, you know, under Rule 1102 don't

11   apply in all respects to sentencing proceedings so they

12   are, for lack of a better word, they are more relaxed.

13             Do you intend to make any objections with the

14   permission of Mr. Ardolf?  Or does he intend to make or

15   want to represent himself?  In other words, I have seen

16   it both ways with standby counsel when a witness is

17   called, they request assistance of counsel and have an

18   understanding or they just say the contrary.  You are

19   standby, and you are going to say nothing, unless I ask

20   you to.  So -- and I see Mr. Rank with a puzzled look on

21   his face.

22             MR. RANK:  I do have a puzzled look, Your

23   Honor, and part of this applies to what I understand

24   standby counsel is.  I was a little taken aback by the

25   lengthy submissions submitted by Mr. O'Brien in this

1    case because he is not the attorney in this case.

2              And so, I think that if -- and the Court has

3    been addressing Mr. O'Brien.  My understanding is Mr.

4    O'Brien is not the attorney of record in this case.

5              THE COURT:  That is true.

6              MR. RANK:  And the attorney of record is the

7    person who under *Faretta* has a right to represent

8    themselves.

9              THE COURT:  That is true.

10             MR. RANK:  Until they say I want to be

11   represented by counsel.  So my question is, is Mr.

12   O'Brien representing Mr. Ardolf, or is Mr. Ardolf

13   representing himself?  And if Mr. Ardolf is representing

14   himself, I think that Mr. Ardolf should be the one that

15   is up here addressing the Court.

16             And the reason I have concern about this,

17   Your Honor, is that when we put on the witness, are

18   there going to be two people --

19             THE COURT:  No, there is not going to be.  It

20   will either be Mr. O'Brien, and that is why I was going

21   to inquire of Mr. Ardolf, it will either be Mr. Ardolf

22   making any objections and of course that, included

23   within the word objection is his right to say, I want to

24   make an objection, but I want to consult my standby

25   counsel.  Or, if Mr. Ardolf makes it clear that he is

1   going to request for the limited purpose of this

2   question that unless he otherwise, one of them is going

3   to be doing the -- it won't be both.  So, and that would

4   be the same, even if there are two co-counsel, I

5   wouldn't say, well, you are both free to make, in other

6   words, if we had two lawyers there instead of one, it

7   would be the same ruling by the Court.  I understand

8   your concern.  We will just make it crystal clear on the

9   record, here.

10          MR. RANK:  And I guess my other concern, Your

11  Honor, is that what has happened in this case has shown

12  that there will be things said by a person representing

13  Mr. Ardolf who -- and then Mr. Ardolf later claims that

14  that person did something that they weren't supposed to

15  do or did something that he wasn't endorsing.  If he is

16  representing himself and speaking on his own behalf,

17  then he can't make that later allegation.

18          THE COURT:  Let me ask Mr. O'Brien first,

19  then I will ask Mr. Ardolf.  Do you want to respond to

20  that, Mr. O'Brien?

21          MR. O'BRIEN:  Sure.  With respect to the

22  narrow question of who would object, if at all, to the

23  witness' testimony, I am confident that Mr. Ardolf would

24  like me to do that.

25          I don't anticipate any objections, knowing

1    what the rules are at a sentencing hearing.  I do not

2    anticipate Mr. Ardolf making any objections to the

3    testimony today.

4              As far as the bigger issue, Your Honor, for

5    example, the submission, I am trying to be of service to

6    the Court.

7              THE COURT:  We will approach -- we will take

8    it step by step.  So, Mr. Ardolf, as long as my Court

9    Reporter and everybody else can hear you, you don't have

10   to come to the podium for this limited question, unless

11   you wish to.  You have heard what Mr. O'Brien has said

12   and he is standby counsel because you have asserted the

13   right and have the right to represent yourself.

14             He has just said that for the limited purpose

15   of -- and we will just take it one part of the hearing

16   at a time.  The limited purpose of the agent taking the

17   stand on issues relating to the objections and the

18   offense, itself, and for lack of a better phrase, the

19   applicability of the guidelines, that you -- if anybody

20   is going to make any objections, you have given him

21   permission to do that.  Is that true?

22             THE DEFENDANT:  Yes, that's true.

23             THE COURT:  All right.  I, as you would

24   probably imagine, I am having a difficult time today.

25   And I understand standby counsel is for cases like this.

1    And so I am just confirming that I need to use him.

2              THE COURT:  We will take it one step at a

3    time.  We will go through the first witness and I will

4    check back in with you.  Before we begin on that

5    testimony, I want to ask a question that admittedly does

6    not relate probably even indirectly to that.

7              In the submission, the responsive

8    submission -- this is on the forfeiture issue.  In the

9    responsive submission yesterday, the United States

10   Attorney's Office ended their position pleading that was

11   e-filed, so it is out there for the world to see.  The

12   Government proposed an alternative to forfeiture, which

13   was conveyed to Defendant's standby counsel.  Because of

14   the Government's overriding goal, the removal of the

15   Defendant from the Xxxxx Xxxxxx neighborhood in Blaine,

16   Minnesota to provide safety for the victims, to that

17   end, we have offered to allow the Defendant to sell his

18   house and put all of the money in trust for his

19   children.

20             In other words, that is telling me if I agree

21   with it, they will walk away.  The Government's offer

22   was communicated to the Defendant, and he has apparently

23   rejected it.

24             Do we know what the status of this is today?

25   Because I have been a Judge for 27 plus years, and 13

 1   here, and these -- the Government rarely is willing to

 2   do such a thing.  I would approve it if it is set out

 3   there.  And I was also going to say that to me it is

 4   kind of a non-issue on -- without getting into some of

 5   the mail correspondence between the jail and children

 6   and such, that we can easily preserve, if there is an

 7   issue of invaluable family pictures on some of these

 8   computers that were seized, we can easily preserve, I

 9   would think, some of that; and that would rarely, if

10   ever, be a defense to a forfeiture claim.

11          What is the status of that, if we know?  And

12   I am not saying we need to know to take the agent's

13   testimony, but I thought, well, is that an issue we are

14   going to be discussing before the hearing is over?

15   Because I read that offer by the Government.

16          In other words, so the record is clear, Mr.

17   Ardolf is in one of those unique positions, apart from

18   being here in trial, he is probably one of -- I don't

19   know what the statistics are, a handful of people own

20   their house free and clear.

21          And so, for the Government to say, we will

22   walk away, in effect, if he wants to sell his house,

23   apart from whatever the sentence is and put the money in

24   trust for his children, we will walk away.  Did I read

25   it correctly?

1           MR. RANK:  Yes, Your Honor.  By way of

2    background, it wasn't just -- that wasn't the first time

3    this offer was made to the Defendant.  Immediately after

4    the trial in this matter and the guilty pleas, I

5    contacted Mr. Ardolf's lawyer at the time and

6    communicated to him the same offer.

7           As the Court is aware, the law is clear that

8    in a child pornography distribution offense if you use

9    your house to facilitate the offense, the standard is

10   very strong, the law is very strong that that house is

11   forfeitable as an instrumentality of the offense.

12           So, we contacted Mr. Ardolf's counsel at the

13   time, showed him the case law on it and said:  Look, if

14   you make efforts now to place -- to sell the house and

15   place the proceeds of the house in a trust for the

16   benefit of the kids, not a trust that Mr. Ardolf has

17   control over, has the ability to get at for the

18   remainder, but if it is put in trust for the benefit of

19   all three of the Ardolf children, that we will walk away

20   from our rights under forfeiture with respect to the

21   house.  And we did that back in December of last year.

22           That was communicated, and Mr. Ardolf

23   rejected that offer at the time, perhaps because he

24   thought he was going to move to withdraw his guilty

25   plea.  But, we then filed the paperwork, filed the

1   motions with respect to forfeiture, laid out the case

2   law and contacted Mr. O'Brien, made the same offer, and

3   at that point we did not get a positive response from

4   that.

5          Our position today, Your Honor, what we plan

6   on seeking from the Court today is a final order of

7   forfeiture on both the computer equipment and the house.

8   And with that order of forfeiture, we don't have to

9   execute on that order of forfeiture.  We can have the

10  ability, even after that order of forfeiture is entered,

11  to still work with counsel for the Defendant in this

12  case to reach the same result, which is to place the

13  proceeds of the house, sell the house relatively

14  quickly, and also to place the proceeds of that house in

15  a trust for the benefit of the kids.

16          So, yes, it was communicated to the Defendant

17  back last December.

18          THE COURT:  I wasn't aware of that in

19  December, not that I claim I should have been.  I just

20  read that today and I thought I would check in before we

21  began the formal part of the hearing.  So --

22          MR. RANK:  That is accurate, Your Honor.

23          THE COURT:  I didn't want to spend a lot of

24  time at this stage, Mr. O'Brien, on it because we will

25  be revisit this.  I won't be cutting anybody off on that

```
 1   issue.  Whether you want to respond or Mr. Ardolf, I saw
 2   he -- I wasn't eavesdropping, but I saw him lean over
 3   and you wrote something down.  But --
 4              MR. O'BRIEN:  Well, Your Honor, I appreciate
 5   the Government's offer, and I am going to continue to
 6   discuss that with Mr. Ardolf, and I have spoken with Mr.
 7   Ardolf's son, as well about it.
 8              THE COURT:  I won't go into it now, and I
 9   probably won't even go into it in any great -- we will
10   address the forfeiture issue, at least agree on what the
11   status of it is before this hearing is over, even if it
12   is after the sentencing.
13              And I won't go into it now, and maybe
14   sometimes the Judge doesn't have to be privy to
15   everything.  But, if one of the objections -- and I
16   don't need to know now, because we will go on and start
17   with the testimony, is the oldest daughter, given how I
18   read the file and the relationship of the family, as sad
19   as that may be to me, we will check in, because I
20   probably will find out that has all been discussed
21   between the parties.
22              And I think as Mr. Rank says, that not unique
23   to this case, either something has a right to be subject
24   to forfeiture or not.  And if it is, it still doesn't
25   mean the issue can't get resolved in some way that might
```

1    serve the interests of all parties.  So, we will come

2    back to that, because it is entirely unrelated to really

3    the rest of the issues before me today.  So -- all

4    right?

5               MR. O'BRIEN:  I understand.

6               THE COURT:  You may proceed Mr. Rank?

7               MR. RANK:  Thank you, Your Honor.  Your

8    Honor, the United States is going to call Special Agent

9    Robert Cameron at this point.  And before I do that, I

10   wanted to address some of the issues of the exhibits

11   that have already been entered into evidence in this

12   case.

13              THE COURT:  And by entered into evidence, you

14   mean as part of the Court's file or at the trial of the

15   matter before the plea?

16              MR. RANK:  Primarily, Your Honor, that were

17   entered at the trial --

18              THE COURT:  At the trial, itself.

19              MR. RANK:  I believe I just want to for the

20   record, the exhibits that have already been admitted by

21   the Court are Exhibits 1 -- Your Honor, do you have a

22   copy of the trial exhibit list?

23              THE COURT:  I do, well I probably do, but if

24   you have an extra copy, other than to go through this,

25   since I have a --

1              MR. RANK:  And I have also got one for the

2    Defense.

3              THE COURT:  Thank you.

4              MR. RANK:  And in fact, this is also helpful.

5    I made a copy for the Court's benefit of our checklist

6    of that which was admitted.

7              THE COURT:  Thank you.

8              MR. RANK:  And based on my notes, what is

9    already in is Exhibit 1, 2, 5, 11, 20, 22, 32 through

10   37.

11             THE COURT:  And maybe what we should do, even

12   though it will take just a bit more time, you don't have

13   to literally read -- but for the record, just maybe

14   identify the exhibit.  In other words, they are

15   identified in some detail in the Government's exhibit

16   list that existed at the time of trial.  So, the record

17   will speak for itself.  So, if you can kind of identify

18   as you go down each one which means we should step back

19   to one and just describe it so there is a general

20   understanding of what they are?

21             MR. RANK:  I will do that.  And there were

22   some broad categories that I can summarize, too, when I

23   get into those.

24             Exhibit 1 was the February 22nd, 2009 e-mail

25   from the Yahoo.com account to a Moss & Barnett employee.

1           Exhibit 2 is -- that was to Brenda Murphy.

2           Exhibit 2 was a February 22nd, 2009 e-mail

3    from that same Yahoo.com account to Philip Young at Moss

4    & Barnett.

5           Exhibit 5 was a February 22nd, 2009, e-mail

6    from the Yahoo.com account to Dave Senger with the two

7    attachments of child pornography.

8           Exhibit 11 is a printout of an e-mail from an

9    internal employee at Moss & Barnett, noting that the

10   e-mails, those series of three e-mails identified in 1,

11   2 and 5 had come in on February 22nd, 2009.

12          Exhibit 20 is a printout of the MySpace page,

13   the fake MySpace page created by the Defendant

14   containing child pornography that was printed by Anoka

15   County Sheriff's Detective Pat O'Hara.

16          Exhibit 22 is a large printout of the child

17   pornography image that was contained on the MySpace

18   page.

19          Exhibit 32 is a March 8th e-mail from another

20   gmail account, a fake gmail account created in the name

21   of Victim B from the indictment, Your Honor, to Joe

22   Maternowski Anthony Dorland at Moss & Barnett.  And then

23   there are a series of e-mails from 33 through 36, which

24   are internal e-mails at Moss & Barnett related to that

25   e-mail.

1               Exhibit 37 is a printout of a text file found

2      on the thumb drive seized from Barry Ardolf's bedroom

3      during the July 21, 2009 search warrant containing a

4      number of identifying -- information related to the

5      creation of that fake gmail account.

6               Exhibit 40 is a map showing where the two

7      routers that Barry Ardolf used to connect to gmail to

8      create that second gmail account was located.

9               41, 42 and 43 are all related to the April

10     1st, 2009 and May 6, 2009 e-mail from the fake Yahoo.com

11     account created by Barry Ardolf to the various public

12     officials, including Vice-President of the United

13     States.

14               THE COURT:  Three of those are identified as

15     to the White House, correct?

16               MR. RANK:  Pardon me?

17               THE COURT:  To the White House?

18               MR. RANK:  Yes, sir, WhiteHouse.gov.

19               Exhibit 81, Your Honor, which is also

20     admitted, is a stipulation of the parties that the image

21     contained in the e-mail sent to Dave Senger and the

22     MySpace page, and it also was found on a number of

23     computers belonging to Barry Ardolf was in fact child

24     pornography, and represented real children.

25               Exhibits 96 through 121 are photographs taken

1  during the search warrant, a map and some photographs

2  taken during the search warrant at Barry Ardolf's

3  residence on July 21, 2009.

4        Exhibits 123 through 141 are items seized

5  during the search of the Ardolf residence on July 21,

6  2009, as are Exhibits 133 and 144, and 148, Your Honor.

7        And lastly, Exhibits 152 and 153 are

8  custodian of record documents related to the creation of

9  a MySpace page and the creation of the gmail accounts.

10       THE COURT:  And just so the record is clear,

11 what you have gone over, and it is consistent with my

12 notes here, the exhibits that were received the first

13 approximately three days of trial?

14       MR. RANK:  That is correct, Your Honor.  As

15 Your Honor is aware, I refer to some of those exhibits

16 in the position pleadings --

17       THE COURT:  That is true.

18       MR. RANK:  -- of the Government and I believe

19 that they also were relied on in part by the Probation

20 Office in coming up with the factual basis for the PSR.

21       THE COURT:  That is also true.  And I could

22 just state, to the extent it is relevant, not unusual

23 for that as the lawyers in the room are aware of,

24 regardless of how the trial ended, whether it ended with

25 a verdict or a plea to reference back that as part of

1    the record.  So --

2              MR. RANK:  Thank you, Your Honor.  The United

3    States calls Special Agent Robert Cameron.

4              THE COURT:  If you would step forward, sir?

5    And then before you step into the witness box, I will

6    give the oath to you.  If you would please raise your

7    right hand?

8              (Witness sworn.)

9              THE COURT:  Then there is a step up there.

10   But, if you would have a seat behind the microphone and

11   once you are seated, if you would -- and you have to sit

12   fairly close to the mike and make sure that little green

13   light is on, otherwise it won't pick you up.  If you

14   would please state your full name and spell your last

15   name?

16             THE WITNESS:  Robert Cameron, C-a-m-e-r-o-n.

17             THE COURT:  You may inquire, Mr. Rank.

18             MR. RANK:  Thank you, Your Honor.  Your

19   Honor, I am going to make an offer as to a number of

20   exhibits that I will be referring to throughout.  They

21   are all identified in the exhibit list.  Copies have

22   been provided to the Court and the Defense before, and

23   they are all listed in detail on the exhibit list I just

24   provided to the Court.

25             I will go, as I am bringing them up, rather

1   than offer and get them in, I want to do a mass offering

2   of the exhibits and refer to them during the course of

3   the testimony of Agent Cameron for efficiency sake.  So,

4   I will -- as they come up, as we are discussing them

5   during the course of his testimony, they will obviously

6   be identified.  I would like to offer them all at once.

7            THE COURT:  All right.

8            MR. RANK:  And I would like to offer, Your

9   Honor, the following exhibits.  Exhibits 3, 4, 6 through

10   10, 12 through 19, 21, 23 through 30, 37, 44, 45, 50

11   through 69, 73 through 80, 85 through 91, and 154 and

12   155.

13            Your Honor, in addition to those exhibits

14   which were all previously disclosed to the Court and

15   Defense Counsel and appear on the exhibit list that

16   we've submitted back during the trial, I have four

17   additional exhibits at this time and I would offer

18   those, as well.

19            They are all letters written by Mr. Ardolf

20   from jail and have been referenced in the submissions by

21   the Government, both in the position pleading and then

22   to a lesser extent in the response to Defense's position

23   pleading.

24            I would offer those at this time.  I have

25   copies of each one of those for Defense Counsel, as

1   well, Your Honor, 160, 161, 162, 163.  And I also have

2   copies of each of those exhibits for the Court.

3            THE COURT:  All right.  My suggestion, Mr.

4   Ardolf and Mr. O'Brien is that without having to be

5   concerned about the word waiver, if there is some

6   objection, is to move through this, but address that

7   concern that the defense may have, is to provisionally

8   receive them under Rule 104.  And I say provisionally

9   for the limited purpose of allowing the testimony to

10  proceed.

11           And then when all is said and done after

12  any -- with or without any objection, after the direct,

13  with or without any cross, if the Defense then, with or

14  without objection wants to say, well, in light of the

15  testimony and how the exhibits were utilized, here is

16  our objection.  You won't get the "W" word waiver out of

17  my mouth.  I will rule up or down.  Is that acceptable?

18           Do you want to mention it -- if you need a

19  moment to explain that to Mr. Ardolf?

20           (Discussion off the record between Mr.

21  O'Brien and the Defendant.)

22           MR. O'BRIEN:  We have no problem with doing

23  that.

24           THE COURT:  And I will check in with both

25  you and Mr. Ardolf at the end of the examination.

1          I will indicate for the record that even if

2   -- and I think in a private conversation Mr. Ardolf and

3   Mr. O'Brien would probably confirm this, that there is

4   nothing unusual about offering actually with or without

5   a testimonial sponsor, sometimes we call it, a number of

6   these exhibits.

7          Some would suggest that if they are somewhere

8   in the Court's file, even if they weren't admitted

9   during the trial, that they are part of the record.

10  But, just to make -- in fairness to everyone, so

11  everything is out in the open, these have all been

12  identified.

13         So, if I proceed in that way and I

14  provisionally receive them as I defined that, is there

15  any objection from the Government?

16         MR. RANK:  No, Your Honor.

17         (Government's Exhibits 3, 4, 6, 7, 8, 9, 10,

18  11, 12, 13, 14, 15, 16, 17, 18, 19, 21, 23, 24, 25, 26,

19  27, 28, 29, 30, 37, 44, 45, 50, 51, 52, 53, 54, 55, 56,

20  57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 73,

21  74, 75, 76, 77, 78, 79, 80, 85, 86, 87, 88, 89, 90, 91,

22  154, 155, 160, 161, 162 and 163 were provisionally

23  received into evidence.)

24         THE COURT:  You may inquire.

25         MR. RANK:  Thank you, Your Honor.

                        ROBERT CAMERON

                      DIRECT EXAMINATION

BY MR. RANK:

     Q.      Good morning, Agent Cameron.

     A.      Good morning.

     Q.      Agent Cameron, where do you work?

     A.      I work Downtown Minneapolis with the FBI.

     Q.      And could you describe in general what you do
for the FBI?

     A.      I am a special agent with the Minnesota Cyber
Crimes Task Force.

     Q.      How long have you been with the FBI?

     A.      Nine years and two days.

     Q.      How long have you been specializing in cyber
crime investigations?

     A.      The entire time.

     Q.      You indicated that you were assigned to the
Cyber Squad, is that correct?

     A.      That is correct.

     Q.      Generally, do you need specialized training
to be assigned to that squad?

     A.      Yes, you do.

     Q.      Did you have some background that brought you
into the cyber investigations?

     A.      Yes.

1     Q.     What was that?

2     A.     I was a network engineer with a national

3  security agency, with Purcell and Hamilton, prior to

4  joining the Bureau.

5     Q.     And did you have some specialized education

6  besides your employment?

7     A.     Absolutely, numerous trainings and

8  certifications, and incident response, forensics, things

9  of that nature.

10    Q.     Okay.  Within the Cyber Squad do certain

11  people have different specialties even within the Cyber

12  Squad at FBI?

13    A.     Absolutely.

14    Q.     And what is your area of specialty?

15    A.     Computer intrusions.

16    Q.     What, in general, does that mean, computer

17  intrusions?

18    A.     I guess in popular nomenclature, it is

19  hacking into computers and things of that nature.

20    Q.     And is that what you have been doing for most

21  of the time you have been working as a Special Agent is

22  focusing in that level of investigation?

23    A.     The entire time.

24    Q.     As part of your duties with the FBI, Agent

25  Cameron, were you involved in the search of Barry

1   Ardolf's residence on July 21, 2009?

2        A.    Yes, I was.

3        Q.    Were you the case agent assigned to the

4   investigation that resulted in that search warrant?

5        A.    Yes.

6        Q.    Can you describe very generally what led you

7   to obtaining a search warrant to search Barry Ardolf's

8   residence?

9        A.    Well, the case was brought to me through Bob

10  Blackmore, an agent on our squad who works child

11  pornography cases.  He had been working with the Anoka

12  County Sheriff's Department on an unusual case that also

13  involved threats to the President.  And once they

14  determined that there might be a computer intrusion

15  aspect, they brought it to my desk.

16       Q.    Was there originally a child pornography

17  investigation?

18       A.    Absolutely.

19       Q.    And that is how it was originally brought

20  into the FBI?

21       A.    Yes.

22       Q.    That is what Special Agent Cameron

23  specializes in is child pornography investigations?

24       A.    Blackmore.

25       Q.    I'm sorry, Bob Blackmore.

1      A.      Right.   That is his speciality, child

2  pornography.

3      Q.      And also at some point in time the Secret

4  Service became involved because there was a threat to

5  the Vice-President?

6      A.      Yes.

7      Q.      You eventually obtained a search warrant to

8  search Mr. Ardolf's residence?

9      A.      Yes.

10     Q.      You were the affiant on that warrant?

11     A.      Yes.

12     Q.      Were you present during the execution of the

13 search warrant?

14     A.      Yes, I was.

15     Q.      In general, can you describe what happened

16 when you went into the house to execute the search

17 warrant?

18     A.      Well, Mr. Ardolf was identified outside of

19 the home, so some agents met with him.  He let us into

20 the home.  We cleared the house for safety reasons, and

21 then I proceeded to interview Mr. Ardolf and the search

22 was conducted.

23     Q.      Let me ask you a little bit about the

24 interview in a moment.  But, in terms of the search,

25 were there a number of agents involved in the search?

1      A.      Absolutely.

2      Q.      And before going in there, was the search

3   being conducted to determine whether Mr. Ardolf had

4   engaged in some computer hacking activities?

5      A.      Yes.

6      Q.      Were you looking for computer equipment?

7      A.      Yes.

8      Q.      Did you find computer equipment?

9      A.      Yes, we did.

10     Q.      How much?

11     A.      I would say over 15 computers, over 40, 50

12  hard drives.  We found a lot of computers.

13     Q.      For a residential search warrant, was that on

14  the extreme high end of the number of computers that you

15  found doing a residential search?

16     A.      Yes, it is very rare to find that many

17  computers in a single residence.

18     Q.      I will ask you a little more about what you

19  found in a moment, but you also indicated that you

20  interviewed Mr. Ardolf at that time; is that correct?

21     A.      Yes.

22     Q.      And when you interviewed him did you ask him

23  some questions about his purpose of your search?

24     A.      Absolutely.  He asked, you know, why we were

25  there and things of that nature.

1    Q.    During the course of the interview was he

2  truthful with you?

3    A.    I don't believe he was.

4    Q.    In fact, did you ask him whether he has any

5  knowledge of wireless networks, for example?

6    A.    Right.  I asked him, for instance, if he knew

7  the difference between WEP encryption and WPA

8  encryption.

9    Q.    Did you also ask him if he knew what

10  BackTrack software was?

11    A.    Yes, I asked him if he knew what it was or

12  had ever used it.

13    Q.    And why is that significant?

14    A.    There is software on BackTrack that can be

15  used to crack wireless networks.

16    Q.    And why, in particular, were you asking Mr.

17  Ardolf about it during the search on July 21st, 2009?

18    A.    There were several CDs at the house that had

19  BT3 on it and things of that nature, which is BackTrack

20  3.

21    Q.    That is significant because that is the

22  software that you were talking about, the hacking

23  software?

24    A.    Absolutely.

25    Q.    You talked about the large number of

1   computers and other electronic media that was seized

2   during the course of the search warrant.  Is that the

3   photos and other items that Special Agent Howe talked

4   about during the course of trial?

5        A.    Right, we took numerous photos of all of the

6   computers and most of the things were seized.

7        Q.    And in addition to searching on the scene,

8   were there some off-site searching or analysis that took

9   place?

10       A.    Yes, we did forensic analysis of things that

11  are seized.

12       Q.    Can you describe in general what kind of

13  analysis you did on the computers and electronic media

14  in this case?

15       A.    Right.  Well, we take the hard drive, image

16  the hard drive and upload it to a Forensic Toolkit which

17  is a forensic tool we use to analyze everything that is

18  on that drive and the items on the machine, on the

19  machine around there, any speed drive, or whatever it

20  is.

21       Q.    And some of the things you took from the

22  Ardolf residence, one was a very large thumb drive, is

23  that correct?

24       A.    Correct.

25       Q.    32 GB thumb drive?

```
1        A.      Yes.

2        Q.      And then were there also, in addition --

3   where was that found?

4        A.      In his bedroom.

5        Q.      In addition to the thumb drive found in his

6   bedroom, did he also have several other computers in his

7   bedroom?

8        A.      Yes.

9        Q.      Did you find in review of those computers

10  items of evidentiary significance as you were going

11  through them?

12       A.      Yes, I did.

13       Q.      I am going to ask you -- you talked a little

14  bit about -- if I could get the screen up, Your Honor?

15  I am going to show, this is Exhibit 123.

16              THE COURT:  Can you activate it?

17              THE CLERK:  Uh-huh.

18              THE COURT:  Yeah, we will have it up here in

19  a moment.  It takes just a moment for that projector to

20  warm up and turn on, but it should be just momentary.

21              It may be on the screen.

22              MR. RANK:  It is starting to show up there,

23  Your Honor.

24              (Discussion off the record.)

25  BY MR. RANK:
```

1      Q.      Actually, before we get to this exhibit, can

2    you see on the screen, Agent Cameron, this is

3    Exhibit 121 admitted at trial.

4            Your Honor, I don't know if you can adjust

5    the lights at all?

6            THE COURT:  I can, and --

7            MR. RANK:  Thank you, Your Honor.

8    BY MR. RANK:

9      Q.      There were a lot of CDs and DVDs that you see

10   from the Ardolf residence, correct?

11     A.      Yes.

12     Q.      I am showing you -- this is -- what are we

13   looking at right here in Exhibit 121?

14     A.      It is just a number of CDs.  Some are backups

15   of operating systems, some are security software, some

16   are --

17     Q.      Without going into detail --

18     A.      I'm not exactly sure what all of them are.  I

19   can see we did look through them and found the ones that

20   we thought were pertinent.

21     Q.      And I was going to ask you.  You found some

22   over his bedroom closet door, is that right?

23     A.      Yeah, that was his bedroom closet.

24     Q.      Did you find other CDs and DVDs throughout

25   the house?

1     A.     Yes.

2     Q.     Hundreds?

3     A.     Hundreds.

4     Q.     Maybe thousands?

5     A.     Maybe.  Yes, there was a lot.

6     Q.     Did you in fact have the opportunity to go

7  through each one of them?

8     A.     I didn't go through every single one, no.

9     Q.     Did you go through a great number of them?

10     A.     Yes, I did.

11     Q.     To look to see what was on there?

12     A.     Right.

13     Q.     When you were going through there, did you

14  find a number of instances of what is shown in

15  Exhibit 123?

16     A.     Yes.

17     Q.     What was -- there is a label on the bottom of

18  that.  What was on 123?

19     A.     That is BackTrack.

20     Q.     And BackTrack is what, if you could describe

21  a little bit more about what BackTrack is?

22     A.     BackTrack is an operating system.  So, you

23  basically boot your computer to this CD, and it is a

24  self-contained operating system.

25     Q.     And it is for what purpose?

1    A.    The purpose of BackTrack, it is used for

2  penetration testing.  It can be used to test wireless

3  networks.  It can be used to crack wireless networks.

4  It can be used to enumerate networks.  It can be used

5  for a lot of reasons.

6    Q.    Did you find more than one version of

7  BackTrack during the search of Barry Ardolf's residence?

8    A.    Yeah.  There was a BackTrack Beta, which was

9  pretty old, several BackTrack 3s and BackTrack 4, which

10 was relatively new at that time.

11   Q.    Now I guess we can go through Exhibit 124, it

12 is another CD with hacking-related software on it, is

13 that correct?

14   A.    Yes, it is.

15   Q.    125, also hacking related software programs?

16   A.    Yes.

17   Q.    Agent Cameron you know this because you went

18 through each one of these CDs or DVDs, is that right?

19   A.    Yeah, each of these CDs I went through and

20 tested and looked through all of them to see that the

21 content was operable and that it worked and everything

22 else.

23   Q.    Same for 126, right?

24   A.    Right.

25   Q.    127?

```
 1        A.      Yes.

 2        Q.      Hacking software programs?

 3        A.      Right.

 4        Q.      128, and that is also the initials BT, that

 5   is the BackTrack software?

 6        A.      Yes, it is.

 7        Q.      129, actually it is spelled out, BackTrack?

 8        A.      Yes.

 9        Q.      130 is another version of BackTrack?

10        A.      Yes.

11        Q.      131, another version of BackTrack?

12        A.      Another one.

13        Q.      And 132, 133?

14        A.      Yeah, I guess it is 2006.  It looks like

15   BackTrack Beta was out.

16        Q.      I think I am doing the last one, 134.  So, as

17   we have gone through, multiple CDs containing

18   hacking-related software; is that correct?

19        A.      That is right.

20        Q.      During your interview with Mr. Ardolf did you

21   ask him whether he had ever used BackTrack?

22        A.      Yes, I did.

23        Q.      What did he say?

24        A.      He said no, he had not used it.

25        Q.      Did you find during the course of your
```

1    forensic examination that indicated otherwise?

2         A.    Yes, I did.

3         Q.    One of the things that you found were some

4    manuals, is that correct?

5         A.    Yes.

6         Q.    And you found some manuals, electronic

7    versions of manuals for using BackTrack on the thumb

8    drive that was recovered from Mr. Ardolf's residence, is

9    that right?

10        A.    Correct.

11        Q.    Did you find those manuals anywhere else?

12        A.    Yes.  We also found them at Medtronic.

13        Q.    Why is that significant that you found those

14   items at Medtronic?

15        A.    Well --

16        Q.    Is that where Barry Ardolf worked?

17        A.    Yes, that is where Barry Ardolf worked; that

18   is correct.

19        Q.    Sot, it was his workspace at Medtronic; is

20   that correct?

21        A.    Yes.

22        Q.    I am going to show you Exhibit 58, which

23   is -- I think I will show you 60 because I think it is

24   turned in the correct way.  No.  There we are.

25              What are we looking at on the screen, Agent

1    Cameron?

2         A.     This is the manual entitled, "Cracking WEP

3    using BackTrack, a Beginner's Guide."

4         Q.     And where was this found?

5         A.     This was at his office.

6         Q.     And were there a series of manuals for these

7    BackTrack found at the office at Medtronic, more than

8    one?

9         A.     Right.  There was at least a few, all dealing

10   with cracking WEP.

11        Q.     And I am going to show Exhibit 61.  And 61 is

12   the electronic version of that same manual that was

13   found in his workspace at Medtronic, is that correct?

14        A.     That is correct.

15        Q.     And I will blow it up.  If we turn to the

16   first page, does this represent the first page of that

17   manual?

18        A.     Yes, it does.

19        Q.     And what is it that is shown on here?

20        A.     It is showing how to -- well, it is showing

21   how he is using -- or you used Kismet to enumerate

22   wireless networks.  And then it shows how to use

23   Aircrack and Aireplay to crack WEP encryption.

24        Q.     Let me just focus on the top portion.

25   Hopefully, this blows up well.

1          Can you read the text starting off with,

2    "This tutorial?"

3          A.     "This tutorial is intended for users with

4    little or no experience with Linux or WiFi.  The folks

5    over at Remote Exploit have released BackTrack, a tool

6    which makes it ridiculously easy to access any network

7    secured by WEP encryption.  This tutorial aims to guide

8    you through the process of using it effectively."

9          Q.     And then if we go down to the tools overview

10   portion, kind of describe to the Court what is shown in

11   the tools overview.

12         A.     First is Kismet.  Basically, that is a

13   wireless networking tool.  You can see, capture packets

14   and see all of the wireless networks that are operating

15   in your vicinity and determine if they have encryption

16   or not.

17              There is air monitoring, airmon-ng that

18   basically puts your wireless card into monitor mode,

19   which is required to perform this operation.  Airodump

20   is a packet capture tool.  It captures all of the

21   packets that come off a wireless network.  Aireplay is a

22   tool to replay certain packets to the intended target of

23   the web attack, and Aircrack takes those, the packets

24   captured with Airmon and cracks the algorithm.

25         Q.     Now, from that overview, I will ask you a

1    little bit about some of the evidence that you found.

2    You did a forensic reexamination of some of the

3    electronic storage devices seized from Barry Ardolf's

4    residence, is that correct?

5         A.    Yes, I did.

6         Q.    Did you find evidence when you were reviewing

7    that that Barry Ardolf had in fact used BackTrack and

8    the software that is on there, BackTrack, to access the

9    wireless router of the victims in this case?

10        A.    Yes, I did.

11        Q.    What, in particular, did you find?

12        A.    I found numerous screen shots of BackTrack on

13   the machines.  I also found cut and pasted copies and

14   flat text files of the cracked WEP key for the victim's

15   router.  And several notes regarding how to use Aircrack

16   and Aireplay, that identified the MAC address and

17   machine address of the victim's wireless router.

18        Q.    I am going to show you Exhibit 54, and this

19   is from a page into it, but did you find some

20   photographs, digital photographs of a computer screen

21   showing BackTrack running on a thumb drive that was

22   recovered from Barry Ardolf's residence?

23        A.    Yes, I did.

24        Q.    All right.  Let me go through to get to one

25   of the first screens on there.  What is showing up on

1    this screen right now, Agent Cameron?

2         A.     That is Kismet on the left.

3         Q.     That is this right here?

4         A.     It is actually the top and the bottom of that

5    are both Kismet there.

6         Q.     And so, in fact, Agent Cameron, this is a

7    digital photograph of a computer screen; is that

8    correct?

9         A.     That is correct.

10        Q.     Did you do some analysis of the file that

11   was -- that this digital photograph came from to

12   determine what camera took it?

13        A.     Right.  We looked at the metadata and

14   identified the camera that took that photo.

15        Q.     Did it turn out to be an Olympus camera of

16   the same make and model as the one that was seized from

17   Barry Ardolf's bedroom?

18        A.     Yes.

19        Q.     In general, could you describe what is shown

20   on the screen?

21        A.     Well, it looks -- actually, I'm sorry, Kismet

22   is on the bottom and up at the top it has got some shell

23   thing going.  The Kismet portion, it is enumerating the

24   networks, and it shows there is a packet column, where

25   he is showing how many packets he is collecting from the

1    specific as access points that would be in the vicinity.

2         Q.    Is this something that would need to be done

3    in order to crack into somebody's wireless router?

4         A.    Right.  You need to identify the network and

5    determine if it is encrypted, determine the strength of

6    that network, things of that nature.

7         Q.    And this is running as part of that software

8    package that is available on BackTrack, is that correct?

9         A.    Correct.

10        Q.    And then what is showing on the upper

11   left-hand -- or the upper portion of the screen?

12        A.    Well, on the left there is all of the MAC

13   addresses of the wireless networks, and it is showing

14   the encryption along those wireless networks.

15        Q.    And MAC address is what?

16        A.    It is a machine address.  It is basically --

17   it is how you uniquely identify an access point.

18        Q.    So, if someone is running this, they can tell

19   all of the wireless routers that are operating in and

20   around their neighborhood?

21        A.    Right.

22        Q.    And so when you talk about encryption levels,

23   going up to the top and blowing up a portion up at the

24   top, the column under the letters ENC, does that

25   represent encryption levels?

1      A.      Yes, it does.

2      Q.      So, by running that particular computer

3  program, you can determine what the level of encryption

4  the different routers were running, is that right?

5      A.      Correct.

6      Q.      So, you can see on there, WPA, WEP, WPA2, is

7  that also correct?

8      A.      Yes.

9      Q.      That will be necessary to operate -- running

10  that would be necessary to find a router to be able to

11  hack into it; is that correct?

12      A.      Right, you need to identify it first.

13      Q.      So, I will then blow up the right-hand

14  portion of the screen.  What does that show?

15      A.      This is showing someone trying to

16  authenticate to a wireless network on the top.

17      Q.      What is the purpose of that?

18      A.      Well, to utilize that router, you would have

19  to authenticate to that router.

20      Q.      So, in terms of -- I want to ask you

21  specifically about hacking into the victims' wireless

22  router.  You found evidence that in fact Mr. Ardolf had

23  done that?

24      A.      Right.

25      Q.      You talked about that a little bit earlier.

1    In terms of the process of cracking someone's

2    encryption, what steps are required to take it, and

3    what, in particular, is being shown on here in terms of

4    the steps?

5         A.    Well, as we discussed, you need to enumerate

6    the network, first.  Then you need to get your packet

7    capture going.  So, you collect all of the packets from

8    that specific network.  You need to authenticate to that

9    machine.  Wait, let me take a step back.

10             First you capture the packets, and you need

11   it for WEP, to defeat WEP, you need to capture ARP

12   packets, specifically ARP packets that contain an

13   initialization vector.  They are called IVs.  So, you

14   need to collect these ARP IV packets.

15             Once you collect one using the air

16   monitoring, you take that packet and replay it with

17   Aireplay against the victim router, or the subject

18   router.  And that creates more IVs.  And all of the time

19   you are capturing all of those packets, all of those IV

20   packets.  Once you have like 300 to 500,000 of them, you

21   put them into Aircrack and it cracks the algorithm.

22        Q.    Now, I am going to try to interpret that into

23   a simpler terminology.  The first thing you need to do

24   is identify the router that you want to crack, is that

25   right?

1        A.      Right.

2        Q.      And that is a little bit of what we saw on

3   that screen earlier, right?

4        A.      Right.

5        Q.      And then you need to bombard that router with

6   authentication requests, is that right?

7        A.      Well, yes and no.  You need to bombard that

8   router with packets to create more vulnerable packets.

9        Q.      A packet, for the Court's benefit, is that

10  the way in which data is transmitted using the internet?

11       A.      Yes.

12       Q.      So, if a computer is trying to talk to a

13  router, it sends packets to that router, is that right?

14       A.      That's right.

15       Q.      And then gets some sort of response?

16       A.      Yes.

17       Q.      And that is the process of the initialization

18  vectors, in order to grab or to gather as much

19  information from that router as possible; is that right?

20       A.      That is the reason why you are sending --

21  that is why you are using Aireplay to send all of those

22  packets to that router, so that router would generate

23  IVs that you can collect.

24       Q.      And basically what you are doing is you are

25  trying to talk to that router.  If you don't have the

1   encryption key, that router is saying, no, you can't

2   talk to me.

3        A.    Right.

4        Q.    And sending back some data to the computer

5   saying:  No, I am not going to talk to you.

6        A.    Yeah, okay.

7        Q.    Is that right?

8        A.    Yeah, I mean, essentially.

9        Q.    And the software allows the computer to then

10  repeat that request thousands of times, hundreds of

11  thousands of times, to gather enough information that

12  can be put into a software package to decrypt the

13  password?

14       A.    Right, air -- excuse me, Aircrack is used to

15  do that.

16       Q.    Okay.  In terms of what you look at and your

17  investigation, did you determine how long, meaning days,

18  weeks, months, it took Mr. Ardolf to access the victim's

19  wireless router in this case?

20       A.    It looked like there was some trial and

21  error.  It looked like it took at least a couple of

22  weeks, maybe a month.

23       Q.    The first fake Yahoo.com e-mail address was

24  created sometime in November of 2008, is that correct?

25       A.    That is correct.

1    Q.    The first attempts that you found in terms of

2  cracking, the wireless router looked like they would

3  have started sometime, end of January, beginning of

4  February, 2009?

5    A.    Right.

6    Q.    And the successful hacking of the wireless

7  router comes somewhere towards the middle of February of

8  2009; is that right?

9    A.    Right.

10   Q.    Right around the time the time of the first

11 e-mail that gets sent out on February 22nd of 2009?

12   A.    Yes.

13   Q.    I am going to show you, there are several

14 exhibits that we just offered, Agent Cameron, that show

15 both digital photos of the screens running BackTrack, as

16 well as -- they are called screen shots of the computer

17 running BackTrack that were found at Mr. Ardolf's

18 residence; is that right?

19   A.    Yes.

20   Q.    I will show you another example.  Can you

21 describe for the Court what this is and where it was

22 found?

23   A.    This was found in his bedroom.

24   Q.    What is it?

25   A.    On a thumb drive.  These are the commands

1    that you use.  This is the arrow down command to collect

2    packets from the target, and then it has the basis ID,

3    which is the MAC address.

4              And then it shows how to associate it with

5    the access point.  You need to associate with the access

6    point before you can send packets to it.  And that is

7    the Qwest 3984 router is the target.

8         Q.    Actually, if I blowing up that middle

9    section, that Qwest 3984 is what?

10        A.    That was the access point operated by the

11   victim.

12        Q.    That was the Kostolniks' wireless router?

13        A.    Yes, it was.

14        Q.    And then it says at the bottom, "key found!"

15   with an explanation point.  Is that the encryption key

16   for getting access to that wireless router?

17        A.    Yes, that is the WEP key.

18        Q.    I am going to show you Exhibit 55.  And this

19   is the first page of Exhibit 55.  And can you tell the

20   Court what this is -- actually the next page is going to

21   be showing?  What is that?

22        A.    This is the screen shot of the Kostolniks'

23   router.

24        Q.    How was it that you would be able to obtain a

25   screen shot of Kostolniks' router?  This was found in

1  Barry Ardolf's bedroom in the thumb drive, is that
2  right?
3       A.     Yes, it was.
4       Q.     How was it that he would be able to obtain
5  that screen shot?
6       A.     You would have to be on the local network.
7  You would have had to be a user of that machine or on
8  that network.
9       Q.     This is evidence that the router has been
10 hacked, is that correct?
11      A.     Right.  This is evidence that Mr. Ardolf was
12 on their network.
13      Q.     And that's -- the same is true for
14 Exhibit 56, is that correct?
15      A.     Yeah.
16      Q.     And I am also going to show you Exhibit 57.
17 What are we looking at in terms of Exhibit 57?
18      A.     These are, it looks like it's iwconfig is
19 like the wireless configuration of your system,
20 something you would run to find out all of your wireless
21 network cards.  Ifconfig is just -- these are just Linux
22 commands.
23      Q.     And for the -- what are Linux commands?
24      A.     Linux is an operating system and Linux
25 commands are used to move around within that operating

1    system.  These are used within a shell, so there is no

2    graphical user interface or anything.  You just bring up

3    a terminal and use commands like this to find out what

4    is going on in your machine.

5         Q.     And so, I asked you about Linux, and you say

6    it is an operating system.  Most people are familiar

7    with Windows operating systems or MAC operating systems.

8    Is the Linux operating system similar to those things?

9         A.     Yes.

10        Q.     Generally speaking, is Linux something that

11   is used by people more technically savvy in computer

12   use?

13        A.     I would say so.

14        Q.     That is a not a normal operating system that

15   you would find in the course of ordinary residential

16   use, is that correct?

17        A.     No.

18        Q.     Okay.  In addition to the hacking-related

19   evidence, Agent Cameron, you also found some child

20   pornography images; is that correct?

21        A.     Yes, I did.

22        Q.     Did you find -- I am going to ask you a few

23   different things.  And I guess, first of all, there were

24   two images of child pornography at issue in this case,

25   is that correct?

1    A.    Right.

2    Q.    And what I am talking about is the image that

3    was sent and attached to the February 22nd, 2009, e-mail

4    to Dave Senger at Moss & Barnett, as well as a version

5    of -- an image that was posted on the fake MySpace page?

6    A.    Right.

7    Q.    They were slightly different images.  The

8    MySpace page image, some of the faces of the children in

9    that child pornography image had their faces whited out;

10   is that right?

11   A.    True.

12   Q.    I am going to ask you -- I think the easiest

13   way to do this is to ask you about an image which is

14   Exhibit 13.  And this shows, Agent Cameron, all of the

15   locations that that image that was attached to the

16   February 22nd, 2009 e-mail to Dave Senger were located,

17   is that right?

18   A.    Yes.

19   Q.    So, if I blow up the one on the far left

20   side, that is an image of the child pornography that was

21   attached to that e-mail, is that correct?

22   A.    Yes.

23   Q.    It has been redacted for display in the

24   courtroom, is that correct?

25   A.    Yes.

1    Q.    The image that was attached to the e-mail did

2    not have the black boxes on it, correct?

3    A.    Correct.

4    Q.    That same image was found in a number of

5    different locations, is that also right?

6    A.    Yes.

7    Q.    So, are those all listed on Exhibit 13, the

8    locations of the different computers?

9    A.    Yes.

10   Q.    Describe where you found -- or where each

11   were located.

12   A.    Okay.

13   Q.    Let me ask you first about the one that is

14   labeled Exhibit 1, and I am just going to focus on the

15   locations of it.

16   A.    Right, that was on the thumb drive in his

17   bedroom.

18   Q.    Okay.

19   A.    On a computer tower in his bedroom.

20         On his laptop computer.

21         On a computer tower in his bedroom, on a

22   different one.

23   Q.    And then lastly?

24   A.    And that is on a Dell desktop computer in his

25   bedroom.

1      Q.     And so just in general, that same image that

2 was attached to the February 22nd e-mail to Dave Senger,

3 you found five versions in five separate locations, five

4 separate digital storage devices on computers or digital

5 storage devices seized from Barry Ardolf's residence; is

6 that correct?

7      A.     Yes, I did.

8      Q.     Meaning that he had that same image on at

9 least five different locations?

10     A.     Correct.

11     Q.     I will ask you then about the second image

12 that we talked about, which is a MySpace image.  And

13 Exhibit 26, on the left-hand side, Agent Cameron, that

14 is the image that was posted on the MySpace page, right?

15     A.     Yes.

16     Q.     And just for the sake of completeness, this

17 is the MySpace page that we are talking about, correct?

18     A.     That is correct.

19     Q.     It was created by Mr. Ardolf in the name of

20 Mr. Kostolnik, is that correct?

21     A.     Yes.

22     Q.     That was something that we are not going get

23 into the details of it, but you were able to link back

24 through a number of different text files and other

25 computer files and other investigatory materials that

1    this was something that was created by Mr. Ardolf?

2        A.    Yes.

3        Q.    You found things like the security question

4    and MySpace page the e-mail had been created with, those

5    sorts of things, located on his computer?

6        A.    Yes.  The text that was on the MySpace page

7    was on the subpoena returns linking the IP addresses to

8    other activity.

9        Q.    And that is the child pornography image we

10   are talking about, correct?

11       A.    Yes.

12       Q.    And again, if we look at Exhibit 26, that

13   shows that MySpace image on the left-hand side, and then

14   on the right-hand side, what is shown on the right-hand

15   side?

16       A.    The images that were found on his computers.

17       Q.    Found those, that same image in three

18   different locations on three different computers

19   recovered from Barry Ardolf's residence?

20       A.    Yes.

21       Q.    I guess the first one was on the thumb drive,

22   second was on the generic computer tower in his bedroom,

23   and the third one was found on the Dell laptop computer?

24       A.    Right.

25       Q.    Meaning that Barry Ardolf possessed those

1    images on three separate computers at one time?

2         A.    Yes.

3         Q.    And that is true, also, with respect to the

4    other image that we talked about, because it was found

5    in five separate computer electronic storage locations,

6    that showed that Barry Ardolf possessed that image on

7    five separate devices in his residence at one time?

8         A.    Yes.

9         Q.    Agent Cameron, in addition to hacking

10   information, and in addition to the child pornography

11   that you found, did you also find, I guess for want of a

12   better term, files showing that Mr. Ardolf was

13   maintaining surveillance on the victims in this case?

14        A.    Yes, I did.

15        Q.    What kinds of things did you find?

16        A.    For instance, he made notes in his text files

17   regarding there's a lot of cars over at their house

18   today.  Maybe it is a birthday.  Maybe I should take

19   note of this.  Or there is a woman, I think it is the

20   grandma of Bethany with the husband with the wooden leg,

21   things of that nature.

22             This car with this license plate was parked

23   outside.  I should take note of that.  This might be a

24   birthday for the child, things of that nature.

25        Q.    Did you also find extensive information

1 reflecting that Mr. Ardolf had done internet

2 surveillance on the victims in this case?

3        A.       Yes.

4        Q.       Found out where they worked, found out names

5 of co-workers, employees, bosses, supervisors, that sort

6 of thing?

7        A.       Right.   He had names of co-workers, bosses,

8 potential workplaces, and then he narrowed down

9 definitive workplaces for both of them, how to contact

10 these different businesses, their internet portals,

11 pictures, things like that.

12        Q.       This is just one -- an example of one of

13 those things that is entitled

14 MattPKostolnikphonenumberandrelatives.txt; is that

15 correct?

16        A.       Yes.

17        Q.       And I am not going to show details of it, but

18 there are several text files that are found on Mr.

19 Ardolf's thumb drive that had this type of information

20 on it, correct?

21        A.       Yes.

22        Q.       I am going to show you Exhibit 74, and I am

23 going to turn it on its side, try to.   Agent Cameron,

24 can you tell the Court what is shown in Exhibit 74?

25        A.       This looks like an internet query through

1    Findlaw to Matt Kostolnik just from the internet.  It

2    wasn't from a specific IP address or e-mail address.  I

3    mean, I'm sorry, it was.  This is coming through an

4    internet portal, not direct from an e-mail account to

5    Matt Kostolnik but through Findlaw.

6         Q.    And this is something that was sent to Matt

7    Kostolnik at his workplace, is that correct?

8         A.    Correct.

9         Q.    Did you look and see, and sort of determine

10   what Findlaw is and how you could send an e-mail like

11   this?

12        A.    Right.  I went to the Findlaw site and

13   determined how it worked, and how you could submit

14   queries to different lawyers through that site.

15        Q.    You could go to a website and you could click

16   on contact, the name of this person, and then send them

17   an e-mail; is that right?

18        A.    Right.

19        Q.    So, this was an e-mail that was received by

20   the victim on July 6 of 2009, saying I know where you

21   and your family lives and I will get you back for suing

22   us; is that correct?

23        A.    Yes.

24        Q.    I am going to show you Exhibit 77 and go to

25   page 4 of Exhibit 77.  Do you see at the very bottom --

1    and Your Honor, may I approach?  There is a mouse pad up

2    here that might make my mousing a bit more effective.

3              Do you see what I highlighted on the screen,

4    Agent Cameron?

5         A.    Yes, I do.

6         Q.    What is that?

7         A.    That is the internet portal where you would

8    put in a submission to a particular lawyer, as

9    discussed.

10        Q.    So, if you clicked on -- did you actually go

11   to those links?  That is something you could put into

12   your web browser, right?

13        A.    Right.

14        Q.    If you go to those links, what came up?

15        A.    The Findlaw sends it to the lawyer of choice,

16   your query.

17        Q.    And it actually came up with Mr. Kostolnik's

18   e-mail address?

19        A.    Yes.

20        Q.    If we go to that same exhibit, can you take a

21   look at the very top portion of it and blow it up so it

22   is a little easier to see?

23              Is that something that was in that same text

24   file that you recovered from the thumb drive in Barry

25   Ardolf's bedroom?

1      A.      Yes, it was.

2      Q.      And does it talk a little bit about the

3   purpose behind some of the e-mails that were being sent

4   or some of the things that Mr. Ardolf was doing?

5      A.      It looks like the motivation was to harm

6   Matt's career, get him fired or defame him in some way

7   so he would lose his credibility.

8      Q.      And in fact, it says right there, this may

9   get Matt fired, correct?

10      A.      That is right.  And also, I mean, it also

11   could definitely damage his marriage if he was having

12   this -- if he was fired for approaching a female

13   co-worker for sex or other things, that could definitely

14   be damaging on a personal and professional level.

15      Q.      Right below -- this is just an example.  Let

16   me try not to get the whole thing in, but there are what

17   looked like a couple of cars that are listed on there

18   and then some license plate numbers.  Do you see those?

19   I have tried not to pull the whole portion up, but it

20   looks like I did.

21              Is that an example of some of the

22   surveillance you are talking about, the notes?

23      A.      Right.  That is an example of the physical

24   surveillance.

25      Q.      Now, I will ask you about Exhibit 75, and

1   this is the one that is a little hard to read, but I am

2   going to put it up as best I can.

3           What are we seeing in Exhibit 75, Agent

4   Cameron?

5       A.      Well, it looks like a Liz Sharpen or someone

6   using her name wrote Bethany through the Edina Realty

7   website, and said:  Hey, I have a message for you.

8       Q.      And just in general, this is an e-mail that

9   was sent to one of the victims in this case at her place

10  of employment through that same sort of a web portal

11  that we talked about --

12      A.      Right, the Edina Realty web portal.

13      Q.      And what is in text of the message?

14      A.      "I know your husband Matt.  I am going to get

15  him.  He is going to pay for getting me pregnant.  Hell,

16  he already has three kids with you.  I don't blame him

17  for asking me to have an abortion.  He goes out at

18  night, but he doesn't..."  it is hard for me to read.

19  "He goes out at night but he isn't always doing what you

20  think he's doing."

21      Q.      This is something that was received by one of

22  the victims at the place of employment, correct?

23      A.      That is correct.

24      Q.      Did you find evidence that this was sent by

25  Barry Ardolf?

1    A.    Yes, I did.

2    Q.    I will show you, this is Exhibit 76.  And

3 this was also -- this is from a text file called

4 BethanyKostolnik.txt, from a thumb drive recovered from

5 Barry Ardolf's bedroom.

6        We go in and see there a number of pieces

7 of information on addresses and locations related to the

8 victims, as well as at the bottom, a list of relatives

9 of the victims.  It continues on.

10        And then what is reflected in the middle

11 lower portion of that text file, Agent Cameron?

12    A.    Right.  That is just the address of the web

13 portal where the e-mail was submitted.

14    Q.    Reflecting the Edina Realty web portal, is

15 that correct?

16    A.    I'm not sure if that is the one, because it

17 is realestate.net.

18    Q.    But, there is an Edina realty reference on

19 it?

20    A.    Yes, absolutely.

21    Q.    And then we go down to the next page, it

22 looks like there is sort of a practice e-mail there; is

23 that correct?

24    A.    Yes.

25    Q.    Similar to the one that was received from the

1    web portal, not exactly the same?

2        A.    Right.

3        Q.    Do you see a reference on there to the actual

4    web portal that would have resulted in e-mails sent to

5    the victim in this case?

6        A.    Yeah, that is it.

7        Q.    Where is that located?

8        A.    That is the BethanyKostolnik.EdinaRealty.com

9    reference, contact.

10       Q.    Right there?

11       A.    Yes.

12       Q.    And is that the kind of thing that you would

13   see if you punched in that URL?

14       A.    That is it.

15       Q.    I want to go back to Exhibit 76, because that

16   wasn't the only e-mail that Mr. Ardolf sent that went to

17   Edina Realty, is that correct?

18       A.    Right.

19       Q.    I am going to go back to Exhibit 76 and this

20   is page 4 of Exhibit 76.  If you look at the bottom,

21   there is a reference in there stating it would have been

22   sent to a supervisor?

23       A.    That is right.

24       Q.    Suggesting that there was an inappropriate

25   suggestion by the victim in exchange for purchasing the

1    house, is that correct?

2         A.    You can put it that way, yes.

3         Q.    The details are in the text of the e-mail,

4    itself, right?

5         A.    Yes, they are.

6         Q.    The purpose of these several series of

7    e-mails is listed at the bottom of the screen I just

8    blew up, is that right?

9         A.    That is right.

10        Q.    What does it say?

11        A.    Use the above page and send that e-mail to

12   Beth's co-workers.  This will kill her career.

13        Q.    All right.  Agent Cameron, over the course of

14   your investigation, forensic investigation, did you come

15   across evidence that Mr. Ardolf had done similar types

16   of things to a former neighbor?

17        A.    Yes, I did.

18        Q.    How was it that you discovered that?

19        A.    Upon reviewing the CDs and the hard drive, in

20   just doing forensic analysis, on one particular CD I

21   found some things that indicated he was targeting a

22   former neighbor in Brooklyn Park.

23        Q.    What was it that you found that caused you to

24   think that?

25        A.    There was a text file, initially I found a

1   text file.  I think it was called Hackhimbad.  And then

2   it had the victims' name, their address, their Social

3   Security number, their birth dates, their wife, their

4   children's Social Security numbers, things of that

5   nature.

6           And I found seven or eight instances of that

7   file with different notes and things and then I also

8   found some screen shots, or some scan images and some

9   files relating to that same victim later on, and a skull

10  was found there.

11       Q.    Initially, though, you found that

12  "Hackhimbad," I'll put the screen shot up again.  This

13  is a text file called Hackhimbad that you found on the

14  thumb drive from Barry Ardolf's bedroom, is that right?

15       A.    Right.

16       Q.    And on that there is an instance of, I will

17  try to avoid a lot of the information that is on there,

18  but there is a text file containing personal information

19  related to the people that are on the screen, the

20  Carstens, is that correct?

21       A.    Yes, it is.

22       Q.    When you came across that text file, did you

23  apply for a second search warrant to go and search for

24  other items related to the Carstens?

25       A.    Right.  I drafted a new affidavit, got

1      another search warrant for those items.

2          Q.     I kind of jumped ahead.  Did you actually

3      contact the Carstens before you did that?

4          A.     Yes, I did.  I contacted the Carstens and

5      asked them if they had allowed anyone to have their

6      personal information, you know, and got a general feel

7      for if there is any reason why this -- any legitimate

8      reason why this information would be out there or why a

9      neighbor would have this information.

10         Q.     And before that, did you do some

11     investigation to determine the significance of the

12     address of the Carstens?

13         A.     Yes, I think I went to Google maps, and in my

14     investigation I identified their home and where it was

15     on the map in relation to the subject's home -- or

16     previous home.

17         Q.     And you determined that Barry Ardolf used to

18     live across the street from the Carstens?

19         A.     Yes.

20         Q.     And you talked to the Carstens?

21         A.     Yes, I did.

22         Q.     And you asked them about the information that

23     was found.  Did you indicate that it was found on Mr.

24     Ardolf's computer or did you ask more general questions?

25         A.     It was definitely more general questions at

1    first.  I didn't want to get into any of that.

2        Q.    And did you find out if they had received

3    some threatening communications in the past?

4        A.    Yes, they got a threatening letter.

5        Q.    Do you want to describe that for the Court?

6        A.    The letter was a printout.  I think there was

7    a Turbo Tax from like 2004 or 2005, and it had the

8    victim's name, and his wife's name, their Social

9    Security numbers, their income.  So, it was like a

10   printout of a screen shot taken from their home computer

11   when they were doing their taxes.  And there is a bunch

12   of skulls.  There it is.  There's a lot of skulls on the

13   side, and the text, "I told you about a year ago that

14   you should be very afraid.  I can destroy you at will.

15   You sorry ass excuse for a human?"

16       Q.    How was it that the Carstens had received

17   what is shown in Government's Exhibit 85?

18       A.    They got it in the mail.

19       Q.    Do you know when they got it in the mail,

20   when they received it?

21       A.    I think it was 2009.

22       Q.    March of 2009?

23       A.    That sounds right.

24       Q.    Was Barry Ardolf living across the street

25   from the Carstens in March of 2009?

1      A.      No, he was not.

2      Q.      In fact he had been moved away, gone from

3  that Brooklyn Park residence for almost a year; is that

4  correct?

5      A.      Like eight months, seven or eight months,

6  nine months, something like that.

7      Q.      So when you talked to the Carstens, they

8  showed you that they had received this in the mail in

9  March of 2009; is that correct?

10     A.      That is right.

11     Q.      And you then got a search warrant to search

12  for additional items related to any intrusion on the

13  Carstens' computer, correct?

14     A.      Correct.

15     Q.      What, if anything, did you find in addition

16  to the text files you talked about already?

17     A.      I found some scanned images of checks and

18  bills paid, like mail that was -- it looked like the

19  mail was taken and scanned from the victim's home and

20  then stored on the thumb drive.  Actually -- yeah, that

21  was on the CD.

22     Q.      Okay.  I am going to do my best to avoid the

23  address on the screen?

24     A.      Right.  So, the subject took the mail,

25  scanned it, and then saved the file to a CD.

1    Q.    So, this was found on one of those CDs that

2 you had found in Barry Ardolf's residence, is that

3 right?

4    A.    Yeah, it was on one of the ones we went

5 through earlier.

6    Q.    It was a Discover bill, as well as a check

7 for the Discover bill?

8    A.    Right.

9    Q.    For the across the street neighbor?

10    A.    Yes.

11    Q.    Reflecting what, that it was taken out of

12 their mail and scanned?

13    A.    Right.  That was the only way I could

14 conceive it would get there.

15    Q.    And that was Exhibit 88.  Did you find

16 another scanned image of some of the Carstens' mail?

17    A.    Right, another bill, and another check.

18    Q.    And this is a the CenterPoint Energy bill, as

19 well as a check, and that was found in Barry Ardolf's

20 residence?

21    A.    Right.

22    Q.    The scanned image of it?

23    A.    Yes.

24    Q.    Did you also find some electronic evidence

25 other than the scanned image?  I am going to ask you

1    about --

2         A.    Yeah, I found some Girl Scout letters, and

3    some documents, letters written by Nannette.

4         Q.    Okay.

5         A.    Yeah, this is it.

6         Q.    This is -- I will hold this up.  This is

7    something that you found in the -- from the CD that was

8    in Barry Ardolf's residence; is that right?

9         A.    Right.

10        Q.    And again, how would you Mr. Ardolf have

11   gotten an electronic copy of a document created by his

12   across the street neighbors?  First of all, how do you

13   know it was created by his across the street neighbors?

14        A.    Just by right clicking and connecting to

15   properties and see who created the document.  The

16   metadata says, for the author name, which is consistent

17   with Nannette.

18        Q.    And there is a company listed on there.  Did

19   you learn as part of your investigation that Mr. Carsten

20   worked for that company?

21        A.    Yes, I did.

22        Q.    So, in order to get an electronic version of

23   this document, how would Mr. Ardolf have gotten that

24   electronic version?

25        A.    Well, either Nannette sent it to him in an

1   e-mail, or got it to him, or if he was on their network

2   and retrieved it from inside of their network.

3       Q.      That would have been consistent with how he

4   would have been able to get their Turbo Tax records and

5   the other financial records, right?

6       A.      Absolutely.

7       Q.      And lastly, I am going to show you

8   Exhibit 87.  Is this something that you also found on

9   one of the computers at Barry Ardolf's residence?

10      A.      Yes.

11      Q.      Okay.  And that is a skull.  Did you compare

12  that to the skull that was on the letter that was sent

13  to them?

14      A.      It would be the same skull.

15      Q.      So, that is the same skull that was shown in

16  Exhibit 85?

17      A.      Correct.

18      Q.      Agent Cameron, when you interviewed the

19  Carstens, did you also ask them about whether in

20  addition to this letter that they had gotten, that they

21  had ever gotten any other threatening communications?

22      A.      Right.  They said that they got printed out,

23  a printed-out threat, one or two, I can't remember, that

24  came out on their home printer.  It just shot out of

25  their home printer.  They thought it was a prank, maybe,

1  from a neighborhood kid, but it was a very threatening

2  similar in the language to this Turbo Tax message.

3      Q.    Again, if Mr. Ardolf printed out a

4  threatening message on their home computer, how would he

5  be able to do that?

6      A.    He would have to be on their network.  They

7  also said that their home page and home screen was

8  changed to pornographic images on a couple of occasions

9  and they said they couldn't attribute that to anybody,

10 either.

11     Q.    Did you, when you interviewed the Carstens

12 find out what the source of any friction was between Mr.

13 Ardolf and the Carstens?

14     A.    Yes.  The Carstens had two disabled twin

15 daughters and their personal care attendants would park

16 in front of Mr. Ardolf's home.  Apparently Mr. Ardolf

17 did not like that they parked their truck in front of

18 his home, so they had a lot of friction.  There was a

19 several unexplained damages to the vehicle or vehicles,

20 and personal confrontations, as well.

21     Q.    Agent Cameron, we submitted some new exhibits

22 here today.  In the course of your investigation, is one

23 of the things that you do is monitor correspondence,

24 communications from people when they are in jail?

25     A.    Yes.

1     Q.    And why is that?

2     A.    Well, we want to know what is going on.  We

3  want to see if there is anything illegal going on,

4  things of that nature.

5     Q.    Did you have some concern over the course of

6  the investigation that based on prior conduct by Mr.

7  Ardolf that he would attempt to continue any retaliation

8  against the victims in this case while he was still in

9  jail?

10    A.    Yes.  We were concerned that he might have

11  other people act on his behalf to do harm to the victims

12  or other people involved in this case.

13    Q.    And that is one of the reasons that you would

14  be monitoring jail correspondence?

15    A.    Yes.

16    Q.    Agent Cameron, I am showing you Exhibits 160

17  through 163.  Are those letters, copies of letters that

18  were sent by the Defendant while he was in jail?

19    A.    Yes, they are.

20    Q.    And in general, if you can identify for the

21  record the date, and without using full names, the

22  recipients of each one, specifically with respect to

23  Exhibits 160, 161 and 163, using the initials?

24    A.    Right.  160 was written from Barry to T.A.,

25  and -- can you help me out here?  I don't know where the

1  date is on this.

2      Q.     If it doesn't have a date on it, it is an

3  exhibit or a letter that was sent while Mr. Ardolf was

4  in jail, which would have started in July of 2010, is

5  that correct?

6      A.     Yes.

7      Q.     Sometime after July of 2010?

8      A.     Right.  And I don't see a date on it.

9      Q.     Okay.  How about 161?

10     A.     Is 161 was written from Barry to K.T.A. and

11  that looks like January 25th, 2011.

12     Q.     162?

13     A.     162 was written from Barry to S.A..  And that

14  was written on January 11, 2011.

15     Q.     163?

16     A.     163 was written from Barry to T.A..  it says

17  November 1st, so that has to be November 1st, 2010.

18             MR. RANK:  Your Honor, I referenced those and

19  excerpted them in the position pleadings, and so I am

20  not going to put any additional testimony in at this

21  time.

22             With that, I have no further questions for

23  Agent Cameron.

24             THE COURT:  With or without consultation,

25  with Mr. Ardolf, do you wish to inquire?

1          MR. O'BRIEN:  Thank you.

2          Your Honor, if it is acceptable, I have some

3   cross-examination of Mr. Cameron.  And the before I

4   finish, if I could just consult with Mr. Ardolf to see

5   if he has something that he wants me to supplement?

6          THE COURT:  Certainly.

7          MR. O'BRIEN:  I understand Agent Cameron's

8   testimony to deal with the proposed enhancement for

9   special skills.  And then secondly, the number of

10  images.  And then thirdly, there was discussion of other

11  instances where Mr. Ardolf had hacked into neighbors and

12  other people, and I assume that that was offered for the

13  purpose of establishing generally a just and reasonable

14  sentence, as opposed to establishing an enhancement in

15  the case.  I believe Agent Cameron's testimony only

16  involved two enhancements, the one for special skills

17  and the one for the number of images.

18         THE COURT:  Mr. Rank?

19         MR. RANK:  I think that is generally

20  accurate, Your Honor, except to the extent the jail

21  letters go to the obstruction enhancement and the

22  acceptance of responsibility request.

23         But, in general, that is true.  And also,

24  Counsel is correct, they are offered for the purpose of

25  providing a more complete picture of the Defendant and

1    and the Defendant's conduct.

2              THE COURT:  All right.

3                    CROSS EXAMINATION

4    BY MR. O'BRIEN:

5         Q.    Good morning, Agent Cameron.

6         A.    Good morning.

7         Q.    When you executed the search warrant in July

8    of 2009, you interviewed Mr. Ardolf.  And you asked him

9    a question about WEP or WPA.  What are those terms?

10        A.    Wired equivalent privacy protection, that is

11   WEP.  And WPA is an upgrade from that, another form of

12   encryption.

13        Q.    So, there are different levels of encryption,

14   different standards, correct?

15        A.    Yes, there are.  There are several.

16        Q.    In fact, some people don't have any

17   encryption at all on their wireless router, right?

18        A.    These days most do out of the box.  But, in

19   2009, let's say -- I am sure some people didn't.

20        Q.    And out of the box, it is usually a WEP, WEP

21   encryption standard, correct?

22        A.    It depends on where you buy.  Now some are

23   coming with WPA; but, yeah, probably in 2009 they were

24   WEP encrypted.

25        Q.    And WPA is a securer security level than WEP?

1      A.      Yes, it is, absolutely.

2      Q.      And what Mr. Ardolf was learning was how to

3  crack the lower-level WEP encryption standard, correct?

4      A.      Well, that was the focus of the

5  investigation.  There are tools on BackTrack to crack

6  WPA.  But, in this particular case, yes.

7      Q.      Because the neighbor had a WEP-encryption

8  standard?

9      A.      That is right.

10      Q.      And there were other neighbors whose

11  computers were accessed, correct?

12      A.      Right.

13      Q.      And they had no encryption at all, right?

14      A.      I'm not sure if they had encryption or not,

15  because I don't know which one of those access points --

16  they were interviewed, and they couldn't remember.

17          I looked at the printout on the Kismet

18  screen, and it looked like the majority of those were

19  encrypted.  If we go back to that exhibit, we can look

20  at it, but it looked like most of them were WEP or WPA.

21      Q.      And again, that is the lowest level of

22  encryption you can buy?

23      A.      WEP was the initial encryption used by all

24  computers.  Now, today, yes, it is a lower tier.

25      Q.      Now, the book, one of the books that was

 1    found in the search warrant was called a "Beginner's

 2    Guide to Cracking WEP," right?

 3         A.     Right, that was the manual, yeah.

 4         Q.     You have had a lot of special training,

 5    correct?

 6         A.     Yeah.  Yes, I have.

 7         Q.     You have worked in the industry and then you

 8    have gotten special training to become an agent?

 9         A.     Yeah, I have had a lot of training.

10         Q.     Far superior to the training that Mr. Ardolf

11    has had?

12         A.     I can't -- probably.  I mean, he was

13    attending Capella University and things of that nature,

14    so I don't know the extent of his training.

15         Q.     Do you believe that you would have any

16    trouble cracking a WEP-encrypted wireless router?

17         A.     I think I can.  No, I would not have any

18    trouble.

19         Q.     It wouldn't take you two to four weeks, would

20    it?

21         A.     Probably not.

22         Q.     You could do it relatively quickly, right?

23         A.     You know what?  I haven't tried, but I am

24    sure it wouldn't.

25         Q.     Okay.  Once you crack the WEP encryption,

1  that allows someone to access another person's wireless

2  internet connection, right?

3       A.    Right.

4       Q.    And so once you -- is it then that you have a

5  password that allows you to access that other wireless

6  router?

7       A.    No, it is just the WEP key, itself, is the

8  password.  The WEP key we saw on the screen earlier is

9  the password to the router.  It is like how you

10  authenticate to a router, say at a hotel with the

11  password.  The SSID is:  Hotel one.  Then it says, type

12  in the key.  And you are on their network.  So, that

13  type of thing.

14       Q.    Once you have that key, you pretty much have

15  free rein to get on to that wireless router when you

16  want to.  All you have to do is enter the key, right?

17  You don't have to redo the cracking process more than

18  once, right?

19       A.    No, unless the key has been changed, that key

20  will be consistently good for that router.

21       Q.    And you can access a wireless router now with

22  a smart phone, right?

23       A.    Yeah.

24       Q.    And you can access it with a laptop computer?

25       A.    Right.

1    Q.    You don't have to be at a traditional

2  computer in a home in order to access a wireless router,

3  right?

4    A.    Right.  There's numerous devices.

5    Q.    And you have to be within range of the access

6  point, right?  Of the router, wireless router?

7    A.    True.

8    Q.    Now, there were -- in the course of your

9  investigation, you found images of child pornography,

10  right?

11    A.    Right.

12    Q.    Now, the image that is included, well that is

13  depicted in Exhibits 13 and 26 of the three children --

14    A.    Is that the one that is --

15    Q.    That was up on the --

16    A.    The one with the whited out faces and the

17  other one with --

18    Q.    Yeah.

19    A.    Yes.

20    Q.    That was the only depiction of child

21  pornography that existed, right?

22    A.    Those instances I described are what I found,

23  yes.

24    Q.    And what you found was you found that same

25  depiction in different computers and in different

1    storage devices, right?

2         A.    Right, the straight depiction, and then the

3    one with the whited-out faces, right.

4         Q.    Right.  And then one of those depictions was

5    sent in the e-mail on February 22nd of 2009, correct?

6         A.    Yeah.

7         Q.    One was posted on the MySpace site, correct?

8         A.    True.

9         Q.    And then there were five separate images

10   found in the drive free space on --

11        A.    I think there was one.  There was one image

12   in drive free space.

13        Q.    One image in drive free space?

14        A.    Right.

15        Q.    Drive free space, is that not -- doesn't that

16   mean that there was once an image there, but the image

17   has been deleted, so drive free means there is no image

18   in that space?

19        A.    No, the image was in that space.  The image

20   was on the computer, then it was put into the recycle

21   bin, and then it was deleted.  But the image still

22   exists on the computer.  The computer marks it as free

23   space, but the full image was still on that machine.

24        Q.    Can a computer user see that image if they

25   access it once it has been deleted?

1    A.    Not if they are coming from the native

2  operating system.

3    Q.    So, that tells me that you need some forensic

4  tools to access that image once it has been deleted?

5    A.    Well, you could externally mount it.  You

6  would need specialized tools to find that image.

7  There's free tools and things you can use to find that

8  image in the free space.  You need a little bit of

9  knowledge to find it.

10    Q.    What if the free space is overwritten?

11    A.    If the free space was overwritten, then the

12  image would be gone.

13    Q.    But, in this case the free space was not

14  overwritten?

15    A.    No.

16    Q.    So, were you able to recreate that image,

17  right?

18    A.    Not recreate it, I was able to identify it,

19  right.

20    Q.    You were able to see the image?

21    A.    Yes.

22    Q.    And without the program that you had as part

23  of law enforcement, you would not have been able to see

24  that?

25    A.    Well, just for clarification I was using the

1  forensic toolkit, but there are numerous ways to

2  retrieve images from free space that aren't privy, or

3  aren't unique to law enforcement that, are publicly

4  available.

5       Q.     Software, right?

6       A.     Well, you could use software or hardware --

7  yes, in this case, it was software.

8       Q.     Now, you did a thorough search of all of the

9  computers and storage units or drives that were found at

10  the Ardolf residence, right?

11      A.     No, I didn't go through every single hard

12  drive or anything.

13      Q.     But you did search them, right?  You did

14  search them?

15      A.     I did search.

16      Q.     You did search the computers, the hard

17  drives?

18      A.     Yeah, all of the ones pertinent to this case,

19  I did go through them, yes.

20      Q.     And the reason you went through them was you

21  were interested to see if there was other child

22  pornography, other images of child pornography, right?

23      A.     I was looking for any evidence pertinent to

24  the case, whether people were targeted, that included

25  the child pornography.

1     Q.     Now, did you find any evidence that Mr.

2   Ardolf had the program necessary to recreate that image

3   once it had been deleted?

4     A.     He did have a number of -- I would have to

5   look at his bookshelf and look at the forensic CDs that

6   were identified.  I can't remember right now if he did

7   have that software.

8          He did have numerous, obviously

9   technically-advanced software products.  I'm not sure if

10  he had that particular program or programs that he could

11  do that.  With the program like BackTrack, I think there

12  is software within that framework where you could

13  retrieve images from free space.

14    Q.     Is it your testimony that you know that Mr.

15  Ardolf had that software that would have allowed him

16  to --

17    A.     No, my testimony is I don't know.

18    Q.     So, you don't know if he had it or not?

19    A.     No.

20    Q.     What is the name of the program that you used

21  to recreate or to identify the image after it had been

22  deleted?

23    A.     Forensic Toolkit.

24    Q.     Forensic Toolkit is the name?

25    A.     Yeah, FTK.

1    Q.    Did Mr. Ardolf have FTK?

2    A.    I didn't see it, no.

3    Q.    Once the image is deleted, but not

4    overwritten, can an image be sent without being

5    reconstructed by the FTK?

6    A.    You are asking if he booted up the operating

7    system, could he pull that image from free space and put

8    it into an e-mail?

9    Q.    We are talking disk free space, right?

10   A.    Right.

11   Q.    Yes.  Yes, that is my question.

12   A.    Yeah, if he boots up Windows and there is

13   something in disk free space, he wouldn't have access to

14   it from the native operating system.  So, he wouldn't be

15   able to e-mail that from the operating system like that,

16   no.

17   Q.    So, on January 21st, 2009, when the search

18   warrant was executed, Mr. Ardolf could not have

19   transmitted the deleted image in the disk free space?

20   A.    Well, not -- no, not as it was identified.

21   Q.    And again, it wasn't -- in order to identify

22   it, he would have needed the Forensic Toolkit which you

23   didn't find in all of the computers and hard disk drives

24   that he had?

25   A.    No.  Basically, there are several different

1   programs that can be used to retrieve -- it is not

2   unique to FTK.  There are a multiple of programs that

3   can be used to retrieve free space.  It is very common

4   in forensics.

5        Q.   Right.  The information that you had, though,

6   from analyzing the computers and the hard drive taken

7   from the Ardolf residence was that he did not have a

8   program capable of doing that, right?

9        A.   I don't know.

10       Q.   You didn't see one.  You didn't find one?

11       A.   I didn't look for one.

12       Q.   Did you find one?

13            MR. RANK:  Objection, asked and answered.

14            THE COURT:  I think the answer is no, he

15   didn't find one because he didn't look for one.

16            MR. O'BRIEN:  Now, Your Honor, if I could

17   just check with Mr. Ardolf and see if he has anything?

18            THE COURT:  Certainly.

19            (Discussion off the record.)

20   BY MR. O'BRIEN:

21       Q.   The ability to access WEP-encrypted wireless

22   router can come from sources that are readily available

23   online, correct?

24       A.   Yeah, I mean, that is where everything that

25   was -- or most of the things were online, yeah.

1      Q.      And it is free software that anyone can get

2   online?

3      A.      Yes.

4      Q.      And that's why -- you wouldn't advise anyone

5   to have just a WEP-encrypted wireless router, right?

6      A.      Probably not, no.  It is vulnerable.  I

7   wouldn't advise that.

8      Q.      Now, there were two images that were sent --

9   I'm sorry, there was -- the image of the three children

10  was sent on an e-mail, on an e-mail attachment that went

11  out on February 2nd, 2009, correct?

12     A.      Right.

13     Q.      And it was posted on a MySpace site, correct?

14     A.      Right.

15     Q.      And there were -- that image was found on

16  digital storage devices, right?

17     A.      It was on computers and -- yes.

18     Q.      Okay.  But --

19     A.      There was no physical copy of it, is that

20  what you are asking?

21     Q.      Well, no, not really.  I am trying to get a

22  number of how many images there were in the different

23  computers and storage devices.

24     A.      Well, there was the five, plus the three, so

25  that would be eight.

1    Q.    There is the two, the e-mail and the --

2    A.    Well, the e-mail and the MySpace --

3    Q.    And MySpace is two?

4    A.    Is two.  And then --

5    Q.    Okay.  And then five were in the, on

6    Exhibit 13, the separate digital storage devices, right?

7    A.    Right.

8    Q.    But, of those five, one had been -- at least

9    one had been deleted?

10    A.    Well, one was in drive free space.  So, yeah.

11    Q.    Was it more than one?

12    A.    One.  One was in the recycle bin, and one

13    was in drive free space.

14    Q.    They had both been deleted, right?

15    A.    No.  One had been put in the recycle bin and

16    the other one had been deleted, and they were on

17    different devices.

18    Q.    And there were three of these images found on

19    separate computers, three of these computers had this

20    image, right?

21    A.    No, five.

22    Q.    No, we are talking about the digital storage

23    devices of -- there were five on the digital storage

24    devices of Exhibit 13?

25    A.    Five different devices.

```
 1        Q.     Right, which would have been --
 2        A.     Five different images on five different
 3   devices.
 4               THE COURT:  One person at a time, please?
 5               MR. O'BRIEN:  I'm sorry.
 6               THE COURT:  That is all right.
 7   BY MR. O'BRIEN:
 8        Q.     Five were on the storage devices, right?
 9        A.     Right.  There were five images on five
10   different storage devices, correct.
11        Q.     One was in the recycle bin?
12        A.     Right.
13        Q.     And one had been deleted?
14        A.     Right.
15        Q.     And then there were three, these images were
16   found on three computers?
17        A.     I would have to look at the spot.  I believe
18   it is five different devices, so I don't know how many
19   of those -- I would have to bring up the slide to see
20   how many of those were USB and how many of those were on
21   computers.  I can't remember.
22        Q.     Well, this is important.  Your testimony was,
23   as I have it written down, that when you were asked
24   about Exhibit 26 and you said that those were images
25   that were found on three separate computers.
```

1      A.     Okay.  So, you are talking about image 26 is

2  the whited-out faces image, correct?

3              MR. RANK:  Your Honor, we have the exhibits,

4  if you want to ask him about a specific exhibit -- I am

5  going to object in terms of asked and answered on the

6  questions.  If you want the specific exhibits with the

7  specific locations, I can pull them out.

8              THE COURT:  If Mr. O'Brien wants to use them,

9  those is fine.

10              MR. RANK:  I would be happy to put them on

11  the screen so we can calk about the exact locations on

12  the exhibit.

13              MR. O'BRIEN:  Will you pull up 26, please?

14  BY MR. O'BRIEN:

15      Q.     Agent, this is Government Exhibit 26.  These

16  are the images, the image that was posted on the MySpace

17  page, also on the computer in the thumb drive recovered

18  from the Ardolf residence, right?

19      A.     Yes.  It looks like two computers, one thumb

20  drive.

21      Q.     All right.  So, there are three images in

22  Exhibit 26, right?

23      A.     Right.

24      Q.     Okay.  And on exhibit --

25      A.     Well, four including the MySpace.

1       Q.      Four including the MySpace, but we already

2   counted that.

3       A.      All right.

4       Q.      And then Exhibit 13 there are five instances

5   where this image was located?

6       A.      Right.

7       Q.      But, one was in the recycling, and one was

8   deleted, right?

9       A.      Right.  Of the five cited on the right-hand

10  side, one was in free space and one was in the recycle

11  bin, correct.

12              MR. O'BRIEN:  Thank you.  Thank you, Your

13  Honor.

14              THE COURT:  How much redirect do you have?

15              MR. RANK:  Just briefly, five minutes.

16              THE COURT:  Well, let me ask, Counsel, now,

17  maybe this isn't the -- I think we have maybe more than

18  two choices, but to try to be fair to everyone,

19  including people in the gallery and try to be efficient

20  with their time and yet try not to make either party

21  feel like, well, we don't want to -- we have issues

22  around the noon hour.

23              We can either -- we will try to finish up Mr.

24  Cameron.  I assume he will still be here for the rest of

25  the hearing.  And then it seems to me, because we have

```
1   to take, one of two things, either a fifteen-minute

2   break immediately, if for no one else in the room, my

3   Court Reporter.  Or, we could say, because for those in

4   the courtroom, if we were going to do that, most

5   important to the parties, we would run.  Much like when

6   we pick a jury in a criminal case, we will run close to

7   one if in fact we could finish.  But, it tramples on

8   people's medical needs sometimes without lunch, just

9   with a fifteen-minute break.  The other option is to

10  take a -- to take a little pressure off the lawyers and

11  clients, well we have to rush, rush, rush on such an

12  important -- all of these important issues -- take

13  something like a 45-minute, unless you ask for an hour

14  recess, and then just go until we are -- go until we are

15  done.

16          Because it seems to me that the likelihood of

17  this whole thing -- you are all going to get in what you

18  want to get in apart from Agent Cameron in the next

19  45 minutes, say, if we take a break, is not entirely

20  realistic.  I don't know how much oral argument people

21  have and the like, but you two would know that and Mr.

22  Ardolf would know that better than I.  We have those two

23  options, it would seem to me.

24          MR. RANK:  Your Honor, I have only a couple

25  of minutes with Agent Cameron.  And my preference would
```

 1    be the fifteen-minute break option so we could continue

 2    through.  We have briefed the issues.

 3              THE COURT:  Well, and I am sorry to

 4    interrupt, but maybe unless Mr. O'Brien or Mr. Ardolf

 5    disagree, worst case scenario, even if that doesn't work

 6    out is if we get to a point where we need to take a

 7    lunch break, we will take it.  It is just that I will

 8    run through part of the noon hour.  But, we will reach a

 9    point where, I think, in fairness to everyone, we will

10    have to take a break, even assuming there's no diabetics

11    or other individuals who need -- but, Mr. O'Brien,

12    whether you need to chat with your client briefly about

13    strong views one way or the other?

14              MR. O'BRIEN:  Thank you.

15              (Discussion off the record.)

16              MR. O'BRIEN:  I think Mr. Rank had a good

17    suggestion, Your Honor.  We are fine with it.

18              THE COURT:  All right.  Why don't you proceed

19    with your redirect, if you wish?

20              MR. RANK:  Thank you, Your Honor.

21              THE COURT:  So, for the folks in the gallery

22    and for the Government and the Defense, when we are done

23    with Mr. Cameron, we will take a fifteen-minute recess

24    and then reconvene.  And we will see where we are

25    45 minutes in afterwards.  All right?

1          MR. RANK:  Thank you, Your Honor.

2               REDIRECT EXAMINATION

3     BY MR. RANK:

4          Q.     Agent Cameron, you, as part of your

5     investigation, you looked at some of the items that were

6     seized from Mr. Ardolf's bedroom; is that correct?

7          A.     Yes.

8          Q.     And you also determined that he was going to

9     Capella University to get his Information Technology

10    Degree, is that correct?

11         A.     Right.

12         Q.     And he actually had an emphasis on

13    information technology in this network security and

14    penetration testing, is that correct?

15         A.     Right.

16         Q.     That is essentially hacking, correct?  Or

17    that is part of the area you were looking at,

18    penetration or hacking?

19         A.     Right.

20         Q.     And network security, protecting against

21    hacking, correct?

22         A.     Correct.

23         Q.     And I am going to show you, he had lots of

24    books on computer technology, correct?

25         A.     Right.

1      Q.      I am just showing you a few that were

2  admitted at trial as Exhibit 115.   These are, I mean I

3  see on here, hacking, one, two, three, four hacking

4  books that are on there.   There are also some network

5  security books, is that correct?

6      A.      Yes.

7      Q.      And if I move on to 116, that is the other

8  side.   This is on the headboard above his bed, is that

9  correct?

10     A.      Right.

11     Q.      These are more books on network security,

12  including hacking, is that correct?

13     A.      Correct.

14     Q.      And there is also one that is on there that

15  is CWNA.   What is that?

16     A.      Certified wireless network administrator.   It

17  is a certification.

18     Q.      That is sort of -- a wireless network

19  administrator, if you were taking that class, would you

20  learn about things like the difference between WEP and

21  WPA?

22     A.      Yes.

23     Q.      And how to set up and how to get around

24  encryption?

25     A.      Right.   It's on configure networks, security

1    configured wireless networks using different forms of

2    encryption, and things like that.

3         Q.    And there is a Pen. Tester's Open Source

4    Toolkit.  Pen. Tester, that is a combination of two

5    words, penetration, tester?

6         A.    Right.

7         Q.    What does that mean, in general?

8         A.    Well, you can enumerate networks, either

9    internally or externally and find out what IPs they are

10   operating on, what operating system they are using.  You

11   can see if they have any open ports, things of that

12   nature.

13              Those are used to test -- like penetration

14   testers are hired by banks and companies like that to

15   test their network, to protect it against attack.

16        Q.    And the books and other things that are

17   reflected in the exhibit forms of 115, 116, 117 among

18   other things show that Mr. Ardolf was educated on

19   detecting network vulnerabilities, correct?

20        A.    Absolutely.

21        Q.    And circumventing those network

22   vulnerabilities?

23        A.    Right.

24        Q.    Precisely what he did to the victims in this

25   case?

1        A.      True.

2        Q.      Do most people have these books on the

3   headboards of their beds in their houses?

4        A.      No.

5        Q.      In general, in this case, Agent Cameron, in

6   order to do what Barry Ardolf did in this case, he had

7   to obtain multiple e-mail addresses from Yahoo.com and

8   gmail.com, is that correct?

9        A.      Correct.

10       Q.      He did that by going to a library computer

11  and then also using some neighbor's wireless routers in

12  order to avoid being detected back to his computer,

13  correct?

14       A.      Correct.

15       Q.      He then took -- after he had done that, he

16  set upon his plan to hack into the victim's wireless

17  router in this case, correct?

18       A.      Correct.

19       Q.      To do that, he taught himself how to hack the

20  system?

21       A.      True.

22       Q.      Using, I would guess, some background

23  material that he had learned in his education reflected

24  on the books on his headboard?

25       A.      That and the desk, yes.

1    Q.    He obtained manuals on using BackTrack, as

2    well as the BackTrack software?

3    A.    Correct.

4    Q.    He used a bootable version that -- BackTrack

5    is a bootable version of software, is that correct?

6    A.    Right.

7    Q.    Which means you have to know how to use a

8    Linux operating system?

9    A.    Right, and you have to modify the bios to

10   boot to the CDs.  Most systems aren't -- so, I mean, you

11   need some technical ability there.

12   Q.    All right.  So, you have to modify the bios

13   to boot the CD.  Does that mean you have to make some

14   changes to your own computer hardware in order to be

15   able to run a bootable CD?

16   A.    No, not hardware.  You just stop it on boot,

17   and then you get to a menu, a blue screen menu.  It

18   looks very old to most people; but, you get to the blue

19   screen menu, then you pick out your bios and then you

20   have to change some settings in there.

21   Q.    Okay, he used the Linux operating system,

22   obviously.  And as I was going through the list, he ran

23   a number of different software programs in order to

24   ultimately crack the encryption, correct?

25   A.    Right.

1    Q.    And he used Kismet, he used AirMon, Airodump,

2  Aireplay and ultimately Aircrack?

3    A.    Right.

4    Q.    And then he used that to be able to get on

5  the victim's wireless router, to then send e-mails using

6  the victim's wireless router in order to make it look

7  like the victim was actually sending those e-mails?

8    A.    Right.

9    Q.    Agent Cameron, Mr. O'Brien asked you about

10  the images in this case.  I will ask you about, first,

11  Exhibit 13.

12        So, what Exhibit 13 shows is that Mr. Ardolf

13  had one, two and three that are reflected on Exhibit 13,

14  those were all saved versions of the image; is that

15  correct?

16    A.    Correct.

17    Q.    And there in the upper right-hand corner is

18  the file name that he gave that file on his computer

19  tower found in his bedroom was "FamilySex14-year12-year

20  and 10.jpeg."  Is that correct?

21    A.    Correct.

22    Q.    There is also, the other two that he saved,

23  he saved one which is reflected in image number one, on

24  the thumb drive he saved it under the name

25  "Kostolnik_MyFavorite.jpeg."  And then he saved it in

1  the same file name in the image that is number three, is

2  that correct?

3      A.      Correct.

4      Q.      In image number four, Counsel asked you about

5  that one because it was found in the drive free space on

6  yet another computer, is that correct?

7      A.      Right.

8      Q.      And that computer, the Optiplex GX270 desktop

9  computer, that is -- you didn't find, I guess reflected

10 on this exhibit, you don't see any other image that is

11 on that Dell Optiplex GX270, is that right?

12     A.      Right.

13     Q.      So, that means that the Defendant possessed

14 that image on that computer at one point in time,

15 correct?

16     A.      Correct.

17     Q.      And it was still on that computer when you

18 did the forensic analysis?

19     A.      Right.

20     Q.      And even if you attempted to delete it, which

21 I think you were explaining to Mr. O'Brien was that the

22 image just stays there, but it just takes the pointer

23 away from that image?

24     A.      Right.

25     Q.      It can be pulled off by using software.  But,

1   ultimately, what that reflects is that that image was on

2   the computer at the time you did the search warrant,

3   right?

4       A.      Right.

5       Q.      And at one point in time, the Defendant had

6   it on the computer in a version that he could see?

7       A.      Right.

8       Q.      Lastly, with number five, that was from yet a

9   different computer, the Dell laptop computer found in

10  Mr. Ardolf's bedroom, and that was in the recycle bin?

11      A.      Right.

12      Q.      That means the little icon on your desktop

13  that you dump things into, that you can go in and

14  retrieve them out very easily?

15      A.      Right.

16      Q.      That is not something you need any forensic

17  software for?

18      A.      No, you just go to the folder and restore the

19  file.

20      Q.      Then I am going to ask you just quickly about

21  Exhibit 26, try to.  So, with respect to the three

22  images on the side, one was found on the thumb drive

23  that was in Barry Ardolf's bedroom, saved as

24  2Family.jpeg.

25              So, in order to do that, Mr. Ardolf had to go

```
1    in and use some modification tools, draw tools to be

2    able to change the faces or mark up the faces on there,

3    is that correct?

4         A.     Yes.

5         Q.     And then save it under a different file name,

6    correct?

7         A.     Right.

8         Q.     And we saw different file names in

9    Exhibit 13, right?

10        A.     Right.

11        Q.     And that was on the thumb drive.  Number two,

12   same image found on the generic computer tower from his

13   bedroom, correct?

14        A.     Correct.

15        Q.     And then that last one, image three, that was

16   found on another laptop Dell computer found in his

17   bedroom?

18        A.     Correct.

19        Q.     Again, what that reflects, both Exhibits 13

20   and Exhibit 26 reflect that at one point in time Mr.

21   Ardolf possessed eight separate images of those

22   computers -- eight separate images of the child

23   pornography on those computers or electronic storage

24   devices?

25        A.     Correct.
```

```
 1        Q.     In addition to the image posted on MySpace

 2   and the image sent in the e-mail to Mr. Senger?

 3        A.     Yes.

 4               MR. RANK:  Thank you.  Nothing further, Your

 5   Honor.

 6               THE DEFENDANT:  Your Honor, I have some

 7   questions which my standby attorney did not ask.

 8               THE COURT:  What we will do is, we will take

 9   our fifteen-minute recess and put Agent Cameron back on

10   the stand.  We will take up that issue.

11               I will likely, once the two of you consulted,

12   whether I have Mr. O'Brien ask the questions or you,

13   that will depend on what I am told when we come back.

14   So, let's take 15 minutes, here.

15               And then I think the folks in the courtroom

16   can assume we will run for at least 45 minutes, and if

17   we are not done, then we will take some type of short

18   lunch break, but we will take at least 45 minutes when

19   we come back.  Stand in recess.

20               (Recess.)

21               THE COURT:  You may all be seated.  And Agent

22   Cameron, if you would retake the stand, sir?

23               Mr. Ardolf, did you have sufficient time to

24   consult -- I don't want to know what was said between

25   the two of you, but did you have sufficient time to
```

1    consult with Mr. O'Brien?

2              THE DEFENDANT:  Yes.  Thank you, Your Honor.

3              THE COURT:  So, is it with your consent that

4    he is going to follow up with some other questions?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Mr. O'Brien?

7              MR. O'BRIEN:  Thank you.

8                   RECROSS EXAMINATION

9    BY MR. O'BRIEN:

10        Q.    Agent Cameron, in order to de-encrypt a WEP

11   standard, you need some technical ability, right?

12        A.    Right.

13        Q.    And you can get that technical ability by

14   reading tutorials that are readily available online,

15   right?

16        A.    Right.

17        Q.    You don't need a college degree?

18        A.    No.

19        Q.    And you don't need superior computer skills

20   to do that?

21        A.    Well, I guess that is objective.

22        Q.    Well, what is your opinion?

23        A.    I would say the majority -- no one that I

24   know of knows how to crack WEP.

25        Q.    No one you know knows how to?  I'm sorry, I

1   didn't hear you.

2        A.     No one in my personal life knows how to --

3   the majority of people I have met don't even know how to

4   crack WEP or what encryption they are using.

5        Q.     Does it require special superior computer

6   skills to crack WEP?

7        A.     Yes.

8        Q.     Now, there were a number of books that were

9   found in the Ardolf home.  If someone had read those

10  books and understood them, would it have taken two or

11  four weeks to de-encrypt a WEP standard?

12       A.     It might.  I don't think any of those books

13  dealt specifically with WEP.

14       Q.     So, there was some laptop computers that were

15  found in the Ardolf home, right?  During the search

16  warrant?

17       A.     Yeah.

18       Q.     And laptop computers typically have a WiFi

19  ability, right?

20       A.     Right.

21       Q.     There were a number of PCs found in the home.

22  PCs typically don't have WiFi ability, right?

23       A.     It depends on how they are configured.   You

24  can put a wireless card on a desktop just as well as you

25  can a laptop.

1      Q.      Did the desktop computers at the Ardolf home

2  have those wireless cards?

3      A.      Yes, they had several wireless cards.

4      Q.      Do you know if the -- you found some

5  BackTrack CDs in the home, right?

6      A.      Right.

7      Q.      And those were important because those are --

8  that is the information -- those contain the information

9  that you need to de-encrypt the WEP, right?

10     A.      The BackTrack framework contains the programs

11 necessary to crack WEP.

12     Q.      Did you see if those functioned on the laptop

13 computers that were found in the home?

14     A.      No, I did not load the BackTrack on those

15 laptop computers.  That would be against protocol.

16     Q.      So, you don't know if they worked?

17     A.      Well, I can see from the evidence seized that

18 he was able to operate those programs.  They did work.

19 He had screen shots of them working.

20     Q.      But you don't know on which computers, right?

21     A.      No.  The thing with BackTrack is it is a live

22 operating system, so nothing stays on the hard drive.

23 BackTrack is a live system.  It doesn't write to the

24 hard drive.  So, all of the files that were retrieved

25 from the thumb drive were taken from there and saved to

1   that thumb drive.  They weren't saved to that home

2   computer, to the computer they were used on.

3            You could put a BackTrack CD in any computer

4   in an entire house and there wouldn't be a particular

5   record of that because it is its own self-contained

6   operating system.

7       Q.    Okay, but that BackTrack CD is not going to

8   work on every single computer?

9       A.    Yeah, it will.  BackTrack will boot on -- I

10  don't know a computer it wouldn't work on.  As long as

11  you can boot to a CD -- as long as a bios allows you to

12  boot to a CD, you can boot to BackTrack.

13      Q.    Now, you talked about the Linux operating

14  system.  That is freely available, isn't it?

15      A.    Yes.

16      Q.    It is used quite frequently, isn't it, as an

17  alternative to Windows?

18      A.    I don't know what their market share is.

19      Q.    Okay.

20      A.    It is not -- it is definitely a lot more -- I

21  don't find it nearly as often as I would find Windows or

22  Mac.

23      Q.    Sure.  Now, the image that was in the free

24  drive space, if a person clicks on that image, would

25  they be able to display it?

1    A.    Yes.  Well, like I discussed, on the native

2  operating system, you can't click on it at all, because

3  you don't see it.

4    Q.    Right.  That is fine.  That is my question,

5  thank you.

6          MR. RANK:  No redirect, Your Honor.

7          THE COURT:  I just have one question.  Not in

8  response, necessarily, to any particular question either

9  lawyer asked, and this isn't related -- the purpose of

10  my question -- I will just think out loud for more the

11  benefit of the counsel than you, frankly, than the

12  clients.  But, this doesn't relate to special training.

13          I am going to tell you the impression that

14  your testimony has left me with in the context of what

15  you described and what you found at the home of Mr.

16  Ardolf in terms of surveillance and going on the

17  wireless of neighbors, whether the direct victim in this

18  case or not, the impression you have left is that many,

19  many hours over an extended period of time was utilized,

20  as opposed to someone turning on a computer on a Monday

21  evening, and accidentally or otherwise doing the things,

22  you know, maybe 10 minutes here, 10 minutes there, what

23  the impression that you've left on me is, well, we are

24  talking -- whatever is being done, these were many, many

25  hours over an extended period of time.

1              For whatever reason somebody would want to

2    spend all of that time is maybe something between the

3    lawyers, if they think that is relevant; but, is that

4    impression -- is my impression accurate?

5              THE WITNESS:  Yes, it is.

6              THE COURT:  In light of my question, anything

7    further, Mr. Rank?

8              MR. RANK:  No, Your Honor.

9              THE COURT:  Mr. O'Brien?

10             MR. O'BRIEN:  No, thank you.

11             THE COURT:  You may step down.

12             (Witness excused.)

13             Any further testimony?  And I will relate

14   this to the issue of the enhancements and the

15   computation under the Guidelines by the United States.

16             MR. RANK:  No, Your Honor.  I do want to just

17   ask that the Court admit -- I think the Court admitted

18   our exhibits, provisionally, and ask them to be finally

19   admitted.

20             And also ask that the record reflect that

21   standby counsel has had a chance to consult with Mr.

22   Ardolf, and Mr. Ardolf has directed him to ask certain

23   questions and that Mr. Ardolf has no further questions.

24             THE COURT:  First of all, Mr. O'Brien, do you

25   need any additional time to consult with Mr. Ardolf as

1    it relates to either anything Mr. Rank has just said or

2    the concluding testimony of the agent?

3              MR. O'BRIEN:  May I inquire, Your Honor?

4              THE COURT:  Yes.

5              (Discussion off the record between Mr.

6    O'Brien and the Defendant.)

7              MR. O'BRIEN:  I have nothing further, Your

8    Honor.

9              THE COURT:  Mr. Ardolf, did have you have

10   ample time to speak with Mr. O'Brien?  And are you

11   satisfied he asked the questions you were expecting or

12   hoping he would ask?

13             THE DEFENDANT:  No.  I -- just a couple of

14   questions I still have that are relatively simple.

15             THE COURT:  Agent Cameron, I would like you

16   to retake the stand, if you would, please?

17             And then, Mr. Ardolf, I would like you to

18   just step -- after the Agent gets on the stand, and I am

19   not asking for -- note the objection of the Government

20   if you have one, but I am going to proceed.

21             Do you want to come over to the podium, Mr.

22   Ardolf?  Go ahead and ask the questions.

23                      RECROSS EXAMINATION

24   BY DEFENDANT ARDOLF:

25        Q.    Agent Cameron, can you determine which

1   computers from the Ardolf house was used for the

2   attacks?

3       A.    I can determine where the files were found.

4       Q.    Thank you.  Can I take that as a no?  Yes or

5   no.  Can you determine which computer was used?  Yes or

6   no.

7             Have you determined which computer was --

8       A.    Yes.

9       Q.    You have.  Which one?

10      A.    We have -- well, there are the desktop where

11  several items of evidence were found, and then there was

12  the laptop, at least the other laptop.  And then

13  evidence was found on at least, I think, five or six

14  different machines.

15      Q.    I am not talking about the evidence.  So, you

16  are telling the Court which computer was used, for sure?

17            MR. RANK:  I am going to object on vagueness

18  grounds.

19            THE COURT:  If you understand the question,

20  you may answer it.  If you don't, you should say so,

21  Agent.

22            THE WITNESS:  Yeah, I don't understand the

23  question.

24  BY DEFENDANT ARDOLF:

25      Q.    How can a person determine which computer was

1    definitely used?

2        A.    Oh, well normally, you would use the media

3    access control number, the Mac number --

4        Q.    Did you do that?

5        A.    -- but your computer was running Mac changer.

6    So if you change your MAC address using Mac changer,

7    which was operational when we did the search warrant,

8    then you would be able to change the MAC address of the

9    attacking machine anytime you wanted, which would make

10   the Mac number irrelevant.

11       Q.    And what computer was running the Mac

12   changer?

13       A.    Your desktop computer in your bedroom.

14       Q.    And did that MAC address coincide with one

15   that was recorded?

16       A.    Well, as I stated, if you are using Mac

17   changer, it doesn't matter what the MAC address is.

18       Q.    And directions for cracking WEP are usually

19   found on the worldwide web.  You testified to that, I

20   believe?

21       A.    Yeah.  You can find those directions on the

22   worldwide web.

23       Q.    The MySpace picture, in addition to the Court

24   redaction, were there additional redactions made to that

25   picture?  White scribbling?  Mr. Rank pointed out

```
1   someone had to open it up in kind of a paint program

2   to --

3         A.     Right, you can use paint to do that.

4         Q.     Did you positively identify those, that

5   picture, as child porn?

6         A.     Yes, that was the same image.

7         Q.     How did you positively identify it as the

8   same picture?

9         A.     Well, we can bring them up.  There are

10  several things -- they are the exact thing images.

11        Q.     So, it was visually, not forensically?

12        A.     Well, MD5sums which are used to enumerate

13  files --

14        Q.     Did you use that?

15        A.     -- they can be different once they're

16  altered.

17        Q.     So, you cannot confirm that that was the

18  second picture?

19        A.     I can look at it and say it is the same

20  picture.

21        Q.     When you set up a router, when you buy one

22  new out of the box, in order for it to be encrypted,

23  someone has to input a password; is that correct?

24        A.     It depends on what model you buy.  A lot of

25  them will come prepackaged with encryption.  They will
```

1    say this is your key.  If you want to change it.  You

2    can log in and change it.  Some are that way, some you

3    need to set a password and configure more.  It depends

4    on what brand you buy.

5         Q.    And in general, most all brands, there is a

6    website you can go to to find out what the general WEP

7    key is for people who forget what it is?

8         A.    There is not a general WEP key available.

9    There is a general password.  If they don't set the

10   password manually, some of the older routers do have

11   default passwords.

12             THE DEFENDANT:  Okay, thank you.  That is

13   all.

14             THE COURT:  Mr. Rank?

15             MR. RANK:  Quickly, Your Honor.

16                   REDIRECT EXAMINATION

17   BY MR. RANK:

18        Q.    Agent Cameron, Mr. Ardolf asked you about Mac

19   changer.  Is that something that is part of that

20   software suite that is on BackTrack?

21        A.    Right.

22        Q.    Particularly, what does Mac changer allow

23   someone who is running BackTrack to do?

24        A.    It allows you to run your wireless MIC MAC

25   address, which means that each wireless card has its own

1    physical MAC address that is kind of embedded into it

2    out of the factory.  But, with Mac changer you can

3    address that MAC address and change it to another

4    number.

5         Q.    So somebody that is running Mac changer has

6    to know that their computer, if they are going to try to

7    talk to a wireless router, that they are going to be

8    identified with a MAC address, right?

9         A.    Right.  Each connection to the MAC address is

10   going to be transmitted in that packet.

11        Q.    And if you wanted to disguise your contacting

12   of that wireless router, that is the purpose of running

13   MAC changer?

14        A.    Absolutely, so they wouldn't be able to

15   attribute it to your MAC address.

16        Q.    So, you would have to know, first of all,

17   that each computer has a unique MAC address, right?

18        A.    Right.

19        Q.    So, somebody who is more knowledgeable about

20   computers would know that about the MAC address?

21        A.    Right.

22        Q.    And you would also have to know that there is

23   a device that you could use to spoof the MAC address, to

24   hide behind a fake MAC address, right?

25        A.    Right.

1    Q.    And you also have to know that the router

2  would be recording MAC addresses of the various

3  computers that would use that router; is that also

4  correct?

5    A.    Right.

6         MR. RANK:  Thank you, Agent Cameron.  No

7  further questions.

8         THE COURT:  Mr. Ardolf or Mr. O'Brien?

9              RECROSS EXAMINATION

10 BY DEFENDANT ARDOLF:

11   Q.    You had said that you had cracked WEP

12 yourself?

13   A.    No, I didn't.

14   Q.    You've never practiced?

15   A.    No.

16   Q.    Did you learn how to do it?

17   A.    Well, I am aware of how it is done.  I don't

18 have a reason to practice.

19   Q.    You are aware of how it is done.  Okay.  Are

20 you aware that on the web, on YouTube, there are many

21 videos on how to crack WEP in less than a minute?

22   A.    Yeah, I am aware of that.

23   Q.    Okay, thank you.

24         MR. RANK:  Nothing further.

25         THE COURT:  Mr. O'Brien?

1        MR. O'BRIEN:  I have no questions, Your

2    Honor.

3        THE COURT:  You may step down, Agent Cameron.

4        (Witness excused.)

5        THE COURT:  Separate -- okay, I guess we left

6    off with moving the admission, unprovisionally, of the

7    exhibits.  That is where I left off with Mr. O'Brien

8    before I had Mr. Ardolf complete the questioning.

9        Mr. O'Brien?

10        MR. O'BRIEN:  I will consult, Your Honor.

11        THE COURT:  All right.

12        (Discussion off the record between Mr.

13    O'Brien and the Defendant.)

14        MR. O'BRIEN:  No objection, Your Honor.

15        THE COURT:  Those exhibits are received.

16    Other than additional argument on the guideline

17    computation in terms of what the advisory guidelines

18    are, any further questions on that issue for the

19    Government?

20        (Government's Exhibits 3, 4, 6, 7, 8, 9, 10,

21    11, 12, 13, 14, 15, 16, 17, 18, 19, 21, 23, 24, 25, 26,

22    27, 28, 29, 30, 37, 44, 45, 50, 51, 52, 53, 54, 55, 56,

23    57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 73,

24    74, 75, 76, 77, 78, 79, 80, 85, 86, 87, 88, 89, 90, 91,

25    154, 155, 160, 161, 162 and 163 were received into

 1 | evidence.)

 2 |       MR. RANK:  No, Your Honor.

 3 |       THE COURT:  Mr. O'Brien, on a separate issue

 4 | of the Guideline computations, separate from argument

 5 | which we will probably go to shortly, any additional

 6 | evidence or testimony other than, of course, the

 7 | position pleadings both parties have filed and any oral

 8 | argument that we are about to proceed with?

 9 |       MR. O'BRIEN:  No, Your Honor.

10 |       THE COURT:  Well, since there are objections

11 | of the Defense, you had said at the beginning of the

12 | hearing, Mr. O'Brien, on this issue, you believed that

13 | you would cover those objections with the permission of

14 | Mr. Ardolf, as opposed to maybe the issue at the end of

15 | whenever a defendant gets to address the Court,

16 | regardless of the attorney status, on what is important

17 | for me to know and what is a fair and appropriate

18 | sentence.  But, on the issue of the objections that have

19 | been filed, do you wish to address the Court, assuming

20 | it is with the permission which I will verify with Mr.

21 | Ardolf?

22 |       MR. O'BRIEN:  If I may, Your Honor --

23 |       THE COURT:  Before you do that, do you

24 | believe you have the permission of Mr. Ardolf?

25 |       MR. O'BRIEN:  I will check.

1          THE COURT:  Well, I can just ask him.  When

2     we started the sentencing hearing, I said the first

3     phase would be after the testimony sentencing was done,

4     I would hear separate legal argument on the objections

5     that were filed to the probation officer's computations

6     under what the advisory guidelines are, which include

7     also one issue of consecutive versus the two-year

8     mandatory minimum.

9          It looks like there is -- but I understood

10     you to say, Mr. Ardolf and Mr. O'Brien, that on that

11     issue, that he had your permission to address those

12     objections that he filed in a 20-page plus position

13     memorandum that had been filed.

14          Does that remain the case?

15          THE DEFENDANT:  Yes, Your Honor, that is

16     correct.  I do need to use his legal advice.

17          THE COURT:  All right.  And I will check in

18     with you and have Mr. O'Brien consult with you after he

19     makes any additional argument.

20          Now, there are two ways we can do this.  And

21     I will defer somewhat to counsel.  We can take these as

22     a group, and we will proceed with your argument, or we

23     can take the ones most important to you, Mr. O'Brien.

24     We will go forward with your -- any argument, or we can

25     take them as a -- I probably would prefer, unless one of

1    you thought it was unfair, to have you go right through

2    your objections, and lead me with what -- noting again

3    you both submitted extensive memoranda, so if someone in

4    the gallery is thinking, well, with all of the testimony

5    we have taken, there wasn't a lot of extensive oral

6    argument.  Well, there have been 20-page plus briefs

7    filed by both parties.

8              But, unless there is an objection to that

9    procedure, I will just have you, Mr. O'Brien, address

10   each of the objections you have made.  Or if you say,

11   well, it would be more manageable for me if I group two

12   or three of the most important, address those, then hear

13   from the Government and then move on, and if you want me

14   to rule on a few as we go, I will do that.

15             MR. O'BRIEN:  Your Honor, I am prepared just

16   to go forward and review all of them and then wait for

17   the Court's ruling.

18             THE COURT:  Is that agreeable with the United

19   States?

20             MR. RANK:  That is acceptable.

21             THE COURT:  I will hear from you, Mr.

22   O'Brien.

23             MR. O'BRIEN:  Your Honor, just so we

24   understand, I am not going to make any further argument

25   about the number of images.  I believe that there are

1   nine, though, not ten, because of the one that was

2   deleted and not capable of being seen by Mr. Ardolf, not

3   being capable of being transmitted, I don't think it is

4   proper to give the two-level enhancement under

5   2G2.2(b)(7).

6           THE COURT:  All right.

7           MR. O'BRIEN:  As far as the special skills,

8   Your Honor, I am going to stand on the testimony of

9   Agent Cameron and not offer any further argument.

10          THE COURT:  And in fairness to you and the

11  Government, you addressed it at some length in the brief

12  that was submitted to me, as well.  So, all right?

13          MR. O'BRIEN:  Although, we -- for the record,

14  we continue to object to the two-level enhancement for

15  special skills.

16          THE COURT:  Yes, you do and I will rule on

17  that once we are done, here.

18          MR. O'BRIEN:  Your Honor, I think the Court

19  is aware -- I know the Court is aware of what the image

20  in question is.

21          THE COURT:  I looked at them.  That is my

22  practice in every case where there is child pornography.

23  I have looked at them.

24          MR. O'BRIEN:  And I have addressed the issue

25  of the four-level enhancement under 2G2.2(b)(4), given

1    the nature of the image.  And I don't think the

2    four-level enhancement is appropriate.  I don't think we

3    need any further argument than what has been submitted

4    to the Court already.

5              THE COURT:  Well, I mean, and having due

6    regard for the fact that we are in a public courtroom,

7    we might as well put the issue out there.  Because it is

8    in both of your briefs that you have filed, and that is,

9    it is -- one, it is the -- is it Savon?  Is that the

10   right -- it is a common child pornography -- in other

11   words, this is showing up in a lot of child pornography

12   cases, which I suggest this isn't primarily a child

13   pornography case.  But, we will get to that at

14   sentencing, my sentencing decision.

15             And so, it is a common site that ends up -- a

16   lot of people get access to it.  But, let's just say

17   what it is so we understand the argument.  It is two

18   males and a female, it is clear -- I can give you my

19   opinion, that on the whited out face, that obviously was

20   whited out on the MySpace but was not when it was sent

21   to Moss & Barnett.

22             I have the opinion it is the same.  It is the

23   same picture.  It is three juveniles.  And one juvenile

24   has his penis in the mouth of the female, and she is

25   also holding the penis of the other male.  So, we might

1   as well have it out, there.  I could use phrases like

2   orally penetrating, but let's just say what the issue

3   is, and I say it with all due respect to all those

4   involved and the three laying on the bed there.  And it

5   is your view that, one, it doesn't fit the definition of

6   sadistic masochistic.  And one primary argument, not the

7   only one, well, it might be a closer call or decision if

8   it was an adult male that was involved with the female

9   and the other juvenile, but it is three juveniles.  I

10  mean, I don't want to oversimplify your concerns, but

11  that is one of the arguments you both addressed; is it

12  not?

13          MR. O'BRIEN:  It is, Your Honor.  And there

14  isn't the typical signs of sadism in that picture.

15  Child pornography is not necessarily sadistic, as

16  reprehensible as it is.  There was no bondage.  There

17  was no violence.  There was no accessory typically

18  associated with sadism, no attire, so as reprehensible

19  as it is, I don't believe it meets the definition of

20  sadism, which I think has an objective definition.  At

21  least the Second Circuit says it does.  And I think that

22  is a wise decision.

23          I don't think it is akin to the definition of

24  pornography that -- well, I know it when I see it.  I

25  think there have to be certain elements there.  And I

1    don't think they are present.  But, that is what I had

2    to say about that proposed enhancement, Your Honor.

3              THE COURT:  All right.

4              MR. O'BRIEN:  Your Honor, the PSR recommends

5    that Mr. Ardolf receive no points -- point reduction for

6    acceptance of responsibility under Sentencing Guidelines

7    3E1.1.  If I could just address that briefly, Your

8    Honor?

9              Mr. Ardolf wrote an acceptance statement.

10   And that starts with an apology not only to the victims,

11   it is to his family, to the Court, and specifically to

12   his children.  And they just have to be mortified by

13   this.  And this case is very difficult for them.

14             Mr. Ardolf knows that he let them down, that

15   he was the only parent that they had, and he acted in a

16   way that really was just horrible to them.  I know that

17   there was a real issue as to the timing of that

18   statement.

19             I believe that Mr. Ardolf is sincere.  He has

20   had over a year in the Sherburne County Jail to think

21   about what he did.  He has now had the benefit of having

22   counseling with a priest.  I think he probably has a

23   closer relationship with his attorney than he did

24   before.  I think he is seeing some insight into his own

25   behavior.

1              I know the Court when it -- when the Court

2    sentences convicted people, the Court sentences people

3    for what they have done wrong, not for who they are.

4    And in the Government's paper I see a little bit of the

5    opposite, that Mr. Ardolf is a dangerous man.  This man

6    must be punished to the extent of the law, the greatest

7    extent of the law.  And I don't think that that is the

8    appropriate philosophy.  There are a number of bad

9    things that Mr. Ardolf did, and one of them, probably

10   the most egregious, was sending the child pornography.

11   And this is going to be the factor which really drives

12   these Guidelines.

13              THE COURT:  That is true in many ways.

14              MR. O'BRIEN:  And we are getting to some very

15   high levels in the Guidelines.  And I know the Court

16   will sentence Mr. Ardolf for the bad things that he has

17   done, knowing that Mr. Ardolf, like everyone in this

18   courtroom, has some positive characteristics.  He is a

19   flawed man, in some ways, but you can't read the letters

20   from his children and from his friends.  And you can't

21   see the pictures of his family and conclude that he is a

22   dangerous, bad man.  He is a man that did bad things.

23   And I would ask --

24              THE COURT:  What should I do, Mr. O'Brien,

25   with less than a few months ago, as both the letters

1    sent to me by Mr. Ardolf, and it happened in the open

2    courtroom, Mr. Ardolf not only explained to me that he

3    was coerced into the plea, and not only said he was

4    innocent.  But, when he said that, he then said and the

5    victims targeted me.  I have been framed by the victims

6    in this case.  That is very specifically what he said,

7    both in the letter to me, and in this courtroom.

8            So, in other words, you are saying -- I'm

9    quite certain Mr. Rank is going to get up and say, I

10   should reject the notion that this, with or without the

11   assistance of a clergy, is sincerely stated today

12   because this isn't just somebody who has admitted their

13   guilt.  But, they were targeting less than a few months

14   ago the victims, the very victims that he terrorized for

15   a long, long time.

16           What should I do with that?

17           MR. O'BRIEN:  Mr. Ardolf for a period of

18   time, and even now he is attorney of record and I am

19   standby counsel, but I am obviously recognizing more of

20   the role of attorney than I was at that point, Your

21   Honor.

22           THE COURT:  And Mr. Ardolf will get a chance

23   to say what he wants to say before we get to the end of

24   this, so --

25           MR. O'BRIEN:  But my point, Your Honor, is I

1   explained to Mr. Ardolf what the elements were that he

2   had to establish in order to prevail in a motion to

3   withdraw his guilty plea.  And I told him one of the

4   elements is you have got to have a credible claim of

5   innocence.  And we discussed that.  And I think his

6   statements as to possible, reasonable doubt pointing to

7   other people having done these acts was a fruit of that

8   thought.

9           I also think, Your Honor, that Mr. Ardolf's

10   thinking has changed.  And he is going to address the

11   Court.  And I can assure the Court that he is not going

12   to be blaming anybody, other than himself.

13           THE COURT:  I think I interrupted you.  You

14   had gone from acceptance and I don't know -- so I don't

15   know, I think I interrupted you.

16           MR. O'BRIEN:  Well, I said what I wanted to

17   say to the Court about acceptance, Your Honor.

18           THE COURT:  All right.

19           MR. O'BRIEN:  And one of the issues that

20   remains is the proposed two-level enhancement for

21   obstruction of justice under Guidelines 3C1.1.

22           As I understand the Government's submission,

23   that enhancement to the Government is warranted based on

24   letters that were sent from Mr. Ardolf to his son,

25   supposed false testimony at the suppression hearing, and

1   then his false denial of guilt at his motion to withdraw

2   his guilty plea.

3            The Government's submission also references

4   the fact that in my submission, Your Honor, I referenced

5   only a portion of the letter that Mr. Ardolf wrote to

6   his son.

7            The reason I only cited that portion was

8   because that was the only portion that was listed in the

9   PSR.  So, there was no attempt on my part to hide

10  anything or to keep the Court from making rulings based

11  on a complete record.

12            But, I think that reviewing the exhibits that

13  the Government has offered today, being the letters

14  between the Ardolf family, I don't think these amount to

15  obstruction, Your Honor.  And I don't think the case law

16  supports it.  And I tried to send the Court what I

17  thought was a sampling of case law that establishes what

18  has to be -- what has to occur in order for obstruction

19  of justice to be attributed to a defendant.

20            As far as the letters to his son, Your Honor,

21  these are replete with chores that have to be done and

22  how this man is going to -- this young man, 18 years

23  old, is going to be the head of household and run a

24  house.  And there were some references, yes, to

25  testimony.  And I believe that Mr. Ardolf's son has no

1    relevant testimony that would have been offered at a

2    trial.

3              Yes, he may have been on a witness list.  I

4    don't think there is a lawyer here that would have put

5    him on the stand.  It is simply irrelevant what took

6    place on August 2nd and August 3rd of 2008.

7              Now, it explains future acts done by Mr.

8    Ardolf.  It was the catalyst for these acts that took

9    place.  But, what happened there is really irrelevant to

10   the crimes that he committed.  It is not part of any

11   element of any of the six crimes that he was convicted

12   of.

13             THE COURT:  What about in the one letter

14   where he laid out the questions and answers for the

15   testimony of what his son should testify to and what

16   exactly he should say?

17             MR. O'BRIEN:  This is what I am told about

18   that, Your Honor, and it makes sense to me.  He said --

19   Mr. Ardolf said that, well, I had a recollection of what

20   happened.  I anticipated that my son would be asked

21   these questions.  I wrote him with the questions I

22   thought he would be asked, and what I thought his

23   answers were based on what he had told me.

24             Importantly, Your Honor, Mr. Ardolf's son

25   wrote back and said, no, that is not what happened.

1    This is what happened.  These are the answers.  I don't

2    think that Mr. Ardolf was attempting to elicit false

3    testimony, wasn't trying to suborn perjury.  He was just

4    trying to prepare his son for possible testimony.  And I

5    don't think there is anybody -- any lawyer in this room

6    that hasn't prepared a client or a witness for court

7    testimony.  So, that is how I view that, Your Honor.

8              THE COURT:  All right.

9              MR. O'BRIEN:  As far as Mr. Ardolf's

10   testimony at the suppression hearing, his false,

11   supposed false denial of guilt -- it wasn't a false

12   denial of guilt at his plea withdrawal hearing, Your

13   Honor.

14             The Guidelines specifically reference the

15   limitations on the use of the enhancement in application

16   note 2 of 3C1.1, which specifically says that the

17   provision for obstruction is not intended to punish the

18   defendant for the exercise of a constitutional right.  A

19   defendant's denial of guilt, other than a denial of

20   guilt under oath that constitutes perjury, refusal to

21   admit guilt or provide information to a probation

22   officer or refusal to enter a plea of guilty is not a

23   basis for application of this provision.

24             In applying this provision in respect to

25   alleged false testimony or statements by the defendant,

1   the Court should be cognizant that inaccurate testimony

2   or statements sometimes may result from confusion,

3   mistake or faulty memory, and thus not all inaccurate

4   testimony or statements, necessarily, reflect a willing

5   attempt or willful attempt to obstruct justice.  I don't

6   think that the testimony at the suppression hearing or

7   what Mr. Ardolf put in his motion to withdraw his plea

8   constitute acceptance given the application note's

9   guidance.

10          So, Your Honor, we are left now with the

11   issue of the aggravated identity theft and the

12   application of 18 U.S.C. 1028A.  And I referenced that

13   in my position paper and it is a rather technical

14   argument.  But, I read 1028 to say that not every

15   incident of identity theft is aggravated.

16          And if it is not aggravated, then the

17   consecutive two-year sentences are not applied.  I think

18   what makes it aggravated is, as I read the statute, is

19   if the offense was done in relation to one of the

20   offenses which is enumerated in 1028A, and particularly

21   1028A(c).

22          Now, the PSR cites Count 1, Count 1 which is

23   a violation of 18 U.S.C. 1030A as the enumerated

24   offense.  But, Your Honor, as I read the elements of 18

25   U.S.C. 1030A, I don't see fraud.  I mean, I see that

1  that is a statute that prohibits the intentional access

2  of a computer without authorization, or exceeds the

3  authorized access, and therefore obtains certain

4  information.  Information obtained in a financial record

5  of a financial institution, or in a consumer reporting

6  agency, information from a department or agency of the

7  United States -- you know, Mr. Ardolf pled guilty to

8  that.  And so I -- it is a moot point that he really did

9  this.

10          But, I don't see how the facts of what

11  happened on February 22nd, 2009, established these

12  elements.  But, in any event, Your Honor, these

13  elements, to me, are specifically not related to fraud.

14  And this is the -- that is the language under

15  1028A(c)(4) that the Government and the Probation Office

16  is using to establish that the aggravated identity theft

17  was committed in relation to another offense.  And I

18  don't think that the offense that they listed has an

19  element of fraud or false statements.

20          I know the Government says:  Well, wait a

21  minute.  A clear reading of 1030, 18 U.S.C. 1030 says

22  that it is fraud.  But, it says fraud and related

23  activity in connection with computers.  So, I think that

24  that is a limiting definition.  And I think in this case

25  that use of 18 U.S.C. 1030 as an enumerated offense to

1  establish the predicate offense for the aggravated

2  identity theft is not appropriate.

3           So, I am left, Your Honor, with a

4  calculation, a base offense level of 22, enhanced by two

5  levels for depiction of a prepubescent minor, two levels

6  for distribution of child pornography, two levels for

7  use of a computer.

8           If the Court grants Mr. Ardolf the two-level

9  reduction for acceptance of responsibility, that leads

10 to a guideline sentence of 78 months to 97 months.  No,

11 without the acceptance, it is 78 to 97 months.  And then

12 if the Court grants his two-level reduction for

13 acceptance of responsibility, the guidelines sentence is

14 63 to 78 months.

15          As far as the supervised release, I know the

16 Government is requesting the maximum.

17          THE COURT:  Why don't we -- why don't we save

18 that for any separate argument?  I will go ahead and

19 make the findings once I hear from Mr. Rank on the

20 Guidelines.

21          And then if you and Mr. Ardolf want to be

22 heard on, well, that may be what the Guidelines say, but

23 here is what we are asking you to do today as a fair

24 sentence in the case.  So --

25          MR. O'BRIEN:  Sure, Your Honor.  Thank you.

1          THE COURT:  Is that acceptable to you, Mr.

2     Ardolf?

3          THE DEFENDANT:  Yes.

4          THE COURT:  All right.

5          MR. RANK:  Thank you, Your Honor.  Your

6     Honor, I will address the objections in the order that

7     Mr. O'Brien did for the benefit of the Court.  First of

8     all, he did not address the number of images

9     enhancement.  What is clear here, Your Honor, is that

10    the image --

11         THE COURT:  He did say it was nine, not ten.

12         MR. RANK:  Right.  And I think the exhibits

13    presented in court today and also the explanation about

14    what those exhibits meant indicate that the number of

15    images should be ten in this case.

16         The argument that somehow one of those images

17    was erased or deleted at one point in time doesn't

18    undermine the fact that it was possessed at one time.

19    And the Guidelines and the relevant conduct under the

20    Guidelines talks about possession at any time.

21         I know counsel in his papers tried to say:

22    Well, there should only be images that were related to

23    the transmission offense and not the possession offense.

24    But, the case law is quite clear for relevant conduct

25    purposes, it is all of the images.  And there are a

1    number of cases out there that talk about both,

2    possession and trafficking offenses, and looking at all

3    of them combined.

4            To say that because there had been an attempt

5    to delete one of the images at the time the search

6    warrant was executed doesn't undermine the fact that Mr.

7    Ardolf possessed that image at one point in time on that

8    computer.

9            It is not an artifact, it is not created as a

10   result of some other file he had saved on there.  It was

11   a unique computer that none of the other images were

12   stored on.  So, based on that, there is no question, and

13   Agent Cameron testified about this, that it meant that

14   he possessed all of those images at one time.  All of

15   those images are images that were used in the offense.

16           The case law is also clear that every

17   electronic version is an image for the purpose of

18   counting and the number of images.  So I think that

19   argument, Your Honor, does not have legs.

20           With respect to the special skills

21   enhancement, Your Honor, I will rely on what the United

22   States has submitted in its written materials to the

23   Court.  I think it is clear based on the information

24   that Agent Cameron presented today, that this was

25   something that took some background, and certainly Mr.

1   Ardolf's computer background aided his ability to

2   execute the hack and all of the related attacks in this

3   case, Your Honor.  I think the special skills

4   enhancement, no question, applies.

5              Your Honor, with respect to the issue with

6   regard to the sadomasochistic or sexual violence

7   enhancement, I think the *Bellflower* case, which is cited

8   in the Government's memorandum, is the best case on

9   that.  And it talks about the applicability of this

10  enhancement when there is any penetration, in this case.

11  And to distinguish in some way between an adult doing it

12  and a child doing it or one of the other children doing

13  it, there is no basis for that distinction.

14             This wasn't a voluntary act by these children

15  represented in the Savon Series photographs, Your Honor.

16  As the Court is aware and as the investigators are

17  aware, these kids were abused over a period of time,

18  sexually abused, and there were pictures taken of those

19  children.  It wasn't their idea to engage in that sexual

20  conduct.  They were posed by adults.  And the fact that

21  they were posed by adults doesn't make it any better

22  than if an adult was committing that act of violence on

23  them.  Forced sex, non-consensual sex between children

24  is a violent act.  And the *Bellflower* case talks about

25  all the reasons why it should be considered a violent

1    act, and therefore a depiction of sexual violence that

2    deserves the enhancement.

3          Your Honor, Counsel's -- I guess I am a

4    little surprised that we are hearing any argument on

5    acceptance of responsibility.  I think the possibility

6    of an acceptance of responsibility reduction in this

7    case is preposterous.  This is a person who has never

8    accepted responsibility.  And I have to say that given

9    the sort of eleventh hour drafting of a written document

10   called -- or for it to be an acceptance of

11   responsibility document is nothing but a bald attempt to

12   get a break on the defendant's sentence, further

13   manipulation that is consistent with other attempts at

14   manipulation by the Defendant both before and after he

15   became part of the court system.

16         Mr. O'Brien has said that there is a

17   distinction between what the Court should do in

18   sentencing somebody for their actions and sentencing

19   somebody for who they are.  And I think that is a false

20   construct, Your Honor.  I know that in State Court there

21   is a distinction between dispositional departures and

22   durational departures and you are supposed to sentence

23   the conduct and not the person.  That is not true in

24   Federal Court.  3553(a) says exactly that that is a

25   relevant issue in determining what the Court should do

1    with respect to sentencing.  In fact, it is the sole

2    reason the Defendant is submitting photographs and

3    letters, because he wants you to think things about him

4    as a person.

5             This case, Your Honor, though, shows in the

6    actions of the Defendant, his conduct in this case, both

7    before and after he was caught, both before and after he

8    became part of the criminal justice system demonstrate

9    the kind of person he is.  And the argument that Mr.

10   Ardolf is now accepting responsibility after initially

11   declining to plead guilty, after violating -- blatantly

12   violating the terms of his pretrial release after -- and

13   I believe the record is clear, lying during the

14   suppression hearing, a finding by Magistrate Judge Noel

15   that he gave testimony that was not credible.  That is

16   report and recommendation language for he lied during

17   his testimony, adopted by this Court afterwards.  And I

18   think in looking at the transcript of that, there is no

19   question that Mr. Ardolf was lying in a calculated way

20   in order to obtain a suppression of the statement that

21   he gave to law enforcement.

22            The coaching of his son through the letters,

23   and the Court can look at the letter that is referenced

24   in the Government's brief which contains the directions

25   on how to testify, as well as the script of how to

1    testify.  In the context of everything, I don't believe

2    that that is a credible explanation of why that was

3    being done.

4              But, lastly, Your Honor, the statements by

5    Mr. Ardolf in connection with his Motion to Withdraw his

6    Guilty Plea are probably the best evidence of the

7    non-acceptance of responsibility.  And I know there is

8    case law that says it is possible to get acceptance of

9    responsibility reductions if somebody does plead during

10   the middle of trial, it is within the Court's

11   discretion, certainly.  But, when someone thereafter

12   moves to withdraw their plea, they take away that

13   acceptance.  They require us to have extensive hearings

14   on it, to brief the issue, to go back and scour the

15   transcript and go through all of the things told to Mr.

16   Ardolf about, is this your choice to be doing this, sir?

17   And then to have him testify under oath that he did all

18   of the stuff, all of the allegations in the indictment,

19   which of course he was doing as a tactical choice to

20   better his position, to do that, and then a couple of

21   months later say, yeah, I was lying during that under

22   oath testimony before you, Judge.  I am going to file a

23   motion -- and it wasn't just a motion he filed on a

24   whim.  He had a hearing.

25             Your Honor pointed out to him the transcript

1    saying, you know, you were advised of all of these

2    things and you testified under oath.  He got advice from

3    counsel on what it meant, and also, apparently, got

4    advice from counsel on what standard, what thing he had

5    to say in order to get the Court to grant his motion to

6    withdraw his guilty plea, to falsely assert that he was

7    in fact innocent.  So, he looked at that and said, I am

8    going to falsely assert that I am innocent in a way to

9    manipulate the process.

10            And now he writes a two-page letter in which

11   he actually indicates that the reason that he did this

12   stuff is because he felt victimized.  And I will tell

13   you, Counsel says I believe he is sincere, that is what

14   Mr. O'Brien said, stood up here and said that.

15            Your Honor, I don't believe he is sincere.

16   And my opinion may not be worth much in the context of

17   things, but if Mr. O'Brien is going to offer his, I will

18   offer mine.  I don't believe he is sincere.  I believe

19   this is further manipulation or attempted manipulation

20   of the case and doesn't even come close to representing

21   acceptance of responsibility.

22            It dovetails, Your Honor, with my response to

23   the arguments on obstruction of justice.  I think there

24   are ample reasons for the Court to determine that Mr.

25   Ardolf obstructed justice in connection with this case.

1  They are all listed out from the lying at the

2  suppression hearing, to the coaching of his son in what

3  his trial testimony -- what he hoped his trial testimony

4  would be, to the coaching of his children on how to

5  write the letters to the Court on how they should --

6            THE COURT:  And his sister?

7            MR. RANK:  And his sister, to the false

8  assertions of innocence.  All of those, Your Honor, each

9  one, any one of -- pick one of those four, could be an

10 adequate basis for an obstruction of justice

11 enhancement.  All of them together make it overwhelming

12 and make it so that it is manifest that the obstruction

13 of justice applies.

14            And lastly, I am again a little perplexed

15 that counsel is pursuing the aggravated identity theft

16 argument.  I think that the statute is so absolutely

17 clear on its face that a predicate offense for an

18 aggravated identity theft violation is a 1030 violation.

19 It is, it is clear under a plain reading of the statute,

20 and it is clear because even if there was some sort of a

21 requirement that -- even if the fraud and false

22 statements reference in 1028A(c), which lists out the

23 predicate offenses, which says in this chapter, and then

24 in parentheses, brought in false statements, which of

25 course is the title of the chapter.  Even if there was

1    an additional element that we show fraud, computer

2    intrusion is fraud.  It is lying to get access into

3    something.  It is providing false information to a

4    router to get access to it.  And that is precisely, Your

5    Honor, why 18 U.S.C. 1030 is called the Computer Fraud

6    and Abuse Act.  Because hacking into and intruding

7    computers requires an element of falsity, of fraud,

8    providing false information in order to get access to

9    that information.

10            So, I don't think it is necessary that we

11   show that there is fraudulent conduct that takes place

12   there.  I think it is a plain reading of the statute

13   shows that any 1030 violation is a predicate offense

14   under 1028A.  And in light of the Sentencing Guidelines

15   in this case, I think it is relevant because I think we

16   ought to be looking at the floor of the sentence in this

17   case, which is seven years.

18            In light of the Guidelines and what I think

19   is the appropriate sentence in this case, I think we are

20   going to be well above that, and I hope to see the

21   sentence here to be well above that seven-year floor.

22            THE COURT:  By floor, you are saying a

23   five-year minimum on the distribution charge, and a

24   two-year mandatory minimum, as you have alleged,

25   consecutively, on the -- that the floor, just on, apart

1   from the Guidelines, really, the mandatory minimum is

2   seven years.

3          MR. RANK:  I think that is correct, Your

4   Honor.  A mandatory minimum of five years on the

5   distribution, plus two for the aggravated identity

6   theft.  There are permissive consecutive sentences --

7          THE COURT:  Well, there is permissive, but

8   you are saying, as a minimum, if I accept the

9   Government's argument, we start at seven years,

10  irrespective of what else happens today.

11         MR. RANK:  I think that is exactly right.

12         THE COURT:  And I suspect that Mr. O'Brien

13  will concede the five years, but not the seven.

14         MR. RANK:  That is correct.  Let me just

15  check with Counsel.  I think that is everything, Your

16  Honor.

17         (Discussion off the record.)

18         Ms. Heino, did I miss anything?

19         THE PROBATION OFFICER:  (Shaking her head in

20  the negative.)

21         MR. RANK:  Thank you, Your Honor.

22         THE COURT:  Any rebuttal, Mr. O'Brien?  Did

23  you want to chat with Mr. Ardolf?  Keeping in mind the

24  argument on what is a proper sentence is not before me

25  right now.  I am just going to make the findings, the

1  legal objections on the Guidelines, and then we will go

2  to final argument, and any statement from the victims

3  on, well, regardless of what the Guidelines say, here is

4  what we say on both sides, so --

5           MR. O'BRIEN:  I don't have anything further

6  on the Guidelines, Your Honor.

7           THE COURT:  All right.  What I will do is I

8  will go ahead and make the rulings.  And for the people

9  less experienced with the court system, what is required

10 in every case is the Judge is to, separate from what are

11 commonly called the 3553(a) factors that state:  Well,

12 here are the guidelines, advisory guidelines, and there

13 is a separate issue of mandatory minimums where Congress

14 steps in and says, well, irrespective of what the

15 Guidelines say, if someone pleads to this as found by

16 the Court, here is the mandatory sentence the Judge must

17 impose.  So that there are one or two of those in play

18 here.  Then there is permissive or discretionary

19 consecutive sentences on different counts, that is up to

20 the Court.

21          But, first, I will address -- make a ruling

22 on each of these which both parties are entitled to, and

23 then I will decide whether or not there should be -- I

24 am not going to take a noon break, but then we will

25 decide whether we go straightforward with final argument

1   on the sentence and I will impose it, or we take a short

2   break.  I will check in with my Court Reporter after we

3   make these rulings, because I am amenable to either one.

4          So, I will first take the objection -- I will

5   just take them in, not necessarily the order in which

6   they were argued, but for ease of my notes and

7   decision-making, I will take them in the order in which

8   they were laid out and objected to by the defense in the

9   presentence report.  And that report -- and of course I

10  take into account the position pleadings and the

11  arguments today.

12         The first one is the enhancement for

13  obstruction of justice, which is a two-level enhancement

14  as the Guidelines refer to it.  First of all, both on

15  this issue and acceptance, because there is one thing

16  they have in common, the -- whether the testimony at the

17  suppression hearing was truthful or untruthful, and it

18  was found as untruthful by the Magistrate, that plays no

19  part in my rulings on either one.

20         So, whether I assume that the testimony was

21  truthful, or that Mr. Ardolf was exercising his

22  constitutional right to put up a defense, or it was

23  untruthful, my decision is the same on both.  First of

24  all, I really have no reluctance in finding -- noting

25  the strong objection of the Defense -- an enhancement

1    for obstruction of justice, quite separate from any

2    pretrial testimony.

3           I base that on, one, the tone and the nature

4    of the letters to the son, to the sister, insistence

5    that I am going to proofread anything you send in, so

6    send it to me first.  And one phrase, keep to my story.

7    I don't really think it did relate to the incident with

8    the victims, with their child on the front lawn of their

9    house.  So I have no reluctance in, apart from that --

10   in addition to that, the notion of coming in, and I will

11   get to acceptance in a few moments of acceptance of

12   responsibility, and targeting the victims saying, not

13   only am I innocent, but they did it.  They framed me, so

14   I don't believe that -- and I say it respectfully, that

15   Mr. Ardolf was truthfully -- and this will come up again

16   for final sentencing, but there is so much sadness in

17   this case.

18          For example, a statement for the record in

19   Exhibit 161.  And one of the shining lights in Mr.

20   Ardolf's life, and she must have been a very special

21   woman, his wife and the mother of his children, yet on

22   page 2 of this exhibit, he is writing to his son.  You

23   can cry about how you lost your mother.  You can cry on

24   losing your dad.  The better the letter, the smaller the

25   jail time the Judge will give me.  There's references to

1    that all throughout all of these.  And I get no

2    satisfaction saying this, because, Mr. Ardolf, you may

3    be correct in your acceptance letter which I will get to

4    in a few moments, when you state that if the love of

5    your life and your wife was alive at the time this

6    happened with the victims, maybe she would have made

7    this right and made this -- and taken that walk and

8    taken care of it.

9              With all of the things that were said about

10   her and what she meant to you and what she meant to this

11   family and the special woman that she was, and the

12   extraordinary effect on the three young children and you

13   when she died, I think November 6th of 2000 in her late

14   thirties, I think it is very sad that the children have

15   gotten involved, with or without their consent, in how

16   to best address the Court, even if it was intended

17   properly.  So, I really have no reluctance in finding

18   the obstruction.

19              I don't really think in the scheme of things

20   it is going to have much effect on what I think is a

21   fair sentence.  And maybe both parties disagree with

22   that.  But, I will explain what I mean by that when we

23   get to the final decision after additional comments.

24              On acceptance of responsibility, again, I

25   take -- I disregard what happened at the suppression

1   hearing.  I won't speculate about that.  I believe that

2   the -- I will mention two issues, neither one that was

3   directly brought up today by the parties that played a

4   key role for me, and it is not a close call denying

5   acceptance of responsibility, regardless of what I may

6   think of the two-page letter, and we will get to that

7   before the sentencing is over.

8           First, at the withdrawal of the plea, and I

9   will respectfully reject the notion that it was Mr.

10  O'Brien or anyone else's fault that I was told it was

11  the Kostolniks that had likely framed, and in fact the

12  letter said, I will sue them if the Judge grants the

13  motion.  That is a secondary reason for me.

14          The primary reason is the timeliness of when

15  the change, even if it is sincere, which I will have my

16  own view on that, where on the eve of the victim's

17  testimony, and they have been -- you can do much more

18  damage with a computer than you can with a gun or drugs,

19  just like I tell people in fraud cases.  You can steel

20  and damage people a lot more with a pen than you can

21  with a gun.  That is what happened here.

22          This family has been terrorized, and I will

23  talk more about that at the time of the final sentencing

24  with respect to living in America is freedom from

25  terror, freedom from stress and peace of mind and

1    serenity in one's home.  That has all been taken from

2    them with an invasion with a computer, apart from the

3    child pornography.  But, I will discuss that, as well.

4            So, on the eve of their testimony, there is a

5    plea that I think they took, according to letters that I

6    received that everyone has, and I think everybody in the

7    courtroom.  I thought it was sincerely meant by you, Mr.

8    Ardolf, and perhaps you will say it was in a few

9    moments.  On the eve of trial, the only thing worse than

10   a continuance of a trial for victims of a crime that has

11   gone on for such a long time as this is trying to build

12   up to testify.

13           And then on the eve of that testimony, the

14   plea is done.  Some type of sense of relief probably

15   came in.  And then to turn around and bring a motion to

16   withdraw the plea and talk about the frame possibility.

17   The lack of timeliness by itself, even if I set aside

18   everything else dictates, in the way the motion was

19   brought, that clearly the Court is not going to give

20   credit for acceptance of responsibility.  I note the

21   strong objection of the Defense.

22           Area of controversy, enhancement for number

23   of images.  I will keep it simple on that issue.  I am

24   going to find ten images and deny the objection.  But,

25   even if I find nine or eight or five, I will make a

1   statement that will become crystal clear when I impose a

2   sentence.

3          I don't think it is going to affect what I do

4   on 3553(a) factors, because I frankly don't believe that

5   the sentence should be more or less if we are down to 10

6   versus 9.  And I think the 3553(a) factors will dictate

7   that the sentence should not be controlled by whether

8   there was two images, because the two images that are

9   most critical, one in particular, was the one that was

10  sent to the employer of the victim in the case.  And

11  that really should be the controlling factor, not

12  whether there were two images, eight images or twelve

13  images, even though the child pornography guidelines are

14  clearly driving much of this case.

15         To the extent that if I gave two consecutive

16  sentences on the non-child pornography cases, that would

17  five-year maximums on each, that would be ten.  And if I

18  gave discretionary consecutives on two and two, that

19  could give me a starting point of 14 years, even apart

20  from the child pornography guidelines.

21         But, there can be no doubt, and I am sure Mr.

22  O'Brien is going to bring it up, all of the family

23  members have, is well what happened to the two to

24  five-year deal that the Government offered with the same

25  information right before the trial started?  I am sure

1    it is going to come up.  It has been in every letter I

2    have gotten.  And I am sure Mr. Rank will have something

3    to say about that in just a few moments.  So, while I am

4    going to give the enhancement for two levels, just so

5    the record is clear, adjusting it, and I will explain at

6    the end when I find the guidelines, in just a moment,

7    how that would affect, because whether I find zero or

8    two images or ten, my sentencing decision today will be

9    the same in my judgment for other reasons.

10              Enhancement for material that portrays

11   sadistic or masochistic conduct.  This is not a

12   complicated legal issue, but it is a more difficult one,

13   factually, for me.  And it would be even if I hadn't had

14   many child pornography cases.  Noting the objection of

15   the Government, I will respectfully grant the objection

16   on this four-level enhancement.

17              It's likely, and I don't disagree with you,

18   Mr. Rank, that there's probably adults standing behind

19   these three children, terrorizing them to get them to

20   engage in oral sex with one another at these tender

21   ages, with or without their knowledge it is being

22   filmed, enforced, but rather than speculate about that

23   and because the real damage in this case is the

24   unredacted photograph that was sent to the employer of

25   Mr. Kostolnik, I will decline to impose the four-level

1  enhancement.  Would it make a difference if there was an

2  adult or there were other issues?  I don't reach that

3  issue.  I've looked at the photographs, and as offensive

4  and damaging as they are, and that is exactly why it was

5  sent to the employer, and we will talk about that in

6  just a few moments.  I decline to give an additional

7  four-level enhancement for sadistic or masochistic

8  conduct without knowing more.

9          And I would suggest something that perhaps

10  neither party will agree with.  I am not so sure my

11  finding that enhancement or not finding it, while it

12  directly affects the advisory guidelines, I'm not sure

13  how it affects what the right sentence is today under

14  the 3553(a) factors.

15          Enhancement for use of special skill.

16  Without any reluctance, I respectfully deny the

17  objection of the defense.  Many, many hours in education

18  were spent, it is clear, the record is clear even before

19  Agent Cameron testified.  The knowledge and special

20  skill apart from all of the time that was spent, for

21  whatever reasons that may be relevant to what is a fair

22  sentence, it is not relevant to this enhancement, is

23  skill and talent beyond the ordinary knowledge of most

24  individuals.  And that is clear in the record, both with

25  the content of what was found in the home, clear as to

1   how it was used both books, CDs self-taught materials.

2   And the fact that we all can get access to it on the

3   internet, I think, is of little significance.

4            Somebody has to choose to dedicate their life

5   to getting a certificate of certified ethical hacker,

6   and choose to get a level of knowledge that I think few

7   people possess.  And even though it is correct, Mr.

8   O'Brien, how that knowledge was used, should we punish,

9   additionally, people who happen to have expertise?  I

10  don't disagree with that.  But, the enhancement clearly

11  should be applied in this case.

12           The aggravated identity theft, I will make

13  another statement that both parties may disagree with.

14  While I agree with the respective opinion, Mr. O'Brien,

15  but I agree with the Government's position, but I will

16  also state that whether I feel I am going to give a

17  mandatory consecutive two years which I will so find at

18  this time, after all the Defendant pled guilty to both

19  counts that were charged under this Section 1028A -- I

20  apologize for using the number -- and the presentence

21  report concluded consistent with the law that a

22  violation of this carries with it a mandatory two years,

23  whatever the rest of the sentence is.  The only

24  exception being if the Court chooses to run it

25  concurrently with one another -- the two separate

1    counts.

2              I think the statute clearly reaches this,

3    consistent with the argument and the record in the case

4    and the argument in the briefs.  I will state that even

5    if the Court would have concluded or a higher court

6    concludes that it shouldn't have been consecutive, I

7    will explain once we get to sentencing why I believe I

8    would have ended up at the same place with a sentence

9    because there was also another rule of law that states

10   when all of the concurrent and consecutive issues are

11   evaluated, if the Court concludes that the 3553(a)

12   factors are not properly served in fairness to either

13   the Government or the Defense, that the Court should

14   then consider the concurrent versus consecutive.

15             Noting the strong objection of the Defense, I

16   will impose that.  And I believe that constitutes all of

17   the -- so, where that leaves us is this.  This creates a

18   level 34, rather than 38.  And based upon no criminal

19   history points, that creates an advisory imprisonment

20   range of 151 to 188 months, not counting in the

21   consecutive two-year sentence, as opposed to a level 38,

22   which is 235 to 293 months, without taking into account

23   the two-year mandatory minimum sentence.  So, that is

24   151 to 188, as the advisory sentence.  Supervised

25   release term of five years up to life, a fine range of

1   17,500 to 250,000, special assessment of $600.  And just

2   for the record, for some perspective, if I had granted a

3   two-level reduction, either for lack of obstruction, or

4   on the lack of the ten photos, because that is a

5   two-level enhancement, that would have dropped the

6   advisory range to 121 to 151 months.  If I had granted a

7   one-level enhancement rather than two, because we're

8   right on the precipice of ten pictures, that would

9   create an advisory range of 135 to 168 months, again

10  without taking into account the mandatory two-year

11  sentence.  So, the advisory range we start with here,

12  Counsel, is 151 to 188.  And to the extent that does not

13  represent what either party has asserted to the Court, I

14  note your objections.  Your objections are preserved.

15  So, when we head into argument, now, and then we are

16  going to talk about a short break before we conclude,

17  before we head into argument, then where we start with

18  is an advisory sentence of 151 to 188 which carries with

19  it a 5-year mandatory minimum, and then a two-year, as I

20  have found, mandatory consecutive.  So the floor, so to

21  speak, turns out to be the seven years, and the maximum

22  is 44 years.  So, that is the span with the Guideline

23  range being 151 to 188.  And under federal law, unlike

24  state law, you earn -- you serve 85 percent of the time.

25  You get 15 percent off each year, regardless of what the

1   Court does, of course.  And whatever time Mr. Ardolf has

2   been in custody is removed, whatever the sentence would

3   be.  I would suggest that we take -- well, let me have

4   counsel consult with their clients.

5           Let me ask Counsel and put you on the spot,

6   you know, because the difficulty with the Judge asking

7   is people feel pressured into making their final

8   arguments.  But, what does the Government foresee with

9   the time you would like to have to make your closing

10  argument, so to speak, and get a victim to testify or

11  come to the podium.

12          MR. RANK:  Your Honor, a couple to different

13  issues.  One is, I want to make sure the Court considers

14  the time for the victim impact statements to be read.  I

15  anticipate that there will be two statements by the

16  victims in this case?  In addition to probably about --

17  I don't know exactly how long that is going to take.  It

18  could take 10, 15 minutes.  My argument will be 10 to

19  15 minutes, Your Honor.

20          THE COURT:  Mr. O'Brien?

21          MR. O'BRIEN:  Well, I know that Mr. Ardolf

22  wants to address the Court, Your Honor.

23          THE COURT:  I assume that.  And what I am

24  thinking, and this may be to the chagrin of some of you,

25  and of course if I am thinking only of myself, I

1   wouldn't take a break.  I am fortunately much less known

2   for that than I was years ago.  But, I think we should

3   take a half-hour here, unless I completely prejudice

4   somebody's schedule to give people a chance to get a

5   bite to eat.  I am not a good judge of that, because I

6   usually don't each lunch.  So I can't attribute that to

7   other people.  But, it seems to me that will take some

8   pressure off.  15 minutes isn't enough for people to get

9   a snack or something and so they feel like, well, the

10  Judge wore us down in the courtroom.  And then we can

11  convene at 2:00 and finish up, if one of you thinks I

12  have either overreacted to the time and we should either

13  take less time or more time, I am all ears.

14          Mr. O'Brien, since you are standing there?

15          MR. O'BRIEN:  Your Honor, I am fine with

16  that.

17          THE COURT:  Mr. Rank?

18          MR. RANK:  Your Honor, I am fine with taking

19  a shorter break, if that is what the Court is inclined

20  to do.  I know that primary issue is --

21          THE COURT:  Well, maybe others, depending on

22  medical needs, snacks -- sometimes people say, well, the

23  Judge just charged through, the lawyers do.  If we had a

24  jury here we wouldn't think of running that long without

25  some type of -- but, let's take until 2:00, and then we

1    will go until we are done.  And I think that is what we

2    should do.   So, we will stand in recess until 2:00.

3              (Luncheon recess.)

4              THE COURT:  You may be seated.  Thank you.

5    Mr. Rank -- excuse me.  I will propose to both you and

6    Mr. Ardolf and Mr. O'Brien, I was going to suggest if

7    there was going to be victim impact statements read or

8    the victims have a statement to make that we could do

9    that at this time.  And then once that is completed, I

10   will hear from Mr. Ardolf and Mr. O'Brien.  And then I

11   will hear from you with respect to -- unless there are

12   other requests for testimony -- with respect to final

13   arguments, or arguments in light of the applicable

14   guidelines as found by the Court with objections noted,

15   even though I am quite certain I understand the

16   positions of each party.  We would proceed in that

17   order.  Is that acceptable to the Government?

18              MR. RANK:  Yes, Your Honor.

19              MR. O'BRIEN:  Certainly, Your Honor.

20              THE COURT:  So, what we will do is without

21   knowing for sure how you are going to proceed, do you

22   know if either victim would like to make a statement to

23   the Court?

24              MR. RANK:  I do, Your Honor, I believe both

25   Matthew Kostolnik and Bethany Kostolnik --

1          THE COURT:  Whether they come up together or

2    alone is up to you.  And maybe they could just stand at

3    the podium with you?

4          MR. RANK:  Give me moment, Your Honor.

5          THE COURT:  All right.

6          MR. RANK:  Your Honor, both Matthew and bet

7    Bethany Kostolnik would like to address the Court and

8    would like to be up here together during their

9    presentation.

10          THE COURT:  That is fine.  And whoever

11    proceeds first, if you would just state your name first

12    and then you can go ahead and say what you want to say.

13          MR. KOSTOLNIK:  Thank you, Your Honor.  Good

14    afternoon.  My name is Matt Kostolnik.  Your Honor, I

15    will intend to briefly introduce some of the facts and

16    go through how all this --

17          THE COURT:  I am sorry to interrupt.  I will

18    just indicate to you that obviously I acknowledge that

19    you have made what is commonly called -- some people

20    would say statements.  We commonly call them victim

21    impact statements.  That I assume all of the parties

22    have read, and as to how and what you want to say today,

23    that is entirely up to you.  So --

24          MR. KOSTOLNIK:  Thank you.  We were excited

25    to move into a new neighborhood and our new home, both

1   of which we thought were everything we wanted.  The

2   incident between Ardolf and my son occurred the second

3   day we were in the home.

4           Ardolf's interaction with my son occurred

5   over a period of minutes during which time it became

6   increasingly apparent to my wife that something was not

7   right about how Ardolf interacted with my son and with

8   her.

9           This was the very first time the two of them

10  had met.  He had just moved into his house a few weeks

11  before us.  My wife was literally unpacking and moving

12  into our home and was visibly pregnant with our third

13  child.  If there was ever a time where it would have

14  been easy to make ordinary small-talk, that was it.

15  Instead, the only question Ardolf asked her was, do you

16  have any more children?  He seemed interested only in

17  playing tag with my son.  But, instead of saying, I bet

18  you can't catch me, he said bet you can't touch me.

19          At one point he held the back of my son's

20  head close to the ground in the direction of a plant he

21  wanted to show him.  My wife felt something was not

22  right.  And she attempted to move our son away from

23  Ardolf.  She picked up our other child.  Ardolf picked

24  up our older son, brought him to our door, and before

25  letting go of him, he kissed him while my wife's back

1    was turned.

2           I was inside when this first incident with

3    Ardolf happened.  I have known my wife since she was 17,

4    and I trust her and I trust her mother's intuition.  And

5    when it comes to keeping our kids safe, I want to

6    emphasize that in all of the years I have known her, she

7    has never described anyone to me, ever, as to how she

8    described Ardolf after this initial incident.  I was

9    convinced we had a problem, but we did not act rashly.

10   Instead, we gave ourselves some time to clear our heads.

11   And the next morning we still felt sick about what

12   happened.  We decided to drive to a park and go for a

13   walk.  Without having been asked, my son brought up the

14   incident and volunteered to my wife that Ardolf had

15   kissed him on the mouth.

16          Bethany and I talked about what to do.  I

17   spoke to my father.  We took a good portion of the

18   afternoon thinking about what to do.  Later when Ardolf

19   was out in his yard, I asked him directly out in the

20   open, tell me what happened between him and my son.  I

21   attempted to engage him in a dialogue to hear his side

22   of the story.

23          I asked broad, open-ended questions and was

24   not accusatory.  It was like pulling teeth.  He kept

25   providing other details.  Finally asking a variation of

1    the same question, what seemed like the 18th time, he

2    admitted he kissed my son.  When I asked him where, he

3    wouldn't even tell me with words.  Instead, he silently

4    put his finger to his lips.  And I asked him, you kissed

5    him on the lips?  And he nodded his head.

6              For me, that was the only confirmation I

7    needed.  Recognizing that no one would have been able to

8    vouch for Ardolf because he was entirely new to the

9    neighborhood, too.  We didn't know who or what we were

10   contending with, or what past he left behind in his old

11   neighborhood.  Under these circumstances, even if what

12   he did was not a crime, we thought the authorities

13   needed to know about it.  Since I had never called the

14   police on anyone, ever, I did not arrive at that

15   decision lightly.  And I have to say, looking back on

16   that decision, our initial impression of this guy that

17   he was a threat was entirely correct.

18             Your Honor is already familiar with the

19   evidence related to the charges, but I would like to

20   tell you about what it is like to have lived through

21   this.  I cannot describe the sick feeling in the pit of

22   my stomach when my assistant showed me a printout of the

23   e-mail she received that she thought was from me.  And

24   then the Chairman of the Board of Directors at my firm

25   followed up a short time later with an e-mail he

1   received that he thought was from me that contained

2   picture attachments of child pornography.  That e-mail

3   had a picture attachment named, "Matt'sKids."  It

4   contained graphic images of three children, two boys and

5   a girl --

6          THE COURT:  And that picture was up here on

7   the screen.  The one that you received didn't have -- or

8   that your firm received didn't have the redaction on the

9   face, either.

10          MR. KOSTOLNIK:  That is correct, Your Honor.

11   The e-mail to Dave Senger, the Chairman of the Board of

12   Directors of my firm was the unredacted image of the

13   three children.  When he talked to me about it, he did

14   not have the image with him, but I later viewed it on

15   the computer of Bruce Garber, our IT professional when I

16   asked him to pull it up, and I viewed it on the screen.

17   And that was the e-mail that Dave Senger received that

18   he had talked to me about earlier that morning.

19          That e-mail, that picture attachment named

20   "Matt'sKids" contained graphic images of three children,

21   two boys and a girl.  I had three children, two boys and

22   a girl.  I felt like me and my family were under attack.

23   Part of me went numb that day, a feeling that worsened

24   later that night when I talked to Bethany about what was

25   happening.  And we didn't know what was going on,  what

1    we should do, or who we could trust.

2              After the initial incident in August with

3    Ardolf and our son, we intended to keep our distance

4    from Ardolf and be very mindful of his presence while we

5    contemplated moving from our new house.  But, after

6    these threats began in February, our already heightened

7    awareness increased tenfold.  We no longer felt safe in

8    our own home.

9              We soon learned from law enforcement that the

10   threats were coming from our house.  We considered our

11   potential vulnerabilities within our home and attempted

12   to address physical and electronic root points.

13             Yet at the same time, because the link

14   between the threats and Ardolf had yet to be established

15   to the degree of certainty required for law enforcement

16   to execute a search warrant, we needed to continue to

17   use the same hacked wireless router in the hopes that

18   Ardolf would continue to make connections that could be

19   tracked.  This was like supplying rope so that Ardolf

20   could use it to hang us.

21             The effect of terrorism on its victims is

22   really twofold.  First, of course, there is the horrific

23   act, itself.  But there is also the secondary effect on

24   the minds of the victims who live in constant fear of

25   another attack.  Until Ardolf was incarcerated, not a

1   day went by where I wasn't thinking that another attack

2   would occur.

3              First, Ardolf used my co-workers as the means

4   to deliver the attack, using a fake e-mail address by

5   name.  Then a few weeks later, he e-mailed other

6   co-workers accusing me of sexual assault.

7              The next month I got a call at my desk from

8   the Secret Service asking me whether I had been sending

9   threats to elected officials.  And the next thing I

10  knew, I was meeting with the Secret Service at my office

11  explaining that, no, I really didn't make bad threats to

12  elected officials.  I also want to say during this

13  meeting it became apparent when the Secret Service began

14  asking me questions that they were not familiar with the

15  investigation that had already been begun by the Anoka

16  County Sheriff's Department.  I don't know why I would

17  have expected them to be, but this revelation was

18  frightening to me.  Because now, to add to the list of

19  threats I had already experienced and was fully

20  expecting to continue, I was in fear that a branch of

21  law enforcement not familiar with the case would

22  follow-up on an incident, unknown to me, and not show

23  the same restraint that the Secret Service did in

24  calling a meeting with me, I would think that one of

25  these incidents would somehow lead to my arrest.

1              The back of Ardolf's lot and house is

2    immediately adjacent to our front and side yard.  There

3    were a picture window in our house.  Ardolf could see

4    into our house.  And we can see out into the windows of

5    the rear of his house.  He was on his computer

6    constantly.

7              So, if I needed a reminder, and I didn't, I

8    was always waiting, wondering when the next bomb would

9    drop.  And since the incidents were alike, yet

10   dissimilar, there was no way of predicting where the

11   next threat would come from.

12             They say that paranoia is making connections

13   between actual events where none really exist.  This is

14   what it is like to be a victim of a crime like this.

15   E-mails are automatically viewed as suspect.  Computers

16   are a gateway of being hacked.  Telephone calls from

17   unrecognizable numbers are no longer innocuous, but

18   potential threats.

19             At its worst, certain strangers may be

20   perceived to be affiliated with unknown threats.  And

21   when events continued to snowball, as they did here, and

22   every few days you are talking with someone involved in

23   the investigation, and every few weeks a new incident

24   does in fact occur, you don't even try to suppress your

25   fear anymore, because someone really is out to get you

1    and they are succeeding.

2              At that point it is hard to call it paranoia.

3    At that point fear and anxiety become a way of life.

4    So, what is it like to live as a victim of these crimes?

5    It means that because threats come in via my workplace

6    e-mail, I experience anxiety at work, especially because

7    Ardolf chose to direct his e-mails to the very same

8    people responsible for deciding whether or not I get to

9    keep my job.

10             It means at home, I lived next door to the

11   person who is and wants to continue to inflict harm on

12   me and my family.  Sleeping through the night didn't

13   happen because a thump in the night is not presumed to

14   be harmless.  I would wake up at the slightest sound

15   that was out of the ordinary and would get out of bed to

16   investigate.

17             In short, there is no sanctuary, physical or

18   otherwise.  And because these threats invade your mind,

19   you are constantly forced to reckon with them.  On July

20   6th, 134 days after the beginning of Ardolf's terror

21   campaign, I received an anonymous e-mail that said:  I

22   know where you and your family live and I am going to

23   get you back for suing us.

24             A week later Bethany opened an e-mail to her

25   that specifically referenced our three kids, and said:

1  I know your husband Matt and I am going to get him.

2  Bethany is a stay at home mom.  It says something about

3  her courage and her upbringing to have raised our

4  children living next door to Ardolf for 707 days until

5  he was incarcerated.

6          She needed to put a brave face on this for

7  our children to simultaneously care for them and keep

8  them safe from harm.  Even with Ardolf incarcerated, she

9  continues to suffer nightmares of him that began during

10  this ordeal.  Yet today, she pities Ardolf and feels

11  compassion for his son and two daughters.

12          At the change of plea hearing, I wanted to

13  believe that Ardolf was remorseful for what he had done.

14  For a moment I believed, mistakenly, that Ardolf had

15  turned a corner.  But after he tried to withdraw his

16  plea of guilty, I now however know the tears he cried

17  were for himself.

18          If you asked Ardolf today, he will tell you

19  he is sorry.  He will acknowledge his guilt.  And he

20  will say, if he could take it all back, he would.  But,

21  when you hear those words, remember what he has to gain

22  or lose here today and that this is not the first time

23  during these proceedings that Ardolf has tried to

24  manipulate the result.

25          A much better gauge of Ardolf is the words he

CASE 0:10-cr-00159-DWF-FLN   Document 130   Filed 08/31/11   Page 172 of 237

used when he didn't think he would be caught.  Words
like terrorist threat, hate.  I'm assigning myself to be
judge, jury and executioner.  Pay the ultimate price.
Put to death.  I swear to God I am going to kill you.  I
am going to get you back.  I am going to get him.  He is
going to pay.

When Ardolf hacked his former neighbors in
his old neighborhood, he made similar violent threats of
death saying:  You should be very afraid.  I can destroy
you.  You sorry, expletive, excuse for a human.

Given a chance, he would do it all again,
either against me and my family or someone else.  What
is the number one job of any husband and father?  It's
to protect and provide for your family.  Knowing that I
lived next door to a person that wanted to have me dead
and wanted to harm my family, I responded.

I have gained greater situational awareness,
physical fitness, getting a new perspective on our
vulnerability to those who would do us harm.

I was lucky.  At the outset I had an employer
who supported the investigation and the retention of an
outside investigator, Scott Johnson, who was
instrumental in capturing evidence of Ardolf's crimes.
That is a unique situation.

The next person targeted by Ardolf is

1   unlikely to have the same resources that we did.  The

2   only real way to protect others from him is to keep him

3   in custody for as long as is permitted under the law.  I

4   know it is right to forgive, and if I live a long life,

5   maybe before I die, I will.  But, right now, justice

6   needs to be done, here today, in this courtroom.

7          The length of Ardolf's sentence is entirely

8   related to the length of time my family can live without

9   fear of his retribution.  In 10 years my daughter will

10  still be in adolescence.  15 years, in her middle teens.

11  She is vulnerable.  We are vulnerable.  And we will

12  remain vulnerable to him throughout our lives except

13  while he is incarcerated.

14         The statutory maximum sentence Ardolf faces

15  based on the crimes he committed is 44 years.  This is a

16  44-year case.  And Ardolf is a 44-year criminal.  Ardolf

17  has lived a life of retribution not just against me and

18  my family, but others.  When he gets out, me and my

19  family are back to where we were before he was

20  incarcerated.  We are either victims or potential

21  victims.

22         Having been through a period of victimization

23  once already, I can tell you that there is no more awful

24  feeling.  The only thing a victim wants is to never be

25  victimized again.  Please help me.  Please help my wife.

1    And please help my children by imposing a substantial

2    sentence.

3              Last, I want to thank the efforts of law

4    enforcement and specifically Special Agent Bob Cameron.

5    To paraphrase Winston Churchill, we sleep soundly in our

6    beds because these brave men and women stand ready to

7    confront those who would do us harm.

8              I want to publicly acknowledge Tim Rank.

9    First, Mr. Rank is the most highly-skilled lawyer I have

10   ever known.  His prosecution of this case has been

11   superlative at every step.  Second, Mr. Rank is a true

12   professional.

13             His interaction with me and my wife should be

14   held out as a model of how to do things the right way.

15             I can look back on the events of the last few

16   years and see many hugely positive developments during

17   the lifecycle of this case.  But, without a doubt, what

18   I am most grateful for is the effort of Tim Rank, who

19   has shown relentless dedication of the law and the

20   pursuit of justice, and of someone who possesses the

21   highest degree of skill and acumen to accomplish those

22   worthy goals.

23             Your Honor, thank you for this opportunity to

24   speak to you today.

25             THE COURT:  Thank you.

1          MRS. KOSTOLNIK:  Your Honor, my name is

2    Bethany Kostolnik.  August 2nd, 2008 changed our lives

3    in an unimaginable way.  My family moved into our home

4    in Blaine specifically because of the neighborhood, a

5    quiet cul-de-sac with kids all around.

6          The incident between Barry and my

7    four-year-old son was heart-wrenching, frightening, and

8    sickening.  The fear that I felt that day has snowballed

9    into nearly three years of stress, pain and suffering at

10   the hands of Barry.

11         I cannot begin to explain the helplessness my

12   husband and I felt as this nightmare began to unfold.

13   We didn't know who to trust.  From one of the first

14   e-mails that was sent, the one of young children shown

15   in sexual poses that was labeled "Matt'sKids."  We knew

16   it was Barry.

17         Later that week we learned that the e-mail

18   had come from our house.  Matt was gone that weekend and

19   I was terrified that someone would think that I actually

20   sent the e-mail, that it had come from me.  I was

21   fearful of someone taking my kids away from me, as a

22   mom.  With nothing but good intentions for our children,

23   this was petrifying.

24         Barry then proceeded to further attempt to

25   ruin Matt's career, my career, our marriage, and he

1  ultimately destroyed any sense of safety we felt in our

2  own home.  I am a stay-at-home mom.  Until he was in

3  jail for violating the terms of his release, I lived

4  each and every day in fear.  I had horrible nightmares.

5  Repeated nightmares of seeing his face in the windows of

6  my home, nightmares of him attacking my children, and

7  nightmares of him attacking me.

8           My husband and I had to explain to our young

9  innocent children way too early that there are evil

10  people in the world and never go into Barry's yard.  All

11  I wanted to do is keep my kids safe.  It is a horrifying

12  feeling to question whether or not you can do that.  His

13  attacks were physical, but the wounds run deeper.  My

14  anger towards Barry has changed to pity.

15           Pity for a man who instead of being a role

16  model and devoting himself to his children who lost

17  their mom at a young age chose to cowardly hide behind

18  computers in his home and terrorize us and attempt to

19  ruin our life.

20           I have a great amount of empathy towards his

21  children.  Our family can't -- although this is true --

22  our family can't get past this experience with the

23  constant reminder that Barry's family is next door to

24  us.  It is very important to us that no one in the

25  Ardolf family lives next door.

 1                I am a compassionate, forgiving and Christian

 2      person, but I don't believe Barry will be reformed in

 3      prison.  He is selfish, impulsive and manipulative.  He

 4      has tried to manipulate the situation from the

 5      beginning.  The only thing Barry is sorry for is that he

 6      got caught.

 7                And the fact that he hinted at his change of

 8      plea hearing that Matt and I framed him is impulsive and

 9      despicable.  I am terrified for the day he gets out of

10      prison.  I am a stay at home mom.  I have a two-year-old

11      girl and two young boys.  I fear for them.

12                Although his violence towards us was never

13      physical, I don't doubt that it could be.  The burden of

14      this situation is indescribable and continues to put a

15      great deal of stress on our family.  It has been

16      life-changing.  Please, Your Honor, I am asking you to

17      give him a heavy sentence, the maximum possible.  We

18      need to start anew and we can't do that if he is out of

19      prison in a short amount of time.  My family has

20      suffered enough at his hands.  We need this nightmare

21      to be over.  Thank you.

22                THE COURT:  Thank you.

23                Mr. O'Brien?  And then whether you want to

24      address the Court first with the permission of Mr.

25      Ardolf, or Mr. Ardolf can address the Court if he

1    wishes.  I will leave that up to you and to him.

2              MR. O'BRIEN:  The Court has no preference,

3    Your Honor?

4              THE COURT:  No, I think that is up to Mr.

5    Ardolf in consultation with you.

6              (Discussion off the record between the

7    Defendant and Mr. O'Brien.)

8              MR. O'BRIEN:  Mr. Ardolf would like to

9    address the Court.

10             THE COURT:  All right.  And I don't mean to

11   insult your intelligence, Mr. Ardolf, but one of the

12   things that I think you are probably aware of, judges

13   appropriately can't assume, and I don't have the right

14   to assume that regardless of who is in front of me.

15             You have the right to make any presentation

16   you wish.  You have the right to say nothing at all, in

17   addition to what Mr. O'Brien has said, and the

18   submissions you have made and others.  And I can't use

19   it against a defendant at sentencing, whether they are

20   representing themselves or not, if they choose not to

21   address the Court.  Some defendants do, some don't, so

22   there is no rule.  So, it is up to you, sir.

23             THE DEFENDANT:  It's terribly difficult to

24   listen to what I did.  I can't believe that I did it.

25   And yes, I do want to apologize to the Kostolniks, their

1   family friends, co-workers, and I have to apologize to

2   my family and friends and to my co-workers.  And I

3   apologize to others that I might have affected.

4           After listening to the Kostolniks and their

5   statements, it is so difficult to proceed with what I

6   have written.  For many months I have woken up with the

7   same twisted gut as when I woke up the first day after

8   my wife unexpectedly died.

9           My victim and everyone involved is the first

10  thing I think of when I wake and the last thing I think

11  of when I sleep.  I am so upset about what I have done

12  that the jail staff have even told me that they can see

13  that I am bluntly upset.  It has been difficult for me

14  to eat.  I have felt no enjoyment.  The general doctors

15  put me on mood stabilizers in an attempt to prevent me

16  from feeling too low.

17          After listening to the Kostolniks, I feel

18  very low.  During the last 12 months in jail, about half

19  that time has been spent in either medium or maximum

20  segregation, which includes 23-hour lockdown.  This

21  isn't because I was a troublemaker, but rather for my

22  safety due to the nature of my case.

23          I have used this time to ask my God for

24  forgiveness.  I ask for forgiveness every day.  There

25  are some words in the Bible which most people have

1  heard:  For the least you do unto me, you do unto

2  yourself.

3            I am now one of the few who really feel and

4  understand that meaning.

5            Jail is a horrible place to spend time.

6  There is no such thing as seeing the outside.  There is

7  no fresh air.  There is nothing to do.  I have spent

8  many months in cells with no hot water.  The food is

9  horrible.  Some meals I can't even stomach.  It is never

10  quiet.  Doors are always slamming, people coming and

11  going.  People usually yelling.  Segregation is where

12  the worst people are kept.  I have seen things I can't

13  talk about in open court.

14            The beds are like taking a sleeping bag and

15  sleeping out in the garage cement floor.  This is

16  because beds literally are either cement or steel, and

17  the mattress is only a couple of inches thick.  Because

18  I am not educated in the law, Mr. O'Brien has dealt with

19  the legal aspects of my case.

20            Today I can defend myself by quoting some

21  cases that I have -- that have been in the Star Tribune,

22  lately.  The comparison is to put in perspective my case

23  with others.  And I also want to say before I will read

24  these, after listening to the impact statements, these

25  seem -- I will just continue.

1          We all know that Denny Hecker was sentenced
2     to 10 years for stealing millions.  On June 29th, the
3     con artist Michael Joseph, he faces 9 to 11 years for
4     stealing $20 million.  He has a previous conviction.
5     May 5, Shelbi Lynn Svare, gave a man a pain patch, which
6     he ate, causing his death.  She was sentenced to 4 years
7     for killing a man.
8          Mr. Daniel Rike (PH) killed his 18-month-old
9     girl.  The Ramsey County District Judge sentenced him to
10    16 months in jail.
11         A DWI driver, Kristin Kealy of Fridley was
12    sentenced to one year for a crash which paralyzed
13    another person for life from the neck down.
14         Jeremy Parker hacked into Eden Prairie-based
15    Digital River and stole about $275,000, and he hacked
16    into two NASA computers.  NASA spent about $67,000 to
17    repair the damage.  He was sentenced to two years.
18         And I can see that this case isn't just about
19    the hacking, it is about the terrorist.  And it is
20    really hard for me, too, to live with what I just heard.
21    And I will be living with that.  I can't look the
22    Kostolniks in the face.  I can't -- I can't face my
23    family.
24         But with respect to the news articles, I
25    didn't kill anyone.  I didn't collect and distribute

1   thousands of porn pictures and movies.  If I was

2   prosecuted in State Court, possession of porn is

3   generally a 15-month state sentence with probation.

4           Your Honor, this state used to have a red

5   light camera.  Red light cameras which took a picture of

6   a car running a red light.  These red light cameras met

7   opposition partially because an officer could no longer

8   apply common sense and human judgment to a situation.  I

9   am asking for some human judgment.

10          The law is the place to go after people who

11  really have a problem with porn.  Human judgment should

12  fall into the area of leniency.

13          My wife dying before the age of 38 has made

14  me acutely aware of how precious time is.  My children

15  and I are asking for a minimum sentence.  The impact

16  this has had on me has been worse as I've become a

17  little bit older.  Again, I would like to ask to

18  apologize to my family and I would like to apologize

19  again to the Kostolniks.

20          THE COURT:  Thank you.  With Mr. Ardolf's

21  permission, I assume, Mr. O'Brien, I assume any

22  arguments you have, I will hear you?

23          MR. O'BRIEN:  Thank you, Your Honor.

24          THE COURT:  And again, I would acknowledge

25  you submitted an extensive, as did Mr. Rank, and his

1   co-counsel, position pleadings that not only addressed

2   what we dealt with earlier, but the issue that is now in

3   front of me on -- well, regardless of what the

4   Guidelines say, what is the proper sentence this

5   afternoon.

6           MR. O'BRIEN:  If I may, Your Honor?

7           I find this to be an incredibly troubling

8   case.  It is gut-wrenching listening to the Kostolniks

9   talk about the psychic harm that they have been

10  inflicted.  It is terrible to speak to Mr. Ardolf's son

11  and his father as they try to make some sense of this.

12  And the way this case has evolved is also troubling, the

13  failure to accept responsibility, the motion to

14  withdraw, it is very painful to see that a situation

15  that should have been handled differently has been

16  handled in a way that now we are facing a very, very

17  long prison sentence.

18          And of course, the question now is, Your

19  Honor, what is a reasonable sentence for such

20  unreasonable acts?  When this case started for me,

21  anyway, I found Mr. Ardolf to be too arrogant, not

22  willing to listen.  I think his feelings, his thoughts

23  had evolved, although I have been raised to think the

24  better of people.  And I think that Mr. Ardolf has had

25  some insight and some realization.  And it has taken a

1    while.

2              And I am reminded that someone said this,

3    that there are three types of secrets:  Those which we

4    only tell our friends; those which we only tell

5    ourselves; and those which we don't even tell ourselves.

6    And I think Mr. Ardolf was in that third category for a

7    while.  I don't think he could come to grips with what

8    he had done.

9              And I think it was so difficult for him to

10   come out and say, yes, I have done this, because of the

11   tremendous harm that he has done to this young couple

12   and their family.

13             But also, he hurt so many people, Medtronic

14   is a victim of this.  Their work stations were used.

15   Mr. Ardolf's father and siblings, and his children --

16   and these are scandalous facts.  This is going to be in

17   the headlines.  There is a tremendous amount of stigma

18   that that family has to put up with.  There is a lot to

19   swallow.

20             THE COURT:  That is true.

21             MR. O'BRIEN:  And now we are facing a huge

22   sentence which is really driven by the application of

23   the child pornography Guidelines.

24             Now, Mr. Ardolf has no one to blame but

25   himself.  He sent those child pornographic images.  But

1   on the other hand, as opposed to a typical child

2   pornography case, he wasn't motivated by a desire for

3   sexual gratification.  He had another very noxious

4   motivation, but it wasn't the typical one for a child

5   porn case.  And these Guidelines are tremendously high.

6           As we look at Mr. Ardolf, as we should under

7   the *United States versus Koon*, we look at him as an

8   individual studying in the unique failings which have

9   brought him before this Court.

10          He has done some bizarre, hurtful acts and he

11  is going to be punished for them and.  He is a person

12  with qualities, but also flaws.  There has been some

13  misplaced arrogance, and I think that has led him to

14  make some decisions through his case which are very

15  troubling.

16          The Court mentioned that I was going to bring

17  up the fact that there was a deal before trial where he

18  could have walked away with a much shorter sentence than

19  he is going to receive.  And --

20          THE COURT:  Well, actually, probably -- I

21  don't know if I mentioned to you, I know that was a

22  question that many of the family members raised, even

23  though they said two years was offered, and I think the

24  potential was more, was closer to a five-year sentence,

25  but it was in there somewhere.  Maybe it was the

1   mandatory two, and it was up for grabs for what I did on

2   Count 1, but that question was raised.

3          MR. O'BRIEN:  It is an issue, but I am not

4   here to say that that deal should hold.  I know that

5   there has been a lot that has happened since then.  I

6   know that the victims in this case have been denied

7   closure.  I know the Government has spent a lot of

8   resources.  And I know the decision not to take that

9   deal was made by Mr. Ardolf.  And I know he has to pay

10  for that.

11         My question is, how much does he have to pay

12  for that?  It is the same conduct.  And I think there

13  should be some measure, some standard to go by in

14  fashioning a reasonable sentence for him.

15         In other words, what is a sentence which is

16  sufficient, but not greater than necessary to promote

17  deterrence?  Now, the Kostolniks have talked about how

18  their worst nightmare is that Mr. Ardolf comes back when

19  he is released and starts this again.  I have much more

20  faith in the United States Probation Office to think

21  that that would ever happen.  So, I don't think

22  deterrence for Mr. Ardolf is necessarily the bigger

23  concern.  I know the Court -- when I have been before

24  this Court on prior occasions, I have learned that the

25  Court is interested not only in deterrence for that

1   individual defendant who the Court is sentencing, but

2   also deterrence, in general.

3          What does this case say about our society?

4   How are we going to deal with somebody who acts as

5   unreasonably and as viciously as Mr. Ardolf?  Well,

6   there has to be a firm sentence, but a measured

7   sentence, Your Honor, one that not only promotes respect

8   for the law and provides just punishment, but one that

9   is sufficient, but not greater than necessary to

10  accomplish those goals.

11         I have suggested a sentence in the range of

12  63 to 78 months.  I suspect the Court is going to

13  sentence Mr. Ardolf to a greater sentence than that.

14  But, I would ask for a measured sentence from the Court.

15         THE COURT:  Thank you.  Mr. Rank?

16         MR. RANK:  Thank you, Your Honor.  Your

17  Honor, this is one of the most difficult sentencing

18  arguments that I have ever had to make.  And I think I

19  have come to that point because I worry that I am not

20  going to say enough to the Court.

21         I know the Court has to take a lot of things

22  into consideration other than my words here today, but I

23  do worry that I am not going to say enough.

24         Judge, there are lawyers who have routinely

25  argued, make arguments to courts, to Your Honor,

1   starting off with, "in all of my years as a lawyer,"

2   that sort of phrase, to make their arguments.  And I

3   have to say I have never, never done that before, never

4   stood in front of a court and said in all of my years as

5   a prosecutor, I have not seen this, or I have seen that.

6   And that is because I never really thought it was

7   appropriate until today's hearing.

8           I have been a prosecutor for a long time in

9   State Court, now in Federal Court, prosecuted a wide

10  variety of people for physical violence, abuse,

11  financial crimes.  I was primarily a homicide prosecutor

12  when I was in the state.

13          And, Your Honor, in all of that time, I have

14  only come across a couple of Defendants, a handful of

15  Defendants who concern me as much as Barry Ardolf

16  concerns me.  His actions that he has taken in

17  connection with this case have shown that he is capable

18  of acting with absolutely ruthless cruelty over a long

19  period of time in a calculated fashion.

20          In this case, living right next door to a

21  family and trying, quite literally, to destroy them.

22  And he has shown, Your Honor, through -- I will address

23  the Court's question that you raised and Mr. O'Brien

24  briefly talked about, and maybe you have seen in

25  letters, which is why should the sentence be different

1  than it was back when there was a plea offer on the

2  table back in April of 2010?  And there is a very easy

3  answer to that question, Your Honor.  Because as the

4  Court is aware, prior to any charging in this case after

5  the search warrant that was executed in this case, I was

6  contacted by Mr. Ardolf's first lawyer, the first of his

7  three lawyers who reached out and said, before any

8  charging takes place, can we come and meet with you?

9  Eric Olson represented Mr. Ardolf at the time and is a

10 good lawyer.  And I didn't frankly know enough about the

11 case at that time other than a case on paper.

12          I said, fine.  We put the case together,

13 Special Agent Cameron and myself sat down with Mr. Olson

14 and Mr. Ardolf, and we showed them a summary of the

15 exhibits and evidence against him.  And that was in

16 around April of 2010.  And we said, if we can resolve

17 this, pre-charging, here is what we would be willing to

18 do.

19          And I made what I thought was a rational

20 offer in consultation with the victims to bring closure

21 to the victims immediately and I got what I thought was

22 a rational, reasonable response, which was Eric called

23 and said:  Let's put it on for a plea hearing.  We have

24 a plea agreement.

25          And that seemed to be a rational response for

1   what had happened if this was a mistake, if this was a

2   lapse in judgment, if this was not about who the

3   Defendant was.

4           And then as the Court knows, we had this on

5   for a sentencing hearing, and right before the

6   sentencing hearing, the weekend before I got a call from

7   Mr. Olson saying I have been fired.

8           THE COURT:  For a plea hearing.

9           MR. RANK:  I'm sorry, for a plea hearing.  I

10  apologize, Your Honor, that is correct.

11          THE COURT:  Right, I remember getting a

12  message that is services had been terminated.

13          MR. RANK:  He was fired and was not going to

14  go forward with the plea at that time.  And Your Honor,

15  it is at that point in time I began to wonder and take a

16  look at the bigger picture of the person, because the

17  rational decision at that time, the reasonable decision

18  at that time based on all of the evidence before him

19  would have been to go forward with the plea agreement.

20          And the actions of Mr. Ardolf since that time

21  period has demonstrated that he is not a rational

22  person.  That he is not only not a rational person, but

23  he is a dangerous person.  And the more we look into his

24  background, his conduct, his conduct not only with

25  respect to the victims in this case, the Kostolniks, but

1    also with his former neighbors, the Carstens; that that

2    says much about Barry Ardolf, personally.

3              And Your Honor, one of the primary goals of

4    sentencing, I think in this case, from my perspective

5    the most important goal of this sentencing is to protect

6    the public from threats.  Public in the form of the

7    Kostolniks who you've heard from today, who very

8    reasonably, very legitimately are concerned for their

9    safety whenever Barry Ardolf is released from prison.

10   But, not just the Kostolniks, but other people.  I think

11   the track record, the conduct in this case of Barry

12   Ardolf demonstrates his propensity, his capability of

13   causing harm, using his technical skills in a way to

14   avoid detection and to cause as much calculated harm as

15   possible.  Not an isolated incident, not a temporary

16   lapse in judgment.  Something that took place over a

17   long period of time with more than one victim.

18              Barry Ardolf is a proven threat.  He is a

19   person who has behaved with no concern for the harm he

20   has committed, both while he was doing it, and I think

21   more importantly, Your Honor, in assessing those 3553(a)

22   factors, his conduct since his crimes were discovered,

23   after he was originally -- the search warrant was

24   executed, after he was charged, and his conduct up until

25   today, that is the person that is before you.

1            We have seen in the course of the things that

2    he has filed, he has no concern when it suits him to

3    disparage the victims, to point the finger back at them,

4    to lie about his own actions in a way that shows,

5    contrary to the statements here today, that he has no

6    feelings of remorse.

7            I am concerned for the victims in this case.

8    I am concerned, Your Honor, for anyone who angers Barry

9    Ardolf, because we have seen what happens when they do.

10   Your Honor, I'm not going to be able to describe the

11   impact on the Kostolniks any better than Matthew

12   Kostolnik and Bethany Kostolnik did.  You've heard what

13   they went through.  You have heard how long and how deep

14   that the pain has been caused by Barry Ardolf and

15   continues until today.

16           I can't imagine what it was like for them in

17   the months between February and July of 2009 before it

18   was discovered that it was Barry Ardolf who was

19   targeting them, waiting for the next attack, knowing

20   that someone had breached their own home.

21           And I don't know what it would have been

22   like, I can't imagine what it would have been like to

23   wait for the next few months before he was charged while

24   he was living next door, the weeks after he decided to

25   withdraw his guilty plea, and even today when he has

1    members of his family living right next door.

2              And I know that the Court today has to come

3    up with a number.  And in some ways, often when we are

4    assessing Sentencing Guidelines, there is a mechanistic

5    approach to that calculation.  One of the exercises is

6    we spent the morning looking at enhancements and doing a

7    little of that number punching.

8              And I think it is important, while those

9    numbers are relevant, and the fact that there was child

10   pornography used, kind of cravenly in this case used, is

11   relevant; but, I think Your Honor is absolutely correct,

12   this is not a child pornography case.

13             This is a case that is based on the actions

14   Mr. Ardolf took to terrorize, to cause immeasurable harm

15   to the victims in this case.  And what I take from, I

16   couldn't have expressed it any better than the

17   Kostolniks did, is that the numbers that the Court is

18   considering for a sentence are not random numbers.  They

19   are not arbitrary numbers.  They are real numbers, they

20   are meaningful numbers.  And when Matthew Kostolnik

21   marks the time in prison for Mr. Ardolf as a yardstick

22   of his family's safety and feelings of safety, those are

23   real numbers, those are real meaningful numbers.

24             They mean feelings of safety for Matthew

25   Kostolnik, for Bethany Kostolnik, and for their

1   children.

2           Your Honor, when the PSR's guidelines

3   reflected a range of up to 293 months, the Government

4   suggested that that was an appropriate prison sentence,

5   293 months, and also indicated in our position pleadings

6   that if the Court disagreed with any of the numbers, any

7   of the guidelines calculations in the PSR --

8           THE COURT:  I could still end up in that

9   neighborhood.

10          MR. RANK:  That is correct.  But, we would be

11  moving for a variance or a departure.  And the reason I

12  thought that the 293 number made some sense is that

13  ultimately, as Your Honor mentioned earlier, that there

14  was only a portion of that sentence that is going to be

15  done, and we'll end up with a rounded 20-year sentence.

16          The 293-month number made sense for that

17  reason.  And the reason behind that is to put Mr. Ardolf

18  in a position where he can't do the same thing to other

19  people.  And I would submit, Your Honor, that based on

20  the actions in this case, based on Mr. Ardolf's actions

21  in this case, based on the assessment of what he has

22  done and what he is likely to do, that is the

23  appropriate sentence in this case, a sentence of around

24  293 months, which will do what in this case is the most

25  important thing, and that is to protect the safety of

1    the victims in this case and protect the safety of

2    future victims of Mr. Ardolf.

3              THE COURT:  Let me ask you a question.  And

4    Mr. O'Brien may or may not -- or Mr. Ardolf, if they

5    want to respond, I guess they could.  Obviously, apart

6    from what the sentence is that I will soon announce, I

7    have an option that the State Courts don't have, and

8    that we utilize here frequently, and that is putting a

9    defendant like Mr. Ardolf on supervised release for the

10   rest of his life.  And then putting him on, basically,

11   no computer use without heavy monitoring and a GPS

12   system where we know where somebody is 24 hours a day,

13   7 days a week, because obviously you will see that more

14   in child pornography cases.  And I don't think people

15   have really discussed this in a computer case.

16             But, obviously, in any computer case with or

17   without child pornography, that is a fairly common

18   condition.  And then if somebody -- so we know where

19   somebody is.  And maybe that is one of the reasons why

20   our numbers are less than one out of three people are

21   ever brought back on a violation in our Court.  I think

22   that is closer to two out of three in maybe State Court.

23   We are just two different courts, but one is not better

24   than the other, but we have that option.  I assume no

25   matter what the sentence is, that you are assuming I am

1   going to consider some strict conditions like that, the

2   idea being, after X number of years on release if there

3   has been flawless compliance, the Judge may discharge

4   early, may not, but can step away with notice to

5   everyone.  Do you have a view on that?

6           MR. RANK:  Well, if what the Court is asking

7   is whether supervised release can be a substitute for

8   incarceration, I would have strong feelings about that.

9           THE COURT:  I wasn't saying one was a

10  substitute for another, but I think the issue comes up

11  especially in cases like this where, increasingly, going

12  to significantly long periods, and because GPS

13  monitoring, computer monitoring, has gotten so

14  inexpensive and so sophisticated, it is more the rule in

15  the Federal Court at least in this District, than it is

16  the exception.

17          MR. RANK:  Your Honor, I believe Mr. Ardolf

18  should be subject to a long term of supervised release,

19  but I think also the facts of this case will demonstrate

20  the supervised release will likely be worthless in the

21  sense of monitoring and proactively preventing him from

22  engaging in conduct.

23          THE COURT:  Why don't you say what you are

24  thinking?  You are thinking that Mr. Ardolf has behaved

25  like somebody who -- and this isn't a criticism of

1    you --

2              MR. RANK:  Yeah.

3              THE COURT:  -- but he is behaving like

4    somebody who is smarter than law enforcement, who is

5    smarter than computer people, and he will find a way to

6    outsmart.  I mean, that has really been one of the

7    themes, apart from today, the theme through the case is

8    that, well, I can -- I know the system.  I can outsmart

9    these people.  You haven't said it in this hearing, but

10   if the threats hadn't been made to the White House, the

11   Anoka County and the BCA admitted, they didn't have a

12   sophistication to catch computer hackers at this level,

13   it took the FBI coming in, and the only reason they were

14   here was the threat to the White House, not the child

15   pornography.  So --

16             MR. RANK:  Your Honor, actually the FBI did

17   get involved based on the child pornography.

18             THE COURT:  Early on, but they came in, and

19   their system -- I was actually surprised when the BCA

20   admitted -- I knew that was the county situation, but

21   when the BCA admitted that we don't have the kind of

22   equipment that could detect those things, yet.

23             MR. RANK:  To get to the Court's point.

24             THE COURT:  Yes.

25             MR. RANK:  Twofold, one is yes, I think you

1  are exactly right, Your Honor, that he believes he can

2  outsmart law enforcement.  And two, we know that he

3  doesn't respect the Court's guidelines, because he

4  violated the conditions of release imposed on him for

5  his release within a couple of weeks of being released

6  in using a laptop computer which he was told not to do

7  and going to a Borders Book shop and accessing the

8  internet.

9        The problem with this concept of supervised

10  release even with GPS monitoring and all sorts of

11  monitoring, by the time Mr. Ardolf is released from

12  prison, right now accessing the internet can be done on

13  a device that is this big (indicating approximately cell

14  phone size).

15        THE COURT:  That is true.

16        MR. RANK:  So I don't know what sort of

17  technological advances are out there.  I will ask, and I

18  haven't gotten to this point yet, but I do think it

19  important when the Court is fashioning his sentence, and

20  also making recommendations to the Bureau of Prisons,

21  that Mr. Ardolf be prevented from having access to

22  computers and internet while he is in prison, and also

23  be prevented from further vocational and technical

24  training when he is in there because it is akin to

25  giving a bomb maker access to chemistry classes; that he

 1   should be prevented from having access to that while he

 2   in the BOP.

 3            The point though that the Court originally

 4   raised is, yes, he should be on supervised release.

 5   But, do I think that that is going to prevent him from

 6   causing harm to someone that angers him in the future?

 7   Absolutely not.  I think the only thing that is going to

 8   do that, the best thing that a going to do that is a

 9   lengthy term of incarceration.

10            I think supervised release is important, that

11   there be some additional time that is out there.  But,

12   based on what I have seen, do I think that will deter

13   him for one moment?  No.

14            THE COURT:  All right.  Mr. O'Brien, with or

15   without -- or with consultation with Mr. Ardolf, is

16   there --

17            MR. O'BRIEN:  Well, obviously, Your Honor, I

18   don't share that jaundiced view of Mr. Ardolf.  And I

19   also think that after several years in a -- at least

20   several years in a federal prison that any arrogance,

21   any misplaced arrogance that Mr. Ardolf has right now is

22   just going to be dissipated to a great extent.

23            And my last point about the supervised

24   release, Your Honor, I will defer to the Court on that.

25   But, I would note that when Mr. Ardolf gets out of

1    prison, the computer world is going to be so different

2    than it is now.  He is going to be so out of touch.  I

3    don't see the threat that Mr. Rank does.  But, I am sure

4    a reasonable period of supervised release would be

5    appropriate, and Mr. Ardolf will be properly monitored.

6                THE COURT:  Mr. Ardolf, do you have anything

7    else you want to add to what Mr. O'Brien has said?

8                (Discussion off the record between the

9    Defendant and Mr. O'Brien.)

10               THE DEFENDANT:  I have no prior convictions.

11   I would like an opportunity not to be in prison.  I know

12   people get opportunities.  That is all I have.

13               THE COURT:  All right, thank you.  You can be

14   seated at counsel table.  What I will do, consistent

15   with other cases, at least, how I will proceed, I will

16   respond, generally, to both the position papers, even

17   though it has been a long hearing for everyone, and to

18   the arguments that have been made.

19               And then what I will do is explain before we

20   come to the podium what the sentence will be, because

21   most people don't like standing at the podium.  And the

22   imposition of the sentence, itself, takes a couple of

23   minutes.

24               First of all, there are some things that I

25   think no one is in disagreement about.  The issue isn't

1   whether they happened, the issue is what effect it

2   should have on the sentence.

3            The first one is, that is not unique to this

4   case, although it is probably very, very severe in this

5   case, so it is probably a good thing, Mr. Ardolf, you

6   apologized to your family.  Most defendants do, some

7   don't.  The public, unless they come to the courtroom

8   think unless there is some violent crime, there's no

9   direct victims.  And, of course, what people know who

10  work in the justice system is in every case the most

11  direct victims in so many cases are the children of a

12  defendant, because many parents commit crimes, make

13  mistakes.

14           And so, it is always on the mind of a judge.

15  I am certain that when the sentence is done in just a

16  few minutes that there will be people with some

17  justification in the courtroom, from your family, who

18  will feel that I have disrespected in some way, if not

19  you, your children and family, because they lost their

20  mother at a tender age, and now their father.

21           Although, as I said, and I think you meant it

22  sincerely, but when I quoted earlier, when you are

23  telling your son how to write his letter to me.  You can

24  cry about how you lost mom, now you are losing dad.  The

25  better the letter, the smaller the jail time the Judge

1   will give me.

2            It's true it is heavy on most judges, and it

3   should be, the effect on the children.  But, that

4   probably goes to explain some of the concerns that Mr.

5   Rank had that you were that single dad in the home when

6   I don't need to figure out all of the reasons you did

7   all of these really unspeakable things to the Kostolniks

8   and perhaps others.  But, knowing that you are the role

9   model, you are to set an example.  And I think we

10  probably in this room agree on one thing, many of us

11  will be judged at the end of our lifetime on the kind of

12  examples we set for our children, those of us lucky

13  enough to have children.  And knowing that this could

14  put you in harm's way.  But sadly, many people have been

15  before you, and not on this exact crime.  So, I do

16  acknowledge, and your children have written very sincere

17  letters, apart from the differing views on the influence

18  you may have had, that aside.  They are obviously asking

19  for some type of compassion and leniency.

20           And so, I am just acknowledging that I know

21  that they are very directly affected by this.  And some

22  would suggest, and I won't -- it won't play any part in

23  my sentence, that apart from the Government's offer or

24  what you end up doing, that not just the best interests

25  of the Kostolniks and their family, but the best

1    interests of your children would be served if you work

2    something out on the forfeiture.  It won't play a part

3    in my direct sentence in the case.  And I am hopeful

4    that happens, because I think it is very difficult for

5    members of your family, no matter what the sentence is

6    and what people think of me in a few minutes, or the

7    Kostolniks or others, with people living side by side,

8    so we will see where that goes.  But, I am mindful of

9    the effect on your children in the case.

10               And I don't make moral judgments.  Judges

11   take an oath not to.  I don't have to impose the

12   sentence I am going to impose, and I can conclude that

13   you may pose a danger which your lawyer and you take

14   strenuous issue with and your family, but that is not

15   the equivalent of saying, well, I think he is a bad dad.

16               I said my peace on the role model part, and I

17   will probably leave it there.  I will probably never

18   know, having been, you know, with the case for some

19   time, whether it was obsession or compulsion, that

20   really apparently blinded you to the effect this would

21   have on your children, that you almost at all costs went

22   out to destroy one or more families, and at all costs to

23   them and at all costs to you and your family.

24               And there are some who have suggested, and I

25   don't say this to upset you or other family members, but

1   there are some who have suggested one consistent theme I

2   have had from everything I have read is that your late

3   dear wife who met such an unexpected and untimely death,

4   I think, at the age of 37, my memory wants to tell me

5   November 6th of 2000, on that very tragic day the theme

6   has been that she was the best thing that ever happened

7   for you.  And the two of you were deeply in love, and

8   that she really was a stable, stable force in your life.

9        And that it is so difficult to lose someone

10   close to you, and that you were never the same person

11   after that.  Nobody was making any excuses for you, but

12   they were more talking about they saw a different Barry

13   Ardolf.  So, I really accept that.  The issue isn't

14   whether that may be -- and to your credit, I don't

15   believe you have made that as an excuse for what has

16   happened here, that I have seen.  But, a lot of people

17   noted that a lot of things changed back there, back

18   then, way over and above being a child just to a single

19   parent.  So, that is also in my mind.

20        I think there is a disconnect for some folks

21   in the case.  Obviously, the letters that I have read

22   describe you as a very intelligent person.  And I think

23   most of us if we were raised at all with proper values

24   don't judge people on the number of fancy initials

25   behind their name.  My dad had an eighth grade education

1    and was a very smart, intelligent, decent man.  And I

2    certainly never judged him, and he raised me not to

3    judge others, which seems to be consistent with the oath

4    I promised to uphold.  So, I think that has been pointed

5    out to me by a number of friends, family, siblings,

6    children.

7              I do have to take exception, and I say this

8    with all due respect, it seems like you have been more

9    involved than you should have been in asking to proof

10   the letters that people were going to write to the

11   Court.  The letters are important, and I haven't really

12   seen that type of involvement over my career.  But,

13   there may have been good reasons for it.  I have tried

14   to understand that.

15             The fact of the matter is, here is where we

16   are.  I have an advisory set of guidelines, based upon

17   my findings, and I will just note briefly, that was

18   where I started off some time ago, was 151 to

19   188 months, not counting the two-year consecutive

20   sentence on two of the counts that would be run

21   together.  And that was, of course, made over the

22   objection of you and your lawyer who felt it should be

23   closer to 50 or 60 months, and over the objection of the

24   Government who thought I should be at 235 and up

25   somewhere.  And so, let me go right to the heart of the

1    matter.

2         The Kostolniks have done what most decent

3    innocent victims would do.  They have asked for up to

4    the maximum, which could be over and above the 235 to

5    the 293 months.  It could be as high as 44 years.

6         You and counsel and family have asked for

7    something closer to five or six years or less.  In

8    fairness to your children, they've asked that whatever

9    happens, that I recommend a facility here in Minnesota.

10   The reality is, whether the sentence is closer to what

11   you have asked for or what the Kostolniks and the

12   Government has asked for, I can't restore the peace of

13   mind, the security, the serenity that you have taken

14   from them by the -- really, almost indescribable terror

15   that you subjected them to over the years.

16        And I want to talk about the child

17   pornography.  I would agree with your lawyer, and now

18   Mr. Rank has also said, well, it is true this really

19   isn't a child pornography case.  And there is much talk

20   separate from this case about the Guidelines that are

21   quite significant in child pornography.  But, I actually

22   think this case on how you used that one particular

23   picture is worse than a child pornography case.

24        In other words, we had four threats to the

25   White House.  We had a hoaxing, saying -- to the legal

1   assistant for Mr. Kostolnik.  We had a come on and

2   proposition by a William Mitchell law student, all

3   purported to come from the victim.

4            And then, yet the uncanny understanding by

5   you, unlike most child pornographers, how truly

6   damaging, indescribably damaging it is to put this child

7   pornography out, because even you decided, when it went

8   out on the internet, to cover the face of the three

9   children, which is an acute understanding of what can I

10  do -- what on the face of this earth will damage and

11  destroy the Kostolniks more than anything I can think

12  of, sending their employer -- victimizing these

13  children, worse than if it was for personal

14  gratification.  That is why the computer hacking

15  guidelines don't give me a lot of guidance.  It isn't a

16  child pornography case, but knowing that when people see

17  these victimized children, that is why your conscience

18  apparently told you to whiteout their faces on the

19  internet, but not when it went to the law firm.

20           You transmitted, when the threats weren't

21  working and nothing else was working, nothing seemed to

22  be happening that would adversely affect the Kostolniks,

23  you sent a picture of two juveniles engaged with or

24  without force in oral sex penetration with a juvenile

25  girl.  And it had -- so, in many ways, that is far worse

1    than sending it to someone for personal gratification,

2    because you are intelligent enough with enough insight,

3    at least at that time, to know what is the one thing I

4    can do to try to destroy these people because the

5    threats to the White House don't seem to be working, the

6    affairs don't seem to be working.  Let's try child

7    pornography.

8            And to do whatever that you could, in my

9    judgment, to destroy them in any way you could -- I

10   don't know why else someone would send that picture and

11   then have it "Matt's Kids" on the top.  That is why,

12   like I said earlier in this proceeding, people can do

13   more damage with computer hacking, especially when they

14   use a picture like that, than they can with a gun or

15   they can with drugs.  And I can't avoid some of the

16   unwarranted disparities, the sentencing disparities in

17   other cases, but I will be responsible for mine and any

18   other sentences I have imposed.  But, I actually think

19   it is more serious than a standard -- so, ironically,

20   the computer guidelines seriously understate the

21   seriousness of what these people have been through and

22   what you have done, and the child pornography

23   guidelines, maybe to an extent overstate it, because it

24   is not really a child pornography case unless I do take

25   into account, which is a significant factor, sending

1    this to the employer.  But, yet having a full

2    understanding, as I said before, how totally damning it

3    is, so you cared enough about those kids when it went to

4    the internet, if not for the Kostolniks to cover their

5    faces, if nothing else, as you kind of pointed out on

6    one of your questions of Agent Cameron.

7            So, where does that leave us today?  Where I

8    am left with because of the Guidelines you all heard me

9    reference two or three times earlier in the day, well

10   even without the mandatory consecutive two years which

11   you and your lawyer strongly objected to, even without

12   the finding the ten images rather than something less

13   than that objected to, although I went to a 34 level,

14   not 38 on the sadistic nature of the photographs for the

15   reasons I stated.

16           I had said a couple of times, well, under the

17   3553(a) factors, I believe no matter how I calculate

18   those issues, I am going to end up at the same place.

19   And what I mean by that is this.  What is that sentence

20   that will promote respect for the law, seems to fit the

21   crime -- even though I can't restore for the victims the

22   peace of mind and the serenity that America is known

23   for, and to be free from that type of terrorizing.

24           What is that sentence that will also avoid

25   unwarranted disparities and deterrence -- both lawyers

1   brought it up.  There are two types of deterrence.  And

2   both are present in this case.  Both usually aren't.

3   The one that is always present is what I call general

4   deterrence saying, we need to say to our community and

5   our public when this happens, here is how serious we

6   think it is, and take into account who the human being

7   is in front of me.  As you said, you have no prior

8   record.

9           And then secondly, over the -- your lawyer

10  has spent some time, or your standby counsel has spent

11  some time on, as you have, saying:  Well, that is one

12  deterrence, but the individual deterrence, you really

13  don't need to protect the public from Mr. Ardolf, which

14  is a contrary view of the Government.  This is one of

15  those rare cases that I get where until I can have an

16  understanding of what compulsively and obsessively drove

17  you for so long, because that incident on the front lawn

18  would not drive a normal person to do any -- most of

19  what happened here with the Kostolniks, no matter what

20  the perceptions were.

21          I believe until I have an understanding of

22  that, that you are at high risk, whether you have some

23  self control.  But, I believe a sentence has to address

24  both types of deterrence.  And today, my view is -- the

25  bottom line is this.  Whether I was required to give the

1  two-year consecutive or not, anything less than a

2  216-month sentence would not promote respect for the law

3  and provide the proper deterrence.  And that is

4  192 months, or 16 years.  The Guidelines calls for 151

5  to 188, and because of the way in which the child

6  pornography was used, the Guidelines didn't contemplate

7  that.  I am going a bit over the high end, 192.  And a

8  two-year consecutive sentence on the aggravated identity

9  theft, but I also find that even if it was discretionary

10  with me, and I was not required to give a two-year

11  mandatory sentence, I would give a sentence of

12  216 months, because anything less than that would not,

13  in my judgment, serve the purpose of sentencing.

14           Is the Government entitled to -- should they

15  be reasonable in asking for at least 293?  Yes.  I

16  balanced the factors and found that this is sufficient,

17  but not greater than necessary to serve all functions of

18  sentencing.  And I am going to put you, and I will lay

19  out the conditions in just a moment when we come to the

20  podium.  I am going to put you on 20 years supervised

21  release, and I will lay out the conditions.

22           And then in the event after -- whether that

23  number, without promising anybody in the courtroom

24  anything, whether it is five years, whether it is ten,

25  if somebody says:  Well, really, everybody has been

1    flawless.  Mr. Ardolf has been fully compliant with

2    everything.  Whether there should be an earlier

3    discharge than that, and there will be GPS monitoring,

4    strict computer control.  I need to leave the courtroom

5    today believing that you are in the group, in that group

6    that is less than one out of three that ever returns

7    here on a violation again, because that is the

8    statistics in our District.

9         So, for those that feel anything less than a

10   300-month or more sentence is inappropriate, I mean no

11   disrespect.  For those loved ones or family members of

12   Mr. Ardolf who feel that anything more than three to

13   five years is unreasonable and unfair, not giving Mr.

14   Ardolf the second chance, I am fully responsible for the

15   sentence.  I won't be apologetic about it.  Because I

16   can't restore everybody to where they were before this

17   happened.  I don't think any sentence can do that.

18        So, if Counsel, and I will talk to each of

19   you, and Mr. Ardolf and Mr. O'Brien and Mr. Rank if you

20   would come to the podium?  Or Co-counsel?  I didn't mean

21   to neglect your Co-counsel, there.  And we will stop for

22   any requests for clarification at the end of the case.

23        As the sentence of this Court and judgment of

24   the law, I commit you to the custody of the Bureau of

25   Prisons for 216 months.  And let me break that down,

1  then I will stop.  This term consists of 60 months on

2  each of Counts 1 and 6, 120 months on Count 4,

3  192 months on Count 5.  Those will be served

4  concurrently.

5           An additional 24 months shall be served

6  consecutively on Counts 2 and 3 with one another,

7  concurrently, but consecutively with the terms Counts 1,

8  4, 5, 6, which is a complicated way for the record of

9  saying it is 216 months.  It is 192, as I stated with

10  the 24 months consecutive.  But, I want to say

11  alternatively that even if I had concluded that the

12  consecutive sentence was not required, I would still end

13  up at 216, because I don't believe anything less than

14  that would promote respect for the law and serve out the

15  3553(a) factors.

16           Does either counsel have a question about

17  that computation, itself?  Mr. Rank?

18           MR. RANK:  No.

19           THE COURT:  I am not asking people to agree

20  to it, because you both object to it, but to the

21  computation, itself.

22           MR. O'BRIEN:  No, Your Honor.

23           THE COURT:  I am going to order a fine in the

24  amount of $10,000.  That should be paid within

25  three months of today's date.

1           In the event there is a forfeiture agreement

2    reached, notwithstanding any decisions I make today

3    where you want to build that in to any forfeiture

4    agreement, then I assume I will be notified.  Otherwise,

5    I base that upon the financial circumstances of the --

6    of the Defendant.

7           Forfeiture, noting the objection of the -- of

8    the Defense, right now where it is, Mr. Rank has said

9    for some time, desired that the Defendant's home be

10   voluntarily sold, or otherwise they are going to pursue

11   and have pursued, in addition to the computers, and I

12   will talk about the contents of the computers in just a

13   moment on one issue raised by the children and Mr.

14   Ardolf.

15          What is the Government's request on the

16   forfeiture today?  And I have a preliminary order of

17   forfeiture and Mr. O'Brien had asked me to sit tight, so

18   to speak, until today's hearing.

19          MR. RANK:  Your Honor, Mr. Alexander from our

20   office is present, so he will correct me if I get any of

21   this wrong.

22          THE COURT:  I am sure he will.

23          MR. RANK:  We filed a Motion for Order of

24   Forfeiture.

25          THE COURT:  You did.

1          MR. RANK:  And we ask that the Court enter

2     that Order of Forfeiture today.  There is a difference

3     between getting the Order of Forfeiture and actually

4     taking the house.

5          THE COURT:  That is true.

6          MR. RANK:  What we would ask the Court to do

7     is rule on the Order of Forfeiture.  We will get it in

8     hand.  And based on that, we will continue in good faith

9     to try to reach a resolution where the house can be

10    sold, and the proceeds of the house be put into a trust

11    for the benefit of the children.  As we have before.

12          But, what I don't want to do is what counsel

13    suggests, is moving this forfeiture matter out at any

14    time.  Forfeiture is a component of sentencing, as Mr.

15    Alexander has told me many times, because I don't really

16    understand all of the legal aspects of forfeiture.

17          But, we ask the Court to enter that order of

18    forfeiture.  We will then have it and we can continue to

19    try to resolve it in the same way we have been trying to

20    resolve it for the last several months.

21          THE COURT:  Mr. O'Brien?

22          MR. O'BRIEN:  May I consult with Mr. Ardolf?

23          THE COURT:  Yes.

24          MR. O'BRIEN:  Your Honor, Mr. Ardolf wanted

25    to clarify that there was still room for negotiation, so

1    that the children aren't put on the street right away,

2    that there be some --

3              THE COURT:  Well, it takes some time, even

4    when there isn't an objection, as you know, Mr. O'Brien,

5    even when there is an objection.  In fact, if anything,

6    sometimes the Court, and maybe the Justice Department is

7    criticized for not moving -- maybe not from a

8    defendant's point of view.  But, I think that will take

9    care of itself, even if Mr. Rank hadn't kind of given

10   his word that he will try to negotiate something.

11   Because, I will likely, over your objection, just so I

12   don't claim there is a stipulation here today, order the

13   forfeiture.  But, the children are not going to be sent

14   out of the home in the immediate future.  That is not

15   the way it would work -- maybe that is the way it should

16   work, assuming the house is empty, but that isn't the

17   way it would work, even if there was nobody in the home,

18   much like some foreclosure and other procedures that

19   always take longer than the public thinks that they

20   should take.

21             I would just say this, while it has played no

22   role in my sentence, I believe that whether the issue is

23   how to deal with all three children or some other

24   issues, I believe that the right thing for all the

25   people involved would be to work out some agreement.

1   And the Government has agreed to try to work with you.

2   I mean, I am not a party to those negotiations, but

3   they've said in writing -- and I didn't realize for how

4   long, to say, look it, we won't try to take any part of

5   the house, other than the computer equipment.  If there

6   can be some arrangement worked out to turn it over and

7   put it in trust for -- sell it, and put the proceeds in

8   trust for -- and I will use the phrase the children,

9   because maybe that is one of the issues, that is more to

10  workout between the parties.  But, if I can be of some

11  help or the Federal Court can, there are certain things

12  appropriate for us to do, and certain things not.  But,

13  I think one concern Mr. Rank, you and co-counsel can --

14  this takes some time.  And so, I don't think that should

15  be a fear -- I mean, I think some decisions should be

16  made, a yes or a no, because then I think there can be

17  some time frames given to all of the members concerned.

18  And unfortunately, probably to most people, it takes

19  longer, even when an agreement has been reached or a

20  court decision, to process this thing through.  So, I --

21  until someone could persuade me differently, I mean, I

22  will -- I mean, I think that there is a lot of merit to

23  whether this was the dream house for people or not, to

24  sell the house, put it in an arrangement that seems fair

25  to your client and family and acceptable to the

1    Government and move on, and let the Kostolniks live in

2    peace, to the extent they can.

3              MR. RANK:  Your Honor, I would ask also that

4    the arrangement -- we would be able to deal with Mr.

5    O'Brien, and Mr. O'Brien is the person that is going to

6    be working with us in terms of putting together a trust.

7    I think it will be a lot more efficient and make it more

8    likely that we are able to reach something.

9              THE COURT:  If that is with Mr. Ardolf's

10   consent, until it is withdrawn.  So, in other words, he

11   wants a contact person because there are things that

12   they can say and do with a lawyer, or another person

13   that is not proper for them to sit down face-to-face

14   without you having someone there, Mr. Ardolf.  It is not

15   unique to this case.

16             Would you -- obviously, Mr. O'Brien, would

17   you agree to help out there if it is with Mr. Ardolf's

18   consent and continue your limited involvement in that

19   regard?

20             MR. O'BRIEN:  Certainly, Your Honor.

21             THE COURT:  Do you want to think about that,

22   Mr. Ardolf?  I am not asking you to agree to any

23   agreement on the house, but if for the time being Mr.

24   O'Brien could be involved to see if there is some

25   arrangement that can be worked out.  And then if you

1    decide, well, there may be, but I am not going to

2    utilize Mr. O'Brien, then that is your decision to make.

3                    THE DEFENDANT:  Yes.

4                    THE COURT:  All right.

5                    MR. O'BRIEN:  Your Honor, if I could, I was a

6    little confused about Court's comment on the interaction

7    between the fine and the selling of the house.

8                    THE COURT:  I am just saying, I have imposed

9    the fine, but I would hate to see -- and I base it on

10   the ability of Mr. Ardolf to pay.  I would not want to

11   see that get in the way of -- in other words, if you are

12   all somewhere saying, we can agree on a forfeiture, but

13   why does the Judge have to impose a $10,000 fine, I

14   suspect I can work with counsel if you would approach to

15   me and say, you know, that has become an issue in the

16   case.  We can resolve this.  But, are you willing to

17   vacate that fine?  It would have to take some

18   arrangement between the parties coming to me, but I

19   would not want that to stand in the way.

20                    But, that would have to take everybody coming

21   to me saying, we have worked this thing out, but it may

22   seem minor to you, Judge, but that is standing in the

23   way.  But, I assume you will all let me know if and when

24   that happens.  So --

25                    MR. O'BRIEN:  I appreciate that, Your Honor.

1           THE COURT:  I am going to sentence you, Mr.

2    Ardolf, at this time.  I don't make any claim -- and so

3    I will then sign that Order of Forfeiture and then the

4    time frame can be communicated to everyone because there

5    are issues with that that don't vary dramatically from

6    case to case, because there is a set procedure in

7    fairness to everyone.  And like I said, if there is a

8    complaint by affected people, it usually takes too long.

9           I sentence you to a term of 20 years, and

10   that is total of supervised release.  That consists of

11   one year on each of Counts 2 and 3, and this may seem

12   highly technical, but I have to indicate what goes with

13   each count, three years on each of Counts 1 and 6, and

14   15 years on Counts 5 -- on Count 5, and 10 years on

15   Count 4, all to run concurrent.  So, even though I had

16   to break those down, because there are limits on each

17   count, there is a total -- I meant to say 20 years on

18   each of Counts 4 and 5, because they are the only ones

19   that permit me to do that.  And actually, Leah, it's

20   actually 20 years on Count 5 and 10 on Count 4, I

21   believe.  But the key, here, the total is 20 years,

22   total.

23           More importantly to me, with that, is if you

24   haven't made other arrangements with the Probation

25   Department, and I predict you will have, at the time of

1    your release, you will report -- if you haven't made

2    arrangements, you will report to your probation officer

3    at the time of your release.  Second, you shall not

4    commit any crimes, be they federal, state or local.

5              Third, you shall not possess a firearm,

6    ammunition, destructive device, or other dangerous

7    weapon.  You shall cooperate as every federal defendant

8    has since October of 2004 with the collection of a DNA

9    sample, and there are some additional requirements

10   because it is a child pornography case.  But, the DNA

11   sample is unrelated to that.  It is every federal felony

12   since October of 2004.

13             You shall comply with the requirements of the

14   Sex Offender Registration Act, that is federal law, as

15   directed by the probation officer and the Bureau of

16   Prisons, or to any state sex offender registration

17   agency in which you work, reside.

18             Now, it is true, there is a lot of

19   controversy, apart from this case in this country and

20   state on what is a qualifying offense, and whether child

21   pornography should be considered a qualified offense for

22   sex offender registration, but it is also true that in a

23   large majority of states it is a requirement.  And under

24   federal law it is a requirement, and probation will work

25   with you on that.

1              You shall abide by the following additional

2      condition of supervised release, which I consider as

3      important or more important to the ones I just

4      mentioned.  First you shall abstain completely from the

5      use of alcohol and other drugs, and not frequent

6      establishments whose primary business is to sell

7      alcoholic beverages.  There has been some discussion --

8      it didn't play a role in my sentence, that there may

9      have been historically, not associated with this

10     offense, any alcohol issues.  And if we screen you, Mr.

11     Ardolf, and there is no identifiable problem, we will

12     step away from it.  We won't do this just to run you

13     through the drill to say we have done it.  Consequently,

14     we will have a full evaluation, and then if there is an

15     identifiable issue, you shall participate in a program

16     for alcohol abuse as approved by Probation.  That will

17     include testing, inpatient, outpatient treatment,

18     support group work.  And you shall contribute any cost

19     to that based upon -- as a co-payment pay program

20     consistent with your ability to pay.

21             You shall provide the probation officer any

22     access to any requested financial information, including

23     credit reports, credit card bills, bank statements, and

24     telephone bills.  More importantly to me, you will

25     refrain from accessing or committing any acts that are

1   consistent with what you pled to, and I will be very

2   specific now.  You shall have no contact, direct or

3   indirect, with the victims in this case.  And I define

4   contact as follows:  No letters, no third-party contact,

5   no communication devices, audio or visual, no visits,

6   and no -- and whatever request there is made cannot be

7   done without the prior consent of the Probation

8   Department.

9           You shall be prohibited entirely from

10  engaging in any computer-related occupation during the

11  term of supervision without the prior approval of the

12  probation officer.  And this doesn't mean I am assuming

13  that you were doing computer-related work at Medtronics,

14  because that has been one of your complaints that people

15  kind of designated you as a computer expert at

16  Medtronic.  I never said such a thing.  But, we want to

17  know what the employment is and what the request is, and

18  it is a violation of your supervised release for the

19  probation officer not to know.

20          And it is the rare case, Mr. O'Brien can

21  confirm to you in private that a Defendant comes back to

22  us or through a lawyer and says, the probation officer

23  and the Court is totally unreasonable.  They put me in a

24  corner and won't let me out.  They need to know before

25  you do something, not after, and we can generally work

1    things out.

2            You shall participate in any recommended

3    psychological or psychiatric counseling or treatment.

4    Again, that doesn't mean that I have decided that you

5    need a specific course, but it means that because

6    oftentimes State and Federal Courts are criticized for

7    not screening for this and trying to provide services at

8    the appropriate time, we'll screen for it and expect

9    that you will participate, if there is a recommendation

10   to be made.  And that includes taking any medication

11   taken by your physician or your medical provider, as

12   well.

13           You shall register with the State Sex

14   Offender Registration Agency in any state where it is a

15   qualifying offense where you are living, or otherwise

16   employed.  And again, the Probation Department will work

17   with you there, because it varies from state to state,

18   separate from the federal requirement.  And Probation is

19   responsible to secure compliance with that.

20           More importantly to me, and I suspect to the

21   Government and to, at least the victims in the case, you

22   shall not possess or use a computer or have access to

23   any online service without the prior notice and approval

24   of the United States Probation and Pretrial Services

25   Office.

1               You shall identify all computer systems,

2     internet-capable devices, and similar memory and

3     electronic devices to which you have access and allow

4     installation of a computer internet monitoring program.

5     Monitoring may include, but is not limited to random

6     examinations of computer systems, along with internet,

7     electronic and media storage devices under your control.

8     The computer system or devices may be removed for more

9     thorough examination as a condition of your release, if

10    necessary.

11              You shall contribute to the cost of such

12    monitoring services based upon your ability to pay as

13    deemed appropriate by the Probation Department.  I will

14    just say this to you, Mr. Ardolf, not to insult your

15    intelligence, one of the common violations these day,

16    because this is subject to the right of Probation to

17    place you on GPS monitoring, as well.  It is very

18    inexpensive for us to utilize.  One of the more common

19    violations, because the monitoring services have got

20    quite sophisticated, are to either use a third-party,

21    not necessarily a child.  Or, the more common in pure

22    child pornography cases, which this is not in my

23    judgment is library.  That is one reason we use GPS

24    systems, because the most common violation I have had is

25    people have been caught in libraries doing things,

1    without notice to Probation.

2              So, they need to know whether it is e-mail

3    connectivity, who knows what it will be when you get

4    out, with cell phones and the like, apart from

5    computers.  You shall submit your person, residence,

6    office, vehicle, any area under your control, to a

7    search conducted by the U.S. Probation officer or

8    supervised designee at a reasonable time, and reasonable

9    manner, based upon, of course, reasonable suspicion that

10   there is a supervised violation occurring for contraband

11   or evidence.

12             You, of course, have an obligation in the

13   interest of yourself and any people you are living with

14   to tell them that things that you control and places you

15   live may be subject to this condition.

16             If you are not employed at a regular

17   occupation as you are released, and you have skills that

18   a number of defendants don't, apart from what has been

19   alleged in the case, we have a work program.  In fact

20   our Federal defendants on supervision are employed at a

21   higher rate in our District than the rest of the

22   population.  And if you are employed, we will sit tight;

23   if not, you will be required to perform up to 20 hours

24   of community service work a week until employed and

25   participate in other job counseling activities.  It may

1    not be necessary in your case, but the fact is, while it

2    is true a number of employers won't touch some federal

3    defendants, or any defendant with a 10-foot pole,

4    increasing numbers do, as long as they are working with

5    us.

6            So, I impose a $600 special assessment for

7    the Crime Victims' Fund, that is $100 per count that has

8    been pled to, not subject to suspension or waiver,

9    separate from any fine issue.  And I direct that that be

10   paid within 30 days.

11           I would note for the record that the victims

12   in the case have not requested restitution unless I am

13   told differently, Mr. Rank.  That is where I will leave

14   it.

15           MR. RANK:  That is correct, Your Honor.

16           THE COURT:  You have a right to take an

17   appeal from this case and this sentence.  If you can't

18   afford to hire a lawyer, one will be appointed to

19   represent you at the public's expense.

20           The notice of appeal must be filed within 14

21   days of me filing the criminal judgment, which will be

22   filed not later than Thursday, could be as soon as the

23   end of business day tomorrow.

24           I am assuming, Mr. O'Brien, and I would have

25   assumed this even if the children hadn't put it in

1   letters to me, that you are asking me to recommend a

2   facility here in Minnesota?

3           MR. O'BRIEN:  That is right, Your Honor.

4           THE COURT:  I will recommend -- I assume you

5   have no objection to that, Mr. Rank?

6           MR. RANK:  No.  I have some other thoughts

7   for recommendations to the Bureau of Prisons, but I

8   don't have any problem with placement recommendations.

9           THE COURT:  I want to say this, I will

10  recommend a Minnesota facility.  Because of the nature

11  of the offense, and that is what the Bureau of Prisons

12  in Texas will get.  And it is not up to anybody in the

13  courtroom, including me.  It is up to the Bureau of

14  Prisons.  They make all decisions out of Texas.  It

15  takes them two to three weeks minimum to make a

16  decision.  It could be as many as four.

17         And you will find that all of the federal

18  prisons are easier time, not for the wrong reasons, but

19  for the right reasons in terms of freedom of movement,

20  services and other things that are available that aren't

21  available because the jail is a pretrial detention

22  facility.  That is not what a prison is.  So, actually

23  it will be easier time, not more difficult time in my

24  judgment.  Prison is prison, but it won't be, I think,

25  as difficult.

1            I always ask the probation officer, even

2      though she won't be consulted, either.  Nobody in her

3      department will.  Sometimes if we know for certain that

4      they will ignore my recommendation, I just say that in

5      anticipation of full disclosure.  Not likely Duluth, but

6      possibly Sandstone, perhaps?

7            THE PROBATION OFFICER:  I am not exactly sure

8      what the designation would be, but I think either that

9      or Duluth would be probable.

10            THE COURT:  Yeah, it is probable.  And so, if

11      I know for certain but because of something in the case

12      or the record that I know that, well, we will recommend

13      it but the Bureau is not going to follow it, I would say

14      so.

15            Mr. Rank, do you have other recommendations

16      to make?  Or requests?

17            MR. RANK:  I do.  Your Honor, I mentioned

18      this earlier, and I know the Court can only make

19      suggestions or recommendations to the Bureau of Prisons,

20      but I do have concern about ongoing vocational training

21      with respect to computers while he is in prison or

22      access to computers while he is in prison.  And I ask

23      that the Court include that in his recommendation to the

24      Bureau of Prisons, that he not be given vocational

25      training or educational training in technical areas.

1          THE COURT:  Mr. O'Brien, Mr. Ardolf, do you

2     want to be heard briefly on that?

3          MR. O'BRIEN:  Well, the problem is that if

4     Mr. Ardolf is going to do any kind of educational

5     pursuit in prison, I think on computers, he should have

6     an integral part of that.  Not that he is studying

7     computers, I think any kind of class would involve some

8     kind of computer use.

9          THE COURT:  I think there is a solution.  It

10    may not satisfy everybody.  And then in the interest of

11    full disclosure, because temporary to what some people

12    may think in the courtroom, not unique to this case,

13    everybody doesn't do what a Federal Judge does or asks

14    them to do.  And the Bureau of Prisons is right at the

15    top of the list, actually, for doing their own thing for

16    better, for worse.  What I will suggest, I will put in

17    there that -- and I am going to do one thing, so it just

18    isn't words in a courtroom or in a criminal judgment.

19    No access -- and just let me be heard out here.  No

20    access to the internet, no computerized training without

21    notice to the Court and Probation.  Now, just let me say

22    this.

23          The Bureau is going to say, we don't -- and

24    their lawyers are going to say, we don't really -- once

25    he has committed Mr. Ardolf to us, we are going to do

1   what we want.  What I am going to do, though, in

2   fairness to the Government and to the Defense, maybe we

3   can check with the Bureau and say, what will they honor,

4   what won't they?  What services are available?  So, I

5   may agree with them or disagree with them so I can get

6   back to counsel in the next couple of days and say, here

7   is what we learned from the Bureau, and here is what

8   they are going to do, or here is what they would have

9   done once they saw the criminal judgment without us.

10  Because I don't know what the reaction is going to be,

11  because we have had some issues, and I am not suggesting

12  there will be one here.  But, can we make that overture?

13  And then we will get back to --

14          THE PROBATION OFFICER:  Yes, I will follow

15  through on that.

16          THE COURT:  And I will agree in the next few

17  days to get back, because sadly or not, it will take two

18  to three weeks at minimum for the Bureau to designate a

19  facility.  So, and they have been taking a little bit

20  longer, recently.  So, I will do that and get back to

21  both, and maybe to make sure it is done, I will put

22  something in writing to you, to you, Mr. O'Brien and a

23  copy to Mr. Ardolf.  And obviously, if the victims or

24  other individuals want to know through Probation or the

25  U.S. Attorney's Office, well, what happened in light of

1    what the Judge said?  I am sure that information can be

2    communicated to those involved in the case.

3             Did have you any other recommendations?

4             MR. RANK:  Your Honor, if Your Honor places

5    that into the judgment --

6             THE COURT:  I will.

7             MR. RANK:  What it will do is it will be a

8    flag for the case manager and BOP, and at least have

9    some impact on the person looking into the background of

10   Mr. Ardolf and making some educated decisions on what is

11   appropriate.

12            THE COURT:  And what I don't know is -- and

13   maybe we will get an answer that is acceptable to

14   everyone.  Maybe we will get an answer saying, well,

15   here is our protocol when we see this.

16            MR. RANK:  We probably won't.

17            THE COURT:  We probably won't.  That is my

18   thought.

19            MR. RANK:  As long as it is a flagged in the

20   judgment, that will go a long way --

21            THE COURT:  Let me ask the expert probation

22   officer if she has any other suggestion, realizing they

23   don't consult her, either.

24            THE PROBATION OFFICER:  Nothing on the Bureau

25   of Prisons, but I would ask the Court to address

1    mandatory drug testing, if that should be --

2              THE COURT:  Excuse me?

3              THE PROBATION OFFICER:  If you could address

4    mandatory drug testing?

5              THE COURT:  Well, the Court was -- until I

6    see an evaluation, other than what I ordered about the

7    no alcohol use.  Until we get an evaluation that says

8    there's identifiable issues, then I would have the right

9    to impose it.  I was going to suspend the mandatory drug

10   testing until I get a report, because right now we have

11   got -- even though we have got some family history that

12   may seem -- we have got really nothing that would

13   ordinarily justify that condition of mandatory drug

14   testing.  So, Mr. Rank?

15             MR. RANK:  I have nothing --

16             THE COURT:  What I would do then is I would

17   suspend it with the understanding that if I get an

18   evaluation back that says, well, Judge, if you had this

19   information, you would have imposed that condition.  I

20   always have the right to do that even if it wasn't

21   whispered here in the courtroom today.  So, Mr. O'Brien,

22   do you want to be heard on that?

23             MR. O'BRIEN:  Well, addressing potential

24   alcohol use, Your Honor, I think the probation officer

25   did identify some use of hard liquor which may --

1          THE COURT:  That is true.

2          MR. O'BRIEN:  Which may mean that Mr. Ardolf

3  could benefit from the DAP Program.

4          MR. RANK:  I have strong objection to that,

5  Your Honor.  I think that that is just simply a way of

6  kicking a year off his sentence in this case.  There is

7  nothing in Mr. Ardolf's history to indicate that he had

8  any alcohol problems into his background that

9  contributed to the offense.  And I think that given what

10  the result of the RDAP Program is, taking 12 months off

11  somebody's sentence, I would object to that.

12          THE COURT:  So, we can bring an end to this,

13  but not to take any shortcuts, I mean, the dilemma is, I

14  think, out of respect to family and friends, because it

15  really didn't have anything to do with any sentence I

16  imposed.  There is some issue about how accurate our

17  family history is, and if there is some issue there.  I

18  think the simple way to answer it, whether it is exactly

19  as Mr. Ardolf has explained to the probation officer or

20  there was some issue -- and of course, there would be

21  issues of mixing liquor, or hard liquor, or non-hard

22  liquor with any medication, that is always a separate

23  issue.  But, I will just order the evaluation, and we

24  will see what they -- we will see what they say.

25          And then if somebody from the Bureau lets us

1   know that it was irresponsible for the Judge not to

2   consider this or that -- again, I am not so sure I will

3   get that kind of contact from them with respect to the

4   program, but I will at least pursue it.  Because that is

5   ironically what they do in the state system, or they

6   used to before I left there a long time ago prior to

7   sentencing.  If they didn't know for sure, they would do

8   the evaluation.

9           We will check into that.  I will decline at

10  this time.  I will take the formal request, so there is

11  no claim that there was an agreement today, formal

12  request to recommend RDAP without -- I will decline to

13  do that today.  I will tell you how it works, Mr.

14  Ardolf.  It likely wouldn't affect where you -- the

15  placement on a sentence of this length now, because one

16  of the things that I think shouldn't happen is the more

17  common issue with the Bureau these days, because they

18  wait until you have about three years left of your

19  sentence, and then we will see people transferred.

20  Because I get complaints from families saying, I thought

21  you recommended the program.

22          They just sent my dad or my husband or my

23  friend or my brother or sister for that matter to this

24  facility, and they don't have the program.  Well, in the

25  longer sentence they move people, because there is such

1    a waiting list in most of these programs.  But, we will

2    look into it, because that is the leading cause of

3    people returning to the system is an unaddressed alcohol

4    or drug problem.  It is just that the information is not

5    entirely clear to me in this instance, but we will

6    pursue it.

7                 Anything else, Mr. Rank?

8                 MR. RANK:  No, Your Honor.

9                 MR. O'BRIEN:  No, Your Honor.

10               THE COURT:  Any questions of me, Mr. Ardolf,

11   whether it relates to my comments on the appeal or any

12   other issue?

13               THE DEFENDANT:  No.

14               THE COURT:  We are adjourned.

15               (Adjournment.)

16

17

18

19               Certified by:   s/ Jeanne M. Anderson

20                               Jeanne M. Anderson, RMR-RPR
                                 Official Court Reporter
21

22

23

24

25

1
2
3

I N D E X

4

Government's Witness:

5

   ROBERT CAMERON

6
7

     Direct Examination by Mr. Rank       Page  29
     Cross Examination by Mr. O'Brien     Page  79
8
     Redirect Examination by Mr. Rank     Page  97
     Recross Examination by Mr. O'Brien   Page 107
9
     Recross Examination by Mr. Ardolf    Page 113
     Redirect Examination by Mr. Rank     Page 117
10
     Recross Examination by Mr. Ardolf    Page 119

11
12

EXHIBITS

13
14

Government's Exhibits:          Page Received:

     3, 4, 6, 7, 8, 9,
15
     10, 11, 12, 13, 14,
     15, 16, 17, 18, 19,
16
     21, 23, 24, 25, 26,
     27, 28, 29, 30, 37,
17
     44, 45, 50, 51, 52,
     53, 54, 55, 56, 57,
18
     58, 59, 60, 61, 62,
     63, 64, 65, 66, 67,
19
     68, 69, 73, 74, 75,
     76, 77, 78, 79, 80,
20
     85, 86, 87, 88, 89,
     90, 91, 154, 155, 160,  Page  28 (Provisionally)
21
     161, 162 and 163      Page 120  (Received)

22
23
24
25